**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| SAM ASH MUSIC CORPORATION, *et al.,* | Case No. 24 –14727 (SLM) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II)
AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE
PROTECTION; (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (IV) MODIFYING AUTOMATIC STAY;
(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

     Sam Ash Music Corporation and the other debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), respectfully represent as follows:

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410). The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

## <u>SUMMARY OF RELIEF REQUESTED</u>

1.      The Debtors filed these chapter 11 cases to pursue an orderly sale of their assets as a going concern.  The Debtors have already negotiated the terms of that sale with their pre-petition lender to act as a proposed stalking horse purchaser of substantially all of the Debtors' assets.  Given the Debtors' liquidity challenges, among other factors, leading up to the commencement of these chapter 11 cases, the stalking horse bid sets a rational baseline for a competitive bidding process.

2.      To preserve the going-concern value of the Debtors' assets and complete the sale process, it is critical that the Debtors have access to the DIP Financing (as defined below) during the chapter 11 cases to continue operating their business in the ordinary course.  Without the DIP Financing and consensual use of cash collateral, the Debtors would not have sufficient liquidity to continue to operate their business and pursue a sale process.

3.      In furtherance thereof, by this Motion, the Debtors seek entry of interim and final orders, substantially in the forms of the Interim Order and Final Order attached hereto as **Exhibit 1** and **Exhibit 2** (to be submitted at a later date) (respectively, the "<u>Interim Order</u>" and "<u>Final Order</u>" and, collectively, the "<u>DIP Orders</u>"):

      (a)      authorizing the Debtors to obtain senior secured post-petition financing on a superpriority basis (the "<u>DIP Financing</u>") in an aggregate principal amount of up to $20 million (the "<u>DIP Facility</u>") pursuant to the terms and conditions of that certain Senior Secured Superpriority Debtor in Possession Loan and Security Agreement substantially in the form as filed with the Court (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among the Debtors and Tiger Finance, LLC (the "<u>DIP Lender</u>");

      (b)      authorizing the Debtors to execute the DIP Credit Agreement and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Lender (as the same may be amended, restated,

supplemented or otherwise modified from time to time, and collectively with the DIP Credit Agreement, the "DIP Documents");

(c)    authorizing the Debtors to consummate the transactions contemplated by the DIP Documents;

(d)    granting to the DIP Lender the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding under the DIP Documents, and the Interim Order and any Final Order, as applicable (collectively, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below);

(e)    granting superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Lender as well as liens pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all prepetition and postpetition property of the Debtors' estate and all proceeds thereof (each as defined below);

(f)    authorizing the Debtors to use Prepetition Collateral and Cash Collateral (each as defined below) (together with the DIP Facility, the "Postpetition Financing Arrangement");

(g)    authorizing the Debtors to grant adequate protection to the DIP Lenders (as defined below);

(h)    scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of the Final Order; and

(i)    granting such other and further relief as this Court deems necessary and just.

## JURISDICTION

4.    The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court absent consent of the parties, cannot enter final

orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.       This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.       The statutory basis for the relief requested herein are sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, and 9014 and rule 4001-3 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

7.       In support of the Motion, the Debtors submit the *Declaration of Jordan Meyers In Support Of Motion Of Sam Ash Music Corporation For The Entry Of (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Superpriority Claims, (III) Authorizing Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Financing Declaration"), which has been filed contemporaneously herewith.

## **BACKGROUND**

8.       On the date hereof (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

9.      Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Jordan Meyers, Chief Restructuring Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions*, sworn to on the date hereof (the "First Day Declaration"), which has been filed with the Court contemporaneously herewith.[2]

**A.      The Prepetition Credit Facility**

10.     Pursuant to that certain Loan and Security Agreement dated February 21, 2024, by and among, Tiger Finance, LLC, as pre-petition lender (the "Prepetition Lender") and the Debtors, as borrowers (the "Prepetition ABL Loan Agreement"), the Prepetition Lender provided an asset-based loan (the "Prepetition ABL Facility") to the Debtors to finance their business operations. As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility is at least $18.125 million (plus accrued and unpaid interest, additional fees, costs, expenses, and other obligations as provided under the Prepetition ABL Loan Agreement) (collectively, the "Prepetition Obligations").

11.     Pursuant to the Prepetition ABL Loan Agreement, the Prepetition Obligations are secured by valid, binding, perfected first priority security interests in and liens (the "Prepetition Liens") on the "Collateral," as defined in the Prepetition ABL Loan Agreement (the "Prepetition Collateral").  In addition, in connection with the Prepetition ABL Loan Agreement, the Debtors entered into that certain (i) Intellectual Property Security Agreement dated February 21, 2024 (the "IPSA"); and (ii) Pledge Agreement dated as of February 24, 2024 (the "Pledge Agreement"). Pursuant to the IPSA, the Debtors granted the Prepetition Lender a continuing security interest in

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, DIP Financing Declaration, or the Interim Order, as applicable.

and lien upon all of their rights, title and interests in the Debtors' copyrights, licenses, patents,

marks, other intellectual property and all general intangibles and income, royalties and payments

connected with the use of same.  Under the Pledge Agreement, the Debtors granted the Prepetition

Lender a continuing security interest in and lien upon all of the shares, interests, participations or

other equivalents of a person's capital stock or partnership, limited liability company or other

equity, ownership or profit interests.

12.    Any and all of the Debtors' cash, including the Debtors' cash and other amounts

on deposit or maintained in any account or accounts by the Debtors, including any amounts

generated by the collection of accounts receivable or other disposition of the Prepetition

Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the

Prepetition Lender's cash collateral within the meaning of section 363(a) of the Bankruptcy

Code (the "Cash Collateral").

**B.    The Pursuit of a Sale Transaction**

13.    As set forth in the First Day Declaration, the Debtors and their advisors have

conducted a targeted search for potential partners to execute a strategic transaction with the

Debtors.  The Debtors have evaluated potential strategic alternatives and financing options.  After

considering the reasonably available possible courses of action, the Debtors determined that a sale

of all or substantially all their assets was in the best interest of the Debtors, their creditors, and all

parties in interest.

14.    As a result of and in conjunction with the sale and marketing process, the Debtors

and their advisors engaged in extensive negotiations with the Prepetition Lender and DIP Lender

to serve as the "stalking horse purchaser" of substantially all of the Debtors' assets other than the

stores at which the Debtors currently are liquidating their assets, to be effectuated through a section

363 sale subject to higher or better offers.  Ultimately, the parties agreed upon the material terms of the sale, and expect to memorialize such terms in a "stalking horse" asset purchase agreement (the "Stalking Horse APA").

15.     In connection with the Stalking Horse APA, Tiger Finance, LLC, as Prepetition Lender, DIP Lender and the "stalking horse" bidder (the "Stalking Horse Bidder"), and the Debtors, entered into the DIP Credit Agreement, a copy of which is attached as **Exhibit A** to the Interim Order, pursuant to which the DIP Lender agreed to provide (either directly or through an affiliate) a DIP Facility in the maximum amount of up to $20,000,000.  The financing proposed under the DIP Documents is critical to the Debtors' ability to continue to operate in the ordinary course of business pending the auction and consummation of the sale transaction or another transaction that may result from the competitive bidding process proposed by the Debtors.

16.     Together, the terms and conditions of the Stalking Horse APA and the DIP Documents provide the Debtors with a transaction that is in the best interests of the Debtors' estates, subject only to any higher or otherwise better bids that may be presented at the auction. The negotiations with Tiger Finance, LLC, in its role as Prepetition Lender, DIP Lender and Stalking Horse Bidder, and its professionals were conducted at arm's length and in good faith by the Debtors and their professionals.  The process is designed to set a reasonable baseline for a competitive bidding process in furtherance of maximizing value for the benefit of all stakeholders.

17.     As set forth in the DIP Financing Declaration and pursuant to D.N.J. LBR 4001-3(b)(1), based on the Debtors' business performance, liquidity profile, capital structure, and the circumstances leading to the commencement of these chapter 11 cases, SCP quickly concluded that alternative financing to the DIP Lender was not likely available.  Indeed, SCP was part of the Debtors' efforts and process to obtain replacement financing in early 2024, which garnered limited

interest.  SCP advised the Debtors that there would be little to gain from embarking on a futile

search for a better post-petition financing alternative.  Indeed, the proposed DIP Facility, coupled

with the consent and authorization to use Cash Collateral as offered by the DIP Lender and the

Prepetition Lender, are the best financing options that the Debtors could obtain.  Fully unsecured

post-petition financing was not available to Debtors.  Other potential sources of debtor in

possession financing for the Debtors, including on a junior secured basis, are also non-existent.

18.     Pursuant to D.N.J. LBR 4001-3(b)(1), in connection with the DIP Facility, SCP

assisted the Debtors in preparing a budget forecasting projected cash flows for the 13-week period

after the Petition Date (attached as **Exhibit B** to the Interim Order) (the "Approved Budget").  As

shown in the Approved Budget, with the DIP Facility, and the use of Cash Collateral, the Debtors

are able to meet their obligations in these chapter 11 cases.  Absent this Court's approval of the

proposed DIP Facility and the Debtors' use of Cash Collateral, the Debtors would immediately run

out of funds required to operate their businesses and would not be able to proceed with the sale

contemplated herein.  Consequently, there is urgent and immediate need to obtain the post-petition

financing provided by the DIP Facility in addition to the use of Cash Collateral.

## SUMMARY OF MATERIAL TERMS OF USE OF CASH COLLATERAL AND DIP FINANCING[3]

19.     In accordance with Bankruptcy Rule 4001(c)(1) and D.N.J. LBR 4001-3(a), the

following is a concise statement and summary of the proposed material terms of the use of Cash

Collateral as specified in the Interim Order:

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Approved Budget**<br>D.N.J. LBR 4001-3(a)(1) | The use of Cash Collateral is governed by the Approved Budget (attached as **Exhibit B** to the Interim Order). |
| **Cash Collateral Use**<br>D.N.J. LBR 4001-3(a)(2)(A) | Pursuant to the Approved Budget, the Debtors seek to utilize Cash Collateral during the period covered by the Interim Order. |
| **Adequate Protection**<br>D.N.J. LBR 4001-3(a)(2)(B) | As adequate protection for any diminution of the Prepetition Lender's interest in the "collateral" resulting from the subordination of their existing liens to the DIP Liens and/or the Debtors' use of Cash Collateral, the Prepetition Lender shall receive the adequate protection granted to the Prepetition Lender (A) pursuant to the DIP Orders, and (B) as otherwise required by the Bankruptcy Court pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise. |
| **Consent of the Prepetition Lender**<br>D.N.J. LBR 4001-3(a)(2)(C) | The Prepetition Lender, subject to the terms and conditions set forth in the DIP Credit Agreement, consents to (a) the use of Cash Collateral, subject to the terms hereof, the Interim Order and the Final Order, as applicable, (b) the DIP Facility, including the DIP Liens, as described in the DIP Credit Agreement and in the Interim Order and the Final Order, as applicable, (c) the sale process, including the designation of the DIP Lender or one or more of its designees as the Stalking Horse Bidder and the Bid Procedures, and (d) the Approved Budget. |

---

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion or this "Summary of Material Terms" is inconsistent in any respect with such documents, the terms of the applicable documents shall control.

20.   In accordance with Bankruptcy Rule 4001(c)(1) and D.N.J. LBR 4001-3, the following is a concise statement and summary of the proposed material terms of the DIP Facility, as specified in the DIP Credit Agreement and the DIP Orders:

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Debtors.<br><br>*See* DIP Credit Agreement, Recitals. |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Tiger Finance, LLC<br><br>*See* DIP Credit Agreement, Recitals. |
| **DIP Facility Commitment and Borrowing Base Formula**<br>Bankruptcy Rule 4001(c)(1)(B)<br>D.N.J. LBR 4001-3(b)(2)(A) | The DIP Lender agrees to make senior secured superpriority debtor-in-possession loans to the Debtors in the amount of up to approximately $20,000,000.  The Borrowing Base is the amount of the Revolving Loans available to Borrowers based on the applicable lending formulas described in Sections 2.1(b) of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, § 2.1(b). |
| **Reporting Information; Use of Proceeds; Approved Budget and Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B)<br>D.N.J. LBR 4001-3 | The DIP Facility includes standard and customary conditions that require the Debtors to provide periodic reports to the DIP Lender and its respective professionals regarding the Approved Budget, key performance reports, and certain other matters. The DIP Facility will be used solely in accordance with the Approved Budget for (a) repayment of the Existing Liabilities, (b) working capital and general corporate purposes of the Debtors, and (c) bankruptcy-related costs and expenses.<br><br>*See* DIP Credit Agreement, § 7.1.<br><br>The Debtors shall perform in accordance with the Approved Budget, subject to the Permitted Variances.<br><br>• *Minimum Sales* – Debtors' actual sales, calculated on a trailing 3-week basis, shall not be less than 90% of the amount set forth in the Approved Budget;<br><br>• *Minimum Collections* – Debtors' actual cash collected from accounts receivable, calculated on a trailing 3-week basis, shall not be less than 90% of the amount set forth in the Approved Budget; |

| | |
|---|---|
| | • *Maximum Disbursements* – Debtors' actual disbursements, calculated on a trailing 3-week basis, shall not exceed by more than 10% the disbursements projected in the Approved Budget; |
| | • *Excess Availability* – Debtors' Excess Availability, tested on a weekly basis, shall not be less than 15% of the amount projected in the Approved Budget; |
| | • *Samson Inventory* – Receipts of Inventory by Samson, must be within 10% the payments made by Samson for all Inventory; and |
| | • *Payroll/Self-Funded Medical Insurance* – Debtors' disbursements with respect to payroll and self-funded medical insurance, calculated on a trailing 3-week basis, shall not be less than 110% of the amount projected in the Approved Budget. |
| | *See* DIP Credit Agreement, § 9.33. |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) D.N.J. LBR 4001-3 | The DIP Credit Agreement shall become effective on the Effective Date and shall continue in full force and effect for a term ending on six (6) months thereafter. *See* DIP Credit Agreement, § 12.1. |
| **Interest Rate** Bankruptcy Rule 4001(c)(l)(B) D.N.J. LBR 4001-3 | Shall mean: (i) as to Prime Rate Loans (if applicable), a rate equal to the then Applicable Margin plus the Prime Rate; and (ii) as to SOFR Loans, a rate equal to the Applicable Margin plus Term SOFR. *See* DIP Credit Agreement, § 1. |
| **Default Rate** Bankruptcy Rule 4001(c)(l)(B) D.N.J. LBR 4001-3 | At all times following the occurrence and during the continuance of an Event of Default, principal, interest and other amounts due on the DIP Loan shall bear interest at a rate equal to 3% per annum in excess of the Interest Rate (the "**Default Rate**"). *See* DIP Credit Agreement, § 1. |
| **Fees, Pricing and Economic Terms** Bankruptcy Rule 4001(c)(l)(B) D.N.J. LBR 4001-3(b)(2)(C) | Pursuant to the DIP Fee Letter: (i) a commitment fee equal to $300,000.00, which shall be fully earned and payable as of the Effective Date; and (ii) an exit fee in an amount equal to $300,000.00 (the "Exit Fee"); provided, that if no Event of Default shall have occurred under the DIP Credit Agreement, the Exit Fee shall be forgiven. *See* DIP Credit Agreement, § 3.3; DIP Fee Letter. |

| **DIP Liens and Superpriority Claims** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | In consideration of the DIP Lender's making of loans and other advances under the DIP Credit Agreement and the consent to the Debtors' use of Cash Collateral, pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, effective immediately upon the entry of the Interim Order, the DIP Lender is granted the DIP Liens (which Liens are subject to the Permitted Prior Liens and the Carve Out) in the DIP Collateral. The DIP Liens to be created and granted to the DIP Lender, as provided herein, are (a) created pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, (b) other than as set forth in clause (c) below, first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and (c) subject only to (i) the Carve Out, and (ii) the Permitted Prior Liens *See* Interim Order, ¶¶ 7, 8. Subject to the Carve Out, all DIP Obligations shall constitute an allowed superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>" and, together with the DIP Liens, collectively, the "<u>DIP Protections</u>") with priority in the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates. *See* Interim Order, ¶ 15. |
|---|---|
| **Roll-up** D.N.J. LBR 4001-3(b)(2)(D) | Upon entry of the Interim Order, and subject to the rights of parties-in-interest to challenge as set forth in the Interim Order, the entire outstanding balance of the Prepetition Debt under the Prepetition Financing Documents is rolled-up. *See* Interim Order, ¶ 5(a). |
| **Milestones** D.N.J. LBR 4001-3(c)(4) | The following Milestones apply: <br> ▪ on or before five (5) Business Days after the Petition Date, the Borrowers shall distribute so called "bid packages" to all potential buyers; <br> ▪ on or before May 15, 2024, the Borrowers shall enter into a stalking horse asset purchase agreement with a third party other than the Lender that is higher and better than the asset purchase agreement entered into with the Lender as included in the Sale Motion, as approved by the Lender; the failure to do so will result in the acceleration of the Sale as defined in and governed by the Consulting Agreement; <br> ▪ on or before May 31, 2024, the Bankruptcy Court shall hold a hearing in respect of the Sale Motion and shall enter an |

|  | order, in form and substance reasonably satisfactory to Lender, establishing bidding procedures by no later than June 3, 2024, which shall include, without limitation, a bid deadline of June 14, 2024 (the "<u>Bid Deadline</u>");

• on or before the Bid Deadline, the Borrowers shall have received, from a bona fide qualified bidder, a bid of at least $7,500,000 in cash for all of Samson's (x) accounts and Credit Card Receivables; (y) inventory and Merchandise; and (z) Intellectual Property and associated goodwill;

• on or before June 20, 2024, the Borrowers shall commence an auction among all qualified bidders (the "<u>Auction</u>"), with the highest and best bid or combination of bids being selected, in consultation with Lender and any Committee appointed in the Case (collectively, the "<u>Successful Bids</u>");

• on or before June 25, 2024, the Bankruptcy Court shall hold a hearing (the "<u>Sale Approval Hearing</u>") in respect of the Successful Bids and shall enter one or more orders on or before July 2, 2024, each in form and substance reasonably satisfactory to Lender, approving the Successful Bids (each a "<u>Sale Approval Order</u>"); <u>provided</u> that if there is no Auction, the Sale Approval Hearing shall be held on or before June 18, 2024 and the Bankruptcy Court shall have entered the Sale Approval Order on or before June 21, 2024 with respect to the approval of the acquisition of all assets of the Borrowers by the Lender via the credit bid as set forth in the Sale Motion; and

• if there is an Auction, on or before July 17, 2024, the closing of the transactions contemplated by the Successful Bids and approved pursuant to the Sale Approval Order shall be consummated and the Borrowers and/or other Borrowers shall have indefeasibly paid in full in cash all Loans (and to the extent not previously paid in full, all Existing Liabilities), plus any accrued and unpaid interest and fees thereon, and irrevocably terminate the commitments to make Loans.

• On or before May 10, 2024, the Bankruptcy Court shall have entered the Interim Order acceptable to Lender;

• On or before June 5, 2024, the Bankruptcy Court shall have entered the Final Order acceptable to Lender, which Final Order shall include, without limitation, (i) authorization and approval of the Maximum Credit and (ii) a one-time accommodation from the Lender to reduce the Obligations by $1,750,000 if no Default or Event of Default exists under this Agreement; and |

|  | ▪ The Borrowers shall promptly, punctually, and faithfully perform all of the terms and conditions of the Orders.<br><br>*See* DIP Credit Agreement, § 9.32. |
|---|---|
| **Termination Events, Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>D.N.J. LBR 4001-3(c)(3) | Each of the following shall constitute an "**Event of Default**":<br><br>(i)  Borrowers fail to pay when due any of the Obligations, or Borrowers or Obligors fail to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements;<br><br>(ii)  any representation, warranty or statement of fact made by Borrowers or Obligors to Lender in this Agreement, the other Financing Agreements or any other agreement, schedule, confirmatory assignment or otherwise shall when made or deemed made be false or misleading in any material respect;<br><br>(iii)  any Obligor revokes, terminates or fails to perform any of the material terms, covenants, conditions or provisions of any guarantee, endorsement or other agreement of such party in favor of Lender;<br><br>(iv)  (i) any judgment for the payment of money is rendered or enforced by a governmental authority in the United States of America or its territories against any Borrower or any Obligor in excess of $500,000 in any one case or in excess of $1,500,000 in the aggregate and shall remain undischarged or unvacated for a period in excess of thirty (30) days (except if it is a judgment for which such Borrower or any Obligor is fully insured by an insurer who has assumed and is actively pursuing the defense of the action or proceeding in which such judgment is rendered and who is fully liable for all amounts payable by such Borrower or any Obligor in respect of such judgment without recourse to Borrower or such Obligor) or execution shall at any time not be effectively stayed, or (ii) any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered or enforced by a governmental authority in the United States of America or its territories against any Borrower or any Obligor or any of their assets, which judgment would materially impede the ability of any Borrower to perform its obligations hereunder or under any of the other Financing Agreements or Lender to realize upon any Collateral;<br><br>(v)  any Obligor, which is a partnership, limited liability company, limited liability partnership or a corporation, dissolves or suspends or discontinues doing business (other than any |

14

Obligor that does not or no longer does conduct business activities and has no assets);

(vi)     any default by any Borrower or any Obligor under any agreement, document or instrument relating to any indebtedness for borrowed money owing to any person other than Lender, or any capitalized lease obligations, contingent indebtedness in connection with any guarantee, letter of credit, indemnity or similar type of instrument in favor of any person other than Lender, in any case in an amount in excess of $500,000, which default continues for more than the applicable cure period, if any, with respect thereto, or any default by any Borrower or any Obligor under any material contract, lease, license or other obligation to any person other than Lender, which default continues for more than the applicable cure period, if any, with respect thereto;

(vii)    any Change of Control shall occur;

(viii)   the indictment or, as Lender may reasonably and in good faith determine, threatened indictment of any Borrower or any Obligor under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against any Borrower or any Obligor, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of any of the property of any Borrower or such Obligor, the loss of which would have a material adverse effect on the operations of Borrowers or such Obligor;

(ix)     there shall be an event of default under any of the other Financing Agreements, the CRO Engagement Documents, the Capstone Agreement, and/or the Consulting Agreement;

(x)      except as a result of the commencement of the Case, any Borrower or any Obligor shall take any action, or shall make a determination, whether or not yet formally approved by any Borrower's or any Obligor's management or board of directors, to (i) suspend the operation of all or a material portion of its business in the ordinary course, (ii) suspend the payment of any material obligations in the ordinary course or suspend the performance under any material contracts in the ordinary course, or (iii) solicit proposals for the liquidation of, or undertake to liquidate, all or a material portion of its assets or business in contravention of the terms and conditions set forth in Section 9.7(b)(ii) hereof;

(xi)     any of the following shall occur in any Case:

(i)        the filing by the Borrowers of a plan of reorganization other than (i) a plan of

reorganization that provides for the payment in full of the Obligations and the Existing Liabilities on the effective date of such plan of reorganization, or (ii) as approved by Lender, or the filing by the Borrowers of any motion or pleading that is inconsistent with the prosecution of any such plan of reorganization;

(ii)      without the prior consent of Lender, the Borrowers shall file a pleading seeking to vacate or modify any of the Orders in a manner adverse to Lender;

(iii)     without the prior consent of the Lender, entry of an order amending, supplementing or otherwise modifying any Order in a manner adverse to the Lender;

(iv)      without the prior consent of Lender, entry of any order that authorizes any of the following:

1.      a priority claim or administrative expense or unsecured claim against the Borrowers (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of Lender in respect of the Obligations, except with respect to the Carve Out;

2.      any lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except (a) with respect to the Carve Out, or (b) Permitted Prior Liens;

3.      except as consented to by Lender, the return of any of the Borrowers' property pursuant to section 546(h) of the Bankruptcy Code; or

4.      the payment of any Indebtedness (other than Indebtedness reflected in the Budget) or as permitted by the Orders;

(v)      reversal, vacation or stay of the effectiveness of any Order;

(vi)    any violation of the terms of any Order;

(vii)    without the prior consent of Lender, the dismissal of the Case or conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion to so dismiss or convert brought by any Borrower;

(viii)    without the prior consent of Lender, appointment of a trustee or an examiner, or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Borrower;

(ix)    without the prior consent of Lender, the filing by the Borrowers of, or the consummation of any sale of all or substantially all the working capital assets of the Borrowers pursuant to section 363 of the Bankruptcy Code, or the occurrence of any such sale without the net proceeds thereof being remitted, contemporaneously therewith, to Lender for payment in full of the Obligations and the Existing Liabilities;

(x)    except as provided for herein or in the Orders, granting of relief from the automatic stay in the Case to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of the Borrowers;

(xi)    the Borrowers' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein or in the Orders) that is senior to or pari passu with Lender's claims under the Financing Agreements and the transactions contemplated thereby to the extent that, upon approval of such motion and closing of the transactions contemplated thereby, the Obligations and the Existing Liabilities would not be paid in full;

(xii)    payment of or granting adequate protection with respect to prepetition indebtedness, other than as expressly set forth in the Orders and the Budget; or

|  | (xiii)    any of the liens or the DIP Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect;<br><br>(xii) any variance to a Budget shall occur, other than Permitted Variances;<br><br>(xiii) the failure to file the Chapter 11 Case on the Petition Date or to meet any of the Milestones;<br><br>(xiv) any Borrower engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Existing Loan Agreement or the Existing Financing Agreements or the Liens securing the Existing Loan Agreement or the Existing Financing Agreements, including without limitation seeking to equitably subordinate or avoid the Liens securing the Existing Loan Agreement; or any Borrower supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Lender;<br><br>(xv) without the prior consent of Lender, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Sections 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;<br><br>(xvi) failure by any Debtor to be in compliance in all material respects with provisions of the Term Sheet, the DIP Orders and/or the Final Order (as applicable);<br><br>(xvii)    the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is pari passu with or senior to the DIP Superpriority Claims or the DIP Liens, excluding liens arising under the DIP Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Lender;<br><br>(xviii)   the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against any of the DIP Lender or its agents and employees, to subordinate or avoid any liens made in connection with the DIP Orders; |
|---|---|

| | |
|---|---|
| | (xix) (1) the assertion by the Debtors in any pleading filed in any court that any material provision of the DIP Orders or Term Sheet is not valid and binding for any reason, or (2) any material provision of the DIP Orders or Term Sheet shall for any reason, or any other order of this Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), cease to be valid and binding (without the prior written consent of the DIP Lender);<br><br>(xx) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases (other than the Prepetition ABL Agent) with respect to any portion of the DIP Collateral exceeding $50,000 in value in the aggregate; or<br><br>(xxi) failure to pay principal, interest or other DIP Obligations in full when due, including without limitation, on the Maturity Date.<br><br>*See* DIP Credit Agreement, § 10.1. |
| **Remedies Upon Event of Default** | Subject to the terms of the DIP Credit Agreement, immediately upon the occurrence and during the continuation of a DIP Termination Event, notwithstanding the provisions of section 362 of the Bankruptcy Code, the DIP Lender may declare in writing an Event of Default (any such declaration shall be referred to herein as a "<u>DIP Termination Notice</u>"). The provision and noticing of the DIP Termination Notice must be pursuant to the Orders, including a five (5) business day remedy/cure period. During such period, the Debtors shall be entitled to seek an emergency hearing before this Court.<br><br>*See* Interim Order, ¶¶ 34-38. |
| **Other Bankruptcy Matters** | All reasonable out-of-pocket costs and expenses of the DIP Lender, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses, whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget.<br><br>*See* Interim Order, ¶ 47.<br><br>The Debtors shall remain liable to the Prepetition Lender for all unpaid Prepetition Indemnity Obligations to the extent permitted pursuant to the applicable Prepetition Financing Documents. |

| | *See* Interim Order, ¶ 29.<br><br>The Final DIP Order shall contain a release for the DIP Lender in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Prepetition Debt, the Prepetition Financing Documents, the DIP Obligations, the DIP Financing Agreements, and any loans or other financial accommodations made by the DIP Lender to the Debtors pursuant to the Prepetition Financing Documents, or the DIP Financing Agreements.<br><br>*See* Interim Order, ¶ 62. |
|---|---|
| **Carve Out**<br>Bankruptcy Rule 4001(c)(l)(B)<br>D.N.J. LBR 4001-3(c)(9) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees, and reserves of the Debtors pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 30. |
| **Granting of Lien on Avoidance Actions**<br>D.N.J. LBR 4001-3(c)(8) | Upon Entry of the Final Order, the DIP Lender is granted a DIP Lien on the proceeds or property recovered, by settlement or otherwise, in respect of claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 7(c). |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(l)(B)(iii)<br>D.N.J. LBR 4001-3 | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition Lender's claims and liens.<br><br>*See* Interim Order, ¶ F. |
| **Limitation on Challenges**<br>Bankruptcy Rule 4001(c)(l)(B)<br>D.N.J. LBR 4001-3 | Any Committee or any other party-in-interest (other than the Debtors) with requisite standing may bring an adversary proceeding, cause of action, objection, claim, defense, or other challenge against any one or more of the Prepetition Lender, the Prepetition Debt and/or the Prepetition Liens (collectively, a "<u>Challenge Proceeding</u>") provided such Challenge Proceeding is otherwise consistent with the Interim Order and is commenced by the later of (i) for any Committee, forty-five (45) days from the date of formation of such Committee, (ii) for any party-in-interest other than an official Committee, sixty (60) days following entry of this Interim Order.<br><br>*See* Interim Order, ¶ 24. |

| | |
|---|---|
| **Limitations or Waiver of Rights under §§ 506(c), 552(b)** Bankruptcy Rule 4001(c)(l)(B) D.N.J. LBR 4001-3(c)(6) | <u>Section 506(c) Waiver</u>: upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the DIP Lender and the DIP Collateral. <br><br> Interim Order, ¶ 42. <br><br> <u>Section 552(b)</u>: upon entry of the Final Order, the DIP Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Lender with respect to proceeds, product, offspring, or profits of any of the DIP Collateral. <br><br> Interim Order, ¶ 51. |

## THE DIP FACILITY

### I.    The Debtors' Need for Access to Financing and the Use of Cash Collateral

21.    As described in the DIP Financing Declaration, the Debtors require access to additional liquidity and use of Cash Collateral to ensure that they can continue operating their businesses during these Chapter 11 Cases and preserve and maximize the value of their estates for the benefit of all parties in interest.  *See* DIP Financing Decl., ¶ 10.

22.    As part of the Debtors' chapter 11 preparations, the Debtors and their advisors reviewed and analyzed the Debtors' anticipated go-forward liquidity needs and the amount of post-petition financing required to support the Debtors' ongoing business operations and fund chapter 11 process costs.  *Id.*, ¶ 11.  This analysis is reflected in the Approved Budget, which is attached as Exhibit 1 to the Interim Order approving the DIP Motion, which projects the Debtors' anticipated cash receipts and disbursements during the projection period and takes into account a number of factors, including (but not limited to) the effect of the chapter 11 filings on the Debtors'

business operations, the fees and interest expense associated with the DIP Facility, restructuring costs (including professional fees), and required operational payments. *Id.*

23.     Based on this analysis, the Debtors determined that they would require incremental liquidity to sensibly fund post-petition operations and chapter 11 costs and provide confidence to vendors, customers, employees, and other constituents that the Debtors will continue to operate in the ordinary course without disruption. *Id.*, ¶ 12. The Postpetition Financing Arrangement set forth in the Orders will allow the Debtors to bridge this gap and progress toward a successful, value-maximizing sale. Absent the relief requested in the DIP Motion, the Debtors would face an immediate risk of substantial, irreparable, and ongoing harm due to liquidity constraints and resulting operational and business challenges, including erosion of employee, vendor, and customer confidence. *Id.*

24.     Moreover, prior to the Petition Date, the Debtors were operating in an over-advance situation. That is, the principal amount of the Debtors' borrowings exceeded the availability under the borrowing base. As a result, the prepetition lender and now, DIP Lender, advised the Debtors that it would only fund these Chapter 11 Cases and the continuation of over-advances through a DIP pursuant to the Approved Budget, and with the typical protections lenders receive through DIP financing. *Id.*, ¶ 13.

25.     Accordingly, the Postpetition Financing Arrangement is essential to the Debtors' operations and preserves and maximizes the value of their estates for the benefit of all parties in interest

**II.     Alternative Sources of Financing Are Not Available on Better Terms**

26.     As set forth in the DIP Financing Declaration, in late 2023, the Debtors engaged in a comprehensive and exhaustive process to recapitalize its balance sheet, including, but not limited

to, refinancing their debt. Although that process culminated in a successful refinancing of the Debtors' asset-based loan with Tiger Finance in February, 2024, the Debtors' financing process yielded few proposals and limited executable options. *See* DIP Financing Decl., ¶ 15.

27.    In the weeks leading up to Petition Date, the Debtors and the DIP Lender engaged in good faith, arm's-length negotiations regarding the terms of the DIP Facility and the Debtors' use of Cash Collateral. Given the results of the recent financing process, the Debtors' capital structure and financial circumstances, the DIP Facility was (and is) the only viable, actionable post-petition financing option available to the Debtors. There are no likely alternative post-petition financing options and certainly none on a junior secured, administrative priority, or unsecured basis. *Id.*, ¶ 16.

28.    Additionally, as an incentive to fund these Chapter 11 Cases with the DIP Financing from the DIP Lender, Tiger Finance agreed to reduce its prepetition allowed secured claim by $1.75 million in the event the Debtors' DIP Motion and the Postpetition Financing Arrangement set forth therein is approved on a final basis. Therefore, the economic terms of the DIP Facility are reasonable and there are no alternative sources of post-petition financing with similar or more favorable terms currently available to the Debtors. *Id.*, ¶ 17.

29.    The DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed post-petition financing, and was the product of extended arm's length, good faith negotiations between and among the Debtors and the DIP Lender. The DIP Facility provides the only path to a value-maximizing transaction. Accordingly, the DIP Facility is reasonable and appropriate under the circumstances and is the Debtors' best and only option currently available under the circumstances. *Id.*, ¶ 18.

## BASIS FOR RELIEF

I.    **The Debtors Should Be Authorized to Obtain Post-Petition Financing Under Section 364 of the Bankruptcy Code**

30.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to and draw on the DIP Facility, and use the proceeds of the DIP Facility and Cash Collateral in accordance with the DIP Orders and the Approved Budget.

31.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a Debtors in possession cannot obtain post-petition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code, a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.  11 U.S.C. § 364.

32.    Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a Debtors that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

- with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;

- secured by a lien on property of the estate that is not otherwise subject to a lien; or

- secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

33.     Thus, pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain adequate unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); *see also* 3 Collier on Bankruptcy ¶ 364.03 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

34.     The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the Debtors in possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37–39 (a Debtors must show it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (Debtor seeking secured credit under Bankruptcy Code § 364(c) must prove it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

35.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c):

- the debtor is unable to obtain unsecured credit solely under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the Debtors' estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the Debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

36.    To show financing required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c). *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* When few lenders are likely to be able and willing to extend the necessary credit to a Debtors, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding the Debtors made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

A.    **Entry into the DIP Facility is an Exercise of Sound Business Judgment as it is Necessary to Preserve the Assets of the Estate**

37.    The Debtors' determination to move forward with the DIP Facility following a robust, arm's-length negotiation process is well within the Debtors' sound business judgment. The DIP Facility will allow the Debtors to: (a) fund ongoing operations during these chapter 11 cases; (b) send a clear "business-as-usual" message to customers, employees, and vendors; (c) fund the administrative costs of these chapter 11 cases; (d) continue their marketing processes for value-maximizing going-concern sales of their businesses; and (e) bridge toward a successful restructuring.

38.    Without immediate approval of a new source of liquidity, the Debtors' business operations and the Chapter 11 Cases in general could be seriously jeopardized.  The new liquidity offered by the proposed DIP Facility will give the Debtors the opportunity to continue operating until it closes on the sale transaction.  The DIP Facility and the proposed terms for post-petition Cash Collateral use are tailored to the Debtors' capital structure and go-forward funding needs and the proposed adequate protection terms set forth in the Interim Order are appropriate.

39.    Accordingly, the Debtors' entry into and performance under the DIP Facility is an exercise of the Debtors' sound business judgment and should be approved.

B.    **The Debtors Should Be Authorized to Grant DIP Liens and Superpriority Claims**

40.    The Debtors propose to obtain financing under the DIP Facility by providing security interests, liens, including priming liens, and superpriority claims as set forth in the DIP Documents and the DIP Orders pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. Specifically, the DIP Documents contemplate that the Debtors' obligations under the DIP Facilities will be secured by priming, first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and liens senior and superior in priority

27

to all other secured and unsecured creditors of the Debtors' estates in all of the Debtors' assets and property, subject only to the Carve Out and Permitted Prior Liens (the "DIP Liens").

41.     The above-described liens on encumbered and unencumbered assets are common features in postpetition financing facilities and are necessary to obtain the DIP Facility, including liens on the proceeds realized upon the sale, disposition and/or termination of any leases, but not the leases themselves and, upon entry of a final Order, the proceeds of Chapter 5 causes of action. Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by a debtor's unencumbered assets and the proceeds thereof, such as proceeds of leaseholds that are subject to leases that prohibit the impositions of liens thereon. *See*, *e.g.*, *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law).

42.     Here, the Debtors satisfy all of the statutory requirements for obtaining postpetition credit under section 364(c).  First, as described above, due to the Debtors' existing secured financing arrangements, no third-party lender was willing to provide postpetition financing on an unsecured or junior priority basis.  Further, the additional liquidity provided by the DIP Facility is necessary for the Debtors to bridge to a successful sale, and the Debtors do not have any other viable postpetition financing options available to them.  Absent approval of the DIP Facility and use of Cash Collateral, the Debtors will have no clear path to exit chapter 11, and the value of the Debtors' estates will be significantly impaired to the detriment of all stakeholders.

43.     Moreover, the DIP Facility is the product of good-faith, arm's-length negotiations among the Debtors and the DIP Lender.  Given these circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents and the Interim Order, are fair, reasonable, and adequate.  For all these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

44.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either (a) the Prepetition Lender has consented or (b) the Prepetition Lender's interests in collateral are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

45.     Here, the Prepetition Lender is consenting to the priming DIP liens, and the Debtors are not seeking to grant priming DIP liens on a non-consensual basis.  Moreover, the Interim Order includes customary adequate protection provisions to adequately protect the Prepetition Lender's interests in collateral.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.**     **No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Terms**

46.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy

Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

47.    As described above, the Debtors cannot, under the circumstances, obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien; or (c) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Financing. The DIP Facility, in the Debtors' judgment, meets the Debtors' requirements to obtain a reliable and executable source of funding.

48.    For these reasons, the Debtors believe that entry into the DIP Credit Agreement is in the best interest of the Debtors' estates, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

**D.    The Proposed Roll-up is Appropriate and Should be Approved**

49.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (so holding).  The business judgment rule shields such business decisions from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

50.    The repayment of prepetition funded indebtedness with postpetition financing (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  Courts in this jurisdiction and other jurisdictions have approved similar DIP financing features in retail and non-retail cases, including on the first day of the case. *See, e.g., In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (authorizing an approximately $200 million DIP financing that included a roll-up of up to $36 million in prepetition first lien term loans debt pursuant to interim order); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (authorizing a "creeping" roll up of prepetition ABL facility pursuant to interim order and a final roll up of remaining amounts pursuant to final order); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (authorizing an approximately $240 million DIP financing that included a roll-up of up to $200 million in prepetition secured first in, last out term loans debt pursuant to interim order); *see also In re ATD Corp.*, No. 18- 12221(KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to the DIP order); *In re Remington*

*Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately

$338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of

$114 million, pursuant to the DIP order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr.

D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving

obligations pursuant to the DIP order); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr.

D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included a full ABL roll-

up of approximately $22 million prepetition debt pursuant to Interim Order).

51.     Here, the DIP Facility includes a negotiated roll-up whereby, upon entry of the

Interim Order, and subject to the satisfaction of the conditions precedent to lending under the DIP

Credit Agreement, the prepetition debt will be fully repaid through the proceeds of the DIP

Facility; provided, however, notwithstanding anything to the contrary in the Interim Order,

approval of the final roll-up pursuant to the Interim Order is subject to a challenge proceeding

under the Interim Order.

52.     These roll-up terms are consistent with roll-ups approved in prior cases and are a

required component of the DIP Facility.  For the reasons detailed herein, the Debtors'

determination to proceed with the DIP Facility is an exercise of the Debtors' sound business

judgment.  This considered business determination encompasses a decision to agree to the roll-up

features of the DIP Facility, without which the Debtors would be unable to obtain the DIP Facility.

Therefore, the roll-up features of the DIP Facility should be approved.

**E.      The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e)**

53.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its rights in any lien or security interest securing those loans,

even if the authority of the debtor to obtain such loans or grant such liens is later reversed or

modified on appeal.  Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this Section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this Section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

54.     As explained in detail herein, the DIP Facility is the result of the Debtors'

reasonable and informed determination that the DIP Lender offered the most favorable terms on

which to obtain needed postpetition financing, and was the product of extended arm's length, good

faith negotiations between and among the Debtors and the DIP Lender.  The terms and conditions

of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only

for purposes that are permissible under the Bankruptcy Code.

55.     Accordingly, the Court should find the DIP Lender is a "good faith" lender within

the meaning of section 364(e) of the Bankruptcy Code, and that it is entitled to all of the protections

afforded thereby.

**F.      The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lender Under the DIP Documents**

56.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to

pay certain fees to the DIP Lender.  In particular, the Debtors have agreed to pay the following

fees in connection with the DIP Facility:

(a)      A commitment fee equal to $300,000.00, which shall be fully earned and

payable as of the Effective Date; and

(b)      An exit fee in an amount equal to $300,000.00 (the "Exit Fee"); provided, that, if no Event of Default shall have occurred under the DIP Credit Agreement, the Exit Fee shall be forgiven.

57.      Courts in this district and others have approved similar fees in large chapter 11 cases. *See In re Cyxtera Techs, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (approving a 6.0% backstop fee and 3.0% commitment fee); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2022) (approving a commitment fee of approximately 3.0% of the DIP loans, a backstop fee of approximately 2.0% of the DIP loans, and a fronting premium of approximately 0.50% of the DIP loans).

58.      These fees are the product of arm's-length and good-faith negotiations among the Debtors and the DIP Lender.  The fees are integral components of the overall terms of the DIP Facility and are required by the DIP Lender as consideration for the extension of post-petition financing.  Accordingly, the Court should authorize the applicable Debtors to pay the fees provided under the DIP Documents in connection with entering into and performing under the same.

**II.      The Debtors Should Be Authorized to Use Cash Collateral**

59.      In addition to the DIP Facility, the Debtors propose to use the Prepetition Lender's Cash Collateral to pay ordinary and necessary business expenses.  Absent use of the Prepetition Lender's Cash Collateral, the Debtors' operations would cease, causing the Debtors' estates to suffer immediate and irreparable harm.  The use of the Prepetition Lender's Cash Collateral will be governed by the Approved Budget and the terms of the Interim (and ultimately Final) Order.

60.      Section 363(c)(2) of the Bankruptcy Code governs a Debtors' use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

The trustee may not use, sell, or lease cash collateral . . . unless—

34

      (A)    each entity that has an interest in such cash collateral consents; or

      (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

61.    The Debtors have satisfied the requirements of sections 363(c)(2) and 363(e) and should be authorized to use the Cash Collateral.  First, as discussed above, the Prepetition Lender consents to the use of the Cash Collateral.  Second, the Debtors are providing the Prepetition Lender with adequate protection, including, replacement liens on the DIP Collateral, including Cash Collateral, in accordance with the priorities set forth in the Interim Order.

62.    As described above, the Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, to honor obligations critical to the success of its ongoing operations, including to employees, vendors, and customers.  Absent access to Cash Collateral, the Debtors cannot continue to operate its business postpetition, diminishing the value of the Debtors' estate to the detriment of all stakeholders, including the Prepetition Lender.

63.    Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the Interim Order.

**G.    The Carve Out is Appropriate**

64.    The liens granted pursuant to the DIP Facility, replacement liens on account of adequate protection, and the superpriority claims of all secured lenders are subject and subordinate to the Carve Out.  The Carve Out contains similar terms to others that have been found to be

reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See In re Thrasio Holdings, Inc.,* No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 4, 2024); *In re Careismatic Brands, LLC,* No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024); *In re DirectBuy Home Improvement, Inc.,* No. 23-19159 (SLM) (Bankr. D.N.J. Nov. 1, 2023); *In re Cyxtera Technologies, Inc.,* No. 23-14853 (JKS) (Bankr. D.N.J. July 19, 2023).

65.     Without the Carve Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part of the adequate protection of the Prepetition Lender's interests in the prepetition collateral.

**H.      Request for Modification of the Automatic Stay**

66.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Interim Order contemplates the modification of the automatic stay (to the extent applicable) to the extent necessary to implement the terms of the Interim Order. Stay modification provisions of this sort are ordinary and usual features of DIP facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully requests the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and DIP Credit Agreement.

## REQUEST FOR FINAL HEARING

67.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the Motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

68.    For the reasons detailed above, it is imperative that the Debtors obtain additional liquidity under the DIP Facility and access to use Cash Collateral at the outset of these chapter 11 cases.  This relief is essential to the Debtors' preservation and maximization of estate value for the benefit of all stakeholders.  Absent interim approval of the relief requested in this Motion, the Debtors would face immediate and irreparable harm due to liquidity constraints and resulting operational and business challenges, including erosion of employee, vendor, and customer confidence.

69.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing within thirty (30) days after the Petition Date and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003(b) ARE SATISFIED

70.    Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons set forth herein, failure to receive the requested relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and result in immediate and irreparable harm to the Debtors. Accordingly, the

Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

71.    An efficient and expeditious approval and implementation of the DIP Facility is in the best interest of the Debtors and its creditors and other parties in interest.  Accordingly, the Debtors requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## WAIVER OF MEMORANDUM OF LAW

72.    Because the legal basis upon which the Debtors relies is incorporated herein and the Motion does not raise any novel issues of law, the Debtors respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3).

## NOTICE

73.    Notice of this Motion has been given to (a) the Office of the U.S. Trustee for the District of New Jersey, Attn: Fran B. Steele, Esq. (Fran.B.Steele@usdoj.gov) and Peter J. D'Auria, Esq. (Peter.J.D'Auria@usdoj.gov); (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Internal Revenue Service; (d) the office of the attorney general for each of the state sin which the Debtors operate; (e) the United States Attorney's Office for the District of New Jersey; (f) counsel for the Prepetition Lender and DIP Lender: Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Anthony B. Stumbo, Esq. and Steven E. Fox, Esq.; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

74.    No prior motion for the relief requested herein has been made to this or any other

court.

**WHEREFORE** the Debtors respectfully request entry of the proposed Interim and Final

Orders granting the relief requested herein and such other and further relief as the Court may deem

just and appropriate.

Dated: May 8, 2024

Respectfully submitted,

**COLE SCHOTZ P.C.**

*/s/ Michael D. Sirota*
Michael D. Sirota, Esq.
Ryan T. Jareck, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536
Email: msirota@coleschotz.com
        rjareck@coleschotz.com
        mpercontino@coleschotz.com

*Proposed Attorneys for Debtors
and Debtors in Possession*

**Exhibit 1**

Interim DIP Order

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
rjareck@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

| | |
|---|---|
| In re:<br><br>SAM ASH MUSIC CORPORATION, *et al.*<br><br>          Debtors.[1] | Chapter 11<br><br>Case No. 24-14727 (SLM)<br><br>Judge:<br><br>(Joint Administration Requested) |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through fifty-two (52), is hereby

**ORDERED**.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410).  The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

Page (2)
Debtors:          SAM ASH MUSIC CORPORATION, *et al.*
Case No.:         24-14727 (SLM)
Caption of Order: INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                  506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                  AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                  GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                  USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                  (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                  RELIEF

---

Upon the Motion (the "***DIP Motion***")[2] of the above-captioned debtors and debtors-in-possession

in the above-captioned cases (collectively, the "***Debtors***"), pursuant to sections 105, 361, 362, 363, 364,

503, 506, and 507 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"),

Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (the "***Bankruptcy Rules***"), and Rule 4001-3

of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "***Local Rules***")

seeking entry of interim and final orders granting the following relief:

**(I)      Interim DIP Financing**

(A)     Authorizing the Debtors to obtain up to $20 million in post-petition financing (the
        "***DIP Facility***") pursuant to (and in accordance with the terms of) that certain
        *Senior Secured Super-Priority Debtor-In-Possession Loan and Security
        Agreement* (as may be amended, modified, or supplemented and in effect from
        time-to-time, the "***DIP Credit Agreement***"), substantially in the form attached as
        **Exhibit A** hereto, by and among the Debtors, as borrowers and Tiger Finance,
        LLC and such other financial institutions that are or may from time to time have
        commitments to make "Loans" (as defined in the DIP Credit Agreement)
        (collectively, the "***DIP Lender***") to the Debtors, which may be used for the
        following in accordance with and as limited by the Approved Budget (as defined
        below) and subject to Paragraph 46 hereof (where applicable):

        (i)      upon entry of this Interim Order (defined below), and subject to the rights
                 of parties-in-interest as set forth in Paragraphs 24-29, to repay with the
                 first draw under the DIP Facility the entire outstanding balance of the
                 Prepetition Debt under the Prepetition Financing Documents (each term
                 as defined below) (the "***Final Roll-Up***");

        (ii)     to pay fees, costs, and expenses as provided in the DIP Financing
                 Agreements, including amounts incurred in connection with the
                 preparation, negotiation, execution, and delivery of the DIP Credit
                 Agreement and the other DIP Financing Agreements as provided in this

---

[2]      Capitalized terms used in this Interim Order (defined below) but not defined herein shall have the meanings
         ascribed to such terms in the DIP Motion and/or the DIP Financing Agreements (as defined below), as the
         context makes applicable.

Page (3)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

Order (this "***Interim Order***") (and upon its entry, the Final Order (defined below));

(iii)    for general operating and working capital purposes, including the payment of post-petition obligations, and certain pre-petition obligations as authorized by the Court pursuant to the Debtors' First Day Motions (as defined below), and for the payment of transaction expenses, for the payment of fees, administrative expenses, and costs incurred in connection with the instant Chapter 11 Cases (the "***Chapter 11 Cases***"), and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital and other lawful corporate purposes of the Debtors, in each case subject to any limitations provided by the Approved Budget (defined below); and

(iv)    to fund the Carve Out (as defined below).

(B)    Authorizing the Debtors to enter into the DIP Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lender, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("*UCC*") financing statements, and all other related agreements, documents, notes, certificates, and instruments to be executed, delivered, and/or ratified by the Debtors in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, the "***DIP Financing Agreements***");

(C)    Authorizing the Debtors to remit all collections, asset proceeds and payments to the DIP Lender for application, or deemed application, first to all Pre-Petition Obligations (as defined below) until such obligations are fully repaid, and then to the repayment of all DIP Obligations (as defined below) in accordance with the DIP Credit Agreement and this Interim Order;

(D)    As set forth below, subject to Paragraphs 24-29 of this Interim Order, approval of certain stipulations by the Debtors as set forth in this Interim Order in connection with the Pre-Petition Credit Agreement (as defined below);

(E)    Effective only upon entry of a Final Order, the waiver of the Debtors' right to assert claims to surcharge against the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code, to the extent set forth below;

Page (4)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

(F)     Granting the DIP Lender the following Liens (as defined in section 101(37) of the Bankruptcy Code) (the "***DIP Liens***") and claims:

(i)     first priority priming, valid, perfected, and enforceable Liens, subject and subordinate only to the Carve Out (as defined below) and Permitted Prior Liens, in and upon all of the Debtors' assets, real and personal properties, and interests, including (A) first-priority senior liens on the proceeds realized by the Debtors upon a sale, assumption, assignment, termination, rejection, surrender, and/or other disposition of Debtors' non-residential real property leasehold interests (collectively, "***Leases***"); provided, that for the avoidance of doubt (i) the foregoing DIP Liens shall exclude the Debtors' interests in the Leases themselves, and (ii) the DIP Collateral (defined below) shall not include the Debtors' Leases solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable non-bankruptcy law to attach to any such real property lease; and (B) effective only upon entry of a Final Order, first-priority senior liens on Bankruptcy Recoveries (defined below) in each case as provided in and as contemplated by this Interim Order and the DIP Financing Agreements; and

(ii)     allowed superpriority administrative claim status in respect of all obligations under the DIP Financing Agreements (collectively, the "***DIP Obligations***"), subject and subordinate only to the Carve Out as provided herein.

**(II)     Interim Use of Cash Collateral** – During the Interim Period (defined below), authorizing the Debtors' use of "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code ("***Cash Collateral***")) in which the DIP Lender has an interest in order to fund certain amounts under the Approved Budget;

**(III)     Modifying the Automatic Stay –** Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Interim Order;

**(IV)     Waiving Any Applicable Stay –** Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order; and

**(V)     Final Hearing** – Scheduling a final hearing (the "***Final Hearing***") to consider entry of an order (the "***Final Order***") granting the relief requested in the DIP Motion on a final basis

Page (5)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

and approving the form of notice with respect to the Final Hearing, in form and substance satisfactory to the DIP Lender.

and upon the *Declaration of Jordan Meyers in Support of First Day Motions* (the "**First Day Declaration**"), and the *Declaration of Jordan Meyers In Support Of Motion Of Sam Ash Music Corporation For The Entry Of (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Superpriority Claims, (III) Authorizing Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**DIP Financing Declaration**"), which was filed contemporaneously with the DIP Motion; and this Court having reviewed the DIP Motion and held an interim hearing with respect to the DIP Motion (the "**Interim Hearing**"); and upon the DIP Motion, the First Day Declaration, the DIP Financing Declaration, and the record of the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

I.    **Procedural Findings of Fact**

A.    **Petition Date.**    On May 8, 2024 (the "**Petition Date**"), each Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

| Page (6) | |
| --- | --- |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

B.      **Jurisdiction and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

C.      **Statutory Predicates**.  The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014 and Local Rule 4001-3.

D.      **Committee Formation.**  As of the date hereof, no statutory committee (a "***Committee***") of unsecured creditors, equity interest holders, or other parties-in-interest has been appointed in the Chapter 11 Cases.

E.      **Notice.**  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors to certain parties-in-interest, including: (i) the Office of the United States Trustee for the District of New Jersey (the "***U.S. Trustee***"); (ii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates; (iii) co-counsel to the DIP Lender and the Prepetition Lender; and (iv) all other known secured creditors of record, and no other or further notice need be given.

II.      **Debtors' Acknowledgements and Agreements (Prepetition Credit Facility)**

F.      Without prejudice to the rights of parties-in-interest as set forth in Paragraphs 24-29 below, each Debtor admits, stipulates, acknowledges, and agrees (collectively, Paragraphs F(1) through F(7) hereof shall be referred to herein as, the "***Debtors' Stipulations***") that:

Page (7)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

(1)     Prepetition Financing Documents.  Prior to the commencement of the Chapter 11
Cases, the Debtors were party to that certain (A) Loan and Security Agreement dated as of February
21, 2024 (as amended, modified, supplemented or restated and in effect from time to time prior to
the date hereof, the "***Prepetition Credit Agreement***"), between and among the Debtors, each joint
and severally as "Borrower", and Tiger Finance, LLC, as "Lender" (the "***Prepetition Lender***"), and
(B) all other agreements, documents, notes, certificates, and instruments executed and/or delivered
with, to, or in favor of the Prepetition Lender including, without limitation, control agreements,
mortgages, security agreements, guaranties, and UCC financing statements and all other related
agreements, documents, notes, certificates, and instruments executed and/or delivered in
connection therewith or related thereto (as amended, modified or supplemented and in effect,
collectively with the Prepetition Credit Agreement, the "***Prepetition Financing Documents***").

(2)     Prepetition Debt Amount.  As of the Petition Date, the Debtors were liable to the
Prepetition Lender under the Prepetition Financing Documents in the approximate aggregate
principal amount of $18.5 million, *plus* interest accrued and accruing at the default rate from
February 29, 2024, costs, expenses, fees (including attorneys' fees and legal expenses), other
charges and other obligations secured by the Prepetition Financing Documents (collectively the
"***Prepetition Debt***").

(3)     Prepetition Collateral.  To secure the Prepetition Debt, the Debtors granted
continuing security interests and Liens (collectively, the "***Prepetition Liens***") to the Prepetition
Lender, upon substantially all of the Debtors' assets and property, including, without limitation,
the following (collectively, the "***Prepetition Collateral***"):[3]

        (i)     all Accounts;

        (ii)    all Goods, including Equipment, Inventory and Fixtures;

        (iii)   all Documents (including, if applicable, electronic Documents), Instruments
                and Chattel Paper (whether tangible or electronic);

        (iv)    all Letters of Credit and Letter-of-Credit Rights;

        (v)     all Securities Collateral;

        (vi)    all Investment Property;

---

[3]     Each term as used in this subsection (3) has the meaning ascribed thereto in the applicable Prepetition
Financing Documents. The collateral set forth in the Prepetition Lender's filed UCC-1 financing statement
is within the scope of New Jersey Uniform Code-Secured Transactions pursuant to N.J.S.A 12A:9-102.

Page (8)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

(vii)    all Intellectual Property;

(viii)   all Commercial Tort Claims;

(ix)     all General Intangibles;

(x)      all Deposit Accounts and Securities Accounts;

(xi)     all Supporting Obligations;

(xii)    to the extent not otherwise described above, all Receivables;

(xiii)   all books and records relating to the Collateral; and

(xiv)    to the extent not covered by clauses (i) through (xiv) of this sentence, all other
         personal property of such Debtors, whether tangible or intangible and all
         Proceeds and products of each of the foregoing and all accessions to,
         substitutions and replacements for, and rents, profits and products of, each of
         the foregoing, any and all proceeds of any insurance, indemnity, warranty or
         guaranty payable to such Debtors from time to time with respect to any of the
         foregoing.

(4)      Prepetition Lien Priority. The Prepetition Liens of the Prepetition Lender have
priority over all other Liens except (x) valid, enforceable, non-avoidable and perfected Liens in
existence on the Petition Date that, after giving effect to any intercreditor or subordination
agreement (if any), are senior in priority to the Prepetition Liens, and (y) valid, enforceable and
non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition
Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any
intercreditor or subordination agreement (if any), are senior in priority to the Prepetition Liens
(collectively, the "***Permitted Prior Liens***").

(5)      Subject to paragraphs 24-29 hereof, as of the Petition Date:

         (i)      the Prepetition Liens are valid, binding, enforceable, and
         perfected first priority Liens, subject only to any Permitted Prior Liens, and are not
         subject to avoidance, recharacterization, or subordination pursuant to the
         Bankruptcy Code or applicable non-bankruptcy law,

         (ii)     (a) the Prepetition Debt constitutes legal, valid, and binding
         obligations of the "Borrowers" and "Obligors" thereunder, enforceable in
         accordance with the terms of the Prepetition Financing Documents (other than in

Page (9)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (b) no offsets, defenses, or counterclaims to any of the Prepetition Debt exists, and (c) no portion of the Prepetition Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law,

(iii)    the Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Lender with respect to the Prepetition Financing Documents or otherwise, whether arising at law or at equity, including, without limitation, any recharacterization, subordination, disallowance, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code, and

(iv)    the Prepetition Debt constitutes an allowed secured claim under sections 502 and 506 of the Bankruptcy Code.

(6)    Subject to paragraphs 24-29 hereof, effective upon entry of this Interim Order, the Debtors shall be deemed to have waived, discharged, and released the Prepetition Lender, together with its respective successors, assigns, subsidiaries, parents, affiliates, agents, attorneys, officers, directors, and employees (collectively, the "***Released Parties***"), of any right the Debtors may have (i) to challenge or object to any of the Prepetition Debt, (ii) to challenge or object to the Prepetition Liens (or any other security for the Prepetition Debt), and (iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Documents, or otherwise.  The Debtors do not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against any of the Released Parties, including anything which would in any way affect the validity, enforceability, priority, and non-avoidability of any of the Prepetition Financing Documents, the Prepetition Debt, or the Prepetition Liens, or any claim of the Prepetition Lender pursuant to the Prepetition Financing Documents, or otherwise.

(7)    <u>Cash Collateral</u>.  As of the Petition Date, the Prepetition Lender has a continuing security interest in and Lien on all or substantially all of the Debtors' Cash Collateral, including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral, to secure the Prepetition Debt.

(8)    <u>Default by the Debtors</u>. The Debtors acknowledge and stipulate that multiple Events of Default (as defined in the Prepetition Credit Agreement) have occurred and are continuing as of the date hereof.

Page (10)
Debtors:              SAM ASH MUSIC CORPORATION, *et al.*
Case No.:             24-14727 (SLM)
Caption of Order:     INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                      506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                      AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                      GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                      USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                      (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                      RELIEF

---

(9)    <u>Proof of Claim</u>. The acknowledgment by Debtors of the Pre-Petition Debt and the liens, rights, priorities and protections granted to or in favor of Prepetition Lender in respect of the Prepetition Collateral as set forth herein and in the Prepetition Financing Documents shall be deemed a timely filed proof of claim on behalf of Prepetition Lender in these Chapter 11 Cases.

**III.    <u>Findings Regarding the Post-Petition Financing</u>**

**G.    Need for Post-Petition Financing**. An immediate need exists for the Debtors to obtain funds from the DIP Facility and use of Cash Collateral in order to fund working capital, continue operations, pay administrative expenses of the Debtors incurred in the Chapter 11 Cases, and to administer and preserve the value of their estates for the benefit of their various stakeholders. The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility and the use of Cash Collateral (in each case in the manner and in the amounts provided herein and in the Approved Budget, in the DIP Credit Agreement, and this Interim Order), the absence of which would immediately and irreparably harm the Debtors, their estates and their stakeholders.

**H.    No Credit Available on More Favorable Terms**. As set forth in the DIP Motion and the DIP Financing Declaration, the Debtors have been unable to obtain any of the following:

(1)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3)    credit for money borrowed secured solely by a Lien on property of the estates that is not otherwise subject to a Lien, or

(4)    credit for money borrowed secured by a junior Lien on property of the estates which is subject to a Lien,

Page (11)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and

this Interim Order.  The Debtors are unable to obtain credit from the DIP Lender without granting to the

DIP Lender the DIP Protections (as defined below).

      **I.**    **Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any

Permitted Prior Lien(s) is/are valid, senior, perfected, or unavoidable.  Moreover, nothing shall prejudice

the following:

    (1)    the rights of any party-in-interest, including, but not limited to, the Debtors, the
DIP Lender, the Prepetition Lender, and/or any Committee to challenge the validity, priority,
perfection, and extent of any such Permitted Prior Liens, or

    (2)    subject to Paragraphs 24-29 below, the rights of any Committee or any other party-
in-interest (other than the Debtors) with requisite standing to challenge the validity, priority,
perfection, and extent of the Prepetition Debt and/or Prepetition Liens as set forth in this Interim
Order.

      **J.**    **Adequacy of the Approved Budget.**  The DIP Lender and the Debtors have agreed that

the budget, which is attached hereto as ***Exhibit "B"*** (as the same may be modified, supplemented, and/or

updated from time to time consistent with the terms of the DIP Credit Agreement, this Interim Order, and

upon its entry, the Final Order, the "***Approved Budget***")[4] is adequate considering all the available assets to

pay the administrative expenses due and accruing for the period commencing on the Petition Date and

continuing through the date of the final hearing with respect to the DIP Motion (the "***Interim Period***").

---

[4]    All backup, schedules, and other detail contained in the Approved Budget is incorporated by reference,
including accruals for professional fee estimates.

| | |
|---|---|
| Page (12) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

**K.**     **Conditions Precedent to DIP Lender' Extension of Financing.**  The DIP Lender has indicated a willingness to provide post-petition financing to the Debtors in accordance with the DIP Credit Agreement, the other DIP Financing Agreements, including the Approved Budget, subject to the following:

(1)     the entry of this Interim Order (and the Final Order), and

(2)     findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, superpriority claims, security interests, and DIP Liens and other protections granted pursuant to this Interim Order (and upon its entry, the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacation, or amendment of this Interim Order (or the Final Order) or any other order, as provided in section 364(e) of the Bankruptcy Code.

**L.**     **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.**  The extension of credit under the DIP Credit Agreement and the other DIP Financing Agreements, and the fees paid and to be paid thereunder, (i) are fair, reasonable, and the best available under the circumstances, (ii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iii) are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms' length between the Debtors and the DIP Lender, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

**M.**     **Relief Essential; Best Interest.**  The relief requested in the DIP Motion (and as provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses (the "***Business***"), the management and preservation of the Debtors' assets during the Interim Period, and to avoid irreparable harm.  It is in the best interest of the Debtors' estates that the Debtors be

| Page (13) | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP Financing Agreements, and to use Cash Collateral, in each case as provided in this Interim Order.  The Debtors have demonstrated good and sufficient cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

**I.**

**DIP FINANCING**

**A.      Approval of Entry into the DIP Financing Agreements**

1.      The DIP Motion is GRANTED on an interim basis as set forth herein.  Except as otherwise expressly provided in this Interim Order, any objection to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

2.      The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreements.

3.      No obligation, payment, transfer or grant of security arising under the DIP Credit Agreement, the other DIP Financing Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under § 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or

Page (14)
Debtors:          SAM ASH MUSIC CORPORATION, *et al.*
Case No.:         24-14727 (SLM)
Caption of Order: INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                  506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                  AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                  GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                  USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                  (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                  RELIEF

---

counterclaim. The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses and other amounts described in the DIP Financing Documents as such become due and without need to obtain further Court approval, including, without limitation, monitoring fees, agency fees, alternate transaction fees, closing fees, unused facility fees, continuing commitment fees, backstop fees, exit fees, servicing fees, yield maintenance premiums, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable and documented fees and disbursements of DIP Lender's attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Financing Documents. Upon execution and delivery, the DIP Credit Agreement and other DIP Financing Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

## B.    Authorization to Borrow

4.      In order to enable them to continue to operate the Business during the Interim Period, and subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, the other DIP Financing Agreements, including the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), during the Interim Period the Debtors are hereby authorized under the DIP Facility to borrow $18.125 million in accordance with the terms and conditions of the DIP Credit Agreement.

| Page (15) | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

**C.    Application of DIP Facility Proceeds**

5.    The advances under the DIP Facility and uses of Cash Collateral shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), solely as follows:

(a)    Upon entry of this Interim Order, and subject to the satisfaction of the conditions precedent to lending under the DIP Credit Agreement, the repayment and refinancing of all Prepetition Debt through the Final Roll-Up with the proceeds of the DIP Facility; provided, however, notwithstanding anything to the contrary in this Interim Order, approval of the Final Roll-Up pursuant to this Interim Order is subject to a Challenge Proceeding and the provisions of Paragraphs 24-29 below.

(b)    to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(c)    for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors, in compliance with and as limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement); and

(d)    to fund the Carve Out (as defined below).

**D.    Conditions Precedent**

6.    The DIP Lender shall not have any obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived in accordance with the DIP Credit Agreement.

| | |
|---|---|
| Page (16) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

**E.      The DIP Liens**

7.      In consideration of the DIP Lender's making of loans and other advances under the DIP Credit Agreement and the consent to the Debtors' use of Cash Collateral, pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and subject to the limitations set forth in Paragraph 7 below, effective immediately upon the entry of this Interim Order (unless expressly set forth otherwise below), the DIP Lender is hereby granted the DIP Liens (which Liens are subject to the Permitted Prior Liens and the Carve Out), which DIP Liens constitute priming, first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, and except as otherwise expressly provided in this Interim Order, in all of the Debtors' assets and property, including, without limitation, the following (collectively, the "***DIP Collateral***"):

> (a)      The Collateral (as defined in the DIP Financing Agreements), including, without limitation:
>
> All: (a) Accounts, (b) Chattel Paper, (c) Commercial Tort Claims (d) Deposit Accounts, (e) Documents, (f) Equipment, (g) Fixtures, (h) General Intangibles (including Payment Intangibles), (i) Goods, (j) Instruments, (k) Inventory, (l) Investment Property, (m) Letter-of-Credit Rights, (n) Software, (o) Supporting Obligations, (p) money, policies and certificates of insurance, deposits, cash, or other property, (q) all real estates, including, without limitation, any Mortgaged Property, (r) all books, records, and information relating to any of the foregoing ((a) through (q)) and/or to the operation of any Debtors' business, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded and maintained, (s) all insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance (whether any of such proceeds, refunds, and premium rebates arise out of any of the foregoing (a) through (r) or otherwise), (t) all liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (s)), including the right of stoppage in transit, and (u) any of the foregoing, whether now owned or now due, or in which any Debtors has an

16

Page (17)
Debtors:           SAM ASH MUSIC CORPORATION, *et al.*
Case No.:          24-14727 (SLM)
Caption of Order:  INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                   506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                   AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                   GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                   USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                   (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                   RELIEF

---

interest, or hereafter acquired, arising, or to become due, or in which any Debtors obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing;

(b)     Proceeds realized upon the sale, disposition and/or termination of any Lease(s), but not the Leases themselves, whether or not so perfected prior to the Petition Date; provided, however, the DIP Collateral shall not include the Debtors' Leases solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable non-bankruptcy law to attach to any such real property lease;

(c)     Upon Entry of the Final Order, the proceeds or property recovered, by settlement or otherwise, in respect of claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code (the "***Bankruptcy Recoveries***"); and

(e)     Any residual cash held in any escrow or other Carveout Reserve Account of the Debtors in respect of fees and expenses of Case Professionals and for Statutory Fees as provided for in the Approved Budget and this Interim Order.

**F.     DIP Lien Priority**

8.     The DIP Liens to be created and granted to the DIP Lender, as provided herein, are:

(a)     created pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code,

(b)     other than as set forth in clause (c) below, first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and

(c)     subject only to (i) the Carve Out, and (ii) the Permitted Prior Liens.

Except as expressly set forth in this Interim Order and subject to the Carve Out, the DIP Liens shall secure

all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority

set forth in the DIP Credit Agreement, subject to the terms of this Interim Order, and upon its entry, the

Page (18)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

terms of the Final Order.  The DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases (other than Permitted Prior Liens) and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of the Chapter 11 Cases to a case(s) under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "***Successor Case***"), and/or upon the dismissal of the Chapter 11 Cases.  The DIP Liens, upon entry of this Interim Order, shall not be subject to sections 510(c), 549, 550, or 551 of the Bankruptcy Code.

**G.      Enforceable Obligations**

9.      The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtors, and shall be enforceable against the Debtors, their estates, and any successors thereto, and their creditors in accordance with their terms.

**H.      Protection of the DIP Lender and Other Rights**

10.     From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Interim Order, in compliance with and as limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

11.     Upon the disposition of DIP Collateral and/or Prepetition Collateral, other than with respect to the sale of Inventory in the ordinary course of business (each such transaction a "***Sale***"), any such DIP Collateral and/or Prepetition Collateral shall be sold free and clear of the Prepetition Liens, the Adequate Protection Liens, and the DIP Liens; provided, however, that such Prepetition Liens, Adequate Protection

Page (19)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

Liens, and DIP Liens shall attach to the proceeds of any such Sale ("**Sale Proceeds**") to the same extent,

validity and priority as such Liens attached to the Prepetition Collateral and/or the DIP Collateral,

respectively.  Any such Sale Proceeds shall be promptly paid at closing on such Sale(s) (including if such

Sale constitutes a DIP Maturity Event): first, to fund the Carve Out; second, to the DIP Lender for

application to the allowed DIP Obligations in accordance with the terms of the DIP Credit Agreement; third

after payment in full of the DIP Obligations, to the Debtors.

12.      The Debtors shall keep the DIP Lender and Prepetition Lender fully informed of the

Debtors' efforts to consummate a Sale(s) and any other sales of equity interests and/or assets of the Debtors

after the Petition Date, and without limiting the generality of the foregoing, the Debtors shall (A) promptly

provide to the DIP Lender and Prepetition Lender copies of all offers for the purchase of any asset(s) and/or

equity interests of any of the Debtors and copies of all bids from any liquidator(s), (B) provide, no less

frequently than weekly, status updates on the Debtors' efforts to consummate a Sale(s) and/or any other

sales, and (C) promptly advise the DIP Lender and Prepetition Lender of any expressions of interest in any

or all of the Debtors' assets and/or equity interests.

13.      In connection with any sale or other dispositions of any assets of the Debtors, the DIP

Lender may seek to credit bid some or all of its claims for the DIP Collateral (each a "**Credit Bid**") pursuant

to section 363(k) of the Bankruptcy Code.  A Credit Bid may be applied only to reduce the cash

consideration with respect to those assets in which the DIP Lender submitting such Credit Bid holds a

security interest on a dollar-for-dollar basis up to the full amount of the DIP Lender's claims.  In all such

instances, the DIP Lender shall be considered a "Qualified Bidder" with respect to its right to acquire all or

| Page (20) | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

any of the assets by Credit Bid; <u>provided</u> that the ability of the DIP Lender to credit bid all or any portion of the DIP Lender's claims for all or any portion of the DIP Collateral shall be subject to the payment in full in cash of any claims secured by Permitted Prior Liens.

## I.      Access to Records; Reporting

14.      In addition to, and without limiting, whatever rights to access the Prepetition Lender has under the Prepetition Financing Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Lender and Prepetition Lender: (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, (iii) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors, and (iv) otherwise to have the full cooperation of the Debtors.  In addition, the Debtors shall provide to the Prepetition Lender all of the financial, collateral, and related reporting required under the DIP Financing Agreements as and when provided to the DIP Lender under the DIP Credit Agreement.

## J.      <u>Superpriority Administrative Claim Status</u>

15.      Subject to the Carve Out, all DIP Obligations shall constitute an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or

Page (21)
Debtors:          SAM ASH MUSIC CORPORATION, *et al.*
Case No.:         24-14727 (SLM)
Caption of Order: INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                  506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                  AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                  GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                  USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                  (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                  RELIEF

---

ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

16.     Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations or with any other claims of the DIP Lender arising hereunder.  The DIP Superpriority Claim shall be junior in right of payment to the Carve Out.

## II.

### **POST-PETITION LIEN PERFECTION**

17.     This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.

18.     Notwithstanding the foregoing, the DIP Lender may, in its discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments

| | |
|---|---|
| Page (22) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

and documents to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

19.     The Debtors shall execute and deliver to the DIP Lender all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto.

20.     The DIP Lender, in its sole discretion, may file a photocopy of the entered, docketed version of this Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Interim Order.

21.     The DIP Lender shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be have co-equal rights with the Prepetition Lender and succeed to the rights of the Prepetition Lender with respect to all mortgages, security agreements, control agreements, and third party notifications in connection with the Prepetition Financing Documents, all prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral

Page (23)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

and/or DIP Collateral, including, without limitation, each collateral access agreement duly executed and delivered by any landlord of any Debtors and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements.

22.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:

(a)     permit the Debtors to grant the DIP Liens, and to incur all liabilities and obligations to the DIP Lender under the DIP Financing Agreements, the DIP Facility, and this Interim Order, and

(b)     authorize the DIP Lender to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Interim Order.

### III.

### AUTHORIZATION FOR USE OF CASH COLLATERAL

23.     Pursuant to the terms and conditions of this Interim Order, the DIP Credit Agreement, and the other DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), the Debtors are authorized to use Cash Collateral during the Interim Period (and terminating upon notice being provided by the DIP Lender to the Debtors that a DIP Termination Event has occurred and is continuing, subject to the terms of this Interim Order), with any and all such Cash Collateral being available to the Debtors to satisfy obligations arising under and/or consistent with the Approved Budget and such other orders of the Court that may be entered upon consent of the DIP Lender.

### IV.

### RESERVATION OF CERTAIN THIRD-PARTY

Page (24)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

### RIGHTS AND BAR OF CHALLENGES AND CLAIMS

24.    Nothing in this Interim Order, the DIP Credit Agreement, or the other DIP Financing

Agreements shall prejudice whatever rights any Committee or any other party-in-interest (other than the

Debtors) with requisite standing that has been sought and granted by this Court may have to bring an

adversary proceeding, cause of action, objection, claim, defense, or other challenge against any one or more

of the Prepetition Lender, the Prepetition Debt and/or the Prepetition Liens (collectively, a "***Challenge***

***Proceeding"***), including, but not limited to, any of the following:

(a)    In the case of the Prepetition Lender, an objection to or challenge of the Debtors'
Stipulations set forth in Paragraphs F(1) through F(7), including (i) the validity, extent, perfection,
or priority of the security interests and Prepetition Liens of the Prepetition Lender in and to the
Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition
Debt, or

(b)    a suit against the Prepetition Lender in connection with or related to the Prepetition
Debt and/or Prepetition Liens, or the actions or inactions of the Prepetition Lender arising out of or
related to the Prepetition Debt and/or Prepetition Liens;

provided however, that any Committee or any other party-in-interest with requisite standing that has been

sought and granted by this Court must commence a Challenge Proceeding asserting such objection or

challenge, including, without limitation, any claim against the Prepetition Lender in the nature of a setoff,

counterclaim, or defense to the Prepetition Debt and/or Prepetition Liens (including, but not limited to,

those under sections 506, 544, 548, 548, 549, 550, and/or 552 of the Bankruptcy Code), by the later of (i)

for any Committee, forty-five (45) days from the date of formation of such Committee, (ii) for any party-

in-interest other than an official Committee, sixty (60) days following entry of this Interim Order, or (iii)

with respect to a chapter 11 trustee appointed in the Chapter 11 Cases, or any chapter 7 trustee appointed

Page (25)
Debtors:                 SAM ASH MUSIC CORPORATION, *et al.*
Case No.:                24-14727 (SLM)
Caption of Order:        INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                         506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                         AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                         GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                         USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                         (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                         RELIEF

---

in a Successor Case, prior to the expiration of the periods set forth in subsections (i) and (ii) above, no later than the date that is the later of (A) fourteen (14) days after the appointment of such trustee, or such other time as determined by the Court after motion and hearing, or (B) the expiration of the time periods set forth in the foregoing subsections (i) and (ii) above (the later of (i), (ii) or (iii) the "***Challenge Period***"), and in the event that no Challenge Proceeding has been commenced during the Challenge Period the date that is the last calendar day of the Challenge Period shall be referred to as the "***Challenge Period Termination Date***").  The failure of any Committee or other third party who desires to investigate either (i) the validity, extent, perfection, or priority of the security interests and Prepetition Liens in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Debt, to make a formal written request to the Prepetition Lender for information validating such prepetition claims and/or Liens on or before the date that is ten (10) calendar days prior to the expiration of the Challenge Period shall operate as a bar to any motion, application or other request by such party(ies) for an extension of the Challenge Period.

25.     Subject to entry of the Final Order, not less than five (5) business days prior to filing a motion seeking standing (a "***Challenge Standing Motion***") to commence a Challenge Proceeding, a Committee or other third party, as the context makes applicable, shall inform the Prepetition Lender, in writing, of its intent to file such standing motion (such writing shall contain a reasonably detailed statement of the claims proposed to be asserted in such Challenge Proceeding and the legal/other bases supporting such claim(s) in the event standing were to be granted by the Court ("***Challenge Statement***")).  The parties shall thereafter meet and confer for purposes of attempting to resolve any issues/claims asserted in the

Page (26)
Debtors:              SAM ASH MUSIC CORPORATION, *et al.*
Case No.:             24-14727 (SLM)
Caption of Order:     INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                      506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                      AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                      GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                      USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                      (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                      RELIEF

---

Challenge Statement.  In the event a third party, including any Committee, thereafter files a Challenge

Standing Motion seeking standing to commence a Challenge Proceeding in accordance with the terms of

the Final Order, any such Challenge Standing Motion shall, at a minimum, include a copy of any proposed

objection or adversary complaint containing a detailed description of the claims and causes of action such

party proposes to pursue.  The Challenge Period shall be tolled for a period not to exceed thirty (30) days

upon the filing of a Challenge Standing Motion by an interested party (including any Committee); provided,

that any such tolling shall be applicable solely to the party that files the subject Challenge Standing Motion,

and no such tolling shall apply to any other party.

26.    The Challenge Period may only be extended (i) with the written consent of the Prepetition

Lender prior to the expiration of the Challenge Period, and for the avoidance of doubt, any such extension

shall only apply to the specific party as to whom such extension may be granted, or (ii) by further order of

the Court after motion and a hearing on not less than five (5) business days' written notice to the Prepetition

Lender. The rights of the Prepetition Lender to oppose any such timely filed Challenge Standing Motion

are fully preserved and reserved hereby, and nothing contained herein shall be construed as consent by the

Prepetition Lender to any such extension or standing request.  If upon consideration of the applicable

Challenge Standing Motion the Court grants the moving party standing to commence and prosecute a

Challenge Proceeding, the Challenge Period shall be deemed to have been automatically extended until the

date that is the later of (x) two (2) business days after the grant of such standing, or (y) such other date as

may be fixed by the Court in any order granting such standing. If upon consideration of the applicable

Page (27)
Debtors:          SAM ASH MUSIC CORPORATION, *et al.*
Case No.:         24-14727 (SLM)
Caption of Order: INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                  506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                  AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                  GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                  USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                  (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                  RELIEF

---

Challenge Standing Motion the Court denies a grant of standing, the Challenge Period shall be deemed to have automatically and irrevocably expired effective as of such date.

27.    For the avoidance of doubt, nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge Proceeding with respect to the Prepetition Financing Documents, the Prepetition Debt, and/or the Prepetition Liens.

28.    Only those parties in interest who commence a Challenge Proceeding on or prior to the expiration of the Challenge Period may prosecute such Challenge Proceeding. As to (x) any parties in interest, including the Committee, who fail to file a Challenge Proceeding on or prior to the expiration of the Challenge Period, or if any such Challenge Proceeding is filed and overruled or otherwise finally resolved or adjudicated in favor of the Prepetition Lender, or (y) any and all matters that are not expressly the subject of a timely Challenge Proceeding: (1) any and all such challenges by any party (including, without limitation, the Committee, any chapter 11 trustee, any examiner or any other estates representative appointed in the Debtors' Chapter 11 Cases, or a chapter 7 trustee, any examiner or any other estates representative appointed in a Successor Case), ***shall be deemed to be forever waived and barred***, (2) all of the findings, Debtors' Stipulations, waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the claims, liens, and interests of the Prepetition Lender shall be of full force and effect and forever binding upon the Debtors' estates and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Case, and (3) any and all claims or causes of action against the Prepetition Lender relating in any way to the Prepetition Financing Documents, Prepetition

Page (28)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

Debt, and Prepetition Liens, shall be deemed to have been released by the Debtors' estates, all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Case.

29.      To the extent any such Challenge Proceeding is commenced, the Prepetition Lender shall be entitled to include the costs and expenses, including, but not limited to, reasonable and documented attorneys' fees and disbursements, incurred in responding to any inquiry, producing documents and/or witnesses in response to formal or informal discovery requests, or otherwise defending the objection or complaint, as part of the Prepetition Debt and Prepetition Liens of the Prepetition Lender to the extent permitted pursuant to the applicable Prepetition Financing Documents.  To the extent any such inquiry or discovery is undertaken or any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the Prepetition Lender shall be entitled to include such costs and expenses, including, but not limited to, reasonable and documented attorneys' fees incurred in responding to the inquiry or discovery or in defending the objection or complaint, as part of such party's prepetition claim which shall be reimbursed by the Debtors.  The Debtors shall remain liable to the Prepetition Lender for all unpaid Prepetition Indemnity Obligations to the extent permitted pursuant to the applicable Prepetition Financing Documents.

**V.**

**CARVE OUT AND PAYMENT OF PROFESSIONALS.**

30. Carve Out.

(a)      Subject to the terms and conditions contained in this Paragraph 30, the DIP Liens and DIP Superpriority Claims are all subject and subordinate to payment of the following (collectively, the "***Carve Out***"):

Page (29)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

1)      All fees required to be paid to the Clerk of the Bankruptcy Court and any quarterly or other fees payable to the U.S. Trustee pursuant to, *inter alia*, 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest, and Section 3717 of title 31 of the United States Code (collectively, the "***Statutory Fees***");

2)      professional fees of, and costs and expenses incurred by, professionals or professional firms retained by the Debtors and a Committee (collectively, the "***Case Professionals***") and allowed by the Bankruptcy Court (whether such approval occurs prior to or after the occurrence of the Termination Declaration Date (defined below), the "***Allowed Professional Fees***")) in an amount not to exceed the lesser of: (x) the actual Allowed Professional Fees incurred by each such Case Professional through the Termination Declaration Date, and (y) the amount reflected in the Approved Budget for each such Case Professional, in each case, through the Termination Declaration Date (the lesser of (x) and (y) being the "***Pre-Carve Out Trigger Notice Cap***");[5]

3)      the allowed professional fees and costs and expenses incurred by Case Professionals incurred after the occurrence of the Termination Declaration Date in an aggregate amount not to exceed $150,000 ("***Post-Carve Out Trigger Notice Cap***"); and

4)      for the reasonable fees and expenses incurred by any Chapter 7 trustee appointed by the Court under section 726(b) of the Bankruptcy Code, not to exceed $25,000 in the aggregate;

For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by the

DIP Lender (which delivery may be by email or other electronic means) to counsel to the Debtors, counsel

to any duly appointed Committee, and the U.S. Trustee, which notice (a) may be delivered following the

occurrence of a DIP Termination Event (as defined below), and (b) must be delivered following either (i)

---

[5]      For the avoidance of doubt, to the extent that a particular Case Professional is over-budget during any measurement period, it shall be entitled to offset such budget overage with any amounts such Case Professional is under-budget in prior or subsequent periods prior to the delivery of a Carve Out Trigger Notice; and to the extent a particular Case Professional is under-budget during any measurement period, it shall be entitled to carry-over such budget excess with any amounts such Case Professional is over-budget in any subsequent periods prior to the delivery of a Carve Out Trigger Notice.

Page (30)
Debtors:           SAM ASH MUSIC CORPORATION, *et al.*
Case No.:          24-14727 (SLM)
Caption of Order:  INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                   506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                   AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                   GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                   USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                   (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                   RELIEF

---

the sale of all or substantially all of the Debtors' assets, or (ii) payment in full of all DIP Obligations stating that the Post-Carve Out Trigger Notice Cap has been invoked.

      (b)    <u>Carve Out Reserves</u>.

      1)    The Debtors shall maintain a separate account for the payment of Allowed Professional Fees (the "***Carve Out Reserve Account***") which account shall be funded by the Debtors, including through use of Cash Collateral, in accordance with the Approved Budget on a weekly basis, in advance, until the delivery of a Carve Out Trigger Notice. From funds in the Carve Out Reserve Account, the Debtors shall pay Allowed Professional Fees to the respective Case Professionals, as applicable, in compliance with any interim compensation procedures entered in the Chapter 11 Cases, in the manner set forth in this Interim Order in accordance with the Approved Budget and prior to any and all other claims. For the avoidance of doubt, under no circumstances shall the Debtors pay any professional fees that have not been approved by Order of this Court, unless payment without Court Order is permissible under any interim compensation procedures order entered by this Court.

      2)    On the day on which a Carve Out Trigger Notice is given by the DIP Lender (the date of such delivery being the "***Termination Declaration Date***"), the Carve Out Trigger Notice shall be deemed a draw request and notice of borrowing by the Debtors under the DIP Credit Agreement in an amount equal to the sum of the amounts set forth in paragraphs 32(a)(1) and 32(a)(2) above, and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date, and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs 32(a)(1) and 32(a)(2) above (which cash amounts shall reduce, on a dollar for dollar basis, the

| | |
|---|---|
| Page (31) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

draw requests and applicable DIP Loans pursuant to this sentence of this paragraph (2)).  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such amounts set forth in paragraphs 32(a)(1) and 32(a)(2) above (the "***Pre-Carve Out Trigger Notice Reserve***") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a draw request and notice of borrowing by the Debtors under the DIP Agreement in an amount equal to the Post-Carve Out Trigger Notice Cap, and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP Loans pursuant to this sentence of this paragraph (2)).  The Debtors shall deposit and hold such amounts in a segregated account in trust to fund an amount equal to the Post-Carve Out Trigger Notice Cap (the "***Post-Carve Out Trigger Notice Reserve***" and, together with the Pre-Carve Out Trigger Notice Reserve, the "***Carve Out Reserves***") prior to any and all other claims.

3)        All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations in paragraphs 32(a)(1) and 32(a)(2) set forth above (the "***Pre-Carve Out Amounts***"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to paragraph 5, below, all remaining funds shall be distributed first to the DIP Lender on account of the DIP Obligations until indefeasibly paid in full, in cash, and thereafter to the Debtors' estates, to be distributed to the Debtors' creditors and interest holders, as and how provided for under the Bankruptcy Code or order of the Court.

Page (32)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

4)      All funds in the Post-Carve Out Trigger Notice Reserve shall be used first

to pay the obligations set forth in paragraphs 32(a)(3) and 32(a)(4) above (the "***Post-Carve Out Amounts***").

If the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to paragraph 5 below,

all remaining funds shall be distributed first to the DIP Lender on account of the DIP Obligations until

indefeasibly paid in full, in cash, and thereafter to the Debtors' estates, to be distributed to the Debtors'

creditors and interest holders, as and how provided for under the Bankruptcy Code or order of the Court.

5)      Notwithstanding anything to the contrary in the DIP Financing

Agreements or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts

set forth in this paragraph 30, then, any excess funds in the Carve Out Reserves following the payment of

the Pre-Carve Out Trigger Amounts and Post-Carve Out Trigger Amounts, respectively, shall be used to

fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 30, prior to making

any payments to the DIP Lender, or any of the Debtors' other creditors, as applicable.

6)      Notwithstanding anything to the contrary in the DIP Documents or this

Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Lender shall not sweep or

foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the

Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any

residual interest in the Carve Out Reserves, with any excess paid to the DIP Lender for application in

accordance with the DIP Credit Agreement and this Interim Order.

7)      Notwithstanding anything to the contrary in this Interim Order, (i) the

failure of the monies in the Carve Out Reserves (once funded in the amounts provided in this paragraph 32)

Page (33)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (ii) in no way shall the Approved Budget, the Carve Out, the Pre-Carve Out Trigger Cap, the Post-Carve Out Trigger Notice Cap, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees or Statutory Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary herein or in a Final Order, or the DIP Financing Agreements, the Carve Out shall be senior to all liens and claims securing the DIP Collateral and the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

(c)       Except as provided herein, the Carve Out shall exclude, and no proceeds of the DIP Facility, DIP Collateral, including any Cash Collateral, shall be used to pay, any fees and expenses (x) incurred in connection with the investigation, assertion or joinder in any Challenge Proceeding or any other claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the DIP Liens, (iii) the Prepetition Debt, or (iv) the Prepetition Liens, or (B) preventing, hindering, or delaying, whether directly or indirectly, the DIP Lender' assertion or enforcement of the DIP Liens and security interests, or its efforts to realize upon any DIP Collateral; provided, however, that such exclusion does not encompass any investigative work conducted by the Case Professionals retained by a Committee, but only up to $50,000.00 of the Carve Out may be used for such investigative work.

(d)       Nothing herein, including the inclusion of line items in the Approved Budget for Case Professionals, shall be construed as consent to the allowance of any particular professional fees or

Page (34)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

expenses of the Debtors, of any Committee, or of any other person or shall affect the right of the DIP

Lender, the U.S. Trustee, or any other party in interest, to object to the allowance and payment of such fees

and expenses. Furthermore, nothing in this Interim Order or otherwise shall be construed: (i) to obligate the

DIP Lender in any way to pay compensation to or to reimburse expenses of any Case Professional, or to

guarantee that the Debtors has sufficient funds to pay such compensation or reimbursement; or (ii) to

increase the Carve Out if allowed fees and/or disbursements are higher in fact than the amounts subject to

the Carve Out as set forth in this Interim Order.

## VI.

### MATURITY; DIP TERMINATION EVENTS; REMEDIES

#### A.      **Maturity**

31.    All DIP Obligations shall be due and payable on the date that is the earliest to occur of any

of the following (each, a "***DIP Maturity Event***"):

      (a)      the date that is six (6) months following the Effective Date; or

      (b)      the occurrence of a DIP Termination Event.

32.    Unless and until the DIP Obligations have been irrevocably repaid in full in cash (or other

arrangements for payment of the DIP Obligations satisfactory to the DIP Lender, in its sole and exclusive

discretion, have been made) and all DIP Facility commitments have been irrevocably terminated, the

protections afforded to the DIP Lender pursuant to this Interim Order and under the DIP Financing

Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any

plan or reorganization or liquidation or converting the Chapter 11 Cases into a Successor Case, and the DIP

Page (35)
Debtors:                SAM ASH MUSIC CORPORATION, *et al.*
Case No.:               24-14727 (SLM)
Caption of Order:       INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                        506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                        AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                        GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                        USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                        (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                        RELIEF

---

Liens and the DIP Superpriority Claims shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens and DIP Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

## B.  **DIP Termination Events**

33.    All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (the earliest such date, herein defined as the "***Termination Date***"):

(i)    the failure of the Court to enter an order granting the relief requested in the DIP Motion on a final basis, in form satisfactory to the DIP Lender, on or before 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the Petition Date;

(ii)    the entry of an order of this Court terminating the right of the Debtors to use Cash Collateral;

(iii)    the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(iv)    the appointment in the Chapter 11 Cases of a trustee or an examiner with expanded powers;

(v)    this Interim Order shall cease, for any reason, to be in full force and effect, or the Debtors shall so assert in any motion filed with the Bankruptcy Court, or any liens or claims created in favor of the DIP Lender under this Interim Order shall cease to be enforceable and of the same effect and priority purported to be created hereby, or the Debtors shall so assert in any motion filed with the Bankruptcy Court;

(vi)    the filing by any interested party of any Challenge Proceeding with respect to the extent, validity, enforceability, priority, perfection and/or non-avoidability of the Prepetition Debt or the Prepetition Liens upon the Prepetition Collateral;

(vii)    an order of this Court shall be entered reversing, staying, vacating or otherwise modifying this Interim Order or any provision contained herein without the prior written consent of the DIP Lender;

Page (36)
Debtors:                SAM ASH MUSIC CORPORATION, *et al.*
Case No.:               24-14727 (SLM)
Caption of Order:       INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                        506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                        AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                        GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                        USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                        (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                        RELIEF

---

(viii)   the actual amount of (a) "Cash Receipts" (or similar term); (b) "Total Cash Disbursements" (or similar term); and (c) "Professional Fees" (or similar term) during any week deviates beyond the Permitted Variance as set forth in the DIP Credit Agreement from the amounts set forth in the Approved Budget for such week, without, in each instance, the prior written consent of the DIP Lender;

(ix)   any material misrepresentation by the Debtors in the financial reporting or certifications to be provided by the Debtors to the DIP Lender under the DIP Credit Agreement and/or this Interim Order;

(x)   without the prior written consent of the DIP Lender, the Debtors propose or support any plan of reorganization or sale of all or substantially all the Debtors' assets or entry of any order confirming any such plan or sale that is not conditioned on the payment in full in cash, on the effective date of such plan or sale, of all DIP Obligations;

(xi)   the Debtors fail to provide any additional adequate protection ordered by the Court and such failure shall continue unremedied for more than three (3) business days after written notice thereof;

(xii)   without the prior written consent of the DIP Lender, the Debtors fail to satisfy any Milestone (as defined in the DIP Credit Agreement);

(xiii)   without the prior written consent of the DIP Lender, the obtaining after the Petition Date of credit or the incurring of indebtedness that is (A) secured by a security interest, mortgage or other lien on all or any portion of the DIP Collateral that is equal or senior to any security interest, mortgage or other lien of the DIP Lender, or (B) entitled to priority administrative status which is equal or senior to that granted to the DIP Lender herein, including, without limitation, the DIP Superpriority Claims;

(xiv)   without the prior written consent of the DIP Lender, the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a lien on or security interest in any DIP Collateral that is senior to any liens or security interests of the DIP Lender having a value greater than $10,000, or (B) the granting (whether voluntary or involuntary) of any lien on any DIP Collateral to any state or local environmental or regulatory agency or authority that is senior to any liens or security interests of the DIP Lender;

(xv)   without the prior written consent of the DIP Lender, the return by the Debtors of more than $[_____] of the Debtors' inventory pursuant to section 546(h) of the Bankruptcy

Page (37)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

Code;

(xvi)   the Debtors' failure to perform, in any respect, any of their material obligations under the DIP Credit Agreement and/or this Interim Order, and/or the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement;

(xvii)   without the prior written consent of the DIP Lender, the Debtors, or any party claiming by, through or under the Debtors, files a motion or other action seeking to surcharge the DIP Collateral under section 506(c) of the Bankruptcy Code; or

(xviii)   the Debtors' failure to indefeasibly pay in full in cash all DIP Obligations on or prior to the occurrence of a DIP Maturity Event;

(each of the forgoing, a "***DIP Termination Event***").

## C.   Rights and Remedies Upon DIP Termination Event

34.   Subject to the terms of the DIP Financing Agreement, immediately upon the occurrence and during the continuation of a DIP Termination Event, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period, the DIP Lender may declare in writing (any such declaration shall be referred to herein as a "***DIP Termination Notice***"), in each case given to each of (v) the Debtors, (w) counsel to the Debtors, (x) counsel to the Prepetition Lender, (y) counsel for any Committee, and (z) the U.S. Trustee, that:

(a)   any obligation otherwise imposed on the DIP Lender to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lender in its sole and exclusive discretion;

(b)   the Debtors shall continue to deliver and cause the delivery of the proceeds of the DIP Collateral to the DIP Lender as provided in this Interim Order and in the DIP Credit Agreement;

Page (38)
Debtors:           SAM ASH MUSIC CORPORATION, *et al.*
Case No.:          24-14727 (SLM)
Caption of Order:  INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                   506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                   AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                   GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                   USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                   (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                   RELIEF

---

(c)     the DIP Lender shall continue to apply such proceeds in accordance with the provisions of this Interim Order and the DIP Credit Agreement; and

(d)     the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Carve Out, as provided in the DIP Credit Agreement and this Interim Order.

35.     Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that five (5) business days after the issuance of the DIP Termination Notice (the "***Remedies Notice Period***"), the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the applicable DIP Financing Agreements and this Interim Order to satisfy the applicable DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out.

36.     During the Remedies Notice Period, the Debtors and any Committee appointed in the Chapter 11 Cases, if any, shall be entitled to seek an emergency hearing before this Court, with any such hearing to be held on reasonable notice to the DIP Lender given the limited duration of the Remedies Notice Period. If (x) the Debtors or any such Committee do not contest the occurrence of a DIP Termination Event and/or the right of the DIP Lender to exercise its remedies, or (y) the Debtors or any such Committee do timely contest the occurrence of a DIP Termination Event and/or the right of the DIP Lender to exercise its remedies, and unless this Court, after notice and hearing prior to the expiry of the Remedies Notice Period stays the enforcement thereof, the automatic stay, solely as to the DIP Lender shall automatically terminate at the end of the Remedies Notice Period.

37.     Subject to the provisions of Paragraphs 34-36 above, upon the expiration of the Remedies Notice Period, the DIP Lender is authorized to exercise its remedies and proceed under or pursuant to the DIP Credit Agreement; except that, (A) with respect to any of the Debtors' leasehold locations, the DIP

| | |
|---|---|
| Page (39) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

Lender's rights shall be limited to such rights (i) as may be ordered by this Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Lender; or (iii) which the DIP Lender has under applicable non-bankruptcy law.

38.     In furtherance of the foregoing, upon and after the declaration of the occurrence of a DIP Termination Event, and subject to DIP Lender obtaining relief from the automatic stay as provided for herein to enforce its rights and remedies against the DIP Collateral, in connection with a liquidation of any of the DIP Collateral, DIP Lender (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of Debtors, to: (i) subject to the limitations in the preceding paragraph 37, enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtors and (ii) use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses. The DIP Lender will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that the DIP Lender actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that the DIP Lender actually occupies or uses such assets or properties or for any fees, rentals or other amounts that may become due following the end of the DIP Lender's occupation or use).

Page (40)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

39.    Nothing included herein shall prejudice, impair or otherwise affect the DIP Lender's rights to seek any other or supplemental relief from the Court in respect of the Debtors, nor the DIP Lender's rights, as provided herein and in the DIP Credit Agreement, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement and the Debtors' rights to oppose same.

**D.    No Waiver of Remedies**

40.    The delay in or the failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies shall not constitute a waiver of any of the DIP Lender's rights and remedies. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lender to: (i) request conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan of reorganization or liquidation; or (iii) subject to section 362 of the Bankruptcy Code exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the DIP Lender may have.

Page (41)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

## VII.

### CERTAIN LIMITING PROVISIONS

### A.   Section 506(c) Claims and Waiver

41.     Nothing contained in this Interim Order shall be deemed a consent by the DIP Lender to any charge, Lien, assessment, or claim against the DIP Collateral or the DIP Liens under section 506(c) of the Bankruptcy Code or otherwise; provided however, that during the Interim Period there shall be no waiver of section 506(c) of the Bankruptcy Code.

42.     As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Credit Agreement, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the DIP Lender and the DIP Collateral.

### B.   Proceeds of Subsequent Financing

43.     If at any time prior to the irrevocable repayment in full in cash of all DIP Obligations and the termination of the DIP Lender's obligations to make loans and advances under the DIP Facility, the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Credit Agreement, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over first, to the DIP Lender to be applied in reduction of the DIP Obligations until paid in full, and second, to the Debtors to be used in accordance with and subject

| | |
|---|---|
| Page (42) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

to the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

### C.    <u>No Priming of DIP Facility</u>

44.     In entering into the DIP Financing Agreements, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations have been irrevocably paid in full in cash (or other arrangements for payment of thereof satisfactory to the DIP Lender, in its sole and exclusive discretion, have been made) and the DIP Credit Agreement has been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to by the DIP Lender, in its sole discretion) in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lender under this Interim Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise.

### VIII.

### <u>OTHER RIGHTS AND OBLIGATIONS</u>

### A.    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**

45.     Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification, amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or the Liens or priority authorized or created

Page (43)
Debtors:              SAM ASH MUSIC CORPORATION, *et al.*
Case No.:             24-14727 (SLM)
Caption of Order:     INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                      506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                      AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                      GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                      USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                      (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                      RELIEF

---

hereby.

46.     Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this Interim Order, any claim or protection granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment, or vacation of any such claim or protection granted to the DIP Lender shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Protections granted herein, with respect to any such claim, including those found under section 364(e) of the Bankruptcy Code.

**B.      DIP Lender's and Prepetition Lender's Expenses**

47.     All reasonable out-of-pocket costs and expenses of the DIP Lender, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses, whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget (provided, however, that such overages shall not weigh against the Debtors in any testing related to compliance with the Approved Budget), shall promptly be paid by the Debtors.  Payment of such fees shall not be subject to allowance by this Court; provided, however, the Debtors, the U.S. Trustee, or counsel for any Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below.  Under no circumstances shall professionals for the DIP Lender be required to comply with the Bankruptcy Court's fee guidelines; provided, however, the

Page (44)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

Debtors shall provide to the U.S. Trustee and any Committee a copy of any invoices received from the DIP

Lender for professional fees and expenses during the pendency of the Chapter 11 Cases.  Each such invoice

shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses

(without limiting the right of the various professionals to redact privileged, confidential, or sensitive

information).  If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the invoices

submitted by the DIP Lender, and the parties cannot resolve such objection within ten (10) days of receipt

of such invoices, the Debtors, U.S. Trustee or such Committee, as the case may be, shall file with the Court

and serve on the DIP Lender an objection (a "***Fee Objection***") limited to the issue of reasonableness of such

fees and expenses.  The Debtors shall promptly pay, and/or the DIP Lender is hereby authorized to make

an advance under the DIP Facility to timely pay, the submitted invoices after the expiration of the ten (10)

day notice period if no Fee Objection is received in such ten (10) day period.  If a Fee Objection is timely

received, the Debtors shall promptly pay, and/or the DIP Lender is hereby authorized to make an advance

under the DIP Facility to timely pay, the undisputed amount only of the invoice(s) that is the subject of

such Fee Objection, and the Court shall have jurisdiction to determine the disputed portion of such

invoice(s) if the parties are unable to resolve the Fee Objection.

## C.    <u>Binding Effect</u>

48.     The provisions of this Interim Order shall be binding upon and inure to the benefit of the

DIP Lender, the Prepetition Lender, the Debtors, and their respective successors and assigns (including any

trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to

the property of the estates of the Debtors), and any Committee (subject to the provisions of Paragraphs 24-

Page (45)
Debtors:                SAM ASH MUSIC CORPORATION, *et al.*
Case No.:               24-14727 (SLM)
Caption of Order:       INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                        506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                        AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                        GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                        USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                        (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                        RELIEF

---

29 above), whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

**D.      No Third Party Rights**

49.      Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors and the DIP Lender.

**E.      No Marshaling**

50.      Upon entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

**F.      Section 552(b) of the Bankruptcy Code**

51.      Upon entry of the Final Order, the DIP Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Lender with respect to proceeds, product, offspring, or profits of any of the DIP Collateral.

**G.      Amendments**

52.      The Debtors and the DIP Lender may amend, modify, supplement, or waive any provision of the DIP Credit Agreement without further approval of this Court, but only after notice to any Committee; provided, however, that notice of any "material" amendment, modification, supplement, or waiver shall be filed with this Court, and any Committee shall have five (5) business days from the date of such filing within which to object in writing to such proposed amendment, modification, supplement, or waiver;

Page (46)
Debtors:              SAM ASH MUSIC CORPORATION, *et al.*
Case No.:             24-14727 (SLM)
Caption of Order:     INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                      506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                      AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                      GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                      USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                      (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                      RELIEF

---

provided, further, that if a Committee timely objects to any material amendment, modification, supplement, or waiver, then such amendment, modification, supplement, or waiver shall only be permitted pursuant to an order of this Court after notice and a hearing.  For purposes of this Paragraph 52, a "material" amendment means: any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the Maximum Credit, (iii) changes the maturity date of the DIP Facility or any DIP Maturity Date to a date sooner than that which is provided under the DIP Credit Agreement and this Interim Order as of the date hereof, (iv) amends any Event of Default under the DIP Credit Agreement to make same more restrictive than exists as of the date hereof, (v) revises any case or sale process milestone set forth in the DIP Credit Agreement in a manner that reduces or shortens the time periods provided for in the DIP Credit Agreement, or (vi) otherwise modifies the DIP Credit Agreement in a manner materially less favorable to the Debtors. All amendments, modifications, supplements, or waivers of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtors and the DIP Lender and, if required, approved by this Court.

## H.    <u>Survival of Interim Order</u>

53.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

(a)    confirming any plan in the Chapter 11 Cases,

(b)    converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code,

(c)    dismissing the Chapter 11 Cases,

(d)    withdrawing of the reference of the Chapter 11 Cases from this Court, or

| | |
|---|---|
| Page (47) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

(e)     providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

54.     The terms and provisions of this Interim Order, including the DIP Protections granted pursuant to this Interim Order and the DIP Financing Agreements, shall continue in full force and effect notwithstanding the entry of any order described in Paragraph 53 and such DIP Protections shall maintain their priority as provided by this Interim Order until all of the DIP Obligations of the Debtors to the DIP Lender pursuant to the DIP Credit Agreement have been irrevocably paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

**I.     <u>Inconsistency</u>**

55.     In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement, the other DIP Financing Agreements, and this Interim Order, the provisions of this Interim Order shall govern and control.

**J.     <u>Enforceability</u>**

56.     This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable on the Petition Date immediately upon execution hereof.

**K.     <u>Objections Overruled</u>**

57.     All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

| | |
|---|---|
| Page (48) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

**L.**     **Waiver of Any Applicable Stay**

58.     Any applicable stay (including, without limitation, under Bankruptcy Rules 4001, 6003 or 6004(h)) is hereby waived and shall not apply to this Interim Order.

**M.**     **Proofs of Claim**

59.     The Prepetition Lender and the DIP Lender will not be required to file proofs of claim in the Chapter 11 Cases or in any Successor Case.

**N.**     **Headings**

60.     The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

**O.**     **Voluntary Reduction in DIP Lender's Allowed Secured Claim**

61.     Upon the entry of the Final Order, the DIP Lender shall provide a one-time accommodation and reduce the DIP Obligations by $1,750,000 pursuant to the terms and conditions set forth in the DIP Credit Agreement.

**P.**     **Releases**

62.     Upon the entry of the Final Order, and subject to Paragraphs 24-29 above, in consideration of the DIP Lender permitting Debtors to use the Prepetition Collateral (including Cash Collateral) and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the DIP Financing Agreements and this Interim Order, as applicable, each Debtor, on behalf of itself and its successors and assigns, (collectively, the "***Releasors***"), shall, forever release, discharge and acquit the DIP Lender and its respective successors and assigns, and their present and former shareholders, affiliates,

48

| | |
|---|---|
| Page (49) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

---

subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives in their respective capacities as such and in connection with DIP Lender in its capacity as an agent or lender under the applicable Prepetition Financing Documents (collectively, the "***Prepetition Releasees***") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that any of the Releasors had, have or hereafter can or may have against Prepetition Releasees (or any of them) as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Prepetition Debt, the Prepetition Financing Documents, the DIP Obligations, the DIP Financing Agreements, and any loans or other financial accommodations made by the DIP Lender to the Debtors pursuant to the Prepetition Financing Documents, or the DIP Financing Agreements.

**Q.    Power to Waive Rights; Duties to Third Parties.**

63.    The DIP Lender shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lender (the "***Lender Rights***"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s). Any waiver by the DIP Lender of any Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject the DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Lender.

Page (50)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF |

## R.    Retention of Jurisdiction

64.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

## IX.

### FINAL HEARING

65.    The Final Hearing on the DIP Motion shall be held before this Court on [_____], 2024, at __:00 _.m. (prevailing Eastern Time) before the Honorable [_____], United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, located at Martin Luther King, Jr. Federal Building, 50 Walnut Street, Newark, NJ 07102, Courtroom [__].

66.    The Debtors shall, within three (3) business days of the entry of this Interim Order, serve a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final Order upon: (A) the U.S. Trustee, 1 Newark Ctr, Ste 21B, Newark, NJ 07102 (Attn: Fran B. Steele, Esq. and Peter J. D'Auria, Esq.); (B) counsel to the DIP Lender and the Prepetition Lender, Riemer & Braunstein LLP (Attn: Anthony B. Stumbo, Esq. and Steven E. Fox, Esq.), Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036 (Email: astumbo@riemerlaw.com; sfox@riemerlaw.com); (C) holders of the thirty (30) largest unsecured claims against the Debtors; (D) any and all parties known to the Debtors to assert a lien or security interest in any of the Prepetition Collateral and/or DIP Collateral, including, without limitation, any party that holds an asserted Permitted Prior Lien; (F) the Internal Revenue Service; (G) all appropriate state taxing authorities; (H) any landlords, owners, and/or operators of premises at which any of the Debtors' operate the Business; and (I) any other party that files a request for notices with the Court as of

Page (51)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
                    506, AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 (I)
                    AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II)
                    GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) AUTHORIZING
                    USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
                    (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED
                    RELIEF

---

the date of such service.

      67.    If no objections to the relief sought in the DIP Motion are filed and served in accordance with this Interim Order, no Final Hearing shall be held, and a separate Final Order may be presented jointly by the Debtors and by the DIP Lender and entered by this Court upon certification of counsel by the Debtors. Any party in interest objecting to the relief sought in the DIP Motion shall submit any such objection in writing and file same with this Court and serve such objection so as to be received no later than **[_____], 2024 at 4:00 p.m. (prevailing Eastern Time)** on the following parties: (A) the U.S. Trustee; (B) counsel to the DIP Lender and the Prepetition Lender, Riemer & Braunstein LLP (Attn: Anthony B. Stumbo, Esq. and Steven E. Fox, Esq.), Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036 (Email: astumbo@riemerlaw.com; sfox@riemerlaw.com); (C) counsel to the Debtors, Cole Schotz P.C. (Attn: Ryan T. Jareck, Esq.), Court Plaza North, 25 Main Street, Hackensack, New Jersey, 07601 (Email: rjareck@coleschotz.com); and (D) counsel to the Committee appointed in these Chapter 11 Cases.

## **EXHIBIT A**

*Execution Version*

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT

among

TIGER FINANCE, LLC,
as Lender

and

SAM ASH MUSIC CORPORATION,
SAMSON TECHNOLOGIES CORP.,
SAM ASH MEGASTORES, LLC,
SAM ASH CT, LLC,
SAM ASH QUIKSHIP CORP.,
SAM ASH FLORIDA MEGASTORES, LLC
SAM ASH ILLINOIS MEGASTORES, LLC
SAM ASH NEW JERSEY MEGASTORES, LLC
SAM ASH NEW YORK MEGASTORES, LLC,
SAM ASH MUSIC MARKETING, LLC,
SAM ASH CALIFORNIA MEGASTORES, LLC,
SAM ASH NEVADA MEGASTORES, LLC
(each as a debtor and debtor-in-possession),
as Borrowers

Dated: as of May 8, 2024

## Table of Contents

**Page**

SECTION 1. DEFINITIONS ...................................................................................................... 2

SECTION 2. CREDIT FACILITY ............................................................................................ 25

2.1   Revolving Loans. ........................................................................................................ 25
2.2   [Reserved]. ................................................................................................................. 26
2.3   Availability Reserves .................................................................................................. 26
2.4   Joint and Several Liability of Borrowers. ................................................................. 26
2.5   Certain Bankruptcy Matters. ..................................................................................... 28

SECTION 3. INTEREST, BORROWING PROCEDURES AND FEES ................................. 29

3.1   Interest and Borrowing Procedures. .......................................................................... 30
3.2   Unused Line Fee ......................................................................................................... 31
3.3   DIP Fee Letter. ........................................................................................................... 31
3.4   Changes in Laws and Increased Costs of Loans. ...................................................... 31
3.5   Effect of Benchmark Replacement ............................................................................. 32

SECTION 4. CONDITIONS PRECEDENT ........................................................................... 34

4.1   Conditions Precedent to Initial Loans ....................................................................... 34
4.2   Conditions Precedent to All Loans ............................................................................ 36

SECTION 5. GRANT OF SECURITY INTEREST ............................................................... 36

5.1   Collateral .................................................................................................................... 36
5.2   Perfection of Security Interests. ................................................................................. 38

SECTION 6. COLLECTION AND ADMINISTRATION ...................................................... 41

6.1   Borrowers' Loan Account. ......................................................................................... 41
6.2   Statements ................................................................................................................... 42
6.3   Collection of Accounts. .............................................................................................. 42
6.4   Payments ..................................................................................................................... 43
6.5   Authorization to Make Loans .................................................................................... 44
6.6   Use of Proceeds .......................................................................................................... 44

SECTION 7. COLLATERAL REPORTING AND COVENANTS ......................................... 45

7.1   Collateral Reporting .................................................................................................. 45
7.2   Accounts Covenants .................................................................................................... 45
7.3   Inventory Covenants ................................................................................................... 47
7.4   Equipment Covenants ................................................................................................. 47
7.5   [Reserved]. ................................................................................................................. 48
7.6   Power of Attorney ....................................................................................................... 48
7.7   Right to Cure ............................................................................................................... 48
7.8   Access to Premises ...................................................................................................... 49

SECTION 8. REPRESENTATIONS AND WARRANTIES ........................................................... 49

8.1   Existence, Power and Authority: Subsidiaries ........................................................ 49
8.2   Financial Statements: No Material Adverse Change ............................................... 49
8.3   Chief Executive Office: Collateral Locations ........................................................ 50
8.4   Priority of Liens: Title to Properties ..................................................................... 50
8.5   Tax Returns .......................................................................................................... 50
8.6   Litigation .............................................................................................................. 50
8.7   Compliance with Other Agreements and Applicable Laws ..................................... 50
8.8   Employee Benefits. ............................................................................................... 51
8.9   Bank Accounts ..................................................................................................... 51
8.10  Credit Card Agreements ....................................................................................... 52
8.11  Accuracy and Completeness of Information ........................................................... 52
8.12  Interrelated Businesses ......................................................................................... 52
8.13  Survival of Warranties: Cumulative ..................................................................... 52
8.14  Margin Stock; Investment Company Act, Etc ....................................................... 52
8.15  Intellectual Property ............................................................................................. 53
8.16  OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Patriot Act ... 53

SECTION 9. AFFIRMATIVE AND NEGATIVE COVENANTS ............................................. 53

9.1   Maintenance of Existence ..................................................................................... 53
9.2   New Collateral Locations ..................................................................................... 54
9.3   Compliance with Laws, Regulations, Etc .............................................................. 54
9.4   Payment of Taxes and Claims ............................................................................... 54
9.5   Insurance .............................................................................................................. 54
9.6   Financial Statements and Other Information. ......................................................... 55
9.7   Sale of Assets ....................................................................................................... 56
9.8   Encumbrances ...................................................................................................... 58
9.9   Indebtedness ......................................................................................................... 59
9.10  Loans, Investments, Guarantees, Etc .................................................................... 60
9.11  Dividends and Redemptions ................................................................................. 61
9.12  Transactions with Affiliates .................................................................................. 62
9.13  Additional Bank Accounts .................................................................................... 62
9.14  Compliance with ERISA ....................................................................................... 62
9.15  Credit Card Agreements ....................................................................................... 62
9.16  Costs and Expenses .............................................................................................. 63
9.17  Litigation .............................................................................................................. 63
9.18  Further Assurances. .............................................................................................. 64
9.19  Cash Management System. .................................................................................... 64
9.20  Engagement of Sierra Constellation Partners LLC ................................................ 64
9.21  Engagement of TigerInsight Analytics. ................................................................. 65
9.22  Capital Expenditures. ........................................................................................... 65
9.23  Investment Banker Engagement. ........................................................................... 65
9.24  [Reserved]. ........................................................................................................... 66
9.25  [Reserved]. ........................................................................................................... 66
9.26  [Reserved]. ........................................................................................................... 66
9.27  [Reserved]. ........................................................................................................... 66

(ii)

9.28    Chapter 11 Claims.........................................................................................66
9.29    Bankruptcy-Related Negative Covenants..................................................66
9.30    Use of Collateral.........................................................................................67
9.31    Communication with Consultants, Liquidators and Financial Advisors ..........67
9.32    Bankruptcy Related Affirmative Covenants..............................................68
9.33    Performance Within Budget.......................................................................69
9.34    Additional Information................................................................................71

SECTION 10. EVENTS OF DEFAULT AND REMEDIES ...........................................71

10.1    Events of Default........................................................................................71
10.2    Remedies.....................................................................................................74

SECTION 11. JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING
LAW ......................................................................................................................78

11.1    Governing Law: Choice of Forum: Service of Process: Jury Trial Waiver......78
11.2    Waiver of Notices.......................................................................................81
11.3    Amendments and Waivers...........................................................................81
11.4    Waiver of Counterclaims............................................................................81
11.5    Additional Waiver......................................................................................81
11.6    Indemnification...........................................................................................81

SECTION 12. TERM OF AGREEMENT; MISCELLANEOUS ...................................82

12.1    Term.............................................................................................................82
12.2    Appointment of Borrowers' Agent.............................................................82
12.3    Notices........................................................................................................83
12.4    Partial Invalidity.........................................................................................84
12.5    Successors...................................................................................................84
12.6    Entire Agreement........................................................................................85
12.7    Loan Publications.......................................................................................85
12.8    Release by Borrowers.................................................................................85
12.9    Counterparts; Electronic Execution...........................................................86
12.10   Patriot Act...................................................................................................86
12.11   Acknowledgement Regarding Any Supported QFCs.................................86
12.12   Keepwell.....................................................................................................87


EXHIBIT A              [Reserved]
EXHIBIT B              Form of Interim Order

Schedule 1.1           Initial Budget
Schedule 5.2(b)        Chattel Paper; Instruments
Schedule 5.2(d)        Deposit Accounts
Schedule 5.2(e)        Investment Property
Schedule 5.2(f)        Letter of Credit Rights
Schedule 5.2(g)        Commercial Tort Claims
Schedule 5.2(h)        Third Party Locations
Schedule 6.3           Deposit Account Banks
Schedule 6.5           Authorized Signatories

Schedule 7.1          Collateral Reporting
Schedule 8.1          Subsidiaries
Schedule 8.3          Chief Executive Office; Collateral Locations; Retail Stores
Schedule 8.4          Permitted Liens
Schedule 8.6          Litigation
Schedule 8.9          Bank Accounts
Schedule 8.10         Credit Card Agreements
Schedule 8.15         Intellectual Property
Schedule 9.9          Permitted Indebtedness
Schedule 9.10         Loans; Investments; Guarantees

### SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement (this "Agreement") dated as of May 8, 2024 is entered into by and among Tiger Finance, LLC ("Lender"), Sam Ash Music Corporation, a New York corporation ("SAMC"), Samson Technologies Corp., a New York corporation ("Samson"), Sam Ash Megastores, LLC, a New York limited liability company ("SAM"), Sam Ash CT, LLC, a Connecticut limited liability company ("SACT"), Sam Ash Quikship Corp., a Florida corporation ("SAQC"), Sam Ash Florida Megastores, LLC, a Florida limited liability company ("SAFM"), Sam Ash Illinois Megastores, LLC, a Illinois limited liability company ("SAIL"), Sam Ash New Jersey Megastores, LLC, a New Jersey limited liability company ("SANJ"), Sam Ash New York Megastores, LLC, a New York limited liability company ("SANY"), Sam Ash Music Marketing, LLC, a New York limited liability company ("SAMM"), Sam Ash California Megastores, LLC, a California limited liability company ("SACM") and Sam Ash Nevada Megastores, LLC, a Nevada limited liability company ("SANV", and together with SAMC, Samson, SAM, SACT, SAQC, SAFM, SAIL, SANJ, SANY, SAMM and SACM (each individually a "Borrower" and collectively, "Borrowers").

W I T N E S S E T H:

WHEREAS, Borrowers and Lender are parties to that certain Loan and Security Agreement, dated as of February 21, 2024 (as amended, modified, supplemented or restated and in effect from time to time prior to the date hereof, collectively the "Existing Loan Agreement").

WHEREAS, on May 8, 2024 (the "Petition Date"), each of the Borrowers (collectively, the "Debtors") filed a voluntary petition for relief (collectively, the "Case") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), and the Debtors are continuing in the possession of their assets and continuing to operate their respective businesses (collectively, the "Business") and manage their respective properties as debtors and debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code (as hereinafter defined);

WHEREAS, the Debtors have requested that Lender make available to Borrowers, from and after the date of entry of the Interim Order (as hereinafter defined), a senior secured, super-priority debtor-in-possession revolving credit facility; and

WHEREAS, to provide security for the repayment of all obligations of the Borrowers hereunder and under the other Financing Agreements, and in addition to all other property of any Borrower that is subject to the liens granted on the "Collateral" (as defined in the Existing Loan Agreement) in favor of Lender securing the Existing Liabilities, as hereinafter defined (such liens, the "Existing Liens"), each of the Debtors will provide to Lender the DIP Liens (as defined in the Orders).

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS

All terms used herein which are defined in Article 1 or Article 9 of the Uniform Commercial Code shall have the meanings given therein unless otherwise defined in this Agreement.  All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires.  All references to Borrowers and Lender pursuant to the definitions set forth in the recitals hereto, or to any other person herein, shall include their respective successors and assigns.  The words "hereof", "herein", "hereunder", "this Agreement" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement and as this Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.  The word "including" when used in this Agreement shall mean "including, without limitation".  An Event of Default shall exist or continue or be continuing until such Event of Default is waived in accordance with Section 11.3 or is cured in a manner satisfactory to Lender, if such Event of Default is capable of being cured as determined by Lender.  Any accounting term used herein unless otherwise defined in this Agreement shall have the meanings customarily given to such term in accordance with GAAP.  For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

"Accounts" shall mean all present and future rights of each Borrower to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, or (d) arising out of the use of a credit or charge card or information contained on or for use with the card, including Credit Card Receivables.

"Affiliate" shall mean, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (a) any Person which beneficially owns or holds 10% or more of any class of equity interests of such Person, (b) any Person of which such Person beneficially owns or holds 10% or more of any class of equity interests or in which such Persons beneficially owns or holds 10% or more of the equity interests and (c) any director or executive officer of such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of equity interests, by agreement or otherwise).  Notwithstanding the foregoing, (1) Sam Ash Properties Corp. will not be considered an Affiliate of the Borrowers, and (2) no Person who is an individual will have personal liability for any Loan.

"Anti-Corruption Laws" shall mean: (a) the U.S. Foreign Corrupt Practices Act of 1977 and (b) any other anti-bribery or anti-corruption laws, regulations or ordinances in any jurisdiction in which any Borrower is located or doing business.

"Anti-Money Laundering Laws" shall mean applicable laws or regulations in any jurisdiction in which Borrower is located or doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"<u>Applicable Margin</u>" shall mean nine percent (9.0%) per annum.

"<u>Authorized Person</u>" shall mean the following: David Ash, Richard Ash, Rob Seith, and any officer of Sam Ash Music Corporation (a) designated in writing as an Authorized Person by David Ash or Richard Ash, and (b) agreed to in writing by Lender.

"<u>Available Tenor</u>" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component  thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to <u>Section 3.5</u>.

"<u>Availability Reserves</u>" shall mean, as of any date of determination, the sum of the Standing Reserve plus such other amounts as Lender may from time to time establish and revise in good faith reducing the amount of Revolving Loans which would otherwise be available to Borrowers under the lending formula(s) provided for herein: (a) the Carve Out Reserve, (b) [reserved], (c) to reflect events, conditions, contingencies or risks which, as determined by Lender in good faith, do or may affect either (i) the Collateral, in contravention of the Budget, or any other property which is security for the Obligations or its value, (ii) the assets, in contravention of the Budget, business or prospects of any Borrower or any Obligor or (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof), (d) to reflect Lender's good faith belief that any collateral report or financial information furnished by or on behalf of any Borrower or any Obligor to Lender is or may have been incomplete, inaccurate or misleading in any material respect, (e) the Gift Card Reserve, (f) in respect of any state of facts which Lender determines in good faith constitutes an Event of Default, or (g) reserves to reflect the amount of any priority or administrative expense claims that, in Lender's reasonable commercially reasonable judgment, require payment during the Case.

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Code (11 U.S.C. § 101 <u>et seq</u>.).

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals hereto.

"<u>Base Rate</u>" shall mean, for any day, the greatest of (a) the Floor, (b) the Federal Funds Rate in effect on such day <u>plus</u> ½%, (c) Term SOFR for a one month tenor in effect on such day, <u>plus</u> 1%, <u>provided</u> that this clause (c) shall not be applicable during any period in which Term SOFR is unavailable or unascertainable, and (d) the rate of interest published as the U.S. prime rate from time to time in the Wall Street Journal.

"<u>Benchmark</u>" shall mean, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 3.5</u>.

"Benchmark Replacement" shall mean, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by Lender and Borrowers giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement shall be deemed to be the Floor for the purposes of this Agreement and the other Financing Agreements.

"Benchmark Replacement Adjustment" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Lender and Borrowers giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

4

(c)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, underlined provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(d)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, underlined provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(e)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if the then-current Benchmark has any Available Tenors, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" shall mean, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" shall mean the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Financing Agreement in accordance with Section 3.5 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Financing Agreement in accordance with Section 3.5.

"Blocked Accounts" shall have the meaning set forth in Section 6.3 hereof.

"Borrower Group" shall mean (a) each Borrower, (b) the parent of each Borrower, (c) any Affiliate or subsidiary of any Borrower, (d) [reserved], (e) the owner of any collateral securing any part of the Obligations, and (f) any officer, director or agent acting on behalf of any of the parties referred to in items (a) through (e) with respect to the extensions of credit provided under the Financing Agreements.

"Borrowers' Agent" shall mean Sam Ash Music Corporation, a New York corporation, in its capacity as agent for Borrowers hereunder, and any successor or replacement agent for Borrowers appointed and approved by lender in writing, and its successors and assigns.

"Borrowing Base" shall mean the amount of the Revolving Loans available to Borrowers based on the applicable lending formulas described in Sections 2.1(a)(i), (ii), (iii) and (iv) of the Loan Agreement, subject to the limits and the Availability Reserves in effect, including a calculation of each component thereof, as set forth in the Borrowing Base Certificate provided by Borrower as the same may be adjusted by Lender pursuant to the terms of the Loan Agreement.

"Borrowing Base Certificate" shall mean a certificate by the chief financial officer, vice president of finance, treasurer or controller of Borrowers' Agent, in a form reasonably satisfactory to Lender, setting forth the calculation of the amount of the Revolving Loans available to Borrowers based on the applicable lending formulas described in Sections 2.1(a)(i), (ii), (iii) and (iv) of this Agreement, subject to the limits and the Availability Reserves in effect, including a calculation of each component thereof, all in such detail as shall be reasonably satisfactory to Lender.  All calculations of such amount in connection with the preparation of any Borrowing Base Certificate shall originally be made by Borrowers' Agent and certified to Lender; provided, that, Lender shall have the right to review and adjust any such calculation upon giving notice thereof to Borrowers' Agent, (a) to reflect Lender's reasonable estimate of declines in value of any of the Collateral described therein, and   (b) to the extent that Lender determines that such calculation is not in accordance with this Agreement.

"Budget" means the financial projections for the Borrowers covering the thirteen-week period commencing on the Petition Date on a weekly basis, which projections shall include, at a minimum, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements (including, for the avoidance of doubt, professional fees) and Inventory for the period covered thereby, substantially in the form of the initial Budget annexed hereto as Schedule 1.1, and any subsequent projections furnished pursuant to Section 9.6 hereof, in each case, in form and substance reasonably satisfactory to Lender.

"Business Day" shall mean any day other than a Saturday, Sunday, or other day on which the Federal Reserve Bank of New York is closed.

"Capital Expenditures" means, with respect to any Person for any period, all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP.

"Carve Out" has the meaning specified therefor in the Orders.

"Carve Out Reserve" means an Availability Reserve established by Lender in the amount of the Carve Out.

"Carve Out Trigger Notice" has the meaning specified therefor in the Orders.

"Case Professionals" has the meaning specified therefor in the Orders.

"Case" has the meaning set forth in the recitals hereto.

"Cash Equivalents" shall mean (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than two hundred seventy (270) days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with any bank that satisfies the criteria described in clause (d) above, so long as either (i) the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, or (ii) such bank is a Specified Bank, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than seven (7) days, with respect to securities satisfying the criteria in clauses (a) or (d) above, and (g) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (f) above.

"Cash Management Order" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to Lender, (i) approving and authorizing the Debtors to use existing cash management systems, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code, and (v) authorizing the Debtors to use existing bank accounts and existing business forms, as such order may be amended or modified with the consent of Lender.

"Change of Control" shall mean (a) except as expressly permitted in Section 9.7 hereof, the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of any Borrower to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act); (b) except as expressly permitted in Section 9.7 hereof, the liquidation or dissolution of any Borrower or the adoption of a plan by the stockholders of any Borrower relating to the dissolution

or liquidation of any Borrower; or (c) the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of more than 25% of the voting power of the total outstanding Voting Stock of Borrower or the Board of Directors of any Borrower.

"Code" shall mean the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Collateral" shall have the meaning set forth in Section 5 hereof.

"Collateral Access Agreement" shall mean an agreement in writing from the person in possession of such Inventory and/or the owner or operator of such premises in form and substance satisfactory to Lender acknowledging Lender's first priority security interest in the Inventory, waiving or subordinating security interests and claims by such person against the Inventory and permitting Lender access to, and the right to remain on, the premises so as to exercise Lender's rights and remedies and otherwise deal with the Collateral.

"Committee" means any statutory committee of unsecured creditors appointed in the Case pursuant to Section 1102 of the Bankruptcy Code.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Conforming Changes" shall mean, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.1(c) and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of any such rate exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Agreement and the other Financing Agreements).

"Consulting Agreement" means that certain Consulting Agreement, dated as of February 27, 2024, by and between Tiger Capital Group, LLC, as "Consultant" and SAMC, as Merchant, as amended by that certain Addendum to Consulting Agreement, dated as of April 24, 2024, and as hereafter may be further amended, modified, supplemented, extended, renewed, restated or replaced.

"Covered Party" shall have the meaning set forth in Section 12.12 hereof.

"<u>Credit Card Acknowledgments</u>" shall mean the agreements, in form and substance reasonably satisfactory to Lender, among Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements, Borrowers and Lender, pursuant to which the Credit Card Issuers or Credit Card Processors acknowledge Lender's first priority security interest in the monies due and to become due to Borrowers (including credits and reserves) under the Credit Card Agreements, and agree to transfer all such amounts to a Blocked Account or another account of a Borrower set forth in the agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"<u>Credit Card Agreements</u>" shall mean all agreements now or hereafter entered into by any Borrower with any Credit Card Issuer or Credit Card Processor, as the same may now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"<u>Credit Card Issuer</u>" shall mean any person who issues or whose members issue credit cards used by customers of the Borrowers to purchase goods, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards, and American Express, Discover, Diners Club, Carte Blanche, the Sam Ash Card, PayPal, Amazon Pay, eBay Pay and other non-bank credit or debit cards.

"<u>Credit Card Processor</u>" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment from a Credit Card Issuer or Credit Card Processor and other procedures with respect to any sales transactions of the Borrowers involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"<u>Credit Card Receivables</u>" shall mean all accounts consisting of the present and future rights of Borrowers to payment by Credit Card Issuers or Credit Card Processors for merchandise or services sold or rendered and delivered to customers of the Borrowers who have purchased such goods or services using a credit card or a debit card issued by a Credit Card Issuer.

"<u>Debtors</u>" has the meaning set forth in the recitals hereto.

"<u>Debtor Relief Law</u>" means the Bankruptcy Code and all other liquidation, bankruptcy, assignment for the benefit of creditors, conservatorship, moratorium, receivership, insolvency, rearrangement, reorganization or similar debtor relief laws of the US or other applicable jurisdictions in effect from time to time.

"<u>Deposit Account Control Agreement</u>" shall mean an agreement in writing, in form and substance satisfactory to Lender, by and among Lender, a Borrower or Obligor and any bank at which any deposit account of such Borrower or Obligor is at any time maintained which provides that such bank will comply with instructions originated by Lender directing disposition of the funds in the deposit account without further consent by such Borrower or Obligor and such other terms and conditions as Lender may require, including as to any such agreement with respect to any Blocked Account, providing that all items received or deposited in the Blocked Accounts are the property of Lender, that the bank has no lien upon, or right to setoff against, the Blocked Accounts, the items received for deposit therein, or the funds from time to time on deposit therein

and that the bank will wire, or otherwise transfer, in immediately available funds, in accordance with the instructions of Lender.

"DIP Fee Letter" means the letter agreement, dated as of May 8, 2024, among Borrowers and Lender with respect to certain fees associated with this Agreement.

"DIP Superpriority Claim" means the allowed superpriority administrative expense claim granted to Lender in the Case and any Successor Case pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in the Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; provided, however, that the DIP Superpriority Claim shall be subject and subordinate to the Carve Out.

"Dividing Person" has the meaning assigned to it in the definition of "Division."

"Division" shall mean the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Division Successor" shall mean any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"Effective Date" shall mean the date the Court approves the Interim Order.

"Eligible Accounts" shall mean Accounts (other than Credit Card Receivables) created by Borrowers which are and continue to be acceptable to Lender based on the criteria set forth below. In general, Accounts shall be Eligible Accounts if:

(a)     such Accounts arise from the actual and bona fide sale and delivery of goods by Borrowers or rendition of services by Borrowers to any person as a business to business account in the ordinary course of their business which transactions are completed in accordance with the terms and provisions contained in any documents related thereto;

(b)     such Accounts are not unpaid more than ninety (90) days after the date of the original invoice for them and in no event more than sixty (60) days from the original due date;

(c)     such Accounts comply with the terms and conditions contained in Section 7.2(c) of this Agreement;

10

(d)      such Accounts do not arise from sales on consignment, guaranteed sale, sale and return, sale on approval, or other terms under which payment by the account debtor may be conditional or contingent;

(e)      the chief executive office of the account debtor with respect to such Accounts is located in the United States of America, or, at Lender's option, if either: (i) the account debtor has delivered to Borrowers an irrevocable letter of credit issued or confirmed by a bank satisfactory to Lender and payable only in the United States of America and in U.S. dollars, sufficient to cover such Account, in form and substance satisfactory to Lender and, if required by Lender, the original of such letter of credit has been delivered to Lender or Lender's agent and the issuer thereof notified of the assignment of the proceeds of such letter of credit to Lender, or (ii) such Account is subject to credit insurance payable to Lender issued by an insurer and on terms and in an amount acceptable to Lender, or (iii) such Account is otherwise acceptable in all respects to Lender (subject to such lending formula with respect thereto as Lender may determine);

(f)      such Accounts do not consist of progress billings, bill and hold invoices or retainage invoices, except as to bill and hold invoices, if Lender shall have received an agreement in writing from the account debtor, in form and substance satisfactory to Lender, confirming the unconditional obligation of the account debtor to take the goods related thereto and pay such invoice;

(g)      the account debtor with respect to such Accounts has not asserted a counterclaim, defense or dispute and does not have, and does not engage in transactions which may give rise to, any right of setoff against such Accounts (but the portion of the Accounts of such account debtor in excess of the amount at any time and from time to time owed by Borrowers to such account debtor or claimed owed by such account debtor shall be deemed Eligible Accounts; provided, that, such Accounts would otherwise be deemed Eligible Accounts);

(h)      there are no facts, events or occurrences which would impair the validity, enforceability or collectability of such Accounts or reduce the amount payable or delay payment thereunder;

(i)      such Accounts are subject to the first priority, valid and perfected security interest of Lender and any goods giving rise thereto are not, and were not at the time of the sale thereof, subject to any liens except those permitted in this Agreement;

(j)      neither the account debtor nor any officer or employee of the account debtor with respect to such Accounts is another Borrower, an officer, employee or agent of or affiliated with any Borrower directly or indirectly by virtue of family membership, ownership, control, management or otherwise;

(k)      the account debtors with respect to such Accounts are not any foreign government, the United States of America, any State, political subdivision, department, agency or instrumentality thereof, unless, if the account debtor is the United States of America, any State, political subdivision, department, agency or instrumentality thereof, upon Lender's request, the Federal Assignment of Claims Act of 1940, as amended or any similar State or local law, if applicable, has been complied with in a manner satisfactory to Lender;

(l)    there are no proceedings or actions which are threatened or pending against the account debtors with respect to such Accounts which might result in any material adverse change in any such account debtor's financial condition;

(m)    such Accounts of a single account debtor or its affiliates do not constitute more than 20% of all Accounts (but the portion of the Accounts not in excess of such percentage may be deemed Eligible Accounts);

(n)    such Account does not arise from rent or lease payment owed to Borrowers from musical instrument rentals and leasings;

(o)    such Accounts are not owed by an account debtor who has Accounts unpaid more than 90 days after the date of the original invoice for them or more than 60 days after the original due date for them which constitute more than 50% percent of the total Accounts of such account debtor;

(p)    such Accounts are owed by account debtors whose total indebtedness to Borrowers does not exceed the credit limit with respect to such account debtors as reasonably determined by Lender from time to time (but the portion of the Accounts not in excess of such credit limit may be deemed Eligible Accounts);

(q)    such Accounts are owed by account debtors deemed creditworthy at all times by Lender, as reasonably determined by Lender; and

(r)    such Accounts are not owed by an account debtor which is a Sanctioned Target.

General criteria for Eligible Accounts may be established and revised from time to time by Lender in good faith.  Any Accounts which are not Eligible Accounts shall nevertheless be part of the Collateral.

"Eligible Credit Card Receivables" shall mean, as to any Borrower, the Credit Card Receivables of such Borrower which are and continue to be acceptable to Lender based on the criteria set forth below.  Credit Card Receivables of a Borrower shall be Eligible Credit Card Receivables if:

(a)    such Credit Card Receivables arise from the actual and bona fide sale and delivery of goods or rendition of services by such Borrower in the ordinary course of the business of such Borrower which transactions are completed in accordance with the terms and provisions contained in any agreements binding on such Borrower or the other party or parties related thereto;

(b)    such Credit Card Receivables are not past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of any credit card or debit card used in any purchase which give rise to such Credit Card Receivables;

(c)    such Credit Card Receivables are not unpaid more than seven days after the date of the sale of Inventory giving rise to such Credit Card Receivables;

12

(d)     all procedures required by the Credit Card Issuer or the Credit Card Processor of the credit card or debit card used in the purchase which gave rise to such Credit Card Receivables shall have been followed in all material respects by such Borrower and all documents required for the authorization and approval by such Credit Card Issuer or Credit Card Processor shall have been obtained in connection with the sale giving rise to such Credit Card Receivables;

(e)     the required authorization and approval by such Credit Card Issuer or Credit Card Processor shall have been obtained for the sale giving rise to such Credit Card Receivables;

(f)     such Borrower shall have submitted all sales slips, drafts, charges and other reports and other materials required by the Credit Card Issuer or Credit Card Processor obligated in respect of such Credit Card Receivables in order for such Borrower to be entitled to payment in respect thereof;

(g)     such Credit Card Receivables comply with the applicable terms and conditions contained in Section 7.2(c) of this Agreement;

(h)     the Credit Card Issuer or Credit Card Processor with respect to such Credit Card Receivables has not asserted a counterclaim, defense or dispute and does not have any right of setoff against such Credit Card Receivables (other than transactions in the ordinary course of the business of such Borrower), such Credit Card Issuer or Credit Card Processor has not sent any notice of its intention to establish a reserve or collateral for obligations of a Borrower to such Credit Card Issuer or Credit Card Processor, and such Credit Card Issuer or Credit Card Processor has not setoff against amounts otherwise payable by such Credit Card Issuer or Credit Card Processor to a Borrower for the purpose of establishing a reserve or collateral for obligations of a Borrower to such Credit Card Issuer or Credit Card Processor (notwithstanding that the Credit Card Issuer or Credit Card Processor may have setoffs for fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with a Borrower as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of a Borrower), but the portion of the Credit Card Receivables owing by such Credit Card Issuer or Credit Card Processor in excess of the greater of such counterclaim, defense, dispute, setoff, reserve and collateral or the amount owing by Borrowers to such Credit Card Issuer or Credit Card Processor shall not be deemed to be ineligible by virtue of this clause (h);

(i)     there are no facts, events or occurrences which would impair in any material respect the validity, enforceability or collectability of such Credit Card Receivables or reduce the amount payable or delay payment thereunder (other than for setoffs for fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with such Borrower as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of a Borrower);

(j)     such Credit Card Receivables are subject to the first priority, valid and perfected security interest and lien of Lender and any goods giving rise thereto are not, and were not at the time of the sale thereof, subject to any encumbrances permitted under the terms hereof;

(k)     Lender shall have received, (i) in form and substance satisfactory to Lender in good faith, a Credit Card Acknowledgment duly authorized, executed and delivered by the applicable Borrower and the Credit Card Issuer or Credit Card Processor for the credit card or debit card used in the sale which gave rise to such Credit Card Receivable (unless otherwise agreed to by Lender), (ii) such Credit Card Acknowledgment shall be in full force and effect and (iii) the Credit Card Issuer or Credit Card Processor party thereto shall be in compliance with the terms thereof; provided, that, in the case of a Credit Card Acknowledgment with respect to American Express, Synchrony Bank, PayPal, Amazon Pay or eBay Pay, Lender hereby agrees that none of American Express, Synchrony Bank, PayPal, Amazon Pay nor eBay Pay shall be required to execute such Credit Card Acknowledgment;

(l)     there are no proceedings or actions which are pending or, to the best of a Borrower's knowledge, threatened against the Credit Card Issuers or Credit Card Processors with respect to such Credit Card Receivables which would reasonably be expected to result in any material adverse change in the continued collectability of the Credit Card Receivables with respect to the Credit Card Issuers or Credit Card Processors;

(m)     such Credit Card Receivables are owed by Credit Card Issuers or Credit Card Processors deemed creditworthy at all times by Lender in good faith;

(n)     no material default or material event of default has occurred under the Credit Card Agreement of a Borrower with the Credit Card Issuer or Credit Card Processor who has issued the credit card or debit card or handles payments under the credit card or debit card used in the sale which gave rise to such Credit Card Receivables which default gives such Credit Card Issuer or Credit Card Processor the right to cease or suspend payments to a Borrower and no material default or material event of default shall have occurred which gives such Credit Card Issuer or Credit Card Processor the right to setoff against amounts otherwise payable to a Borrower (other than for then current fees and chargebacks consistent with the current practices of such Credit Card Issuer or Credit Card Processor as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of Borrower) or the right to establish reserves or establish or demand collateral and such Credit Card Agreements are otherwise in full force and effect and constitute the legal, valid, binding and enforceable obligations of the parties thereto, provided that, so long as no material default or event of default has occurred under the Credit Card Agreement of a Borrower with any Credit Card Issuer or Credit Card Processor, the existence of a fully funded reserve with such Credit Card Processor or Credit Card Issuer or the substitution of a cash-collateralized Letter of Credit issued by a third party for a reserve with a Credit Card Processor or Credit Card Issuer will not cause such Credit Card Receivables from being ineligible solely by virtue of this clause (n);

(o)     the terms of the sale giving rise to such Credit Card Receivables and all practices of a Borrower with respect to such Credit Card Receivables comply in all material respects with applicable Federal, State, and local laws and regulations;

(p)     the Credit Card Issuer or Credit Card Processor has not sent any notice of default and/or notice of its intention to cease or suspend payments to a Borrower in respect of such Credit Card Receivables; and

14

(q)      the customer using the credit card or debit card giving rise to such Credit Card Receivable shall not have returned the merchandise purchased giving rise to such Credit Card Receivable.

"Eligible Inventory" shall mean Inventory of Borrowers consisting of finished goods held for resale in the ordinary course of the business of Borrowers which are acceptable to Lender based on the criteria set forth below.  In general, Eligible Inventory shall not include (a) work in process; (b) raw materials or components which are not part of finished goods; (c) spare parts for Borrowers' business equipment and fixtures; (d) packaging and shipping materials; (e) supplies used or consumed in Borrowers' business; (f) Inventory at premises other than those owned and controlled by Borrowers (unless otherwise agreed to by Lender), except (i) if Lender shall have received a Collateral Access Agreement with respect to such premises; provided, that, notwithstanding that Lender shall not have received such a Collateral Access Agreement, Lender will consider any Inventory at a Retail Store location which otherwise constitutes Eligible Inventory, as Eligible Inventory, provided, that, Lender establishes Availability Reserves in respect of unpaid amounts at any time payable by Borrowers to the owners and lessors of such Retail Stores to reasonably protect Lender's rights, remedies and priorities in an otherwise deal with the Collateral located in such location, without limiting any other rights and remedies of Lender under this Agreement or under the other Financing Agreements with respect to the establishment of Availability Reserves or otherwise, and (ii) prepaid Inventory purchased by Borrower which is in transit within the United States to the premises owned and controlled or leased by Borrowers provided, that (A) Lender may establish Availability Reserves in respect of unpaid amounts at any time payable by Borrowers to bailees handling the shipping and delivery of such Inventory to reasonably protect Lender's rights, remedies and priorities in and otherwise deal with such Inventory, (B) Lender is satisfied that title to such Inventory shall have passed to Borrowers, and (C) such Inventory shall not have been in transit for periods longer than commercially reasonable as determined by Lender; (g) Inventory subject to a security interest or lien in favor of any person other than Lender except those security interests permitted in this Agreement and which are junior in priority to Lender's security interest therein; (h) bill and hold goods; (i) obsolete Inventory; (j) Inventory which is not subject to the first priority, valid and perfected security interest of Lender; (k) Inventory consisting of sheet music, unless such Inventory is controlled and monitored by Borrowers in the same manner as Borrowers' other Eligible Inventory and would otherwise be deemed Eligible Inventory; (1) musical instruments or any other Inventory held for rental purposes; (m) returned Inventory which is not held for resale; (n) damaged and/or defective Inventory; and (o) Inventory purchased or sold on consignment. General criteria for Eligible Inventory may be established and revised from time to time by Lender in good faith.  Any Inventory which is not Eligible Inventory shall nevertheless be part of the Collateral.

"Equipment" shall mean all of each Borrower's now owned and hereafter acquired equipment, machinery, computers and computer hardware and software (whether owned or licensed), wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof.

"ERISA" shall mean the United States Employee Retirement Income Security Act of 1974, as the same now exists or may hereafter from time to time be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"ERISA Affiliate" shall mean any person required to be aggregated with any Borrower or any of its Subsidiaries under Sections 414(b), 414(c), 414(m) or 414(o) of the Code.

"Event of Default" shall mean the occurrence or existence of any event or condition described in Section 10.1 hereof.

"Excess Availability" shall mean the amount, as determined by Lender, calculated at any time, equal to: (a) the lesser of (i) the amount of the Revolving Loans available to Borrowers as of such time based on the Budget, as determined by Lender, and subject to the sublimits and Availability Reserves from time to time established by Lender hereunder and (ii) the Maximum Credit, minus (b) the amount of all then outstanding and unpaid Obligations.

"Excluded Property" shall have the meaning set forth in Section 5.1 hereof.

"Excluded Swap Obligation" shall mean, with respect to any Borrower, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Borrower of, or the grant by such Borrower of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act (7 U.S.C. § 1 et seq.), and any successor statute or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) due to such Borrower's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (7 U.S.C. § 1 et seq.), and any successor statute and the regulations thereunder at the time the guaranty of such Borrower or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

"Existing Loan Agreement" has the meaning set forth in the recitals hereto.

"Existing Financing Agreements" means the "Financing Agreements" under (and as defined in) the Existing Loan Agreement.

"Existing Liabilities" means (i) the "Obligations", as defined in the Existing Loan Agreement, and (ii) all other obligations under the Financing Agreements delivered in connection with the Existing Loan Agreement.

"Existing Liens" has the meaning set forth in the recitals hereto.

"Federal Funds Rate" shall mean, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Lender from three Federal funds brokers of recognized standing selected by it (and, if

any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"Final Order" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Case substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to Lender, which order shall (a) have been entered on such prior notice to such parties as may be satisfactory to Lender and (b) not have been vacated, reversed, modified, amended or stayed.

"Final Order Date" means the date of the entry of the Final Order.

"Final Roll-Up" has the meaning set forth in the Interim Order.

"Financing Agreements" shall mean, collectively, this Agreement, the Orders, the Pledge Agreement, each Deposit Account Control Agreement, each Investment Property Control Agreement, the Intellectual Property Security Agreement, the DIP Fee Letter, and all notes, guarantees, intercreditor agreements and all other agreements, documents and instruments, now or at any time hereafter executed and/or delivered by Borrowers in connection with this Agreement or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Floor" shall mean a rate of interest equal to [ ]$^{1}$%.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied.

"Gift Card Reserve" is an Availability Reserve as established by Lender with respect to gift cards, which may be increased or decreased in its commercially reasonable discretion, to reflect events, conditions (including without limitation the result of any field examination), contingencies or risks which, as determined by Lender in good faith, do or may affect the Collateral or any other property which is security for the Obligations or its value.

"Governmental Authority" shall mean the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, county, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Hedge Agreement" shall mean a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code which is Title 11 of the United States Code.

"Information Certificate" shall mean the Information Certificate of Borrowers and Obligors, dated as of February 21, 2024, containing material information with respect to Borrowers

---

[1] The rate that is equal to 1-month SOFR as of the Effective Date.

and Obligors, their businesses and assets provided by or on behalf of Borrowers and Obligors to Lender in connection with the preparation of this Agreement and the other Financing Agreements and the financing arrangements provided for herein.

"Intellectual Property " shall mean all of each Borrower's now owned and hereafter arising or acquired patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations, trademarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or the license of any trademark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship, domain names and domain name registration; software and contract rights relating to computer software programs, in whatever form created or maintained.

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement dated as of February 21, 2024 herewith pursuant to which SAMC and Samson collaterally assigned their Intellectual Property to Lender.

"Interest Period" shall mean, with respect to any SOFR Loan, a period commencing on the date of the making of such SOFR Loan (or the continuation of a SOFR Loan) and ending 3 months thereafter as selected by Borrowers' Agent in accordance with the terms of this Agreement; provided, that (a) interest shall accrue at the applicable rate based upon Term SOFR from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 3 months after the date on which the Interest Period began, as applicable, (d) Borrowers may not elect an Interest Period which will end after the Maturity Date and (e) no tenor that has been removed from this definition pursuant to Section 3.5 shall be available.

"Interest Rate" shall mean,

(r)    Subject to clause (b) of this definition below:

(i)    as to Prime Rate Loans (if applicable), a rate equal to the then Applicable Margin plus the Prime Rate;

(ii)    as to SOFR Loans, a rate equal to the Applicable Margin plus Term SOFR;

(s)    Notwithstanding anything to the contrary contained herein, Lender may, at its option, increase the Applicable Margin otherwise used to calculate the Interest Rate for Prime

18

Rate Loans and SOFR Loans in an amount equal to 3% per annum: (i) for the period (A) from and after the effective date of termination or non-renewal of this Agreement until Lender has received full and final payment of all outstanding and unpaid Obligations and cash collateral or letters of credit, and (B) from and after the date of the occurrence of an Event of Default and for so long as such Event of Default is continuing and (ii) on Revolving Loans at any time outstanding in excess of the amount of Revolving Loans available to Borrowers under Section 2.1 (whether or not such excess(es) arise or are made with or without the knowledge or consent of Lender and whether made before or after an Event of Default).

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Case substantially in the form of Exhibit B hereto and otherwise acceptable to Lender, approving, inter alia, this Agreement and the other Financing Agreements, and (a) authorizing the incurrence by Borrowers of secured indebtedness on an interim basis in accordance with this Agreement, and (b) subject to the terms thereof, approving the payment by Borrowers of the fees and other amounts contemplated by this Agreement, which order shall not have been vacated, reversed, modified, amended or stayed.

"Interim Order Period" means the period of time from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"Inventory" shall mean all of each Borrower's now owned and hereafter existing or acquired goods, wherever located, which (a) are leased by a Borrower as lessor; (b) are held by a Borrower for sale or lease or to be furnished under a contract of service; (c) are furnished by a Borrower under a contract of service; or (d) consist of raw materials, work in process, finished goods or materials used or consumed in its business.

"Investment Property Control Agreement" shall mean an agreement in writing, in form and substance satisfactory to Lender, by and among Lender, a Borrower or Obligor and any securities intermediary, commodity intermediary or other person who has custody, control or possession of any investment property of such Borrower or Obligor acknowledging that such securities intermediary, commodity intermediary or other person has custody, control or possession of such investment property on behalf of Lender, that it will comply with entitlement orders originated by Lender with respect to such investment property, or other instructions of Lender, or (as the case may be) apply any value distributed on account of any commodity contract as directed by Lender, in each case, without the further consent of such Borrower or Obligor and including such other terms and conditions as Lender may require.

"Loans" shall mean the Revolving Loans.

"Margin Stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Maximum Credit" shall mean the amount of $20,000,000.

"Milestones" has the meaning provided therefor in Section 9.32(g) hereof.

"Net Amount of Eligible Accounts" shall mean the gross amount of Eligible Accounts less (a) sales, excise or similar taxes included in the amount thereof and (b) returns, discounts, claims,

credits and allowances of any nature at any time issued, owing, granted, outstanding, available or claimed with respect thereto.

"Net Amount of Eligible Credit Card Receivables" shall mean the gross amount of Eligible Credit Card Receivables less (a) sales, excise or similar taxes, included in the amount thereof and (b) returns, discounts, claims, credits and allowances of any nature at any time issued, owing, granted, outstanding, available or claimed with respect thereto.

"Net Orderly Liquidation Value" means the value that is estimated to be recoverable in an orderly liquidation, net of liquidation expenses; such value to be as determined from time to time by Lender in its reasonable credit judgment or by a qualified appraisal company selected by Lender.  On Borrowers' written request a second appraisal company may be selected by Borrowers and the average of the two results will be Net Orderly Liquidation Value.

"Obligations" shall mean any and all Revolving Loans and all other obligations, liabilities and indebtedness of every kind, nature and description owing by Borrowers and/or its affiliates under or pursuant to the Financing Agreements, including principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, whether arising under this Agreement or otherwise, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and however acquired by Lender; provided, that, the Obligations shall exclude any Excluded Swap Obligation.

"Obligor" shall mean any guarantor, endorser, acceptor, surety or other person liable on or with respect to the Obligations or who is the owner of any property which is security for the Obligations, other than Borrowers.  As of the Effective Date, there are no individual Obligors.

"OFAC" shall mean The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Orders" shall mean, collectively, the Interim Order and the Final Order.

"Overadvance" shall have the meaning set forth in Section 2.1(c) hereof.

"Patriot Act" shall have the meaning set forth in Section 8.16 hereof.

"Payment Account" shall have the meaning set forth in Section 6.3 hereof.

"Permitted Equity Offering" shall have the meaning set forth in Section 9.7(b)(iv) hereof.

"Permitted Holders" shall mean, collectively, (a) The Estate of Paul Ash, (b) David Ash, (c) Richard Ash, (d) Sam Ash, (d) spouses of any of the foregoing, (e) the estates and lineal descendants of any of the foregoing and (i) trusts, the beneficiaries of which are the Persons described on clauses (a) through (e) above.

"Permitted Liens" shall have the meaning set forth in Section 5.2(a) hereof.

"Permitted Non Affiliated Merger" shall have the meaning set forth in Section 9.7(a) hereof.

"Permitted Prior Liens" has meaning provided therefor in the Orders.

"Permitted Variances" has the meaning provided therefor in Section 9.33(b) hereof.

"Petition Date" has the meaning set forth in the recitals hereto.

"Person" or "person" shall mean any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Internal Revenue Code of 1986, as amended), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"POR" means a definitive plan of reorganization in respect of the Case.

"Prime Rate" shall mean the Base Rate.

"Prime Rate Loans" shall mean any Loans or portion thereof on which interest is payable based on the Prime Rate in accordance with the terms of this Agreement.

"Protective Advances" shall have the meaning set forth in Section 2.1(d) hereof.

"QFC Credit Support" shall have the meaning set forth in Section 12.12 hereof.

"Qualified ECP Guarantor" shall mean, in respect of any Swap Obligations, each Borrower that has total assets exceeding $10,000,000 at the time the grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Records" shall mean all of Borrowers' present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrowers with respect to the foregoing maintained with or by any other person).

"Relevant Governmental Body" shall mean the Board of Governors or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors or the Federal Reserve Bank of New York, or any successor thereto.

"Retail Stores" shall mean the retail stores and distribution centers which are now existing or hereafter operated by the Borrowers and which sell Inventory or fulfill Borrowers' customer orders.

"Revolving Loans" shall mean the loans now or hereafter made by Lender to or for the benefit of Borrowers on a revolving basis (involving advances, repayments and readvances) as set forth in Section 2.1 hereof.

"Sale Motion" has the meaning provided therefor in Section 9.32(b).

"Sam Ash Card" shall mean the private label credit card issued by the Sam Ash Card Issuer, subject to the arrangements of SAMC with the Sam Ash Card Issuer as set forth in the Sam Ash Card Agreement.

"Sam Ash Card Agreement" shall mean the Merchant Agreement, dated April 27, 2010, between SAMC and GE Money Bank (as predecessor to Synchrony Bank), as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Sam Ash Card Receivables" shall mean all Accounts arising from the sale of Inventory by Borrowers in the ordinary course of business to a customer who has purchased such Inventory using the Sam Ash Card.

"Sam Ash Card Issuer" shall mean Synchrony Bank (as successor to GE Money Bank) and its successors and assigns, or any subsequent Credit Card Issuer replacing Synchrony Bank or any then-existing Credit Card Issuer with respect to such private label credit card as to which there has been compliance with Section 4.1 (k) hereof.

"Samson" shall mean Samson Technologies Corp., a New York corporation.

"Sanction" or "Sanctions" shall mean any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and anti-terrorism laws imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. State Department, the U.S. Department of Commerce, or through any existing or future Executive Order, (b) the United Nations Security Council, (c) the European Union, (d) the United Kingdom, or (e) any other Governmental Authority in any jurisdiction in which (i) any member of the Borrower Group is located or conducts business, (ii) in which any of the proceeds of the Loans will be used, or (iii) from which repayment of the Obligations will be derived.

"Sanctioned Target" shall mean any target of Sanctions, including: (a) Persons on any list of targets identified or designated pursuant to any Sanctions, (b) Persons, countries, or territories that are the target of any territorial or country-based Sanctions program, (c) Persons that are a target of Sanctions due to their ownership or control by any Sanctioned Target(s), or (d) otherwise a target of Sanctions, including vessels, planes and ships, that are designated under any Sanctions program.

"SOFR" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Loan" shall mean each portion of a Loan that bears interest at a rate determined by reference to Term SOFR (other than pursuant to clause (c) of the definition of "Base Rate") as the context may require.

"Specified Bank" shall mean JP Morgan Chase Bank, N.A., or such other bank as Lender may approve from time to time; provided, that, if any of the foregoing banks (or accounts at any of such banks) fail to maintain a rating of at least A-1 from S&P or at least P-1 from Moody's, such bank shall cease to be a Specified Bank commencing on the date that is sixty (60) days following the receipt by Borrowers' Agent of a written notice from Lender which specifies that such bank will cease to be a Specified Bank.

"Standing Reserve" shall mean, as of the Effective Date, an Availability Reserve in an amount equal to $945,000; provided, that, following the Effective Date, Lender may in is commercially reasonable discretion increase or decrease the Standing Reserve to reflect events, conditions (including without limitation the result of any field examination), contingencies or risks which, as determined by Lender in good faith, do or may affect the Collateral or any other property which is security for the Obligations or its value.

"Store Accounts" shall have the meaning set forth in Section 6.3(a) hereof.

"Substantial Asset Disposition Transaction" shall mean a transaction providing for the sale, transfer, assignment, conveyance or other disposition by Borrowers (including a transaction(s) pursuant to Section 363 of the Bankruptcy Code), which may be accomplished by one or more individual sales or dispositions by Borrowers or Borrowers' equity holders of the assets or equity interests of Borrowers (other than sales or other dispositions of inventory in the ordinary course of Borrowers' business), which transaction provides for the payment at closing or closings of cash consideration in the aggregate sufficient to pay in full all of the Obligations (including any Overadvance, if any) due to Lender at the time of closing or closings thereof, the terms and conditions of which transaction shall be set forth in a Substantial Asset Disposition Agreement.

"Substantial Asset Disposition Agreement" shall mean an agreement that provides for the sale or disposition (including a transaction(s) pursuant to Section 363 of the Bankruptcy Code), which may be accomplished by one or more individual sales or dispositions by Borrowers or Borrowers' equity holders of all of the assets or equity interests of Borrowers (other than sales or other dispositions of Inventory in the ordinary course of Borrowers' business) on such terms and conditions acceptable to Lender in its sole discretion.

"Successor Case" means any case under Chapter 7 of the Bankruptcy Code upon the conversion of any the Case, or in any proceedings superseding or related to any of the foregoing.

"Supported QFC" shall have the meaning set forth in Section 12.12 hereof.

"Swap Obligation" shall mean, with respect to any Borrower, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Term SOFR" shall mean, for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; provided, further, that if Term SOFR determined as provided above shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Administrator" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Lender in its reasonable discretion).

"Term SOFR Reference Rate" shall mean the forward-looking term rate based on SOFR.

"Testing Period" has the meaning provided therefor in Section 9.33(c) hereof.

"Unadjusted Benchmark Replacement" shall mean the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unused Line Fee Rate" shall mean 0%.

"U.S. Government Securities Business Day" shall mean any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities; provided, that for purposes of notice requirements herein, in each case, such day is also a Business Day.

"U.S. Special Resolution Regime" shall have the meaning set forth in Section 12.12 hereof.

"Value" shall mean, as determined by Lender in good faith, with respect to Inventory, the lower of (a) cost computed on a first in first out basis or an average cost basis or (b) market value.

"Variance Report" shall mean a variance report prepared by a responsible officer of Borrowers' Agent setting forth actual cash receipts and disbursements of the Borrowers for the preceding one calendar week period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such calendar week as compared to the Budget and the most recent weekly cash flow forecast delivered by the Borrowers, in each case, for each Testing Period (and each such Variance Report shall include reasonably detailed explanations for all material variances (including Permitted Variances) and shall be certified by a responsible officer of Borrowers' Agent);

**SECTION 2.  CREDIT FACILITY**

2.1    Revolving Loans.

(a)    Upon entry of the Interim Order, Lender shall make an initial Revolving Loan to Borrowers in an aggregate amount equal to $18,125,576.19 (which amount shall be applied by the Lender to repay the Existing Liabilities in full.

(b)    Upon entry of the Interim Order, and from time to time thereafter, Lender agrees to make Revolving Loans to Borrowers in accordance with the applicable provisions of the Budget in an aggregate amount up to the sum of:

(i)    85% percent of the Net Amount of Eligible Accounts, plus

(ii)    97.5% percent of the Net Orderly Liquidation Value of the Eligible Inventory, plus

(iii)    90% percent of the Net Amount of Eligible Credit Card Receivables, less

(iv)    any Availability Reserves as determined in the reasonable discretion of the Lender.

(c)    Lender may, in its discretion, from time to time, upon not less than five (5) days prior notice to Borrowers, (i) reduce the lending formula with respect to Eligible Accounts or Eligible Credit Card Receivables to the extent that Lender determines in good faith that the general creditworthiness of account debtors has declined or (ii) reduce the lending formula(s) with respect to Eligible Inventory to the extent that Lender determines that: (A) the number of days of the turnover of the Inventory for Retail Stores open more than twelve (12) months) for any period has increased in any material respect or (B) the liquidation value of the Eligible Inventory, or any category thereof, has decreased, or (C) the nature and quality of the Inventory has deteriorated.  In determining whether to reduce the lending formula(s), Lender may consider events, conditions, contingencies or risks which are also considered in determining Eligible Accounts or Eligible Credit Card Receivables, Eligible Inventory.  At no time shall the aggregate amount of the Revolving Loans exceed the Maximum Credit.

(d)    In the event that the outstanding amount of any component of the Loans, or the aggregate amount of the outstanding Loans, exceed the Maximum Credit or the other sublimits set forth in the Budget, as applicable (any such event shall be referred to as an "Overadvance"), such event shall not limit, waive or otherwise affect any rights of Lender in that circumstance or on any future occasions and Borrowers shall, upon demand by Lender, which may be made at any time or from time to time, immediately repay to Lender the entire amount of any such excess(es) for which payment is demanded.  Notwithstanding the foregoing, Lender consents to and authorizes the issuance of Revolving Loans in an Overadvance situation provided such issuance is pursuant to the Budget.  Subject to the terms and conditions hereof, Borrowers may from time to time borrow, prepay and reborrow Revolving Loans.

(e)    Any contrary provision of this Agreement or any other Financing Agreement notwithstanding, Lender hereby is irrevocably authorized by Borrowers, at any time

25

when an Event of Default has occurred and is continuing, in Lender's sole discretion, to make Revolving Loans to, or for the benefit of, Borrowers that Lender, in its sole discretion, deems necessary or desirable to preserve or protect the Collateral, or any portion thereof (the Revolving Loans described in this <u>Section 2.1(d)</u> shall be referred to as "<u>Protective Advances</u>").  Lender is hereby authorized by the by Borrowers to make such Protective Advances notwithstanding that an Overadvance exists or would be created thereby.  Each Protective Advance shall be deemed to be a Revolving Loan hereunder, shall be repayable on written demand, secured by Lender's liens and security interests, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Revolving Loans that are SOFR Loans.

2.2     [Reserved].

2.3     <u>Availability Reserves</u>. All Revolving Loans otherwise available to Borrowers pursuant to the lending formulas and subject to the Maximum Credit and other applicable limits hereunder shall be subject to Lender's continuing right to establish and revise Availability Reserves.  Without limiting the generality of the foregoing, Lender may establish an Availability Reserve equal to the aggregate amount of deposits held by Borrowers from customers for Inventory which has not been delivered to such customers.

2.4     <u>Joint and Several Liability of Borrowers</u>.

(a)     Each Borrower is accepting joint and several liability hereunder and under the other Financing Agreements in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.4), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

(d)     The Obligations of each Borrower under the provisions of this Section 2.4 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 2.4(d)) or any other circumstances whatsoever.

(e)     Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Revolving Loans

issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement).  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.4 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.4, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.4 shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this Section 2.4 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or Lender.

(f)     Each Borrower represents and warrants to Lender that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each Borrower further represents and warrants to Lender that such Borrower has read and understands the terms and conditions of the Financing Agreements.  Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)     The provisions of this Section 2.4 are made for the benefit of Lender and its successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Lender Group or any of its successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 2.4 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Lender, the provisions of this Section 2.15 will forthwith be reinstated in effect, as though such payment had not been made.

(h)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Financing Agreements, any payments made by it to Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to Lender hereunder are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

(i)    Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Lender, and such Borrower shall deliver any such amounts to Lender for application to the Obligations in accordance herewith.

2.5    Certain Bankruptcy Matters.

(a)    Except to the extent expressly provided otherwise in an Order, Borrowers hereby agree that, subject and subordinate only to the Carve Out, the Obligations shall be deemed to (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the Orders.

(b)    In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any Financing Agreement, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)    Notwithstanding anything to the contrary contained herein or elsewhere:

(i)    the parties hereto agree, and the Orders shall provide, that Lender shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other Financing Agreement.  If Lender (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of Lender's liens on the

Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.5(c) or of the perfection of any other liens in favor of Lender on the Collateral; and

(ii)     except as otherwise agreed to by Lender, the liens, lien priorities, DIP Superpriority Claims and other rights and remedies granted to Lender pursuant to this Agreement, the Orders or the other Financing Agreements (specifically including, but not limited to, the existence, perfection, enforceability and priority of the liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Case, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     subject only to the Carve Out and to the extent provided in any of the Orders and subject to the Orders, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of Lender against the Borrowers in respect of any Obligations;

(ii)     other than as provided in the Orders or the Financing Agreements, Lender's liens on the Collateral shall constitute valid, enforceable and perfected liens, and, except with respect to the Carve Out and Permitted Prior Liens (and as otherwise set forth in the Orders), shall be prior to all other liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     the parties hereto agree, and the Orders shall provide, that Lender's liens on the Collateral shall continue to be valid, enforceable and perfected without the need for Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of lien or similar instruments or to otherwise perfect Lender's liens under applicable non-bankruptcy law.

(e)     In connection with any sale or other disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, in accordance with applicable law and, with respect to any credit bid, Borrowers hereby give Lender the power and right, without assent by such Borrower, to "credit bid" up to the full amount of all Obligations and any Existing Liabilities then outstanding, if any, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral provide such "credit bid" is consistent with and pursuant to Section 363(k) of the Bankruptcy Code.

**SECTION 3.  <u>INTEREST, BORROWING PROCEDURES AND FEES</u>**

3.1   <u>Interest and Borrowing Procedures</u>.

(a)     Borrowers shall pay to Lender interest on the outstanding principal amount of the non-contingent Obligations at the Interest Rate, except as otherwise provided in <u>Section 3.5</u>. All interest accruing hereunder on and after the date of any Event of Default or termination or non-renewal hereof shall be payable on demand.

(b)     Borrower's Agent may from time to time (but in no event more than twice per calendar week) request SOFR Loans by a written request by an Authorized Person delivered to Lender (which may be delivered via e-mail).  All such requests which are not via e-mail (and unless Lender elects otherwise in the exercise of its sole discretion, such borrowings shall not be made until the completion of) Lender's authentication process (with results satisfactory to Lender) prior to the funding of any such requested Loan.  Each borrowing request shall be received by Lender no later than 5:00 p.m. on the Business Day prior to the requested funding date and shall be accompanied by a Borrowing Base Certificate setting forth the calculation of the amount of Revolving Loans available to Borrowers based on the applicable portions of the Budget (subject to the limits and Availability Reserves in effect) as of the close of business of the immediately preceding Business Day, together with all applicable schedules thereto.  Lender will endeavor to fund the Loan within twenty-four hours of each borrowing request so long as the day following such request is a Business Day; provided, that, if the day following a borrowing request is not a Business Day, Lender will endeavor to fund the Loan on the next Business Day.  Notwithstanding anything to the contrary contained herein, Lender shall not be required to match fund any Obligations as to which interest accrues at Term SOFR or the Term SOFR Reference Rate.  For the avoidance of doubt, all borrowing requests must be for Revolving Loans at Term SOFR.

(c)     Any SOFR Loans shall, at Lender's option, upon notice by Lender to Borrowers' Agent, convert to Prime Rate Loans in the event that (i) an Event of Default shall exist, (ii) this Agreement shall terminate or not be renewed, or (iii) the aggregate principal amount of existing SOFR Loans continued at the beginning of an Interest Period shall at any time during such Interest Period exceed either (A) the aggregate principal amount of the Loans then outstanding, or (B) the sum of the then outstanding principal amount of the Revolving Loans then available to Borrowers under Section 2 hereof.  Borrowers shall pay to Lender, upon demand by Lender (or Lender may, at its option, charge any loan account of Borrowers) any amounts required to compensate Lender or any participant with Lender for any loss (including loss of anticipated profits), cost or expense incurred by such person, as a result of the conversion of SOFR Loans to Prime Rate Loans pursuant to any of the foregoing.

(d)     Interest shall be payable by Borrowers to Lender monthly in arrears not later than the first Business Day of each calendar month and shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.  The interest rate on non-contingent Obligations (other than SOFR Loans) shall increase or decrease by an amount equal to each increase or decrease in the Prime Rate effective on the first day of the month after any change in such Prime Rate is announced based on the Prime Rate in effect on the last day of the month in which any such change occurs.  In no event shall charges constituting interest payable by Borrowers to Lender exceed the maximum amount or the rate permitted under any applicable law or regulation, and if any such part or provision of this Agreement is in contravention of any such law or regulation, such part or provision shall be deemed amended to conform thereto.

(e)      No Borrower will fund any repayment of the Obligations with proceeds, or provide as Collateral any property, that is directly or indirectly derived from any transaction or activity that is prohibited by Sanctions, Anti-Money Laundering Laws or Anti-Corruption Laws, or that could otherwise cause Lender or any other party to any Financing Agreements to be in breach of Sanctions, Anti-Money Laundering Laws or Anti-Corruption Laws.

(f)      Term SOFR Conforming Changes. In connection with the use or administration of Term SOFR, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Financing Agreement, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Financing Agreement. Lender will promptly notify Borrowers of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

3.2      Unused Line Fee. Borrowers shall pay to Lender monthly an unused line fee at a rate per annum equal to the Unused Line Fee Rate, calculated upon the amount by which the Maximum Credit exceeds the average daily principal balance of the outstanding Revolving Loans during the immediately preceding month (or part thereof) while this Agreement is in effect and for so long thereafter as any of the Obligations are outstanding, which fee shall be payable on the first day of each month in arrears.

3.3      DIP Fee Letter.    Borrowers shall pay to Lender, for its own account, fees in the amounts and at the times specified in the DIP Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever

3.4      Changes in Laws and Increased Costs of Loans.

(a)      Notwithstanding anything to the contrary contained herein (but subject to Section 3.5), all SOFR Loans shall, upon written notice by Lender to Borrowers' Agent, convert to Prime Rate Loans in the event that (i) any change in applicable law or regulation (or the interpretation or administration thereof) shall either (A) make it unlawful for Lender or any participant to make or maintain SOFR Loans or to comply with the terms hereof in connection with the SOFR Loans, or (B) shall result in the increase in the costs to Lender or any participant of making or maintaining any SOFR Loans by an amount deemed by Lender to be material, or (C) reduce the amounts received or receivable by Lender in respect thereof, by an amount deemed by Lender to be material or (ii) Term SOFR for any Interest Period will not adequately and fairly reflect the cost to Lender of making or maintaining SOFR Loans during such Interest Period; provided, that, in the case of clause (i)(B), (i)(C) or (ii) above, no SOFR Loans shall be required to be converted to Prime Rate Loans prior to the last day of the Interest Period for such SOFR Loan unless Lender waives the obligation of Borrowers to pay amounts otherwise owing by Borrowers in respect of such SOFR Loan pursuant to Section 3.6(b) hereof.  Borrowers shall pay to Lender, upon demand by Lender (or Lender may, at its option, charge any loan account of Borrowers) any amounts required to compensate Lender or any participant with Lender for any loss (including loss of anticipated profits), cost or expense incurred by such person as a result of the foregoing, including, without limitation, any such loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such person to make or maintain the SOFR Loans or any portion thereof.  A certificate of Lender setting forth the basis

for the determination of such amount necessary to compensate Lender as aforesaid shall be delivered to Borrowers and shall be conclusive, absent manifest error.  Notwithstanding anything in this Agreement to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, and all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a change in law for purposes of this Agreement, regardless of the date enacted, adopted or issued.

(b)      If any payments or prepayments in respect of the SOFR Loans are received by Lender other than on the last day of the applicable Interest Period (whether pursuant to acceleration, upon maturity or otherwise), including any payments pursuant to the application of collections under Section 6.3 or any other payments made with the proceeds of Collateral, Borrowers shall pay to Lender upon demand by Lender (or Lender may, at its option, charge any loan account of Borrowers) any amounts required to compensate Lender or any participant with Lender for any additional loss (including loss of anticipated profits), cost or expense incurred by such person as a result of such prepayment or payment, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such person to make or maintain such SOFR Loans or any portion thereof.

3.5    Effect of Benchmark Replacement.

(a)      Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Financing Agreement, upon the occurrence of a Benchmark Transition Event, Lender and Borrowers may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after Lender has posted such proposed amendment to Borrowers.   No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 3.5 will occur prior to the applicable Benchmark Transition Start Date.

(b)      Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Financing Agreement, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Financing Agreement.

(c)      Notices; Standards for Decisions and Determinations. Lender will promptly notify Borrowers of (1) the implementation of any Benchmark Replacement and (2) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  Lender will notify Borrowers of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 3.5 and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by Lender pursuant to this Section 3.5, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and

any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Financing Agreement, except, in each case, as expressly required pursuant to this <u>Section 3.5</u>.

(d)    <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Financing Agreement, at any time (including in connection with the implementation of a Benchmark Replacement), (1) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (I) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by Lender in its reasonable discretion or (II) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then Lender may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (2) if a tenor that was removed pursuant to clause (1) above either (I) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (II) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then Lender may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    <u>Benchmark Unavailability Period</u>. Upon Borrowers' receipt of notice of the commencement of a Benchmark Unavailability Period, (1) Borrowers may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Borrowers will be deemed to have converted any such request into a request for a borrowing of or conversion to Prime Rate Loans and (2) any outstanding affected SOFR Loans will be deemed to have been converted to Prime Rate Loans at the end of the applicable Interest Period. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

(f)    <u>Rates</u>.  Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Term SOFR or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative, successor or replacement rate thereto (including any then-current Benchmark or any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement), as it may or may not be adjusted pursuant to this Section 3.6, will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  Lender and its affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto and such transactions may be

adverse to a Borrower.  Lender may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Term SOFR or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## SECTION 4.  <u>CONDITIONS PRECEDENT</u>

4.1    <u>Conditions Precedent to Initial Loans</u>. Each of the following is a condition precedent to Lender making the initial Loans hereunder:

(a)    [reserved];

(b)    Lender shall have received at least 10 Business Days prior to the Effective Date (i) all documentation and information as is requested by Lender in connection with applicable "know your customer" and anti-money-laundering rules and regulations, (ii) customary individual background searches for each Borrower's senior management and key principals, and (iii) for each Borrower's that qualifies as a "legal entity customer" under 31 C.F.R. §1010.230, a certification in form and substance satisfactory to Lender regarding beneficial ownership as required by such regulation and in the case of (i), (ii) and (iii),which certification shall be complete and accurate in all respects, and the results of which are reasonably satisfactory to Lender;

(c)    Lender shall have received evidence, in form and substance satisfactory to Lender, that Lender has valid perfected and first priority security interests in and liens upon the Collateral and any other property which is intended to be security for the Obligations or the liability of any Obligor in respect thereof, subject only to the security interests and liens permitted herein or in the other Financing Agreements;

(d)    Lender shall have received a certificate of status with respect to each Borrower, dated within 30 days of the Effective Date (or such earlier date as is acceptable to Lender), issued by the appropriate officer of the jurisdiction of organization of such Borrower, in each case which certificate shall indicate that such Borrower is in good standing in such jurisdiction.  Lender shall have also received a certificate of an authorized officer of a Borrower's Agent, in form and substance satisfactory to it, certifying (i) that attached copies of the governing documents of each Borrower are true and complete, and in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution, delivery and performance of the Financing Agreements is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this Agreement and the other Financing Agreements; and (iii) to the title, name and signature of each Person authorized to sign the Financing Agreements.

(e)    [reserved];

(f)    Lender shall have received the initial Budget;

(g)     Lender shall have received the results of (i) a recent lien search in each jurisdiction where each Borrower is organized and to the extent requested by Lender, where material assets of such Borrower are located, and (ii) a recent search of the United States Patent and Trademark Office, and in each case such search shall reveal no liens on any of the assets of a Borrower except for liens permitted hereunder;

(h)     Lender shall have received the most recent collateral reports required to be delivered under this Agreement, setting forth the Revolving Loans available to Borrowers as of the date hereof as completed in a manner satisfactory to Lender and duly authorized, executed and delivered on behalf of Borrowers' Agent;

(i)     [reserved];

(j)     [reserved];

(k)     Lender shall have received, in form and substance satisfactory to it, (i) Florida out-of-state affidavits of execution, duly executed and delivered by each Borrower formed or incorporated under laws of Florida or (ii) evidence of the full payment of any Florida Stamp Tax payable under Florida law in respect of the UCC financing statements filed by Lender against such Borrower;

(l)     [reserved];

(m)     Borrowers shall have paid (or will pay on the Effective Date) all Expenses incurred in connection with the transactions evidenced by the Agreement and the other Financing Agreements;

(n)     Lender shall have received a true and complete list, as of the Effective Date, of all executory contracts and unexpired leases to which any Borrower is a party;

(o)     Lender shall have received evidence of insurance coverage in form, scope and substance reasonably satisfactory to Lender, and certificates of insurance policies naming Lender as loss payee and additional insured;

(p)     the other Financing Agreements and all instruments and documents hereunder and thereunder shall have been duly executed and delivered to Lender, in form and substance satisfactory to Lender;

(q)     the Interim Order shall have been entered by the Bankruptcy Court, substantially in the form of Exhibit B hereto;

(r)     all "first day" motions and proposed orders have been filed with and submitted to the Bankruptcy Court, in each case in form and substance reasonably satisfactory to Lender and otherwise consistent with the Budget;

(s)     there shall not be pending any litigation or other proceeding that is not subject to the automatic stay under Section 362(a) of the Bankruptcy Code, the result of which could reasonably be expected to have a material adverse effect on the operations of Borrowers;

(t)    there shall not have occurred any default of any material contract or agreement of any Borrower that is not subject to the automatic stay under Section 362(a) of the Bankruptcy Code, of any Borrower, the result of which, either individually or in the aggregate, could reasonably be expected to have a material adverse effect on the operations of Borrowers; and

(u)    Borrowers shall have delivered to Lender a duly-executed asset purchase agreement providing for the sale of its Business or substantially all of the assets of the Borrowers pursuant to Section 363 of the Bankruptcy Code, on terms (including without limitation the adherence to the Milestones) acceptable to the sole satisfaction of Lender.

4.2    Conditions Precedent to All Loans. Each of the following is an additional condition precedent to Lender making Loans to Borrowers, including the initial Loans and any future Loans:

(a)    all representations and warranties contained herein and in the other Financing Agreements shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan and after giving effect thereto (except to the extent such representations and warranties relate to a specific date, in which case such representations and warranties shall be true and correct in all material respects as of such specific date);

(b)    the making of such Loan complies with, and is for a purpose permitted by, the Budget and, after giving effect to the making of such borrowing, the Orders remain in full force and effect;

(c)    (i) there shall not have been (x) any order granted by the Bankruptcy Court sustaining any objection by any Person, nor (y) any motion, complaint, objection or other pleading filed by any party, challenging, in either case, the validity, priority, perfection, or enforceability of the Existing Financing Agreements, the Existing Liabilities, or any lien granted pursuant to the Existing Financing Agreements, and (ii) no lien granted pursuant to the Existing Financing Agreements shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Case, including, without limitation, the Committee; and

(d)    no Event of Default shall have occurred and be continuing on and as of the date of the making of such Loan and after giving effect thereto.

## SECTION 5.  **GRANT OF SECURITY INTEREST**

5.1    Collateral. To secure payment and performance of all Obligations pursuant to this Agreement and/or the Orders, each Borrower hereby grants to Lender a continuing security interest in, a lien upon, and a right of set off against, and hereby assigns to Lender as security, the following property and interests in property of such Borrower (and hereby confirms, reaffirms and ratifies the prior grant and collateral assignment thereof), whether now owned or hereafter acquired or existing, and wherever located (collectively, the "Collateral"):

(a)    Accounts;

(b)    all present and future contract rights, general intangibles (including tax and duty refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, applications for the foregoing, trade secrets, goodwill, processes, drawings, blueprints, customer lists, licenses, whether as licensor or licensee, choses in action and other claims and existing and future leasehold interests in equipment, real estate and fixtures), chattel paper, documents, letter of credit rights, instruments, securities and other investment property, letters of credit, bankers' acceptances, letter of credit rights and guaranties;

(c)    all present and future monies, supporting obligations, securities and investment property (including security accounts, security entitlements, commodity contracts or commodity accounts); credit balances, deposits, deposit accounts and other property of Borrowers now or hereafter held or received by or in transit to Lender or its affiliates or at any other depository or other institution from or for the account of Borrowers, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Accounts and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (ii) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Accounts or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(d)    Inventory and other goods;

(e)    Equipment;

(f)    All commercial tort claims (including, without limitation, those identified on Schedule 5.2(g) hereto);

(g)    Records;

(h)    To the extent not otherwise described above, all other assets; and

(i)    all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of any or all of the foregoing.

Notwithstanding anything to the contrary contained in this Agreement of the other Financing Agreements, the Collateral shall not include any of the following (collectively the "Excluded Property") (a) any equity interests issued by SAMC or SACT or (b) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability, or result in the abandonment, voiding or cancellation, of such intent-to-use trademark applications under applicable federal law, provided, that upon submission and acceptance by the United Stated Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1051(c) or (d) (or any successor provisions), such intent-to-use trademark application shall be considered Collateral hereunder.

5.2    <u>Perfection of Security Interests</u>.

(a)    Each Borrower and Obligor represents and warrants that, upon and subject to the entry of the Interim Order, Lender will have (a) a legal and valid security interest in all of the Collateral securing the payment and performance of the Obligations and (b) a perfected security interest in all of the Collateral.  Upon the entry of the Interim Order, the liens which secure the Obligations shall constitute first priority liens under Section 364(d) of the Bankruptcy Code, having the priority set forth in the Orders, subject only to the Carve Out, the liens indicated on <u>Schedule 8.4</u> hereto and the other liens permitted under Section 9.8 hereof (collectively, the "<u>Permitted Liens</u>").  Each Obligor agrees that at the sole cost and expense of the Obligors, (i) such Obligor will maintain the security interest created by the Orders in the Collateral as a perfected security interest having the priority set forth therein (subject to the Carve Out) and shall defend such security interest against the claims and demands of all Persons (other than with respect to the Carve Out and Permitted Liens), (ii) such Obligor shall furnish to Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may request, all in reasonable detail and (iii) at any time and from time to time, upon the written request of Lender, such Obligor shall promptly and duly execute and deliver, and file and have recorded, such further instruments and documents and take such further action as Lender may reasonably request, including the filing of any financing statements, continuation statements and other documents (including this Agreement) under the UCC (or other applicable laws) in effect in any jurisdiction with respect to the security interest created hereby and the execution and delivery of Deposit Account Control Agreements, all in form reasonably satisfactory to Lender and in such offices (including, without limitation, the United States Patent and Trademark Office and the United States Copyright Office) wherever required by applicable law in each case to perfect, continue and maintain a valid, enforceable, first priority security interest in the Collateral as provided herein and to preserve the other rights and interests granted to the Agent hereunder, as against the Obligors and third parties (other than with respect to the Carve Out and Permitted Liens), with respect to the Collateral.

(b)    No Borrower or Obligor has any chattel paper (whether tangible or electronic) or instruments, except as set forth on <u>Schedule 5.2(b)</u> hereto. In the event that any Borrower or Obligor shall be entitled to or shall receive any chattel paper or instrument, such Borrower or Obligor shall promptly notify Lender thereof in writing. Promptly upon the receipt thereof by or on behalf of such Borrower or Obligor (including by any agent or representative), such Borrower or Obligor shall deliver, or cause to be delivered to Lender, all tangible chattel paper and instruments that such Borrower or Obligor has or may at any time acquire, accompanied by such instruments of transfer or assignment duly executed in blank as Lender may from time to time specify, in each case except as Lender may otherwise agree. At Lender's option, such Borrower or Obligor shall, or Lender may at any time on behalf of such Borrower or Obligor, cause the original of any such instrument or chattel paper to be conspicuously marked in a form and manner acceptable to Lender with the following legend referring to chattel paper or instruments as applicable: "This [chattel paper] [instrument] is subject to the security interest of Tiger Finance, LLC and any sale, transfer, assignment or encumbrance of this [chattel paper] [instrument] violates the rights of such secured party."

(c)    In the event that any Borrower or Obligor shall at any time hold or acquire an interest in any electronic chattel paper or any "transferable record" (as such term is defined in

Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), such Borrower or Obligor shall promptly notify Lender thereof in writing.  Promptly upon Lender's request, such Borrower or Obligor shall take, or cause to be taken, such actions as Lender may reasonably request to give Lender control of such electronic chattel paper under Section 9-105 of the Uniform Commercial Code and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction.

(d)     No Borrower or Obligor has any deposit accounts, except as set forth on Schedule 5.2(d) hereto. Borrowers and Obligors shall not, directly or indirectly, open, establish or maintain any deposit account unless each of the following conditions is satisfied:  (i) Lender shall have received not less than five (5) Business Days prior written notice of the intention of Borrower or Obligor to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Lender the name of the account, the owner of the account, the name and address of the bank at which such account is to be opened or established, the individual at such bank with whom such Borrower or Obligor is dealing and the purpose of the account, (ii) the bank where such account is opened or maintained shall be acceptable to Lender, and (iii) on or before the opening of such deposit account, such Borrower or Obligor shall as Lender may specify either (A) deliver to Lender a Deposit Account Control Agreement with respect to such deposit account duly authorized, executed and delivered by such Borrower or Obligor and the bank at which such deposit account is opened and maintained or (B) arrange for Lender to become the customer of the bank with respect to the deposit account on terms and conditions acceptable to Lender. The terms of this subsection (d) shall not apply to deposit accounts specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of such Borrower's or Obligor's salaried employees or to deposit accounts specifically and exclusively used to support the payment of contest prizes to customers of Borrowers as required by law.

(e)     No Borrower or Obligor owns or holds, directly or indirectly, beneficially or as record owner or both, any investment property, or has any investment account, securities account, commodity account or other similar account with any bank or other financial institution or other securities intermediary or commodity intermediary, in each case except as set forth on Schedule 5.2(e) hereto.

(i)     In the event that any Borrower or Obligor shall be entitled to or shall hold or acquire any certificated securities (other than certificated securities of another Borrower or Obligor), such Borrower or Obligor shall promptly endorse, assign and deliver the same to Lender, accompanied by such instruments of transfer or assignment duly executed in blank as Lender may from time to time specify.  If any securities, now or hereafter acquired by such Borrower or Obligor are uncertificated and are issued to such Borrower or Obligor or its nominee directly by the issuer thereof, such Borrower or Obligor shall immediately notify Lender thereof and shall as Lender may specify, either (A) cause the issuer to agree to comply with instructions from Lender as to such securities, without further consent of such Borrower or Obligor or such nominee, or (B) arrange for Lender to become the registered owner of the securities.

(ii)     No Borrower or Obligor shall, directly or indirectly, open, establish or maintain any 'investment account, securities account, commodity account or any other similar

account (other than a deposit account) with any securities intermediary or commodity intermediary unless each of the following conditions is satisfied: (A) Lender shall have received not less than five (5) Business Days prior written notice of the intention of such Borrower or Obligor to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Lender the name of the account, the owner of the account, the name and address of the securities intermediary or commodity intermediary at which such account is to be opened or established, the individual at such intermediary with whom such Borrower or Obligor is dealing and the purpose of the account, (B) the securities intermediary or commodity intermediary (as the case may be) where such account is opened or maintained shall be acceptable to Lender, and (C) on or before the opening of such investment account, securities account or other similar account with a securities intermediary or commodity intermediary, such Borrower or Obligor shall as Lender may specify either (1) execute and deliver, and cause to be executed and delivered to Lender, an Investment Property Control Agreement with respect thereto duly authorized, executed and delivered by Borrower and such securities intermediary or commodity intermediary or (2) arrange for Lender to become the entitlement holder with respect to such investment property on terms and conditions acceptable to Lender.

(f)     No Borrower or Obligor is the beneficiary or otherwise entitled to any right to payment under any letter of credit rights, letter of credit, banker's acceptance or similar instrument, except as set forth on Schedule 5.2(f) hereto. In the event that any Borrower or Obligor shall be entitled to or shall receive any right to payment under any letter of credit rights, letter of credit, banker's acceptance or any similar instrument, whether as beneficiary thereof or otherwise, such Borrower or Obligor shall promptly notify Lender thereof in writing. At any time the face amount of any outstanding letter of credit rights, letters of credit, banker's acceptance and similar instruments exceed $250,000 individually or $1,000,000 in the aggregate, such Borrower or Obligor shall immediately, as Lender may specify, either (i) deliver, or cause to be delivered to Lender, with respect to any such letter of credit rights, letter of credit, banker's acceptance or similar instrument, the written agreement of the issuer and any other nominated person obligated to make any payment in respect thereof (including any confirming or negotiating bank), in form and substance satisfactory to Lender, consenting to the assignment of the proceeds of letter of credit rights, letter of credit, banker's acceptance or any similar instrument to Lender by such Borrower or Obligor and agreeing to make all payments thereon directly to Lender or as Lender may otherwise direct or (ii) cause Lender to become, at such Borrower's or Obligor's expense, the transferee beneficiary of the letter of credit rights, letter of credit, banker's acceptance or similar instrument (as the case may be).

(g)     No Borrower or Obligor has commercial tort claims, except as set forth on Schedule 5.2(g) hereto. In the event that any Borrower or Obligor shall at any time have any commercial tort claims that exceed $250,000 in the aggregate, such Borrower or Obligor shall promptly notify Lender thereof in writing, which notice shall (i) set forth in reasonable detail the basis for and nature of such commercial tort claim and (ii) include the express grant by such Borrower or Obligor to Lender of a security interest in such commercial tort claim (and the proceeds thereof). In the event that such notice does not include such grant of a security interest, the sending thereof by such Borrower or Obligor to Lender shall be deemed to constitute such grant to Lender. Upon the sending of such notice, any commercial tort claim described therein shall constitute part of the Collateral and shall be deemed included therein. Without limiting the authorization of Lender provided in Section 5(a) hereof or otherwise arising by the execution by

such Borrower or Obligor or any of the other Financing Agreements, Lender is hereby irrevocably authorized from time to time and at any time to file such financing statements naming Lender or its designee as secured party and such Borrower or Obligor as debtor, or any amendments to any financing statements, covering any such commercial tort claim as Collateral. In addition, such Borrower or Obligor shall promptly upon Lender's request, execute and deliver, or cause to be executed and delivered, to Lender such other agreements, documents and instruments as Lender may require in connection with such commercial tort claim.

(h)     No Borrower or Obligor has any goods, documents of title or other Collateral in the custody, control or possession of a third party, except as set forth on Schedule 5.2(h) hereto, except for goods located in the United States in transit to a location of such Borrower or Obligor permitted herein in the ordinary course of business of such Borrower or Obligor in the possession of the carrier transporting such goods, and except for goods in the custody of a repair service in the ordinary course of business. In the event that any goods, documents of the title or other Collateral are at any time in the custody, control or possession of any other person not referred to on Schedule 5.2(h) hereto or such carriers or repair service, such Borrower or Obligor shall promptly notify Lender thereof in writing. Promptly upon Lender's request, such Borrower or Obligor shall deliver to Lender a Collateral Access Agreement duly authorized, executed and delivered by such person and Borrower.

(i)     Borrowers and Obligors shall take any other actions reasonably requested by Lender from time to time to cause the attachment, perfection and first priority of, and the ability of Lender to enforce, the security interest of Lender in any and all of the Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Borrower's or Obligor's signature thereon is required therefor, (ii) causing Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of Lender to enforce, the security interest of Lender in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Lender to enforce, the security interest of Lender in such Collateral, (iv) obtaining the consents and approvals of any governmental authority or third party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

## SECTION 6.  COLLECTION AND ADMINISTRATION

6.1    Borrowers' Loan Account. Lender shall maintain one or more loan account(s) on its books in which shall be recorded (a) all Loans and other Obligations and the Collateral, (b) all payments made by or on behalf of Borrowers and (c) all other appropriate debits and credits as provided in this Agreement, including fees, charges, costs, expenses and interest. All entries in the loan account(s) shall be made in accordance with Lender's customary practices as in effect from time to time.

6.2    Statements. Lender shall render to Borrowers' Agent each month a statement setting forth the balance in the Borrowers' loan account(s) maintained by Lender for Borrowers pursuant to the provisions of this Agreement, including principal, interest, fees, costs and expenses. Each such statement shall be subject to subsequent adjustment by Lender but shall, absent manifest errors or omissions, be considered correct and deemed accepted by Borrowers and conclusively binding upon Borrowers as an account stated except to the extent that Borrowers' Agent gives written notice to Lender of any specific exceptions of Borrowers thereto within sixty (60) days after such statement has been received by Borrowers' Agent.  Until such time as Lender shall have rendered to Borrowers' Agent a written statement as provided above, the balance in Borrowers' loan account(s) shall be presumptive evidence of the amounts due and owing to Lender by Borrowers.

6.3    Collection of Accounts.

(a)    Borrowers shall establish and maintain, at its expense, deposit account arrangements and merchant payment arrangements with the banks set forth on Schedule 6.3 hereto and, subject to Section 5.2(d) hereof, such other banks as Borrowers may hereafter select.  The banks set forth on Schedule 6.3 hereto constitute all of the banks with which Borrowers have deposit account arrangements and merchant payment arrangements as of the date hereof and identifies each of the deposit accounts at such banks that are used solely for receiving store receipts from a retail store location of any Borrower (together with any other deposit accounts at any time established or used by any Borrower for receiving such store receipts from any retail store location, collectively, the "Store Accounts" and each individually, a "Store Account") or otherwise describes the nature of the use of such deposit account by Borrowers.

(b)

(i) Borrowers shall deposit all proceeds from sales of Inventory in every form, including, without limitation, cash, checks, credit card sales drafts, credit card sales or charge slips or receipts and other forms of store receipts (other than amounts retained in registers and vaults at the retail stores as cash on hand which amounts shall not exceed in the aggregate for all retail stores of Borrowers at any time an amount equal $500,000) on each Business Day into the Store Accounts of Borrowers used solely for such purpose.  All available funds deposited into each Store Account shall be sent by wire transfer or other electronic funds transfer to the Blocked Accounts daily; provided, that, no funds in any Store Account shall be required to be transferred to the Blocked Accounts unless and until the available funds in such Store Account exceeds $5,000 for more than three (3) consecutive days.

(ii) Borrowers shall establish and maintain, at their expense, deposit accounts with such banks as are acceptable to Lender (the "Blocked Accounts") subject to a Deposit Account Control Agreement into which Borrowers shall on a daily basis either cause all amounts on deposit in the Store Accounts to be sent as provided in Section 6.3(a)(i) above or shall itself deposit or cause to be deposited all proceeds from sales of Inventory, all other amounts payable to Borrowers from Credit Card Issuers and Credit Card Processors and all other proceeds of Collateral; provided that, no funds in any Store Account shall be required to be transferred to the Blocked Accounts unless and until the available funds in such Store Account exceeds $1,000 for more than three (3) consecutive days.  Before any Blocked Account is opened, Borrowers shall deliver, or cause to be

delivered to Lender a Deposit Account Control Agreement duly authorized, executed and delivered by each bank where such a Blocked Account is maintained, and at any time and from time to time Lender may become the bank's customer with respect to any of the Blocked Accounts and promptly upon Lender's request, Borrowers shall execute and deliver such agreements and documents as Lender may require in connection therewith.  Lender shall instruct the depository banks at which the Blocked Account are maintained to transfer the funds on deposit in the Blocked Accounts to such bank account of Lender as Lender may from time to time designate for such purpose (the "Payment Account").

(c)     For purposes of calculating the amount of the Loans available to Borrowers, such payments will be applied (conditional upon final collection) to the Obligations on the business day of receipt by Lender of immediately available funds in the Payment Account provided such payments and notice thereof are received in accordance with Lender's usual and customary practices as in effect from time to time and within sufficient time to credit Borrowers' loan account on such day, and if not, then on the next business day.  For the purposes of calculating interest on the Obligations, such payments or other funds received will be applied (conditional upon final collection) to the Obligations on the date of receipt of immediately available funds by Lender in the Payment Account provided such payments or other funds and notice thereof are received in accordance with Lender's usual and customary practices as in effect from time to time and within sufficient time to credit Borrowers' loan account on such day, and if not, then on the next business day.

(d)     Borrowers and all of its affiliates, subsidiaries or agents shall, acting as trustee for Lender, receive, as the property of Lender, any monies, checks, notes, drafts or any other payment relating to and/or proceeds of Accounts or other Collateral which come into their possession or under their control and immediately upon receipt thereof, shall deposit or cause the same to be deposited in the Blocked Accounts, or remit the same or cause the same to be remitted, in kind, to Lender.  Subject to Section 6.3(a) hereof, in no event shall the same be commingled with Borrowers' own funds.  Borrowers agrees to reimburse Lender on demand for any amounts owed or paid to any bank at which a Blocked Account is established or any other bank or person involved in the transfer of funds to or from the Blocked Accounts arising out of Lender's payments to or indemnification of such bank or person.  The obligation of Borrowers to reimburse Lender for such amounts pursuant to this Section 6.3 shall survive the termination or non renewal of this Agreement.

6.4     Payments. All Obligations shall be payable to the Payment Account as provided in Section 6.3 or such other place as Lender may designate from time to time.  Lender may apply payments received or collected from Borrowers or for the account of Borrowers (including the monetary proceeds of collections or of realization upon any Collateral), prior to the issuance of a Carve Out Trigger Notice, as follows:  first, an amount sufficient to fully fund the Carve Out Reserve Account (as defined in the Interim Order); second, to pay any fees, indemnities or expense reimbursements then due to Lender from Borrower; third to pay interest due in respect of any Loans; fourth to pay principal due in respect of the Loans, and fifth, to pay or prepay any other Obligations whether or not then due, in such order and manner as Lender determines and at any time an Event of Default exists or has occurred and is continuing, to provide cash collateral for any contingent Obligations.  After the issuance of a Carve Out Trigger Notice, Lender may apply payments received or collected from Borrowers or for the account of Borrowers pursuant to the

Orders.  At Lender's option, all principal, interest, fees, costs, expenses and other charges provided for in this Agreement or the other Financing Agreements may be charged directly to the loan account(s) of Borrowers.  Borrowers shall make all payments to Lender on the Obligations free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, duties, taxes, levies, imposts, fees, deductions, withholding, restrictions or conditions of any kind.  If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect from and after such date of surrender or return as if such payment or proceeds had not been received by Lender.  Borrowers shall be liable to pay to Lender, and does hereby indemnify and hold Lender harmless for the amount of any payments or proceeds surrendered or returned plus any interest and/or penalties, if any, that may be payable by Lender.  This Section 6.4 shall remain effective notwithstanding any contrary action which may be taken by Lender in reliance upon such payment or proceeds.  This Section 6.4 shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

6.5     Authorization to Make Loans. Lender is authorized to make the Loans based upon telephonic or other instructions (which may be delivered via e-mail) received from anyone purporting to be an officer of a Borrower or Borrowers' Agent or other authorized person or, at the discretion of Lender, if such Loans are necessary to satisfy any Obligations.  All requests for Loans hereunder shall specify the date on which the requested advance is to be made established (which day shall be a Business Day or a US. Government Securities Business Day, as applicable) and the amount of the requested Loan.  Requests received after 11:00 a.m. New York City time on any day shall be deemed to have been made as of the opening of business on the immediately following Business Day or a US. Government Securities Business Day, as applicable).  All Loans under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, Borrowers when deposited to the credit of Borrowers or otherwise disbursed or established in accordance with the instructions of any Borrower or Borrowers' Agent or in accordance with the terms and conditions of this Agreement.  Loans requested by the Borrowers' Agent pursuant to the foregoing will be wire transferred by Lender to an account provided by Borrowers' Agent to Lender in writing on the date hereof and signed by an authorized signatory of the Borrowers as identified on Schedule 6.5 hereto.  The foregoing account can only be changed in writing by an authorized signatory of Borrowers' Agent as identified on Schedule 6.5 hereto.  All requests for Loans which are not made on-line via e-mail shall be subject to (and unless Lender elects otherwise in the exercise of its sole discretion, such Loans shall not be made until the completion of) Lender's authentication process (with results satisfactory to Lender) prior to the funding of any such requested Loan.

6.6     Use of Proceeds. Borrowers shall use the initial proceeds of the Loans provided by Lender to Borrowers hereunder only for: (a) to repay the Existing Liabilities in full, (b) costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Financing Agreements.  All other Loans made by Lender to Borrowers pursuant to the provisions hereof shall be used by Borrowers only for general operating, working capital and other proper corporate purposes of Borrowers, in each case subject to and as limited by the Budget and as may be permitted by the Orders, and (c) in a manner that is not otherwise prohibited by the terms hereof or under the Orders.  None of the proceeds of the Loans will be

44

used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System. Each Borrower will not, and will cause each other member of the Borrower Group not to, directly or indirectly, use any of the Loans to fund, finance or facilitate any activities, business or transactions that would be prohibited by Sanctions, Anti-Money Laundering Laws or Anti-Corruption Laws.

## SECTION 7. <u>COLLATERAL REPORTING AND COVENANTS</u>

7.1     <u>Collateral Reporting</u>. Borrowers or Borrowers' Agent shall provide Lender with each of the statements, reports, certificates, schedules and other items for forth on <u>Schedule 7.1</u> no later than the times specified therein. If any of Borrowers' records or reports of the Collateral are prepared or maintained by an accounting service, contractor, shipper or other agent, Borrowers hereby irrevocably authorizes such service, contractor, shipper or agent to deliver such records, reports, and related documents to Lender and to follow Lender's instructions with respect to further services at any time that an Event of Default exists or has occurred and is continuing. Nothing contained in any Borrowing Base Certificate shall be deemed to limit, impair or otherwise affect the rights of Lender contained herein and in the event of any conflict or inconsistency between the calculation of the borrowing base as set forth in any Borrowing Base Certificate and as determined by Lender in good faith, the determination of Lender shall govern and, absent manifest error, be conclusive and binding upon Borrower. Without limiting the foregoing, Borrowers' Agent shall furnish to Lender any information which Lender may reasonably request regarding the determination and calculation of any of the amounts set forth in any Borrowing Base Certificate. Subject to the terms set forth herein, the Borrowing Base may be adjusted in accordance with the terms of this Agreement based on the information received by Lender pursuant to this Agreement.

7.2     <u>Accounts Covenants</u>.

(a)     Borrowers shall notify Lender promptly of (i) any material delay in any Borrower's performance of any of its obligations to any account debtor, Credit Card Issuer or Credit Card Processor or the assertion of any claims, offsets, defenses or counterclaims by any account debtor, Credit Card Issuer or Credit Card Processor, or any disputes with account debtors, Credit Card Issuers or Credit Card Processors, or any settlement, adjustment or compromise thereof and (ii) all material adverse information relating to the financial condition of any account debtor, Credit Card Issuer or Credit Card Processor. No credit, discount, allowance or extension or agreement for any of the foregoing shall be granted to any account debtor, Credit Card Issuer or Credit Card Processor without Lender's consent, except in the ordinary course of Borrowers' business in accordance with practices and policies previously disclosed in writing to Lender. So long as no Event of Default exists or has occurred and is continuing, Borrowers shall settle, adjust or compromise any claim, offset, counterclaim or dispute with any account debtor, Credit Card Issuer or Credit Card Processor. At any time that an Event of Default exists or has occurred and is continuing, Lender shall, at its option, have the exclusive right to settle, adjust or compromise any claim, offset, counterclaim or dispute with account debtors, Credit Card Issuers or Credit Card Processors or grant any credits, discounts or allowances.

(b)     Without limiting the obligation of Borrowers to deliver any other information to Lender, each Borrower or Borrowers' Agent shall promptly report to Lender any

return of Inventory by any one account debtor if the inventory so returned in such case has a value in excess of $250,000.  In the event any account debtor returns Inventory when an Event of Default exists or has occurred and is continuing, Borrowers shall, upon Lender's request, (i) hold the returned Inventory in trust for Lender, (ii) segregate all returned Inventory from all of its other property, (iii) dispose of the returned Inventory solely according to Lender's instructions, and (iv) not issue any credits, discounts or allowances with respect thereto without Lender's prior written consent.

(c)       With respect to each Account: (i) the amounts shown on any invoice delivered to Lender or schedule thereof delivered to Lender shall be true and complete, (ii) no payments shall be made thereon except payments delivered to a Store Account or a Blocked Account pursuant to the terms of Section 6.3 of this Agreement, (iii) no credit, discount, allowance or extension or agreement for any of the foregoing shall be granted to any account debtor, Credit Card Issuer or Credit Card Processor except as reported to Lender in accordance with this Agreement and except for credits, discounts, allowances or extensions made or given in the ordinary course of Borrowers' business in accordance with practices and policies previously disclosed to Lender, (iv) there shall be no setoffs, deductions, contras, defenses, counterclaims or disputes existing or asserted with respect thereto except as reported to Lender in accordance with the terms of this Agreement, (v) none of the transactions giving rise thereto will violate any applicable State or Federal laws or regulations, all documentation relating thereto will be legally sufficient under such laws and regulations and all such documentation will be legally enforceable in accordance with its terms, and (vi) there shall be compliance with the provisions of the Credit Card Acknowledgments delivered from time to time.

(d)       Lender shall have the right at any time or times, in Lender's name or in the name of a nominee of Lender, to verify the validity, amount or any other matter relating to any Account or other Collateral, by mail, telephone, e-mail or otherwise.

(e)       Borrowers shall deliver or cause to be delivered to Lender, with appropriate endorsement and assignment, with full recourse to Borrowers, all chattel paper and instruments which Borrowers now owns or may at any time acquire immediately upon Borrowers' receipt thereof, except as Lender may otherwise agree.

(f)       Lender may, at any time or times that an Event of Default exists or has occurred and is continuing, (i) notify any or all account debtors, Credit Card Issuers and Credit Card Processors that the Accounts have been assigned to Lender and that Lender has a security interest therein and Lender may direct any or all accounts debtors to make payment of Accounts directly to Lender, (ii) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any and all Accounts or other obligations included in the Collateral and thereby discharge or release the account debtor, Credit Card Issuer or Credit Card Processor or any other party or parties in any way liable for payment thereof without affecting any of the Obligations, (iii) demand, collect or enforce payment of any Accounts or such other obligations, but without any duty to do so, and Lender shall not be liable for its failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto and (iv) take whatever other action Lender may deem necessary or desirable for the protection of its interests.  At any time that an Event of Default exists or has occurred and is continuing, at Lender's request, all invoices and statements sent to any account

46

debtor, Credit Card Issuer or Credit Card Processor shall state that the Accounts and such other obligations have been assigned to Lender and are payable directly and only to Lender and Borrowers shall deliver to Lender such originals of documents evidencing the sale and delivery of goods or the performance of services giving rise to any Accounts as Lender may require.

(g)     Borrowers and Lender hereby agree that the delivery of the Borrowing Base Certificate via e-mail or, subject to Lender's authentication process, by such other electronic method as may be approved by Lender from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the Borrowing Base as may be approved by Lender from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of Borrowers to execute and deliver such Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate had been manually executed and delivered by Borrowers and delivered to Lender.

7.3     <u>Inventory Covenants</u>. With respect to the Inventory: (a) Borrowers shall at all times maintain inventory records reasonably satisfactory to Lender, keeping correct and accurate records itemizing and describing the kind, type, quality and quantity of Inventory, such Borrower's cost therefor, and daily withdrawals therefrom and additions thereto; (b) [reserved]; (c) Borrowers shall not remove any Inventory from the locations set forth or permitted herein, without the prior written consent of Lender, except (i) for sales of Inventory in the ordinary course of Borrowers' business, (ii) to move Inventory directly from one location set forth or permitted herein to another such location and (iii) to move Inventory to locations where Borrowers are involved in a trade show, provided such Inventory is returned to its former location within ten (10) days after its removal and that such Inventory does not exceed $100,000 in cost at any one time; (d) [reserved;] (e) Borrowers shall produce, use, store and maintain the Inventory with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with applicable laws (including the requirements of the Federal Fair Labor Standards Act of 1938, as amended and all rules, regulations and orders related thereto); (f) Borrowers assume all responsibility and liability arising from or relating to the production, use, sale or other disposition of the Inventory; (g) Borrowers shall not sell Inventory to any customer on approval, or any other basis which entitles the customer to return or may obligate Borrowers to repurchase such Inventory, except in the ordinary course of business; (h) Borrowers shall keep the Inventory in good and marketable condition; and (i) Borrowers shall not, without prior written notice to Lender, acquire or accept any Inventory on consignment or approval.

7.4     <u>Equipment Covenants</u>. With respect to the Equipment: (a), upon Lender's request at any time or times on or after an Event of Default, Borrowers shall, at their expense, deliver or cause to be delivered to Lender written reports or appraisals as to the Equipment in form, scope and methodology acceptable to Lender and by an appraiser acceptable to Lender; (b) Borrowers shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear excepted); (c) Borrowers shall use the Equipment with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with all applicable laws; (d) the Equipment is and shall be used in Borrowers' business and not for personal, family, household or farming use; (e) Borrowers shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of the business of Borrowers or to move Equipment directly from one location set forth or permitted herein to another such location and except for the

47

movement of motor vehicles used by or for the benefit of Borrowers in the ordinary course of business; (f) the Equipment is now and shall remain personal property and Borrowers shall not permit any of the Equipment to be or become a part of or affixed to real property; and (g) Borrowers assume all responsibility and liability arising from the use of the Equipment.

7.5     [Reserved].

7.6     Power of Attorney. Subject to the Orders, each Borrower hereby irrevocably designates and appoints Lender (and all persons designated by Lender) as such Borrower's true and lawful attorney in fact, and authorizes Lender, in Borrower's or Lender's name, to: (a) at any time an Event of Default exists or has occurred and is continuing (i) demand payment on Accounts or other proceeds of Inventory or other Collateral, (ii) enforce payment of Accounts by legal proceedings or otherwise, (iii) exercise all of Borrowers' rights and remedies to collect any Account or other Collateral, (iv) sell or assign any Account upon such terms, for such amount and at such time or times as Lender deems advisable, (v) settle, adjust, compromise, extend or renew an Account, (vi) discharge and release any Account, (vii) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or other similar document against an account debtor, (viii) notify the post office authorities to change the address for delivery of such Borrower's mail to an address designated by Lender, and open and dispose of all mail addressed to such Borrower, and (ix) do all acts and things which are necessary, in Lender's determination, to fulfill such Borrower's obligations under this Agreement and the other Financing Agreements; (b) to (i) take control in any manner of any item of payment or proceeds thereof, (ii) have access to any lockbox or postal box into which such Borrower's mail is deposited, (iii) endorse such Borrower's name upon any items of payment or proceeds thereof and deposit the same in Lender's account for application to the Obligations, and (iv) endorse such Borrower's name upon any chattel paper, document, instrument, invoice, or similar document or agreement relating to any Account or any goods pertaining thereto or any other Collateral; and (c) at any time to (i) sign such Borrower's name on any verification of Accounts and notices thereof to account debtors and (ii) execute in such Borrower's name and file any UCC financing statements or amendments thereto.  Each Borrower hereby releases Lender and its officers, employees and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of Lender's own (or its officers', employees' and designees') gross negligence or willful misconduct as determined pursuant to a final non appealable order of a court of competent jurisdiction.  The power of attorney granted pursuant to this Section 7.6 shall not be deemed to revoke any prior powers of attorney granted by Borrowers.

7.7     Right to Cure. Lender may, at its option, (a) cure any material default by any Borrower under any material agreement with a third party, (b) pay or bond on appeal any judgment entered against any Borrower, (other than a judgment that does not constitute an Event of Default under Section 10.1(d) hereof), (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral (other than taxes, liens, security interests or other encumbrances permitted under Section 9.8 hereof) and (d) pay any amount, incur any expense or perform any act which, in Lender's judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Lender with respect thereto. Lender may add any amounts so expended to the Obligations and charge such Borrower's account therefor, such amounts to be repayable by such Borrower on demand.  Lender shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have

assumed any obligation or liability of such Borrower.  Any payment made or other action taken by Lender under this Section shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

7.8     Access to Premises. From time to time as requested by Lender, at the cost and expense of Borrowers, (a) Lender or its designee shall have complete access to all of Borrowers' premises during normal business hours and after reasonable written notice to Borrowers' Agent, or at any time and without notice to Borrowers if an Event of Default exists or has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of Borrowers' books and records, including the Records, and (b) Borrowers shall promptly furnish to Lender such copies of such books and records or extracts therefrom as Lender may reasonably request, and (c) use during normal business hours such of Borrowers' personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing and if an Event of Default exists or has occurred and is continuing for the collection of Accounts and realization of other Collateral.

## SECTION 8.  REPRESENTATIONS AND WARRANTIES

Borrowers hereby represents and warrants to Lender the following (which shall survive the execution and delivery of this Agreement), the truth and accuracy of which are a continuing condition of the making of Loans by Lender to Borrowers:

8.1     Existence, Power and Authority: Subsidiaries. Each Borrower is a corporation or a limited liability company duly organized and in good standing under the laws of its state of incorporation (or formation) and is duly qualified as a foreign corporation (or company) and in good standing in all states or other jurisdictions where the nature and extent of the business transacted by it or the ownership of assets makes such qualification necessary, except for those jurisdictions in which the failure to so qualify would not have a material adverse effect on such Borrower's financial condition, results of operation or business or the rights of Lender in or to any of the Collateral.  Subject to the entry of the Interim Order or the Final Order, as applicable, the execution, delivery and performance of this Agreement, the other Financing Agreements and the transactions contemplated hereunder and thereunder are all within each Borrower's corporate powers, have been duly authorized and are not in contravention of law or the terms of each Borrower's certificate of incorporation or formation, by laws, operating agreement, or other organizational documentation, or any indenture, agreement or undertaking to which any Borrower is a party or by which any Borrower or its property are bound.  Subject to the entry of the Interim Order or the Final Order, as applicable, this Agreement and the other Financing Agreements constitute legal, valid and binding obligations of Borrowers enforceable in accordance with their respective terms.  Borrowers do not have any subsidiaries except as set forth on Schedule 8.1 hereto.

8.2     Financial Statements: No Material Adverse Change. All financial statements relating to Borrowers which have been or may hereafter be delivered by Borrowers to Lender have been prepared in accordance with GAAP and fairly present the financial condition and the results of operation of Borrowers as at the dates and for the periods set forth therein.

8.3     Chief Executive Office: Collateral Locations.  The chief executive office of each Borrower and each Borrower's Records concerning Accounts are located only at its respective address set forth below and its only other places of business and the only other locations of Collateral, if any, are the addresses set forth on Schedule 8.3 hereto, subject to the right of Borrowers to establish new locations in accordance with Section 9.2 below.  Schedule 8.3 hereto correctly identifies each of the Retail Stores and any locations which are not owned by Borrowers and sets forth the owners and/or operators thereof.

8.4     Priority of Liens: Title to Properties. The security interests and liens granted to Lender under this Agreement and the other Financing Agreements constitute valid and perfected first priority liens and security interests in and upon the Collateral subject only to the Permitted Liens.  Each Borrower has good and marketable title to all of its properties and assets subject to no liens, mortgages, pledges, security interests, encumbrances or charges of any kind, except those granted to Lender and the Permitted Liens.

8.5     Tax Returns. Borrowers have filed, or caused to be filed, in a timely manner (subject to any extensions granted to or timely requested by Borrowers) all tax returns, reports and declarations which are required to be filed by it.  All information in such tax returns, reports and declarations is complete and accurate in all material respects.  Borrowers have paid or caused to be paid all taxes due and payable or claimed due and payable in any assessment received by it, except taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Borrowers and with respect to which adequate reserves have been set aside on its books.  Adequate provision has been made for the payment of all accrued and unpaid Federal, State, county, local, foreign and other taxes whether or not yet due and payable and whether or not disputed.

8.6     Litigation. Except for the Chapter 11 Cases and as set forth on Schedule 8.6 hereto, as of the date hereof, there is no present investigation by any governmental agency pending, or to the best of any Borrower's knowledge threatened, against or affecting any Borrower, its assets or business and there is no action, suit, proceeding or claim by any Person pending, or to the best of any Borrower's knowledge threatened, against Borrowers or its assets or goodwill, or against or affecting any transactions contemplated by this Agreement, which if adversely determined against any Borrower would result in any material adverse change in the assets, business or prospects of Borrowers or would impair the ability of Borrowers to perform its obligations hereunder or under any of the other Financing Agreements to which it is a party or of Lender to enforce any Obligations or realize upon any Collateral.

8.7     Compliance with Other Agreements and Applicable Laws. Subject to the entry of the Interim Order or the Final Order, as applicable, as of the date hereof, each Borrower is in compliance in all material respects with all applicable provisions of laws, rules, regulations, licenses, permits, approvals and orders of any foreign, federal, state or local governmental authority, including those set forth in or promulgated pursuant to the Occupational Safety and Health Act of 1970, as amended, the Fair Labor Standards Act of 1938, as amended, the Code, all federal, state, and local statutes, regulations, rules and orders relating to consumer credit (including as each has been amended, the Truth in Lending Act, the Fair Credit Billing Act, the Equal Credit Opportunity Act and the Fair Credit Reporting Act), all federal, state and local statutes, regulations, rules and orders pertaining to sales of consumer goods (including the Consumer Products Safety

Act of 1972, as amended, and the Federal Trade Commission Act of 1914, as amended, and all regulations, rules and orders promulgated thereunder), except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a material adverse change, or any such non-compliance is subject to the automatic stay.  Each Borrower will, and will cause each other member of the Borrower Group to, comply with Sanctions and comply with Anti-Money Laundering Laws and Anti-Corruption Laws in all material respects.

8.8    Employee Benefits.

(a)    Borrowers have not engaged in any transaction in connection with which Borrowers or any of their ERISA Affiliates could be subject to either a civil penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Code, including any accumulated funding deficiency described in Section 8.8(c) hereof and any deficiency with respect to vested accrued benefits described in Section 8.8(d) hereof.

(b)    No liability to the Pension Benefit Guaranty Corporation has been or is expected by Borrowers to be incurred with respect to any employee benefit plan of Borrowers or any of their ERISA Affiliates.  There has been no reportable event (within the meaning of Section 4043(b) of ERISA) or any other event or condition with respect to any employee pension benefit plan of Borrower or any of their ERISA Affiliates which presents a risk of termination of any such plan by the Pension Benefit Guaranty Corporation.

(c)    Full payment has been made of all amounts which Borrowers or any of their ERISA Affiliates is required under Section 302 of ERISA and Section 412 of the Code to have paid under the terms of each employee benefit plan as contributions to such plan as of the last day of the most recent fiscal year of such plan ended prior to the date hereof, and no accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, exists with respect to any employee benefit plan, including any penalty or tax described in Section 8.8(a) hereof and any deficiency with respect to vested accrued benefits described in Section 8.8(d) hereof.

(d)    The current value of all vested accrued benefits under all employee benefit plans maintained by Borrowers that are subject to Title IV of ERISA does not exceed the current value of the assets of such plans allocable to such vested accrued benefits, including any penalty or tax described in Section 8.8(a) hereof and any accumulated funding deficiency described in Section 8.8(c) hereof.  The terms "current value" and "accrued benefit" have the meanings specified in ERISA.

(e)    Neither Borrowers nor any of their respective ERISA Affiliates is or has ever been obligated to contribute to any "multiemployer plan" (as such term is defined in Section 4001(a)(3) of ERISA) that is subject to Title IV of ERISA.

8.9    Bank Accounts. All of the deposit accounts, investment accounts or other accounts in the name of or used by Borrowers maintained at any bank or other financial institution are set forth on Schedule 8.9 hereto, subject to the right of Borrowers to establish new accounts in accordance with Section 9.13 below or the Cash Management Order.

8.10    Credit Card Agreements. Set forth in <u>Schedule 8.10</u> hereto is a correct and complete list of (a) all of the Credit Card Agreements and all other agreements, documents and instruments existing as of the date hereof between or among Borrowers, the Credit Card Issuers, the Credit Card Processors and any of their affiliates, (b) the percentage of each sale payable to the Credit Card Issuer or Credit Card Processor under the terms of the Credit Card Agreements, (c) all other fees and charges payable by Borrowers under or in connection with the Credit Card Agreements and (d) the term of such Credit Card Agreements.  The Credit Card Agreements constitute all of such agreements necessary for Borrowers to operate their business as presently conducted with respect to credit cards and debit cards and no Accounts of Borrower arise from purchases by customers of Inventory with credit cards or debit cards, other than those which are issued by Credit Card Issuers with whom Borrowers have entered into one of the Credit Card Agreements set forth <u>on Schedule 8.10</u> hereto or with whom Borrowers have entered into a Credit Card Agreement in accordance with Section 9.13 hereof.  Each of the Credit Card Agreements constitutes the legal, valid and binding obligations of such Borrower and to the best of Borrowers' knowledge, the other parties thereto, are enforceable in accordance with their respective terms and are in full force and effect.

8.11    <u>Accuracy and Completeness of Information</u>. All information furnished by or on behalf of Borrowers in writing to Lender in connection with this Agreement or any of the other Financing Agreements or any transaction contemplated hereby or thereby, including all information on the Schedules hereto and on the Information Certificate is true and correct in all material respects on the date as of which such information is dated or certified and does not omit any material fact necessary in order to make such information not misleading.  No event or circumstance has occurred which has had or could reasonably be expected to have a material adverse effect on the business, assets or prospects of Borrowers, which has not been fully and accurately disclosed to Lender in writing.

8.12    <u>Interrelated Businesses</u>. Borrowers share an identity of interests such that any benefit received by each of Borrowers benefits the others.  Each Borrower renders services to or for the benefit of the other Borrowers, make loans and advances to or for the benefit of the other Borrowers and provide administrative, marketing, payroll and management services to or for the benefit of the other Borrowers.  Borrowers have centralized accounting and legal services.

8.13    <u>Survival of Warranties: Cumulative</u>. All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to Lender on the date of each additional borrowing or other credit accommodation hereunder (other than representations and warranties that are specifically limited by their terms to a different date) and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender.  The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which Borrowers shall now or hereafter give, or cause to be given, to Lender.

8.14    <u>Margin Stock; Investment Company Act, Etc</u>.  No Borrower owns any Margin Stock or engages principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No Borrower is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any

other Federal or State statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. No Borrower is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

8.15    Intellectual Property. Each Borrower owns or licenses or otherwise has the right to use all Intellectual Property necessary for the operation of its business as presently conducted or proposed to be conducted. As of the date hereof, Borrowers do not have any Intellectual Property registered, or subject to pending applications, in the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in the United States, any State thereof, any political subdivision thereof or in any other country, other than those described on Schedule 8.15 hereto and has not granted any licenses with respect thereto other than non-exclusive licenses entered into in the ordinary course of business. No event has occurred which permits or would permit after notice or passage of time or both, the revocation, suspension or termination of such rights. No Intellectual Property or goods bearing or using any Intellectual Property presently contemplated to be sold by or employed by any Borrower infringes any patent, trademark, service mark, trade name, copyright, license or other Intellectual Property owned by any other Person.

8.16    OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws; Patriot Act. (a) No member of the Borrower Group is a Sanctioned Target or is owned or controlled by, or is acting on behalf of, a Sanctioned Target, (b) each member of the Borrower Group has instituted, maintains and complies with policies, procedures and controls reasonably designed to assure compliance with Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws, and (c) to the knowledge of any Borrower, no member of the Borrower Group is under investigation for an alleged breach of Sanction(s) or of Anti-Money Laundering Laws or Anti-Corruption Laws by a governmental authority. Each Borrower is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001, as amended) (the "Patriot Act"). As of the Effective Date, the information included in the certification regarding beneficial ownership as required by 31 C.F.R. §1010.230 received by Lender from any Borrower that is a "legal entity customer" as defined in such regulation, is true and correct in all respects.

## SECTION 9. AFFIRMATIVE AND NEGATIVE COVENANTS

9.1    Maintenance of Existence. Each Borrower shall at all times preserve, renew and keep in full, force and effect its corporate (or company) existence and rights and franchises with respect thereto and maintain in full force and effect all permits, licenses, trademarks, tradenames, approvals, authorizations, leases and contracts necessary to carry on the business as presently or proposed to be conducted. Each Borrower shall give Lender thirty (30) days prior written notice of any proposed change in its legal name, which notice shall set forth the new name and such Borrower shall deliver to Lender a copy of the amendment to the Certificate of Incorporation or Formation of such Borrower providing for the name change certified by the Secretary of State of the jurisdiction of incorporation or formation of such Borrower as soon as it is available.

9.2     <u>New Collateral Locations</u>. Any Borrower may open any new location within the continental United States provided (a) Borrowers' Agent gives Lender thirty (30) days prior written notice of the intended opening of any such new location and (b) such Borrower executes and delivers, or causes to be executed and delivered, to Lender such agreements, documents, and instruments as Lender may deem reasonably necessary or desirable to protect its interests in the Collateral at such location, including UCC financing statements.

9.3     <u>Compliance with Laws, Regulations, Etc</u>.  Borrowers shall, at all times, comply in all material respects with all laws, rules, regulations, licenses, permits, approvals and orders and duly observe all material requirements, of any foreign, federal, state or local governmental authority applicable to it, including, the Occupational Safety and Health Act of 1970, as amended, the Fair Labor Standards Act of 1938, as amended, all federal, state, and local statutes, regulations, rules and orders relating to consumer credit (including as each has been amended, the Truth in Lending Act, the Fair Credit Billing Act, the Equal Credit Opportunity Act and the Fair Credit Reporting Act), all federal, state and local statutes, regulations, rules and orders pertaining to sales of consumer goods (including the Consumer Products Safety Act of 1972, as amended, and the Federal Trade Commission Act of 1914, as amended, and all regulations, rules and orders promulgated thereunder) and all statutes, rules, regulations, orders, permits and stipulations relating to environmental pollution and employee health and safety.

9.4     <u>Payment of Taxes and Claims</u>. Subject to any applicable provisions in any Debtor Relief Law, Borrowers shall duly pay and discharge all taxes, assessments, contributions and governmental charges upon or against it or its properties or assets, except for taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to Borrowers and with respect to which adequate reserves have been set aside on its books.  Borrowers shall be liable for any tax or penalties imposed on Lender as a result of the financing arrangements provided for herein and Borrowers agrees to indemnify and hold Lender harmless with respect to the foregoing, and to repay to Lender on demand the amount thereof, and until paid by Borrowers such amount shall be added and deemed part of the Loans, provided, that, nothing contained herein shall be construed to require Borrowers to pay any income or franchise taxes attributable to the income of Lender from any amounts charged or paid hereunder to Lender. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

9.5     <u>Insurance</u>. Each Borrower shall, at all times, maintain with financially sound and reputable insurers insurance with respect to the Collateral against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by corporations of established reputation engaged in the same or similar businesses and similarly situated.  Said policies of insurance shall be satisfactory to Lender as to form, amount and insurer.  Each Borrower shall furnish certificates, policies or endorsements to Lender as Lender shall require as proof of such insurance, and, if any Borrower fails to do so, Lender is authorized, but not required, to obtain such insurance at the expense of Borrowers.  All policies shall provide for at least thirty (30) days prior written notice to Lender of any cancellation or reduction of coverage and that Lender may act as attorney for Borrowers in obtaining, and at any time an Event of Default exists or has occurred and is continuing, adjusting, settling, amending and canceling such insurance.  Each Borrower shall cause Lender to be named as a loss payee and an additional insured (but without any liability for any premiums) under such insurance policies and each Borrower shall obtain

noncontributory lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Lender.  Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Lender as its interests may appear and further specify that Lender shall be paid regardless of any act or omission by Borrowers or any of their affiliates.  At its option, Lender may apply any insurance proceeds received by Lender at any time to the cost of repairs or replacement of Collateral and/or to payment of the Obligations, whether or not then due, in any order and in such manner as Lender may determine or hold such proceeds as cash collateral for the Obligations.

       9.6   <u>Financial Statements and Other Information</u>.

       (a)   Each Borrower shall keep proper books and records in which true and complete entries shall be made of all dealings or transactions of or in relation to the Collateral and the business of such Borrower and its combined affiliates (if any) in accordance with GAAP and Borrowers' Agent shall furnish or cause to be furnished to Lender: (i) within thirty (30) days after the end of each fiscal month of Borrowers except for each fiscal month that is the last month of a fiscal quarter of Borrowers, monthly profit and loss statements of Borrowers and of each Retail Store on a combined and combining basis and monthly statements of Capital Expenditures and accounts payable (together with a year-to-date report of Capital Expenditures through the end of such month) of Borrowers on a combined and combining basis, all in reasonable detail, fairly presenting the financial position and the results of the operations of Borrowers and its subsidiaries as of the end of and through such fiscal month; (ii) within forty five (45) days after the end of each of the first three fiscal quarters of Borrowers, unaudited combined balance sheets and statement of cash flow of the Borrowers and its combined affiliates, all in reasonable detail, fairly presenting the financial position and the results of the operations of Borrowers and its combined affiliates as of the end of and through such fiscal quarter; (iii) within sixty (60) days after the end of each fourth fiscal quarter of Borrowers, a draft unaudited combined statement of income and loss of the Borrowers and its combined affiliates, in reasonable detail, fairly presenting the financial position and the results of the operations of Borrowers and its combined affiliates as of the end of and through such fiscal quarter; and (iv) within one hundred and five (105) days after the end of each fiscal year of Borrowers, audited combined financial statements (including in each case balance sheets, statements of income and loss, statements of cash flow and statements of shareholders' equity) and supplemental schedules of financial statements of Borrowers and its combined affiliates which schedules have been subjected to the auditing procedures applied to the audits of the combined financial statements, and the accompanying notes thereto, all in reasonable detail, fairly presenting the financial position and the results of the operations of Borrowers and its combined affiliates as of the end of and for such fiscal year, together with the unqualified opinion of independent certified public accountants, which accountants shall be an independent accounting firm selected by Borrowers and reasonably acceptable to Lender, that such financial statements have been prepared in accordance with GAAP, and present fairly the results of operations and financial condition of Borrowers and its combined affiliates as of the end of and for the fiscal year then ended.

       (b)   At such time as available, but in no event later than thirty (30) days prior to the end of each fiscal year of Borrowers, projected combined financial statements (including in each case, forecasted balance sheets and statements of income and loss, statements of cash flow, and statements of shareholders' equity) of Borrowers for the next two (2) fiscal years, all in

reasonable detail, and in a format consistent with the projections delivered by Borrowers to Lender prior to the date hereof or in such other format acceptable to Lender, together with such supporting information as Lender may reasonably request. Such projected financial statements shall be prepared on a monthly basis for the next succeeding year and on an annual basis for each year thereafter. Such projections shall represent Borrowers reasonable best estimate of the future financial performance of Borrowers for the periods set forth therein and shall have been prepared on the basis of the assumptions set forth therein which Borrowers believes are fair and reasonable as of the date of preparation in light of current and reasonably foreseeable business conditions (it being understood that actual results may differ from those set forth in such projected financial statements).

(c)      Borrowers' Agent shall promptly notify Lender in writing of the details of (i) any loss, damage, investigation, action, suit, proceeding or claim relating to the Collateral or any other property which is security for the Obligations or which would result in any material adverse change in Borrowers' business, properties, assets, goodwill or condition, financial or otherwise and (ii) the occurrence of any Event of Default or event which, with the passage of time or giving of notice or both, would constitute an Event of Default.

(d)      Borrowers' Agent shall promptly after the sending or filing thereof furnish or cause to be furnished to Lender (i) copies of such reports which SAMC sends to its stockholders generally as Lender may reasonably request from time to time and (ii) copies of all reports and registration statements which SAMC files or may file with the Securities and Exchange Commission, any national securities exchange or the National Association of Securities Dealers, Inc.

(e)      Borrowers' Agent shall furnish or cause to be furnished to Lender such budgets, forecasts, projections and other information respecting the Collateral and the business of Borrowers, as Lender may, from time to time, reasonably request. Lender is hereby authorized to deliver a copy of any financial statement or any other information relating to the business of Borrowers to any court or other government agency or to any participant or assignee or prospective participant or assignee. Each Borrower hereby irrevocably authorizes and directs all accountants or auditors to deliver to Lender, at Borrowers' expense, copies of the financial statements of Borrowers and any reports or management letters prepared by such accountants or auditors on behalf of Borrowers and to disclose to Lender such information as they may have regarding the business of Borrowers. Any documents, schedules, invoices or other papers delivered to Lender may be destroyed or otherwise disposed of by Lender one (1) year after the same are delivered to Lender, except as otherwise designated by Borrowers' Agent to Lender in writing.

9.7      Sale of Assets. Except as otherwise provided by the Sale Motion, Borrowers shall not, directly or indirectly:

(a)      merge into or with or consolidate (including in each case pursuant to a Division) with any other Person (other than a Borrower) or permit any other Person (other than a Borrower) to merge into or with or consolidate (including in each case pursuant to a Division) with it, except that, a non-affiliated person may merge or consolidate into a Borrower in connection with an acquisition permitted under Section 9.10(f) hereof, provided that, each of the following

conditions is satisfied as determined by Lender (hereafter referred to as a "Permitted Non Affiliated Merger"):

(i)     Lender shall have received not less than fifteen (15) days prior written notice of the intention of Borrower to so merge and such other information with respect thereto as Lender may reasonably request,

(ii)     as of the effective date of the merger or consolidation and after giving effect thereto, no Event of Default, or act, condition or event which with notice or passage of time or both would constitute an Event of Default, shall exist or have occurred and be continuing,

(iii)     Lender shall have received true, correct and complete copies of all agreements, documents and instruments relating to such merger, including, but not limited to, the certificate or certificates of merger as filed with each appropriate Secretary of State,

(iv)     Borrower shall be the surviving entity and shall immediately upon the effectiveness of the merger expressly confirm in writing pursuant to an agreement, in form and substance satisfactory to Lender, its continuing liability in respect of the Obligations and the Financing Agreements and execute and deliver such other agreements, documents and instruments as Lender may reasonably request,

(v)     the surviving entity shall, immediately after giving effect to such transaction or series of transactions, have a consolidated net worth as determined in accordance with GAAP (including, without limitation, any indebtedness incurred or anticipated to be incurred in connection with or in respect of such transactions or series of transactions) equal to or greater than the consolidated net worth of Borrower as determined in accordance with GAAP immediately prior to such transactions or series of transactions,

(vi)     Borrower shall not become obligated with respect to any indebtedness, nor any of its property become subject to any lien, unless Borrower could incur such indebtedness or create such lien hereunder,

(vii)     each Borrower executes and delivers and causes to be delivered to Lender all documents and instruments required by Lender under Section 9.18,

(viii)     Lender shall not be required to treat any Accounts or Inventory acquired pursuant to any merger as eligible for lending purposes hereunder,

(ix)     the other conditions set forth in Section 9.10(f) hereof shall be satisfied, and

(x)     dispositions of other assets as reasonably consented to by Lender or as may be approved by the Bankruptcy Court.

(b)     sell, assign, lease, transfer, abandon or otherwise dispose (whether or not effected pursuant to a Division) of any stock or indebtedness to any other Person or any of its assets to any other Person, except for

(i)     sales of Inventory in the ordinary course of business;

(ii)    upon receipt of the prior written approval of Lender, bulk sales or other dispositions of Inventory not in the ordinary course of business in connection with Retail Store closings, at arm's length; <u>provided</u> that all such Retail Store closings shall be conducted with Tiger Group, LLC and/or its Affiliates, agents or designees serve as the sole liquidation agent,

(iii)    the disposition of worn out or obsolete Equipment or Equipment no longer used in the business of Borrowers so long as (A) if an Event of Default exists or has occurred and is continuing, any proceeds are paid to Lender and (B) such sales do not involve Equipment having an aggregate fair market value in excess of $100,000 for all such Equipment disposed of in any fiscal year of Borrowers),

(iv)    the licensing, on a non-exclusive basis, of trademarks, patents and other intellectual property rights in the ordinary course of business,

(v)    the issuance and sale of any capital stock, provided that, (A) a Borrower provides Lender with not less than fifteen (15) days prior written notice of such issuance and sale by such Borrower, which notice shall specify the material terms and conditions of such capital stock, the total amount and net cash proceeds of which it is anticipated will be realized from the issuance and sale, and all other material terms thereof, (B) Borrowers shall not be required to pay any dividends or repurchase or redeem such capital stock or make any other payments in respect thereof at any time prior to one (1) year following the Maturity Date, except as expressly permitted under Section 9.11 hereof (C) the terms of the capital stock and the terms of the purchase and sale thereof shall not include terms and conditions which (1) limit or restrict the rights of Borrowers to request, and Lender to make, any Loans (including Loans in excess of the amounts available to Borrowers under the lending formulas contained herein), the right of Borrowers to amend or modify any of their terms and conditions of this Agreement or any of the other Financing Agreements, or the rights of Borrowers to repay, prepay, refinance, replace or substitute for the indebtedness of Borrowers to Lender, (2) require Lender to release any of the Collateral, or (3) prohibit the execution and delivery by Borrowers of this Agreement or any of the other Financing Agreements required to be delivered hereunder or the performance by Borrowers of any of the terms and conditions contained herein or in any of the other Financing Agreements to be performed by Borrowers, (D) as of the date of such issuance and sale and after giving effect thereto, no Event of Default, or act, condition or event which with notice or passage of time or both would constitute an Event of Default shall exist or have occurred and be continuing and (E) all of the proceeds from such sale or issuance shall promptly be remitted to the Blocked Account (hereafter referred to as a "Permitted Equity Offering"), or

(c)    form or acquire any subsidiaries, except form subsidiaries to the extent permitted in Section 9.10 hereof.

9.8    <u>Encumbrances</u>. Borrowers shall not create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, except:

(a)    liens and security interests of Lender securing the Existing Liabilities;

(b)      liens securing the payment of taxes, either not yet overdue or that constitute prepetition claims;

(c)      nonconsensual statutory liens (other than liens securing the payment of taxes) arising in the ordinary course of Borrowers' business to the extent: (i) such liens secure indebtedness which is not overdue or (ii) such liens secure indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to Borrowers, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(d)      zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of Borrowers as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

(e)      purchase money security interests in Equipment (including capital leases) in an amount not to exceed $100,000 in the aggregate at any time outstanding (excluding Equipment consisting of computers and computer hardware and software (whether owned or leased) of up to an aggregate amount of $500,000) and purchase money mortgages on real estate so long as such security interests and mortgages do not apply to any property of Borrowers other than the Equipment or real estate so acquired, and the indebtedness secured thereby does not exceed the cost of the Equipment or real estate so acquired, and the Equipment or real estate so acquired is used in the business or used as a Retail Store, as the case may be, which security interest in such Equipment may be prior in right to Lender's security interest therein pursuant to a subordination agreement, in form and substance reasonably satisfactory to Lender, in favor of any holder of such security interest in any such Equipment to the extent required by such holder;

(f)      [reserved];

(g)      the security interests and liens set forth on Schedule 8.4 hereto which are not otherwise permitted under the other clauses of this Section 9.8;

(h)      Permitted Prior Liens and liens created prior to the Petition Date.

9.9      Indebtedness. None of Borrowers shall incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any obligations or indebtedness, except:

(a)      the Existing Liabilities and the Obligations;

(b)      unsecured obligations and indebtedness owed by any of Borrowers to any of the other Borrowers, subject to the Permitted Variances;

(c)      trade obligations and normal accruals in the ordinary course of business not yet due and payable, or with respect to which any Borrower is contesting in good faith the amount or validity thereof by appropriate proceedings diligently pursued and available to any such Borrower, and with respect to which adequate reserves have been set aside on its books;

(d)    [reserved];

(e)    [reserved];

(f)    [reserved];

(g)    unsecured indebtedness of any Borrower for borrowed money incurred after the date hereof provided for under the Budget; and

(h)    [reserved].

9.10    <u>Loans, Investments, Guarantees, Etc</u>.   None of Borrowers shall, directly or indirectly, make any loans or advance money or property to any person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase the stock or indebtedness or all or a substantial part of the assets or property of any person, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly) the indebtedness, performance, obligations or dividends of any Person or agree to do any of the foregoing, except:

(a)    the endorsement of instruments for collection or deposit in the ordinary course of business;

(b)    investments in cash and Cash Equivalents;

(c)    loans by any Borrower to any of the other Borrowers;

(d)    [reserved];

(e)    unsecured guarantees by SAMC after the date hereof of the obligations of any Obligor, any other Borrower or Samson (Shenzen) Trading Co. Ltd. under any real property lease with respect to Retail Stores, office space or warehouse facilities leased by such other Borrower, Obligor or Samson (Shenzen) Trading Co. Ltd. and used by any of them in the ordinary course of business or under any equipment lease with respect to equipment leased by such other Borrower or Obligor and used by any Borrower in the ordinary course of business; <u>provided</u>, <u>that</u>, in the case of any such guarantee of the obligations of Samson (Shenzen) Trading Co., Ltd., the amount of liability under all such guarantees shall not exceed $100,000 in the aggregate;

(f)    [reserved];

(g)    loans and advances by SAMC to officers and employees of Borrowers made prior to the Effective Date and set forth on <u>Schedule 9.10</u> hereto;

(h)    [reserved];

(i)    advances by Borrowers to their shareholders representing the excess cash distributions made by the Borrowers for income tax purposes based upon such Borrower's reasonable estimate of the cash distributions required pursuant to Section 9.11 (b) hereof; provided that, such advances are promptly repaid by such shareholders upon the determination that such Borrower distributed excess cash payments;

60

(j)      [reserved]; and

(k)      the loans, advances and guarantees set forth on <u>Schedule 9.10</u> hereto (which are not otherwise permitted under the other clauses of this Section 9.10); provided, that, as to such loans, advances and guarantees, (i) Borrowers shall not, directly or indirectly, (A) amend, modify, alter or change the terms of such loans, advances or guarantees or any agreement, document or instrument related thereto, or (B) as to such guarantees, redeem, retire, defease, purchase or otherwise acquire the obligations arising pursuant to such guarantees, or set aside or otherwise deposit or invest any sums for such purpose, and (ii) Borrowers shall furnish to Lender all notices or demands in connection with such loans, advances or guarantees or other indebtedness subject to such guarantees either received by Borrowers or on its behalf, promptly after the receipt thereof, or sent by Borrowers or on its behalf, concurrently with the sending thereof, as the case may be.

9.11    <u>Dividends and Redemptions</u>.  None of Borrowers shall, directly or indirectly, declare or pay any dividends on account of any shares of class of capital stock of Borrowers now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of capital stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration other than common stock or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, except:

(a)      any subsidiary of a Borrower may pay cash dividends to such Borrower out of legally available funds therefor; and

(b)      each Borrower shall be permitted to pay cash distributions to its stockholders or members, as the case may be, in respect of any taxable year or portion thereof during which such Borrower is a Subchapter S corporation or a limited liability company for federal tax purposes in an aggregate amount equal to the product of (x) such Borrower's aggregate taxable income for such year (determined as if such Borrower were an individual whose only source of income, gain, loss, deduction and credit for income tax purposes ("tax items") for such year consisted solely of the tax items recognized by such Borrower for such year or properly carried over to such year from any prior year) and (y) the highest aggregate marginal federal, state and local income tax rate (determined by taking into account the deductibility of state and local income taxes for federal income tax purposes) to which any of the stockholders or members, as the case may be, of such Borrower who is an individual is subject for such year; and such Borrower shall be permitted to make such payments on a taxable quarterly basis based on a reasonable estimate for such year of the amounts specified in clauses (x) and (y) above, and provided further, that to the extent the aggregate amount so distributed pursuant to any such estimate in respect of such year exceeds the actual aggregate amount permitted to be distributed by such Borrower for such year pursuant to this paragraph (b), such Borrower shall cause its stockholders or member, as the case may be, to promptly repay such excess to such Borrower; provided that, (i) Lender shall have received ten (10) days prior to the payment thereof, a certificate signed by such Borrower's chief financial officer, in form and substance satisfactory to Lender, stating the taxes payable by each of such Borrower's shareholders in respect of their taxable shares of such Borrower's taxable income or gains for such taxable year (if any) and providing full information and computations supporting such statement and (ii) such distribution is not in violation of applicable law or any other agreement to which such Borrower is a party or by which such Borrower is bound.

9.12    <u>Transactions with Affiliates</u>. None of Borrowers shall, directly or indirectly, (a) purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director, agent or other person affiliated with Borrowers, except (i) in the ordinary course of and pursuant to the reasonable requirements of Borrowers business and upon fair and reasonable terms no less favorable to the Borrowers than Borrowers would obtain in a comparable arm's length transaction with an unaffiliated person and (ii) for any real property lease between a Borrower and Sam Ash Properties Corp. entered into from time to time in the ordinary course of and pursuant to the reasonable requirements of such Borrower's business or (b) make any payments of management, consulting or other fees for management or similar services, or of any indebtedness owing to any officer, employee, shareholder, director or other person affiliated with Borrowers except reasonable compensation to officers, employees and directors for services rendered to Borrowers in the ordinary course of business' consistent with past practices.

9.13    <u>Additional Bank Accounts</u>. None of Borrowers shall, directly or indirectly, open, establish or maintain any deposit account, investment account or any other account with any bank or other financial institution, other than the Blocked Accounts and the accounts set forth on <u>Schedule 8.9</u> hereto, except: (a) as to any new or additional Blocked Accounts and other such new or additional accounts which contain any Collateral or proceeds thereof, with the prior written consent of Lender and subject to such conditions thereto as Lender may establish and (b) as to any accounts used by Borrowers to make payments of payroll, taxes or other obligations to third parties, after prior written notice to Lender.

9.14    <u>Compliance with ERISA</u>. None of Borrower shall with respect to any "employee benefit plans" maintained by such Borrowers or any of their ERISA Affiliates: (i) terminate any of such employee benefit plans so as to incur any liability to the Pension Benefit Guaranty Corporation established pursuant to ERISA, (ii) allow or suffer to exist any prohibited transaction involving any of such employee benefit plans or any trust created thereunder which would subject Borrower or such ERISA Affiliate to a tax or penalty or other liability on prohibited transactions imposed under Section 4975 of the Code or ERISA, (iii) fail to pay to any such employee benefit plan any contribution which it is obligated to pay under Section 302 of ERISA, Section 412 of the Code or the terms of such plan, (iv) allow or suffer to exist any accumulated funding deficiency, whether or not waived, with respect to any such employee benefit plan, (v) allow or suffer to exist any occurrence of a reportable event or any other event or condition which presents a material risk of termination by the Pension Benefit Guaranty Corporation of any such employee benefit plan that is a single employer plan, which termination could result in any liability to the Pension Benefit Guaranty Corporation or (vi) incur any withdrawal liability with respect to any multiemployer pension plan.

As used in this Section 9.14, the terms "employee benefit plans", "accumulated funding deficiency" and "reportable event" shall have the respective meanings assigned to them in ERISA, and the term "prohibited transaction" shall have the meaning assigned to it in Section 4975 of the Code and ERISA.

9.15    <u>Credit Card Agreements</u>. Each Borrower shall (a) observe and perform all material terms, covenants, conditions and provisions of the Credit Card Agreements to be observed and performed by it at the times set forth therein; (b) not do, permit, suffer, or refrain from doing anything, as a result of which there could be a default under or breach of any of the terms of any

of the Credit Card Agreements; (c) at all times maintain in full force and effect the Credit Card Agreements and not terminate, cancel, surrender, modify, amend, waive or release any of the Credit Card Agreements, or consent to or permit to occur any of the foregoing; except, that, Borrowers may terminate or cancel any of the Credit Card Agreements in the ordinary course of the business of Borrowers; provided, that, Such Borrower shall give Lender not less than fifteen (15) days prior written notice of its intention to so terminate or cancel, (d) not enter into any new Credit Card Agreements with any new Credit Card Issuer or Credit Card Processor unless (i) Lender shall have received not less than thirty (30) days prior written notice of the intention of Borrower to enter into such agreement (together with such other information with respect thereto as Lender may request) and (ii) such Borrower delivers, or causes to be delivered to Lender, a Credit Card Acknowledgement in favor of Lender; (e) give Lender immediate written notice of any Credit Card Agreement entered into by Borrower after the date hereof, together with a true, correct and complete copy thereof and such other information with respect thereto as Lender may request; and (f) furnish to Lender, promptly upon the request of Lender, such information and evidence as Lender may require from time to time concerning the observance, performance and compliance by Borrowers or the other party or parties thereto with the terms, covenants or provisions of the Credit Card Agreements.

9.16    Costs and Expenses. Subject to the Orders, Borrowers shall pay to Lender on demand all costs, expenses, filing fees and taxes paid or payable in connection with the preparation, negotiation, execution, delivery, recording, administration, collection, liquidation, enforcement and defense of the Obligations, Lender's rights in the Collateral, the Existing Loan Agreement, this Agreement, the other Financing Agreements and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including: (a) all costs and expenses of filing or recording (including Uniform Commercial Code financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable); (b) all insurance premiums, appraisal fees and search fees; (c) costs and expenses of remitting loan proceeds, collecting checks and other items of payment, and establishing and maintaining the Blocked Accounts, together with Lender's customary charges and fees with respect thereto; (d) [reserved]; (e) costs and expenses of preserving and protecting the Collateral; (f) costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Lender, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Financing Agreements or defending any claims made or threatened against Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (g) all out of pocket expenses and costs heretofore and from time to time hereafter incurred by Lender during the course of periodic field examinations of the Collateral and Borrowers' operations, plus a per diem charge at the then market rate per person per day for Lender's examiners in the field and office; and (h) the fees and disbursements of counsel (including legal assistants and, without limitation, local bankruptcy counsel in the state of New Jersey) to Lender in connection with any of the foregoing.

9.17    Litigation. Borrowers shall promptly report to Lender, any investigation by any governmental agency pending, or to the best of any Borrower's knowledge threatened, against or affecting any Borrower, its assets or business and any action, suit, proceeding or claim by any Person pending, or to the best of any Borrower's knowledge threatened, against Borrowers or its

assets or goodwill, or against or affecting any transactions contemplated by this Agreement, which if adversely determined against any Borrower would result in any material adverse change in the assets, business or prospects of Borrowers or would impair the ability of Borrowers to perform its obligations hereunder or under any of the other Financing Agreements to which it is a party or of Lender to enforce any Obligations or realize upon any Collateral.

9.18    <u>Further Assurances</u>. At the request of Lender at any time and from time to time, subject to the entry and terms of the Interim Order (or the Final Order, as applicable), Borrowers shall, at its expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or cause to be done such further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement or any of the other Financing Agreements.  Lender may at any time and from time to time request a certificate from an officer of Borrowers representing that all conditions precedent to the making of Loans contained herein are satisfied.  In the event of such request by Lender, Lender may, at its option, cease to make any further Loans until Lender has received such certificate and, in addition, Lender has determined that such conditions are satisfied.  Where permitted by law, Borrowers hereby authorize Lender to execute and file one or more UCC financing statements signed only by Lender.

9.19    <u>Cash Management System</u>. The Bankruptcy Court shall have entered the Cash Management Order, providing, <u>inter alia</u>, authorization for Borrowers continued use and maintenance of its existing cash management system, and otherwise upon terms acceptable to Lender.

9.20    <u>Engagement of Sierra Constellation Partners LLC</u>.  Pursuant to the terms and conditions of (i) that certain Terms of Engagement, dated as of April 4, 2024, by and between Sierra Constellation Partners, LLC ("<u>Sierra</u>"), Jordan Meyers and SAMC, as approved by Lender, and (ii) that certain Sam Ash Music Corporations Unanimous Consent of Directors in Lieu of a Special Meeting of the  Board, dated as of April 4, 2024 (collectively the foregoing (i) and (ii), the "<u>CRO Engagement Documents</u>"), Borrowers engaged, and after the Effective Date shall continue to engage, Sierra and Jordan Meyers (collectively, the "<u>Chief Restructuring Officer</u>"), to serve as financial advisors and chief restructuring officer to the Borrowers, with such engagement to be at the sole cost and expense of Borrowers.  Pursuant to the CRO Engagement Documents, the Chief Restructuring Officer shall assist Borrowers in, among other things, the marketing process of the Borrowers assets, the formulation and presentation to Lender of the Budget, variance reports, collateral reports required under the Financing Agreements, and a restructuring or other plan (with a timeline) designed to return Borrowers to profitability or otherwise to maximize the value of Borrowers' assets.  In connection with the foregoing, Borrowers hereby:

(a)    authorize Lender and Chief Restructuring Officer to communicate directly with each other regarding all matters relating to the services to be rendered by the Chief Restructuring Officer to Borrowers, including, without limitation, to discuss the Budget, the marketing process, all financial reports, business information, findings and recommendations of the Chief Restructuring Officer, and concerning Borrowers' ongoing implementation of any restructuring strategies;

(b)      authorize and direct the Chief Restructuring Officer to provide Lender with copies of all reports and other information prepared or reviewed by the Chief Restructuring Officer, and Borrowers covenant and agree that Lender may rely on any information provided by the Chief Restructuring Officer as if provided directly by Borrowers;

(c)      until such time as all Existing Liabilities and all Obligations have been paid in full, agree to continue to retain Sierra and the Chief Restructuring Officer to assist the Borrowers with the preparation of the Budget and the other financial and Collateral reporting required to be delivered to Lender pursuant to this Agreement; and

(d)      acknowledge and agree that any amendment, restatement, termination or breach of the CRO Engagement Documents by Borrowers will constitute an Event of Default hereunder.

9.21      Engagement of TigerInsight Analytics.  Prior to the Effective Date, Borrowers engaged, and after the Effective Date shall continue to engage at all times during the term of this Agreement, TigerInsight Analytics ("TigerInsight") on terms and conditions acceptable to Lender. Borrower shall pay all fees and reimburse all reasonable and documented out-of-pocket expenses of TigerInsight when due in accordance with the terms and conditions of the Borrowers' engagement of TigerInsight. All such fees and expenses paid by Borrowers to TigerInsight shall be credited against the monthly administrative fee paid pursuant to the DIP Fee Letter for the month during which such fees and expense are paid to TigerInsight.

9.22      Capital Expenditures.  Borrowers, on a consolidated basis, shall make Capital Expenditures in an amount less than or equal to the applicable amount set forth in the Budget, subject to the Permitted Variances.

9.23      Investment Banker Engagement.  On April 16, 2024, Borrowers delivered to Lender satisfactory evidence of the Borrowers' selection, in its business judgment, of Capstone Capital Markets, LLC ("Capstone") as investment banker to assist with the refinancing of the Obligations and/or the potential sale of substantially all of the assets of the Borrowers, on terms acceptable to the sole satisfaction of Lender, which such retention shall continue through the Maturity Date (collectively, the "Capstone Agreement").  Borrowers hereby acknowledge and agree the marketing process as conducted by Sierra has thus far been unsuccessful, hence the additional retention of Capstone was a required and necessary action, and provides for an appropriate timeframe to market the Borrowers for sale.  Borrowers further acknowledge and agree that all fees, expenses and reimbursements due and owing to Capstone shall not be granted priority over any of the amounts due and owing to Lender; provided however, Lender acknowledges and agrees that the priority of Capstone's fees and expenses incurred solely in connection with a going-concern sale of the Borrowers may be elevated by the Carve Out on terms acceptable to the satisfaction of Lender.  In connection with the foregoing, Borrowers hereby:

(a)      authorize Lender and Capstone to communicate directly with each other regarding all matters relating to the services to be rendered by Capstone to the Borrowers, including, without limitation, to discuss all financial reports, business information, findings and recommendations of Capstone, prospects for the Substantial Asset Disposition Transaction,

contacts made or to be made, terms and term sheets, and such other matters as Lender shall reasonably request from time-to-time;

(b)    authorize and direct Capstone to provide Lender (with a copy to Borrowers) with copies of all reports, term sheets, letters of intent (whether preliminary, interim or final in form and content) and other information prepared, received or reviewed by Capstone in connection with the ongoing solicitation for a Substantial Asset Disposition Transaction;

(c)    agree, either independently or in combination with Capstone and Sierra, to provide Lender with periodic reports at such times as may be reasonably requested by Lender, but in no event less frequently than on a weekly basis, concerning the status of the ongoing efforts to complete a Substantial Asset Disposition Transaction; and

(d)    acknowledge and agree that any amendment, restatement, termination or breach of the Capstone Agreement by Borrowers will constitute an Event of Default hereunder.

9.24    [Reserved].

9.25    [Reserved].

9.26    [Reserved].

9.27    [Reserved].

9.28    Chapter 11 Claims.   The Borrowers shall not, until payment in full of the Obligations and the Existing Liabilities, except with respect to the Existing Liabilities and the Carve Out, and otherwise to the extent permitted under the Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or lien which is pari passu with or senior to the claims or liens, as the case may be, of Lender hereunder or under the Orders, or apply to the Bankruptcy Court for authority to do so.

9.29    Bankruptcy-Related Negative Covenants.   The Borrowers shall not consent to or permit to exist any of the following:

(a)    any modification, stay, vacation or amendment to the Orders to which Lender has not consented in writing;

(b)    a priority claim or administrative expense or unsecured claim against any Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of Lender in respect of the Obligations, except with respect to the Existing Liabilities, Permitted Prior Liens and the Carve Out;

(c)    except as agreed to by Lender, any order which authorizes the return of any of the Borrowers' property pursuant to Section 546(h) of the Bankruptcy Code;

(d)      any order which authorizes the payment of any Obligations (other than the Existing Liabilities, Obligations reflected in the Budget, and other Obligations approved by Lender) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Obligations which is secured by a lien (other than as expressly set forth in the Orders or the Budget); or

(e)      any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Financing Agreements or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Financing Agreements.

9.30    Use of Collateral.  Other than as expressly permitted in the Orders, Borrowers shall not use or permit the use of Collateral, proceeds of Loans, portion of the Carve Out or any other amounts directly or indirectly by any of the Borrowers, any Committee, if any, or any trustee or other estate representative appointed in the Case (or any Successor Case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(a)      to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the liens granted under the Financing Agreements or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay Lender in "full" in cash; or

(b)      to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against Lender and each of its officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation: (i) any avoidance actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the liens granted under the Financing Agreements, the Financing Agreements, the Existing Loan Agreement, the Existing Liabilities or the Existing Liens; (iv) any action seeking to invalidate, modify, reduce, expunge, set aside, avoid or subordinate, in whole or in part, the Obligations; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to Lender hereunder or under any of the other Financing Agreements (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Financing Agreements and the Orders).

9.31    Communication with Consultants, Liquidators and Financial Advisors.

The Borrowers authorize Lender to communicate directly with its independent certified public accountants, appraisers, financial advisors, liquidators, investment bankers and consultants, Sierra, the Chief Financial Officer and Capstone, which have been engaged from time to time by the Borrowers, and authorizes and shall instruct those parties to communicate to Lender

information relating to each Borrower with respect to the business, results of operations, prospects and financial condition of such Borrower.  Senior management of the Borrowers and such financial and restructuring consultants shall (unless Lender otherwise consents, which consent may be by e-mail) participate in weekly telephonic calls with Lender (and/or their advisors and counsel) to discuss various matters, including the Budget and Permitted Variances.

9.32    Bankruptcy Related Affirmative Covenants.

(a)    On the Petition Date, Borrowers shall have filed a motion under Sections 363 and 365  of the Bankruptcy Code (and not pursuant to sections 327, 328, 330, or 331 thereof) seeking assumption of the Consulting Agreement pursuant to the terms and conditions thereof, including, without limitation, the retention of and payments to the Consultant, and conduct of the "Sale" as defined therein.

(b)    Within three (3) days of the Petition Date, Borrowers shall file a motion or series of motions (collectively, a "Sale Motion") requesting approval of a Section 363 sale process the purpose of which is to sell all of the Borrower's and other Borrowers' businesses and assets as a going concern to Lender pursuant to a credit bid by Lender in exchange for the outstanding amount of the Obligations, which Sale Motion shall include a motion seeking authority to establish bidding procedures. In furtherance of the above-described Section 363 sale process, the following additional milestones shall be applicable:

(i)    on or before five (5) Business Days after the Petition Date, the Borrowers shall distribute so called "bid packages" to all potential buyers;

(ii)    on or before May 15, 2024, the Borrowers shall enter into a stalking horse asset purchase agreement with a third party other than the Lender that is higher and better than the asset purchase agreement entered into with the Lender as included in the Sale Motion, as approved by the Lender; the failure to do so will result in the acceleration of the Sale as defined in and governed by the Consulting Agreement;

(iii)    on or before May 31, 2024, the Bankruptcy Court shall hold a hearing in respect of the Sale Motion and shall enter an order, in form and substance reasonably satisfactory to Lender, establishing bidding procedures by no later than June 3, 2024, which shall include, without limitation, a bid deadline of June 14, 2024 (the "Bid Deadline");

(iv)    on or before the Bid Deadline, the Borrowers shall have received, from a bona fide qualified bidder, a bid of at least $7,500,000 in cash for all of Samson's (x) accounts and Credit Card Receivables; (y) inventory and Merchandise; and (z) Intellectual Property and associated goodwill;

(v)    on or before June 20, 2024, the Borrowers shall commence an auction among all qualified bidders (the "Auction"), with the highest and best bid or combination of bids being selected, in consultation with Lender and any Committee appointed in the Case (collectively, the "Successful Bids");

(vi)    on or before June 25, 2024, the Bankruptcy Court shall hold a hearing (the "Sale Approval Hearing") in respect of the Successful Bids and shall enter one or more orders on or before July 2, 2024, each in form and substance reasonably satisfactory to Lender, approving the Successful Bids (each a "Sale Approval Order"); provided that if there is no Auction, the Sale Approval Hearing shall be held on or before June 18, 2024 and the Bankruptcy Court shall have entered the Sale Approval Order on or before June 21, 2024 with respect to the approval of the acquisition of all assets of the Borrowers by the Lender via the credit bid as set forth in the Sale Motion; and

(vii)    if there is an Auction, on or before July 17, 2024, the closing of the transactions contemplated by the Successful Bids and approved pursuant to the Sale Approval Order shall be consummated and the Borrowers and/or other Borrowers shall have indefeasibly paid in full in cash all Loans (and to the extent not previously paid in full, all Existing Liabilities), plus any accrued and unpaid interest and fees thereon, and irrevocably terminate the commitments to make Loans.

(c)    On or before May 10, 2024, the Borrowers shall have filed a motion under Section 365 of the Bankruptcy Code seeking authorization by the Bankruptcy Court to reject any unexpired leases associated with Retail Stores to be closed pursuant to the Consulting Agreement.

(d)    On or before May 10, 2004, the Bankruptcy Court shall have entered the Interim Order acceptable to Lender.

(e)    On or before June 5, 2004, the Bankruptcy Court shall have entered the Final Order acceptable to Lender, which Final Order shall include, without limitation, (i) authorization and approval of the Maximum Credit and (ii) a one-time accommodation from the Lender to reduce the Obligations by $1,750,000 if no Default or Event of Default exists under this Agreement.

(f)    The Borrowers shall promptly, punctually, and faithfully perform all of the terms and conditions of the Orders.

(g)    All dates, terms and conditions set forth in this Section 9.32 shall be collectively referred to as the "Milestones".

9.33    Performance Within Budget; Inventory Matters.    At all times following the Effective Date, each Borrower will, and will cause each of its Subsidiaries to, strictly perform in accordance with the Budget (subject to Permitted Variances (as defined below)), including having made all scheduled payments to the Lender as applicable as and when required.  Furthermore:

(a)    By Thursday of each week, the Borrowers shall deliver to Lender a report of the Borrowers' budget-to-actual performance for the previous week with respect to the applicable Budget.  Borrowers shall achieve the following financial performance thresholds with respect to the Budget, subject to the variances as set forth below (collectively, the "Permitted Variances"):

(i)    *Minimum Sales* – Borrowers' actual sales, calculated on a trailing 3-week basis, shall not be less than 90% of the amount set forth in the Budget;

(ii)    *Minimum Collections* – Borrowers' actual cash collected from accounts receivable, calculated on a trailing 3-week basis, shall not be less than 90% of the amount set forth in the Budget;

(iii)    *Maximum Disbursements* – Borrowers' actual disbursements, calculated on a trailing 3-week basis, shall not exceed by more than 10% the disbursements projected in the Budget;

(iv)    *Excess Availability* – Borrowers' Excess Availability, tested on a weekly basis, shall not be less than 15% of the amount projected in the Budget;

(v)    *Samson Inventory* – Receipts of Inventory by Samson, must be within 10% the payments made by Samson for all Inventory; and

(vi)    *Payroll/Self-Funded Medical Insurance* – Borrowers' disbursements with respect to payroll and self-funded medical insurance, calculated on a trailing 3-week basis, shall not be less than 110% of the amount projected in the Budget.

(b)    The foregoing shall be reported on Thursday of each week on a cumulative basis commencing with the first Thursday to occur after the first full calendar week following the Effective Date, and thereafter on a weekly and a cumulative basis (each of the foregoing periods, a "Testing Period") pursuant to the Variance Report delivered by the Borrowers to Lender.

(c)    Lender and Borrowers agree that line item disbursement amounts budgeted under the Budget (x) are limited to the dollar amounts reflected in each line item within the Budget, (y) may not be applied to satisfy obligations under other line items, and (z) may be carried over into subsequent weekly periods to account for timing differences, but such budgeted line item amounts may not be pre-funded or accelerated without Lender's prior written consent, which consent may be withheld and/or delayed in Lender's exclusive discretion (and no such consent shall be implied from any other authorization or acquiescence by Lender); provided further, that the Lender shall consider in good faith weekly variances resulting from changes in the timing of particular receipts or disbursements and, in such cases, approval of such variances shall not be unreasonably withheld (solely to the extent the Budget is not exceeded on a cumulative basis).

(d)    Borrowers agree that receipts of Inventory by Borrowers must be within 10% the payments made by Borrowers for all Inventory; provided that, the Lender shall consider in good faith weekly variances resulting from changes in the timing of particular receipts of Inventory or events outside of the Borrowers' control and, in such cases, approval of such variances shall not be unreasonably withheld; provided further that, Borrowers shall provide to Lender on a weekly basis an Inventory report setting forth on a per-vendor basis the expected amount of Inventory to be purchased from each such vendor, together with the expected date of

receipt by Borrowers of each such item of Inventory, with such report being subject to the prior written consent of Lender and such consent shall not be unreasonably withheld.

9.34    Additional Information.  Each Borrower will, and will cause each of its Subsidiaries to:

(a)    as soon as practicable in advance of filing with the Bankruptcy Court of all documents, motions and pleadings related to the Orders or this Agreement, deliver to Lender all such documents to be filed and provide Lender with a reasonable opportunity to review and comment on all such documents;

(b)    deliver to Lender promptly after the same are available, copies of all material pleadings, applications, judicial information, financial information and other documents filed on behalf of any Borrower with the Bankruptcy Court in the Case, or distributed by or on behalf of any Borrower to any Committee; and

(c)    allow Lender access to, upon reasonable notice during normal business hours, all financial professionals engaged by the Borrowers, including, but not limited to, Sierra (which engagement, with respect to any financial professionals engaged after the Effective Date, shall be on terms and conditions reasonably satisfactory to Lender).

## SECTION 10.  EVENTS OF DEFAULT AND REMEDIES

10.1    Events of Default. The occurrence or existence of any one or more of the following events are referred to herein individually as an "Event of Default", and collectively as "Events of Default":

(a)    Borrowers fail to pay when due any of the Obligations, or Borrowers or Obligors fail to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements;

(b)    any representation, warranty or statement of fact made by Borrowers or Obligors to Lender in this Agreement, the other Financing Agreements or any other agreement, schedule, confirmatory assignment or otherwise shall when made or deemed made be false or misleading in any material respect;

(c)    any Obligor revokes, terminates or fails to perform any of the material terms, covenants, conditions or provisions of any guarantee, endorsement or other agreement of such party in favor of Lender;

(d)    (i) any judgment for the payment of money is rendered or enforced by a governmental authority in the United States of America or its territories against any Borrower or any Obligor in excess of $500,000 in any one case or in excess of $1,500,000 in the aggregate and shall remain undischarged or unvacated for a period in excess of thirty (30) days (except if it is a judgment for which such Borrower or any Obligor is fully insured by an insurer who has assumed and is actively pursuing the defense of the action or proceeding in which such judgment is rendered and who is fully liable for all amounts payable by such Borrower or any Obligor in respect of such judgment without recourse to Borrower or such Obligor) or execution shall at any time not be

effectively stayed, or (ii) any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered or enforced by a governmental authority in the United States of America or its territories against any Borrower or any Obligor or any of their assets, which judgment would materially impede the ability of any Borrower to perform its obligations hereunder or under any of the other Financing Agreements or Lender to realize upon any Collateral;

(e)    any Obligor which is a partnership, limited liability company, limited liability partnership or a corporation, dissolves or suspends or discontinues doing business (other than any Obligor that does not or no longer does conduct business activities and has no assets);

(f)    [reserved];

(g)    [reserved];

(h)    [reserved];

(i)    any default by any Borrower or any Obligor under any agreement, document or instrument relating to any indebtedness for borrowed money owing to any person other than Lender, or any capitalized lease obligations, contingent indebtedness in connection with any guarantee, letter of credit, indemnity or similar type of instrument in favor of any person other than Lender, in any case in an amount in excess of $500,000, which default continues for more than the applicable cure period, if any, with respect thereto, or any default by any Borrower or any Obligor under any material contract, lease, license or other obligation to any person other than Lender, which default continues for more than the applicable cure period, if any, with respect thereto;

(j)    any Change of Control shall occur;

(k)    the indictment or, as Lender may reasonably and in good faith determine, threatened indictment of any Borrower or any Obligor under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against any Borrower or any Obligor, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of any of the property of any Borrower or such Obligor, the loss of which would have a material adverse effect on the operations of Borrowers or such Obligor;

(l)    [reserved];

(m)    there shall be an event of default under any of the other Financing Agreements, the CRO Engagement Documents, the Capstone Agreement, and/or the Consulting Agreement;

(n)    except as a result of the commencement of the Case, any Borrower or any Obligor shall take any action, or shall make a determination, whether or not yet formally approved by any Borrower's or any Obligor's management or board of directors, to (i) suspend the operation of all or a material portion of its business in the ordinary course, (ii) suspend the payment of any material obligations in the ordinary course or suspend the performance under any material contracts in the ordinary course, or (iii) solicit proposals for the liquidation of, or undertake to

liquidate, all or a material portion of its assets or business in contravention of the terms and conditions set forth in Section 9.7(b)(ii) hereof;

(o)        any of the following shall occur in any Case:

(i)        the filing by the Borrowers of a plan of reorganization other than (i) a plan of reorganization that provides for the payment in full of the Obligations and the Existing Liabilities on the effective date of such plan of reorganization, or (ii) as approved by Lender, or the filing by the Borrowers of any motion or pleading that is inconsistent with the prosecution of any such plan of reorganization;

(ii)        without the prior consent of Lender, the Borrowers shall file a pleading seeking to vacate or modify any of the Orders in a manner adverse to Lender;

(iii)        without the prior consent of the Lender, entry of an order amending, supplementing or otherwise modifying any Order in a manner adverse to the Lender;

(iv)        without the prior consent of Lender, entry of any order that authorizes any of the following:

1.        a priority claim or administrative expense or unsecured claim against the Borrowers (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331,  364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of Lender in respect of the Obligations, except with respect to the Carve Out;

2.        any lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except (a) with respect to the Carve Out, or (b) Permitted Prior Liens;

3.        except as consented to by Lender, the return of any of the Borrowers' property pursuant to section 546(h) of the Bankruptcy Code; or

4.        the payment of any Indebtedness (other than Indebtedness reflected in the Budget) or as permitted by the Orders;

(v)        reversal, vacation or stay of the effectiveness of any Order;

(vi)        any violation of the terms of any Order;

(vii)        without the prior consent of Lender, the dismissal of the Case or conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion to so dismiss or convert brought by any Borrower;

(viii)    without the prior consent of Lender, appointment of a trustee or an examiner, or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Borrower; or

(ix)    without the prior consent of Lender, the filing by the Borrowers of, or the consummation of any sale of all or substantially all the working capital assets of the Borrowers pursuant to section 363 of the Bankruptcy Code, or the occurrence of any such sale without the net proceeds thereof being remitted, contemporaneously therewith, to Lender for payment in full of the Obligations and the Existing Liabilities;

(x)    except as provided for herein or in the Orders, granting of relief from the automatic stay in the Case to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of the Borrowers;

(xi)    the Borrowers' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein or in the Orders) that is senior to or pari passu with Lender's claims under the Financing Agreements and the transactions contemplated thereby to the extent that, upon approval of such motion and closing of the transactions contemplated thereby, the Obligations and the Existing Liabilities would not be paid in full;

(xii)    payment of or granting adequate protection with respect to prepetition indebtedness, other than as expressly set forth in the Orders and the Budget; or

(xiii)    any of the liens or the DIP Superiority Claims granted hereunder cease to be valid, perfected and enforceable in any respect;

(p)    any variance to a Budget shall occur, other than Permitted Variances;

(q)    the failure to file the Chapter 11 Case on the Petition Date or to meet any of the Milestones;

(r)    any Borrower engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Existing Loan Agreement or the Existing Financing Agreements or the Liens securing the Existing Loan Agreement or the Existing Financing Agreements, including without limitation seeking to equitably subordinate or avoid the Liens securing the Existing Loan Agreement; or any Borrower supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Lender; or

(s)    without the prior consent of Lender, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Sections 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral.

10.2    <u>Remedies</u>.

(a)      Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Orders, in case any one or more of the Events of Default shall have occurred and be continuing, and whether or not the maturity of the Loans shall have been accelerated pursuant hereto, Lender may proceed to protect and enforce its rights and remedies (at the same time or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of Liens with respect to the Collateral, Lender shall provide the Borrower written notice pursuant to the Orders (with a copy to counsel for any Committee and to the United States Trustee) prior to taking the action contemplated thereby) under this Agreement or any of the other Financing Agreements by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Financing Agreements or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of Lender. No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

(b)      Without limiting the foregoing, at any time an Event of Default exists or has occurred and is continuing, Lender may, in its discretion and without limitation, (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender , (ii) with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral, (iii) require Borrowers, at Borrowers' expense, to assemble and make available to Lender any part or all of the Collateral at any place and time designated by Lender, (iv) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (v) remove any or all of the Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (vi) sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including entering into contracts with respect thereto, public or private sales at any exchange, broker's board, at any office of Lender or elsewhere) at such prices or terms as Lender may deem reasonable, for cash, upon credit or for future delivery, with Lender having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of Borrowers, which right or equity of redemption is hereby expressly waived and released by Borrowers and/or (vii) terminate this Agreement.  If any of the Collateral is sold or leased by Lender upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by Lender.  If notice of disposition of Collateral is required by law, five (5) days prior notice by Lender to Borrowers' Agent designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and Borrowers waives any other notice.  In the event Lender institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, Borrower waives the posting of any bond which might otherwise be required.

(c)      Lender may apply the cash proceeds of Collateral actually received by Lender from any sale, lease, foreclosure or other disposition of the Collateral to payment of the Obligations, in whole or in part and in such order as Lender may elect, whether or not then due. Borrowers shall remain liable to Lender for the payment of any deficiency with interest at the

highest rate provided for herein and all costs and expenses of collection or enforcement, including attorneys' fees and legal expenses.

(d)     Without limiting the foregoing, upon the occurrence of an Event of Default or an event which with notice or passage of time or both would constitute an Event of Default, Lender may, at its option, without notice, (i) cease making Loans or reduce the lending formulas or amounts of Revolving Loans available to Borrowers and/or (ii) terminate any provision of this Agreement providing for any future Loans to be made by Lender to Borrowers.

(e)     Lender may, at any time or times that an Event of Default exists or has occurred and is continuing, enforce any Borrower's rights against any account debtor, secondary obligor or other obligor in respect of any of the Accounts or other payment intangibles and other monetary obligations (collectively, together with Accounts, "Receivables").  Without limiting the generality of the foregoing, Lender may at such time or times (i) notify any or all account debtors, secondary obligors or other obligors in respect thereof that the Receivables have been assigned to Lender and that Lender has a security interest therein and Lender may direct any or all account debtors, secondary obligors and other obligors to make payment of Receivables directly to Lender, (ii) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any and all Receivables or other obligations included in the Collateral and thereby discharge or release the account debtor or any secondary obligors or other obligors in respect thereof without affecting any of the Obligations, (iii) demand, collect or enforce payment of any Receivables or such other obligations, but without any duty to do so, and Lender shall not be liable for its failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto and (iv) take whatever other action Lender  may deem necessary or desirable for the protection of its interests.  At any time that an Event of Default exists or has occurred and is continuing, at Lender's request, all invoices and statements sent to any account debtor shall state that the Accounts and such other obligations have been assigned to Lender and are payable directly and only to Lender and Borrowers shall deliver to Lender  such originals of documents evidencing the sale and delivery of goods or the performance of services giving rise to any Receivables as Lender may require.  In the event any account debtor returns Inventory when an Event of Default exists or has occurred and is continuing, Borrowers shall, upon Lender's request, hold the returned Inventory in trust for Lender, segregate all returned Inventory from all of its other property, dispose of the returned Inventory solely according to Lender's instructions, and  not issue any credits, discounts or allowances with respect thereto without Lender's prior written consent.

(f)     To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner (which duties cannot be waived under such law), each Borrower acknowledges and agrees that it is not commercially unreasonable for Lender (i) to fail to incur expenses reasonably deemed significant by Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain consents of any governmental authority or other third party for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against account debtors, secondary obligors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (iv) to exercise collection remedies against account

debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other persons, whether or not in the same business as Borrowers for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, (xi) to purchase insurance or credit enhancements to insure Lender against risks of loss, collection or disposition of Collateral or to provide to Lender a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the Collateral.  Each Borrower acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the Collateral and that other actions or omissions by Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to Borrowers or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

(g)    For the purpose of enabling Lender to exercise the rights and remedies hereunder, Borrower hereby grants to Lender, to the extent assignable, an irrevocable, non-exclusive license (exercisable at any time an Event of Default shall exist or have occurred and for so long as the same is continuing without payment of royalty or other compensation to Borrowers) to use, assign, license or sublicense any of the trademarks, service-marks, trade names, business names, trade styles, designs, logos and other source of business identifiers and other intellectual property and general intangibles now owned or hereafter acquired by any Borrower, wherever the same maybe located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

(h)    (i) No Borrower shall have the right to object to Lender's enforcement of remedies set forth in the Orders and the Financing Agreements on any basis other than an assertion that an Event of Default under this Agreement or the other Financing Agreements has not occurred or has been cured within the cure periods expressly set forth in the applicable Financing Agreements; and (ii) each Borrower shall cooperate fully and not interfere with Lender in connection with the Sale (as defined in the Consulting Agreement).

(i)    Subject to the Orders, in case any one or more of the covenants and/or agreements set forth in this Agreement or any other Financing Agreement shall have been breached by any Borrower, then the Lender may proceed to protect and enforce Lender's rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Financing Agreement.  Without limitation of the foregoing, the Borrowers agree that failure to comply with any of the covenants contained herein will cause

77

irreparable harm and Lender shall be entitled to seek specific performance in the event of any breach thereof.  Lender shall be indemnified by the Borrowers against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof.

**SECTION 11.  JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW**

11.1    Governing Law: Choice of Forum: Service of Process: Jury Trial Waiver.

(a)    The validity, interpretation and enforcement of this Agreement and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal law of the State of New York and, to the extent applicable, the Bankruptcy Code.

(b)    The Borrowers agree that any suit for the enforcement of this Agreement or any other Financing Agreement may be brought in the Bankruptcy Court and, to the extent the Bankruptcy Court declines or is otherwise unable to exercise jurisdiction, any court of the State of New York sitting in the Borough of Manhattan or any federal court sitting therein as Lender may elect in its sole discretion and consent to the non-exclusive jurisdiction of such courts.  The Borrowers hereby waive any objection which they may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum. The Borrowers agree that any action commenced by any Borrower asserting any claim or counterclaim arising under or in connection with this Agreement or any other Financing Agreement shall be brought solely in the Bankruptcy Court or, to the extent the Bankruptcy Court declines or is otherwise unable to exercise jurisdiction, a court of the State of New York sitting in the Borough of Manhattan or any federal court sitting therein as Lender may elect in its sole discretion, and the Borrowers consent to the exclusive jurisdiction of such courts with respect to any such action. Nothing contained herein shall be deemed to constitute Lender's consent to (i) the jurisdiction of the Bankruptcy Court for any purposes other than the enforcement of this Agreement and the Orders, or (ii) jurisdiction before any bankruptcy court in the Case.

(c)    Each Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth on the signature pages hereof and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at Lender's option, by service upon Borrowers in any other manner provided under the rules of any such courts.  Within thirty (30) days after such service, Borrowers shall appear in answer to such process, failing which Borrowers shall be deemed in default and judgment may be entered by Lender against Borrowers for the amount of the claim and other relief requested.

(d)    BORROWERS AND LENDER EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR THE

78

TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.    BORROWERS AND LENDER EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT BORROWERS OR LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)    Lender shall not have any liability to Borrowers (whether in tort, contract, equity or otherwise) for losses suffered by Borrowers in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non appealable judgment or court order binding on Lender, that the losses were the result of acts or omissions constituting gross negligence or willful misconduct.  In any such litigation, Lender shall be entitled to the benefit of the rebuttable presumption that it acted in good faith and with the exercise of ordinary care in the performance by it of the terms of this Agreement.

(f)    IN THE EVENT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "COURT") BY OR AGAINST ANY PARTY HERETO IN CONNECTION WITH ANY CLAIM AND THE WAIVER SET FORTH IN CLAUSE (D) ABOVE IS NOT ENFORCEABLE IN SUCH PROCEEDING, THE PARTIES HERETO AGREE AS FOLLOWS:

(i)    WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN SUBCLAUSE (ii) BELOW, ANY CLAIM SHALL BE DETERMINED BY A GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1.  THE PARTIES INTEND THIS GENERAL REFERENCE AGREEMENT TO BE SPECIFICALLY ENFORCEABLE.  VENUE FOR THE REFERENCE PROCEEDING SHALL BE IN THE COUNTY OF LOS ANGELES, CALIFORNIA.

(ii)    THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A GENERAL REFERENCE PROCEEDING: (A) NON-JUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY, (B) EXERCISE OF SELF-HELP REMEDIES (INCLUDING SET-OFF OR RECOUPMENT), (C) APPOINTMENT OF A RECEIVER, AND (D) TEMPORARY, PROVISIONAL, OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS, OR PRELIMINARY INJUNCTIONS).  THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (A) - (D) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO PARTICIPATE IN A REFERENCE PROCEEDING PURSUANT TO THIS AGREEMENT WITH RESPECT TO ANY OTHER MATTER.

(iii)    UPON THE WRITTEN REQUEST OF ANY PARTY, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR

JUSTICE.  IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN 10 DAYS OF SUCH WRITTEN REQUEST, THEN, ANY PARTY SHALL HAVE THE RIGHT TO REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(B).  THE REFEREE SHALL BE APPOINTED TO SIT WITH ALL OF THE POWERS PROVIDED BY LAW.  PENDING APPOINTMENT OF THE REFEREE, THE COURT SHALL HAVE THE POWER TO ISSUE TEMPORARY OR PROVISIONAL REMEDIES.

(iv)    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REFEREE SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING.  ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS A COURT REPORTER AND A TRANSCRIPT IS ORDERED, A COURT REPORTER SHALL BE USED AND THE REFEREE SHALL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT.  THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY THE COSTS OF THE COURT REPORTER, PROVIDED THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE.

(v)    THE REFEREE MAY REQUIRE ONE OR MORE PREHEARING CONFERENCES.  THE PARTIES HERETO SHALL BE ENTITLED TO DISCOVERY, AND THE REFEREE SHALL OVERSEE DISCOVERY IN ACCORDANCE WITH THE RULES OF DISCOVERY, AND SHALL ENFORCE ALL DISCOVERY ORDERS IN THE SAME MANNER AS ANY TRIAL COURT JUDGE IN PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA.

(vi)    THE REFEREE SHALL APPLY THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH CALIFORNIA SUBSTANTIVE AND PROCEDURAL LAW.  THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT.  THE REFEREE SHALL REPORT HIS OR HER DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW.  THE REFEREE SHALL ISSUE A DECISION AND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 644, THE REFEREE'S DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT.  THE FINAL JUDGMENT OR ORDER FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE SHALL BE FULLY APPEALABLE AS IF IT HAS BEEN ENTERED BY THE COURT.

(vii)    THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED IN A GENERAL REFERENCE PROCEEDING PURSUANT HERETO WILL BE

DECIDED BY A REFEREE AND NOT BY A JURY. AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR OWN CHOICE, EACH PARTY HERETO KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT AGREES THAT THIS REFERENCE PROVISION SHALL APPLY TO ANY DISPUTE BETWEEN THEM THAT ARISES OUT OF OR IS RELATED TO THIS AGREEMENT OR THE OTHER FINANCING AGREEMENTS.

11.2    <u>Waiver of Notices</u>. Each Borrower hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and commercial paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein. No notice to or demand on Borrowers which Lender may elect to give shall entitle any Borrower to any other or further notice or demand in the same, similar or other circumstances.

11.3    <u>Amendments and Waivers</u>. Neither this Agreement nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender, and as to amendments, as also signed by an authorized officer of each Borrower. Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights, powers and/or remedies unless such waiver shall be in writing and signed by an authorized officer of Lender. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Lender would otherwise have on any future occasion, whether similar in kind or otherwise. Anything in this Agreement to the contrary notwithstanding (i) any amendment contemplated by <u>Section 3.5</u> to this Agreement in connection with a Benchmark Transition Event shall be effective as contemplated by such <u>Section 3.5</u> and (ii) any amendment contemplated by Section 3.1(f) of this Agreement in connection with the use or administration of Term SOFR shall be effective as contemplated by such <u>Section 3.1(f)</u>.

11.4    <u>Waiver of Counterclaims</u>. Each Borrower waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

11.5    <u>Additional Waiver</u>. Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Borrower hereby absolutely, knowingly, unconditionally, and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.

11.6    <u>Indemnification</u>. Each Borrower shall jointly and severally indemnify and hold Lender, and its directors, agents, employees and counsel, harmless, except in the case of gross negligence or willful misconduct of Lender or its directors, agents, employees or counsel, from and against any and all losses, claims, damages, liabilities, costs or expenses imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery,

enforcement, performance or administration of this Agreement, any other Financing Agreements, or any undertaking or proceeding related to any of the transactions contemplated hereby or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrowers shall pay the maximum portion which it is permitted to pay under applicable law to Lender in satisfaction of indemnified matters under this Section. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

## SECTION 12.  <u>TERM OF AGREEMENT; MISCELLANEOUS</u>

12.1    <u>Term</u>.

(a)    This Agreement and the other Financing Agreements shall become effective on the Effective Date and shall continue in full force and effect for a term ending on November [___][2], 2024 (the "<u>Maturity Date</u>").  Upon the effective date of termination or nonrenewal of the Financing Agreements, Borrowers shall pay to Lender, in full, all outstanding and unpaid Obligations and shall furnish cash collateral to Lender in such amounts as Lender determines are reasonably necessary to secure Lender from loss, cost, damage or expense, including attorneys' fees and legal expenses, in connection with any contingent Obligations, including checks or other payments provisionally credited to the Obligations and/or as to which Lender has not yet received final and indefeasible payment.  Such payments in respect of the Obligations and cash collateral shall be remitted by wire transfer in Federal funds to such bank account of Lender, as Lender may, in its discretion, designate in writing to Borrowers' Agent for such purpose.  Interest shall be due until and including the next business day, if the amounts so paid by Borrowers to the bank account designated by Lender are received in such bank account later than 12:00 noon, New York City time.

(b)    No termination of this Agreement or the other Financing Agreements shall relieve or discharge Borrowers of their respective duties, obligations and covenants under this Agreement or the other Financing Agreements until all Obligations have been fully and finally discharged and paid, and Lender's continuing security interest in the Collateral and the rights and remedies of Lender hereunder, under the other Financing Agreements and applicable law, shall remain in effect until all such Obligations have been fully and finally discharged and paid.

12.2    <u>Appointment of Borrowers' Agent</u>.

(a)    Each Borrower hereby irrevocably appoints SAMC as Borrowers' Agent hereunder, and SAMC hereby agrees to act in such capacity as agent for such Borrowers hereunder. Each Borrower further irrevocably authorizes Borrowers' Agent to take such action on such Borrowers' behalf and to exercise such rights and powers hereunder as are delegated to Borrowers' Agent by the terms hereof, together with such rights and powers as are reasonably incidental thereto.

---

[2] Six months from the Effective Date.

(b)     Borrowers' Agent is hereby expressly and irrevocably authorized by each Borrower, without hereby limiting any implied or express authority, (i) to give and receive on behalf of such Borrower all notices and other materials delivered or provided to be delivered by Lender to such Borrower or by such Borrower to Lender pursuant to the Financing Agreements, (ii) to request Revolving Loans on behalf of such Borrower, and (iii) to pay, on behalf of such Borrower, all Obligations at any time due Lender for the benefit of Lender pursuant to the terms of this Agreement.

12.3    Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone or electronic method of transmission (and subject in each case to clause (c) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail as follows:

(i)     if to any Borrower:

Sam Ash Music Corporation
278 Duffy Avenue
Hicksville, New York 11801
Attention: David Ash
Email: dash@samash.com

with copy to (which shall not constitute notice):

Cole Schotz P.C.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Attention: Ryan T. Jareck
Email: rjareck@coleschotz.com

(ii)    Lender:

Tiger Finance, LLC
60 State Street, Floor 11
Boston, Massachusetts 02109
Attention: Andy Babcock
E-Mail: ababcock@tigergroup.com

with copy to (which shall not constitute notice):

Riemer & Braunstein LLP
Time Square Tower
7 Times Square, Suite 2506
New York, New York 10036
Attention: Anthony Stumbo
Email: AStumbo@riemerlaw.com

Any party hereto may change its address or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(b)      All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, or (ii) delivered through an electronic method of transmission to the extent provided in clause (c) below shall be effective as provided in such clause.

(c)      Notices and other communications to Lender hereunder may be delivered or furnished by e-mail or any internet or extranet-based site providing for access to data protected by passcodes or other security systems approved by Lender for such purpose and in each case to the extent that Lender may approve pursuant to procedures approved by Lender; provided, that, the foregoing shall not apply to notices pursuant to Section 2 or such other notices as Lender may specifically hereafter agree. Unless otherwise specified by Lender, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided, that, if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or extranet-based site shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided, that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

12.4    Partial Invalidity. If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

12.5    Successors. This Agreement, the other Financing Agreements and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Lender, Borrowers and their respective successors and assigns, except that Borrowers may not assign their rights under this Agreement, the other Financing Agreements and any other document referred to herein or therein without the prior written consent of Lender. Lender may, after notice to Borrowers, assign its rights and delegate its obligations under this Agreement and the other Financing Agreements and further may assign, or sell participations in, all or any part of the Loans or any other interest herein to another financial institution or other person (other than any competitor of Borrowers engaged in the same line of business or any shareholder of any such competitor), in which event, the assignee or participant shall have, to the extent of such assignment or participation, the same rights and benefits as it would have if it were the Lender hereunder, except as otherwise provided by the terms of such assignment or participation.

12.6    <u>Entire Agreement</u>.  This Agreement, the other Financing Agreements, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

12.7    <u>Loan Publications</u>.  Anything in this Agreement to the contrary notwithstanding (a) Lender may disclose information relating to the credit facility under this Agreement to loan syndication and price reporting services, including Gold Sheets and other publications, with such information to consist of terms and conditions and other information customarily found in such publications and services and (b) Lender may otherwise use the corporate names, logos and insignias of Borrowers and Obligors and such information in "tombstones" or other advertisements, public statements or other marketing materials (including on its website).

12.8    <u>Release by Borrowers</u>.

(a)    <u>Release</u>.

(i)    In consideration of the agreements of Lender contained herein and the making of Loans by or on behalf of Lender to Borrowers pursuant to this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Borrower on behalf of itself and its successors and assigns, hereby, jointly and severally, absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives and its successors and assigns (Lender and all such other parties being hereinafter referred to collectively as the "<u>Releasees</u>" and individually as a "<u>Releasee</u>"), of and from all demands, actions, causes of action, suits, controversies, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "<u>Claim</u>" and collectively, "<u>Claims</u>") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which each Borrower, or any of its successors or assigns may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever that arose solely in connection with this Agreement prior to the date of this Agreement.

(ii)    Each Borrower understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(iii)    Each Borrower agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the release set forth above.

(iv)     Each Borrower represents and warrants that it is the sole and lawful owner of all right, title and interest in and to all of the claims released hereby and it has not heretofore voluntarily, by operation of law or otherwise, assigned or transferred or purported to assign or transfer to any person any such claim or any portion thereof.

(v)     Nothing contained herein shall constitute an admission of liability with respect to any Claim on the part of any Releasee.

12.9    Counterparts; Electronic Execution.  This Agreement and any notices delivered under this Agreement, may be executed by means of (i) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Lender reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on this Agreement or on any notice delivered to Lender under this Agreement. This Agreement and any notices delivered under this Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument.  Delivery of an executed counterpart of a signature page of this Agreement and any notices as set forth herein will be as effective as delivery of a manually executed counterpart of the Amendment or notice.  The foregoing shall apply to each other Financing Agreement mutatis mutandis.

12.10   Patriot Act.  Lender hereby notifies each Borrower that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies each Person or corporation who opens an account or enters into a business relationship with it, which information includes the name and address of such Borrower and other information that will allow Lender to identify such Person in accordance with the Patriot Act and any other applicable law. Each Borrower is hereby advised that any Loans are subject to satisfactory results of such verification.  Lender shall have the right to periodically conduct due diligence on each Borrower, its senior management and key principals and legal and beneficial owners. Each Borrower agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Lender shall constitute Obligations for which Lender is entitled to reimbursement and be for the account of Borrowers.

12.11   Acknowledgement Regarding Any Supported QFCs.  To the extent that the Financing Agreements provide support, through a guarantee or otherwise, for any Hedge Agreement or any other agreement or instrument that is a QFC (such support, "QFC Credit Support", and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Financing Agreements and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)      In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Financing Agreements that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Financing Agreements were governed by the laws of the United States or a state of the United States.

(b)      As used in this Section 12.12, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

12.12   Keepwell.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower to honor all of its obligations under the Financing Agreements in respect of Swap Obligations (provided, that, each Qualified ECP Guarantor shall only be liable under this Section 12.12 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 12.12, or otherwise under any Financing Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section 12.12 shall remain in full force and effect until payment in full of the Obligations.  Each Qualified ECP Guarantor intends that this Section 12.12 constitutes, and this Section 12.12 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Borrower for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

IN WITNESS WHEREOF, Lender and Borrowers have caused these presents to be duly executed as of the day and year first above written.


TIGER FINANCE, LLC, as Lender

By: _____

Name: __Andy Babcock_____

Title: __Managing Director_____
__5/8/2024__

[Signature Page for Senior Secured Super-Priority Debtor-In-Possession Loan and Security Agreement]

IN WITNESS WHEREOF, Lender and Borrowers have caused these presents to be duly executed as of the day and year first above written.

<u>BORROWERS</u>

SAM ASH MUSIC CORPORATION

By: _____
Name:    David C. Ash
Title:    CEO

SAMSON TECHNOLOGIES CORP.

By: _____
Name:    David C. Ash
Title:    Vice President

SAM ASH MEGASTORES, LLC

By:  Sam Ash Music Corporation,
its sole member

By: _____
Name:    David C. Ash
Title:    CEO

SAM ASH CT, LLC

By: _____
Name:    David C. Ash
Title:    Member

SAM ASH QUIKSHIP CORP.

By: _____
Name:    David C. Ash
Title:    CEO

SAM ASH FLORIDA MEGASTORES, LLC

By: _____
Name:    David C. Ash
Title:    CEO

[Signature Page for Senior Secured Super-Priority Debtor-In-Possession Loan and Security Agreement]

SAM ASH ILLINOIS MEGASTORES, LLC

By: _____
Name: _____David C. Ash_____
Title: _____CEO_____


SAM ASH NEW JERSEY MEGASTORES,
LLC

By: _____
Name: _____David C. Ash_____
Title: _____CEO_____


SAM ASH NEW YORK MEGASTORES, LLC

By: _____
Name: _____David C. Ash_____
Title: _____CEO_____


SAM ASH NEVADA MEGASTORES, LLC

By: _____
Name: _____David C. Ash_____
Title: _____CEO_____


SAM ASH CALIFORNIA MEGASTORES,
LLC

By: _____
Name: _____David C. Ash_____
Title: _____CEO_____


SAM ASH MUSIC MARKETING, LLC

By: _____
Name: _____David C. Ash_____
Title: _____CEO_____


[Signature Page for Senior Secured Super-Priority Debtor-In-Possession Loan and Security Agreement]

SCHEDULE 1.1

<u>Initial Budget</u>

[see attached]

**Sam Ash Music Corporation**
**DIP Budget**
*(in thousands of USD)*                    CONFIDENTIAL - SUBJECT TO FRE 408

| Week Ending Sunday | Forecast 1 Post-Petition 5/12/2024 | Forecast 2 Post-Petition 5/19/2024 | Forecast 3 Post-Petition 5/26/2024 | Forecast 4 Post-Petition 6/2/2024 | Forecast 5 Post-Petition 6/9/2024 | Forecast 6 Post-Petition 6/16/2024 | Forecast 7 Post-Petition 6/23/2024 | Forecast 8 Post-Petition 6/30/2024 | Forecast 9 Post-Petition 7/7/2024 | Forecast 10 Post-Petition 7/14/2024 | Forecast 11 Post-Petition 7/21/2024 | Forecast 12 Post-Petition 7/28/2024 | Forecast 13 Post-Petition 8/4/2024 | Forecast 14 Post-Petition 8/11/2024 | Forecast 15 Post-Petition 8/18/2024 | Winddown | 15-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | | | | |
| Sam Ash - Retail | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sam Ash - GOB | 4,777 | 4,231 | 3,722 | 2,889 | 2,971 | 2,753 | 2,612 | 2,737 | 2,558 | 1,654 | 381 | - | - | - | - | - | 31,285 |
| Sam Ash - E-Comm | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Samson | 716 | 716 | 716 | 702 | 619 | 619 | 619 | 610 | - | 48 | 121 | 145 | 169 | - | - | - | 5,317 |
| Other | 50 | 50 | 50 | 8 | - | - | - | - | - | - | - | - | - | - | - | - | 640 |
| **Total Sales** | **5,543** | **4,997** | **4,488** | **3,599** | **3,590** | **3,372** | **3,231** | **3,404** | **2,679** | **1,799** | **550** | **-** | **-** | **-** | **-** | **-** | **37,253** |
| **Cash Flow** | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | |
| Sam Ash - Retail | 4,176 | 4,622 | 4,078 | 3,347 | 3,052 | 2,950 | 2,772 | 2,791 | 2,732 | 2,094 | 925 | 158 | - | - | - | 2,692 | 33,698 |
| Sam Ash - E-Comm | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Samson | 519 | 489 | 555 | 555 | 703 | 685 | 538 | 538 | - | - | - | - | - | - | - | - | 4,582 |
| Sale Proceeds | - | - | - | - | - | - | - | - | 7,500 | - | - | - | - | - | - | - | 7,500 |
| Other | 21,444 | 52 | 52 | 26 | 3 | - | - | 30 | 95 | 140 | 166 | 70 | - | - | - | 99 | 22,078 |
| **Total Receipts** | **26,139** | **5,163** | **4,685** | **3,928** | **3,758** | **3,635** | **3,310** | **10,859** | **2,827** | **2,235** | **1,091** | **229** | **-** | **-** | **-** | **2,790** | **67,858** |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Merchandise Payments - Samson | - | - | - | - | - | - | 300 | - | - | - | - | - | - | - | - | - | 300 |
| Payroll - Stores | 513 | 534 | 544 | 539 | 832 | 329 | 328 | 327 | 327 | 326 | 320 | 309 | 802 | - | - | - | 6,032 |
| Payroll, 401k and Payroll Taxes - HQ + Samson | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 25 | 25 | 416 | 2,631 |
| Payroll, Benefits and Payroll Taxes - Samson China | - | 27 | - | - | - | 27 | - | - | - | - | - | - | - | - | - | - | 54 |
| Advertising Expense - e-commerce and stores | 25 | 25 | 25 | 25 | 25 | 25 | - | - | - | - | - | - | - | - | - | - | 150 |
| Rent Expense, CAM and taxes | 15 | - | - | 1,082 | - | - | - | - | 1,082 | - | - | - | - | - | - | - | 2,180 |
| Medical / Health Insurance | 75 | 75 | 75 | 115 | 101 | 51 | 51 | 51 | 91 | 51 | 51 | 51 | 91 | 83 | 3 | 542 | 968 |
| Insurance | - | - | - | 25 | - | - | - | - | - | 25 | - | 250 | - | 25 | - | - | 325 |
| IT/Communications w/o utilities | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | - | 225 |
| 3PL - Samson | 23 | 23 | 23 | 23 | 23 | 23 | 23 | - | - | - | - | - | - | - | - | - | 184 |
| Sales Commissions - Samson | - | 30 | 8 | - | - | 30 | 8 | - | - | - | - | - | - | - | - | - | 76 |
| Freight - Samson | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | - | - | - | - | - | - | - | - | 96 |
| Sales Tax Payable | - | - | 944 | - | - | - | 1,039 | - | - | - | - | 673 | - | - | 440 | - | 3,096 |
| Supplies- DCs | - | 25 | - | - | - | 15 | - | - | - | - | 15 | - | - | - | - | - | 45 |
| Credit Card Charges | - | - | - | - | - | 100 | - | - | - | - | 100 | - | - | - | - | - | 225 |
| Utilities | 75 | 75 | 75 | 75 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 10 | 10 | - | 730 |
| Freight | 50 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | - | - | - | - | - | 875 |
| Car leases/allowances | - | - | - | 11 | - | - | - | - | 11 | - | - | - | - | 11 | - | - | 33 |
| Customs & Ocean Freight | 36 | 36 | 36 | - | - | - | - | - | - | - | - | - | - | - | - | - | 108 |
| Other Operating Disbursements | 35 | 39 | 28 | 38 | 35 | 39 | 28 | 39 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 100 | 454 |
| **Total Operating Disbursements** | **1,087** | **1,220** | **2,073** | **2,248** | **1,381** | **1,305** | **803** | **1,843** | **1,914** | **756** | **1,114** | **1,452** | **995** | **78** | **517** | **1,058** | **18,786** |
| **Operating Cash Flow** | **25,052** | **3,943** | **2,611** | **1,680** | **2,377** | **2,331** | **2,507** | **9,016** | **912** | **1,479** | **(24)** | **(1,223)** | **(995)** | **(78)** | **(517)** | **1,732** | **49,072** |
| **Cumulative Cash Flow** | **26,186** | **30,129** | **32,740** | **34,420** | **36,797** | **39,128** | **41,634** | **50,650** | **51,563** | **53,042** | **53,018** | **51,795** | **50,800** | **50,722** | **50,205** | **51,937** | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | | |
| DIP Interest and Fees | 300 | - | - | 221 | - | - | - | - | 82 | - | - | - | 55 | - | - | - | 658 |
| Store Closure Fees | 284 | 364 | 384 | 365 | 279 | 207 | 205 | 211 | 226 | 240 | 189 | 33 | - | - | (700) | - | 2,287 |
| Professional Fees | 368 | 175 | 225 | 205 | 205 | 205 | 205 | 205 | 195 | 170 | 650 | 170 | 170 | 170 | 363 | - | 3,681 |
| Utility Escrow Account | - | 175 | - | - | - | - | - | - | - | - | - | - | - | - | (175) | - | - |
| Accrued Vacation | - | - | - | - | - | - | - | - | - | - | 1,450 | - | - | - | - | - | 1,450 |
| KERP | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 350 | - |
| 503b(9) Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1,500 | - |
| Stub Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1,420 | - |
| D&O Tail | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-Operating Disbursements** | **952** | **714** | **609** | **791** | **484** | **412** | **410** | **416** | **503** | **410** | **2,289** | **203** | **225** | **170** | **(512)** | **3,270** | **8,076** |
| **Net Cash Flow** | **24,100** | **3,230** | **2,003** | **889** | **1,893** | **1,919** | **2,097** | **8,600** | **409** | **1,069** | **(2,313)** | **(1,426)** | **(1,220)** | **(248)** | **(5)** | **(1,538)** | **40,996** |
| **Cumulative Net Cash Flow** | **24,636** | **27,866** | **29,869** | **30,757** | **32,651** | **34,569** | **36,666** | **45,266** | **45,676** | **46,745** | **44,432** | **43,005** | **41,786** | **41,538** | **41,533** | **39,995** | |
| **Debt Schedule & Cash** | | | | | | | | | | | | | | | | | |
| **DIP Facility**   $ 20,000 | | | | | | | | | | | | | | | | | |
| Beginning Balance | - | 18,725 | 13,819 | 11,816 | 9,178 | 7,284 | 5,365 | 3,269 | - | - | - | - | - | - | - | - | |
| (+/-) Borrowing / Repayment | 18,725 | (4,906) | (2,003) | (889) | (1,893) | (1,919) | (2,097) | (3,269) | - | - | - | - | - | - | - | - | |
| (+/-) Other Adjustments | - | - | - | (1,750) | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Ending Balance** | **18,725** | **13,819** | **11,816** | **9,178** | **7,284** | **5,365** | **3,269** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | |
| *Net Borrowing Base Value* | *17,881* | *15,730* | *13,963* | *11,900* | *9,760* | *7,633* | *5,521* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | |
| **Total Availability** | **(844)** | **1,911** | **2,146** | **2,723** | **2,476** | **2,268** | **2,252** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | |
| **ABL Facility**   $ 35,000 | | | | | | | | | | | | | | | | | |
| Beginning Balance | 21,413 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| (+/-) Borrowing / Repayment | (21,413) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| (+/-) Other Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Ending Balance** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | |
| **Cash Balance** | | | | | | | | | | | | | | | | | |
| Cash - BOP | 1,836 | 1,677 | - | - | - | - | - | - | 5,331 | 5,741 | 6,810 | 4,497 | 3,070 | 1,851 | 1,603 | 1,598 | |
| (+/-) Adjustments | (159) | (1,677) | - | - | - | - | - | 5,331 | 409 | 1,069 | (2,313) | (1,426) | (1,220) | (248) | (5) | (1,538) | |
| **Cash - EOP** | **1,677** | **-** | **-** | **-** | **-** | **-** | **-** | **5,331** | **5,741** | **6,810** | **4,497** | **3,070** | **1,851** | **1,603** | **1,598** | **60** | |

**EXHIBIT B**

**Sam Ash Music Corporation**
**DIP Budget**
*(in thousands of USD)*

| | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | Forecast 14 | Forecast 15 | Winddown | 15-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending Sunday | Post-Petition 5/12/2024 | Post-Petition 5/19/2024 | Post-Petition 5/26/2024 | Post-Petition 6/2/2024 | Post-Petition 6/9/2024 | Post-Petition 6/16/2024 | Post-Petition 6/23/2024 | Post-Petition 6/30/2024 | Post-Petition 7/7/2024 | Post-Petition 7/14/2024 | Post-Petition 7/21/2024 | Post-Petition 7/28/2024 | Post-Petition 8/4/2024 | Post-Petition 8/11/2024 | Post-Petition 8/18/2024 | | |
| **Sales** | | | | | | | | | | | | | | | | | |
| Sam Ash - Retail | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sam Ash - GOB | 4,777 | 4,231 | 3,722 | 2,889 | 2,971 | 2,753 | 2,612 | 2,737 | 2,558 | 1,654 | 381 | - | - | - | - | - | 31,285 |
| Sam Ash - E-Comm | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Samson | 716 | 716 | 716 | 702 | 619 | 619 | 619 | 619 | - | 48 | 121 | 145 | 169 | - | - | - | 5,317 |
| Other | 50 | 50 | 50 | 8 | - | - | - | - | - | - | - | - | - | - | - | - | 640 |
| **Total Sales** | **5,543** | **4,997** | **4,488** | **3,599** | **3,590** | **3,372** | **3,231** | **3,404** | **2,679** | **1,799** | **550** | **-** | **-** | **-** | **-** | **-** | **37,253** |
| **Cash Flow** | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | |
| Sam Ash - Retail | 4,176 | 4,622 | 4,078 | 3,347 | 3,052 | 2,950 | 2,772 | 2,791 | 2,732 | 2,094 | 925 | 158 | - | - | - | 2,692 | 33,698 |
| Sam Ash - E-Comm | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Samson | 519 | 489 | 555 | 555 | 703 | 685 | 538 | 538 | - | - | - | - | - | - | - | - | 4,582 |
| Sale Proceeds | - | - | - | - | - | - | - | 7,500 | - | - | - | - | - | - | - | - | 7,500 |
| Other | 21,444 | 52 | 52 | 26 | 3 | - | - | 30 | 95 | 140 | 166 | 70 | - | - | - | 99 | 22,078 |
| **Total Receipts** | **26,139** | **5,163** | **4,685** | **3,928** | **3,758** | **3,635** | **3,310** | **10,859** | **2,827** | **2,235** | **1,091** | **229** | **-** | **-** | **-** | **2,790** | **67,858** |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Merchandise Payments - Samson | - | - | - | - | - | - | 300 | - | - | - | - | - | - | - | - | - | 300 |
| Payroll - Stores | 513 | 534 | 544 | 539 | 832 | 329 | 328 | 327 | 327 | 326 | 320 | 309 | 802 | - | - | - | 6,032 |
| Payroll, 401k and Payroll Taxes - HQ + Samson | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 213 | 25 | 25 | 25 | 416 | 2,631 |
| Payroll, Benefits and Payroll Taxes - Samson China | - | 27 | - | - | - | 27 | - | - | - | - | - | - | - | - | - | - | 54 |
| Advertising Expense - e-commerce and stores | 25 | 25 | 25 | 25 | 25 | 25 | 25 | - | - | - | - | - | - | - | - | - | 150 |
| Rent Expense, CAM and taxes | 15 | - | - | 1,082 | - | - | - | - | 1,082 | - | - | - | - | - | - | - | 2,180 |
| Medical / Health Insurance | 75 | 75 | 75 | 115 | 101 | 51 | 51 | 51 | 91 | 51 | 51 | 91 | 83 | 3 | 3 | 542 | 968 |
| Insurance | - | - | 25 | - | - | - | - | - | 25 | - | 250 | - | 25 | - | - | - | 325 |
| IT/Communications w/o utilities | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | - | 225 |
| 3PL - Samson | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | - | - | - | - | - | - | - | - | 184 |
| Sales Commissions - Samson | - | 30 | 8 | - | - | 30 | 8 | - | - | - | - | - | - | - | - | - | 76 |
| Freight - Samson | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | - | - | - | - | - | - | - | - | 96 |
| Sales Tax Payable | - | - | 944 | - | - | - | 1,039 | - | - | - | - | 673 | - | - | 440 | - | 3,096 |
| Supplies- DCs | - | 25 | - | - | - | 15 | - | - | - | - | 15 | - | - | - | - | - | 45 |
| Credit Card Charges | - | - | - | - | 100 | - | - | - | - | - | 100 | - | - | - | - | - | - |
| Utilities | 75 | 75 | 75 | 75 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 10 | 10 | 10 | - | 730 |
| Freight | 50 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | - | - | - | - | - | 875 |
| Car leases/allowances | - | - | - | 11 | - | - | - | - | 11 | - | - | - | 11 | - | - | - | 33 |
| Customs & Ocean Freight | 36 | 36 | 36 | - | - | - | - | - | - | - | - | - | - | - | - | - | 108 |
| Other Operating Disbursements | 35 | 39 | 28 | 38 | 35 | 39 | 28 | 39 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 100 | 454 |
| **Total Operating Disbursements** | **1,087** | **1,220** | **2,073** | **2,248** | **1,381** | **1,305** | **803** | **1,843** | **1,914** | **756** | **1,114** | **1,452** | **995** | **78** | **517** | **1,058** | **18,786** |
| **Operating Cash Flow** | **25,052** | **3,943** | **2,611** | **1,680** | **2,377** | **2,331** | **2,507** | **9,016** | **912** | **1,479** | **(24)** | **(1,223)** | **(995)** | **(78)** | **(517)** | **1,732** | **49,072** |
| **Cumulative Cash Flow** | **26,186** | **30,129** | **32,740** | **34,420** | **36,797** | **39,128** | **41,634** | **50,650** | **51,563** | **53,042** | **53,018** | **51,795** | **50,800** | **50,722** | **50,205** | **51,937** | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | | |
| DIP Interest and Fees | 300 | - | - | 221 | - | - | - | - | 82 | - | - | - | 55 | - | - | - | 658 |
| Store Closure Fees | 284 | 364 | 384 | 365 | 279 | 207 | 205 | 211 | 226 | 240 | 189 | 33 | - | - | (700) | - | 2,287 |
| Professional Fees | 368 | 175 | 225 | 205 | 205 | 205 | 205 | 205 | 195 | 170 | 650 | 170 | 170 | 170 | 363 | - | 3,681 |
| Utility Escrow Account | - | 175 | - | - | - | - | - | - | - | - | - | - | - | - | (175) | - | - |
| Accrued Vacation | - | - | - | - | - | - | - | - | - | - | 1,450 | - | - | - | - | - | 1,450 |
| KERP | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 350 | - |
| 503(b)(9) Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1,500 | - |
| Stub Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1,420 | - |
| D&O Tail | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-Operating Disbursements** | **952** | **714** | **609** | **791** | **484** | **412** | **410** | **416** | **503** | **410** | **2,289** | **203** | **225** | **170** | **(512)** | **-** | **8,076** |
| **Net Cash Flow** | **24,100** | **3,230** | **2,003** | **889** | **1,893** | **1,919** | **2,097** | **8,600** | **409** | **1,069** | **(2,313)** | **(1,426)** | **(1,220)** | **(248)** | **(5)** | **(1,538)** | **40,996** |
| **Cumulative Net Cash Flow** | **24,636** | **27,866** | **29,869** | **30,757** | **32,651** | **34,569** | **36,666** | **45,266** | **45,676** | **46,745** | **44,432** | **43,005** | **41,786** | **41,538** | **41,533** | **39,995** | |
| **Debt Schedule & Cash** | | | | | | | | | | | | | | | | | |
| **DIP Facility** [$ 20,000] | | | | | | | | | | | | | | | | | |
| Beginning Balance | - | 18,725 | 13,819 | 11,816 | 9,178 | 7,284 | 5,365 | 3,269 | - | - | - | - | - | - | - | - | - |
| (+/-) Borrowing / Repayment | 18,725 | (4,906) | (2,003) | (889) | (1,893) | (1,919) | (2,097) | (3,269) | - | - | - | - | - | - | - | - | - |
| (+/-) Other Adjustments | - | - | - | (1,750) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Balance** | **18,725** | **13,819** | **11,816** | **9,178** | **7,284** | **5,365** | **3,269** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| *Net Borrowing Base Value* | *17,881* | *15,730* | *13,963* | *11,900* | *9,760* | *7,633* | *5,521* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| **Total Availability** | **(844)** | **1,911** | **2,146** | **2,723** | **2,476** | **2,268** | **2,252** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | | |
| **ABL Facility** [$ 35,000] | | | | | | | | | | | | | | | | | |
| Beginning Balance | 21,413 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (+/-) Borrowing / Repayment | (21,413) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (+/-) Other Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Balance** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Cash Balance** | | | | | | | | | | | | | | | | | |
| Cash - BOP | 1,836 | 1,677 | - | - | - | - | - | - | 5,331 | 5,741 | 6,810 | 4,497 | 3,070 | 1,851 | 1,603 | 1,598 | |
| (+/-) Adjustments | (159) | (1,677) | - | - | - | - | - | 5,331 | 409 | 1,069 | (2,313) | (1,426) | (1,220) | (248) | (5) | (1,538) | |
| **Cash - EOP** | **1,677** | **-** | **-** | **-** | **-** | **-** | **-** | **5,331** | **5,741** | **6,810** | **4,497** | **3,070** | **1,851** | **1,603** | **1,598** | **60** | |

## Exhibit 2

Final DIP Order

[Intentionally Left Blank]