**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| SAM ASH MUSIC CORPORATION, *et al.* | Case No. 24-14727 (SLM) |
| Debtors.[1] | (Jointly Administered) |

## NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF ORDERS (I) (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND (II) (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE <u>ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS</u>

**PLEASE TAKE NOTICE** that on <u>**June 3, 2024 at 10:00 a.m. (prevailing Eastern**</u>

<u>**Time)**</u>, or as soon thereafter as counsel may be heard, the above-captioned debtors and debtors in

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410).  The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

possession (the "<u>Debtors</u>"), by and through their undersigned proposed counsel, shall move the *Debtors' Motion for Entry of Orders (I) (A) Approving Bidding Procedures and Breakup Fee, (B) Approving Stalking Horse Purchase Agreement, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, and (E) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases and (II) (A) Authorizing the Debtor to Enter into an Asset Purchase Agreement, (B) Approving the Asset Purchase Agreement, and (c) Authorizing the Assumption and Assignment of the Assumed Contracts* (the "<u>Motion</u>") before the Honorable Stacey L. Meisel, United States Bankruptcy Judge, in Courtroom 3A of the United States Bankruptcy Court for the District of New Jersey, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Newark, NJ 07102, for entry of an order (the "<u>Order</u>"), substantially in the form submitted herewith, establishing procedures for the allowance of interim compensation and reimbursement of expenses of professionals retained by this Court.

    **PLEASE TAKE FURTHER NOTICE** that in support of the relief requested in the Motion, the Debtors shall rely on the accompanying Motion, which sets forth the relevant legal and factual bases upon which the relief requested should be granted.  A proposed Order granting the relief requested in the Motion is also submitted herewith.

    **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion shall:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "<u>General Order</u>") and the *Commentary Supplementing Administrative Procedures* dated as of March 2004 (the "<u>Supplemental Commentary</u>") (the General Order, the Supplemental

47659143

Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received no later than seven (7) days before the hearing date set forth above.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Epiq Corporate Restructuring, LLC at https://dm.epiq11.com/SamAsh.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed and served, the Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d) and the relief requested may be granted without further notice or hearing.

*[Remainder of Page Intentionally Left Blank]*

DATED:  May 10, 2024   Respectfully submitted,

**COLE SCHOTZ P.C.**

By: */s/Michael D. Sirota*
    Michael D. Sirota, Esq.
    Ryan T. Jareck, Esq.
    Matteo Percontino, Esq.
    Court Plaza North
    25 Main Street
    Hackensack, NJ 07601
    (201) 489-3000
    (201) 489-1536 Facsimile
    Email: msirota@coleschotz.com
      rjareck@coleschotz.com
      mpercontino@coleschotz.com

*Proposed Counsel to Debtors and Debtors in
Possession*

47659143

**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SAM ASH MUSIC CORPORATION, *et al.*, | Case No. 24-14727 (SLM) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I) (A) APPROVING BIDDING
PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE
PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS AND LEASES AND (II) (A) AUTHORIZING
THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT,
(B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS**

TO THE HONORABLE STACEY L. MEISEL
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410). The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

The above-captioned debtors and debtors in possession (the "Debtors")[2] respectfully states

as follows in support of this motion (this "Motion"):

## Preliminary Statement

1.      As set forth in the *Declaration of Jordan Meyers, Chief Restructuring Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 17] (the "First Day Declaration"), the Debtors initiated these cases with the intent to conduct a going concern sale process for all or some of their assets, on an expedited basis, and simultaneously initiating store closing sales at their retail locations to monetize their inventory.  This dual path process is necessary to maintain optionality, conserve liquidity and maximize the value of the Debtors' assets.  The Debtors, however, continue to believe that there is value in their brand and operations as a going concern.  The Debtors remain interested in exploring potential sale transactions on a postpetition basis. Accordingly, by this Motion, the Debtors propose an expeditious, public and flexible bidding and sale process to pursue a going concern transaction or a sale of discrete assets that is substantially similar to those procedures by other retailers in similar circumstances.   In the event that the Debtors are unable to implement a sale transaction, the Debtors will not have sufficient liquidity to continue to operate in the ordinary course and will be forced to wind-down their operations and liquidate all of their existing inventory.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference of the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

final order in connection with this Motion to the extent that it is later determined that the Court absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and rules 6004-1 and 6004-2 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

**Background**

5.      As set forth in the First Day Declaration, the Debtors are "The World's Favorite Music Store ®" having served thousands of musicians since 1924 as a family-owned manufacturer and specialty retailer of musical instruments and related equipment.  As of the date hereof, the Debtors operate 42 stores and 4 distribution centers throughout the United States.  The Debtors also operate an ecommerce business that primarily conducts sales domestically.  Further, the Debtors operate a wholesale business, Samson, which designs, markets, distributes, and sells products to musical instrument and consumer electronic retailers, distributors, and sound contractors both domestically and internationally.  The Debtors are headquartered in Hicksville, New York and currently employ approximately 830 employees.

6.      On May 8, 2024 (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has

3

47548066

been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint

administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 3].

### Relief Requested[3]

7.    By this Motion, the Debtors seek entry of an order, substantially in the form

attached hereto as **Exhibit A** (the "<u>Bidding Procedures Order</u>"):

(a)    authorizing and approving the bidding procedures attached to the
Bidding Procedures Order as **Exhibit 1** (the "<u>Bidding Procedures</u>");

(b)    establishing the following dates and deadlines in connection with the
Bidding Procedures:

(i)    <u>Bid Deadline</u>: June 14, 2024, at 4:00 p.m., prevailing Eastern Time

(ii)    <u>Auction</u>: June 20, 2024, at 10:00 a.m., prevailing Eastern Time

(iii)    <u>Sale Hearing</u>: June 18, 2024, at 10:00 a.m., prevailing Eastern Time
(if no Auction) or June 28, 2024, at 10:00 a.m., prevailing Eastern
Time (if Auction)

(c)    authorizing entry into the stalking horse agreement by and between the
Debtors and Tiger Finance, LLC (the "<u>Stalking Horse APA</u>") attached as
**Exhibit 2** to the Bidding Procedures Order, approving a break up fee in the
amount of $150,000 (the "<u>Breakup Fee</u>");

(d)    authorizing the form and manner of notice of an auction (the "<u>Auction</u>") and
sale hearing(s) (the "<u>Sale Hearing</u>") with respect to the sale of the assets
free and clear of liens, claims, encumbrances, and other interests
(the "<u>Sale</u>"), attached as **Exhibit 3** to the Bidding Procedures Order
(the "<u>Sale Notice</u>");

(e)    approving procedures for the assumption and assignment of certain
executory contracts and unexpired leases (collectively, the "<u>Contracts</u>") in
connection with the Sale (the "<u>Assumption and Assignment Procedures</u>"),
including notice of proposed cure payments;

---

[3] The Debtors reserve the right to file and serve any supplemental pleadings or declarations that the Debtors
deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the
competitive bidding and sale process and the results thereof, in support of their request for entry of the Bidding
Procedures Order or the Sale Order.

47548066

(f)      providing that, in light of the fact that the Debtors' privacy policy does not prohibit the transfer of personal identifiable information, the appointment of a consumer privacy ombudsman is not required; and

(g)      granting related relief.

8.      Additionally, the Debtors will seek entry of one or more orders at the applicable Sale Hearing (the "Sale Order"):[4]

(a)      authorizing and approving the Sale to the successful bidder(s) on the terms substantially set forth in the successful bid(s);

(b)      and approving the Sale of the assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in an asset purchase agreement with successful bidder(s);

(c)      authorizing the assumption and assignment of executory contracts and leases as set forth in an asset purchase agreement with successful bidder(s); and

(d)      granting related relief.

9.      For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and therefore, should be granted.

## **The Proposed Sale**

**I.    The Debtors' Assets**

10.      The assets in the contemplated sale transaction (the "Assets") consist of, among other related things, (i) designation rights with respect to leasehold interests, fixed assets, fixtures, equipment, and inventory in all of the Debtors' stores, distribution centers, and/or warehouses; (ii) the Debtors' intellectual property, consisting of trademarks, domain names, customer files, and related data; and (iii) the Debtors' eCommerce assets.

---

[4] A copy of the Sale Order will be filed on the docket in advance of the Sale Hearing.

47548066

11.     While the Debtors operate the business as a single integrated enterprise, segmentation of certain business units is possible.  In particular, Debtor, Samson Technologies Corp. is a wholesaler, manufacturer, and distributor of its own products and equipment, including among other brands, Samson, Michael Kelly Guitar Co., and Hartke. Separately, Sam Ash Music operates retail stores and an e-commerce retail business, which sells merchandise, including products from Samson Technologies Corp. through those retail channels.  Thus, while the Debtors are seeking to sell their Assets in their entirety, the Debtors believe the Assets could be segmented to permit opportunities for multiple buyers such that bids can be made by buyers focused on the Assets related to the Samson business unit or focused on the Sam Ash Music business unit (collectively, the "Business Units").

## II.     The Debtors' Marketing Process

12.     As more fully described in the First Day Declaration, the Debtors filed these chapter 11 cases with the intent to conduct a going concern sale process with respect to its businesses and a liquidation process with respect to their stores.

13.     Debtors' business operations, like those of many of their peers in the retail industry, have been negatively impacted by adverse market conditions, including, most notably, the COVID-19 pandemic.  In late 2023, the Debtors engaged in a comprehensive and exhaustive process to recapitalize their balance sheet, including but not limited to, refinancing their debt.  That process culminated in a refinancing of the Debtors' asset-based loan with Tiger Finance, LLC ("Tiger Finance") on February 21, 2024.  As part of the refinancing with Tiger Finance, the Debtors agreed to engaged SierraConstellation Partners LLC ("SCP") as financial advisors.

14.     Subsequently, in light of the sustained weak business performance, the Debtors and SCP worked diligently to solicit and develop strategic alternatives to maximize the Debtors' value for the benefit of all of their stakeholders and to facilitate discussions with the Debtors' capital

structure constituents.  At the same time, the Debtors also retained the services of SCP to conduct a targeted search for potential partners to execute a strategic transaction with the Debtors.

15.     Beginning in late February 2024, SCP initiated a process that ultimately resulted in it contacting nine (9) prospective financial and/or strategic partners to gauge interest in a strategic transaction with the Debtors.  A number of parties executed non-disclosure agreements and began conducting varying levels of diligence at that time.

16.     As the Debtors search for a strategic partner unfolded, the Debtors engaged Tiger Capital Group, LLC ("Tiger Capital") to conduct an inventory monetization and store closing plan at eighteen (18) underperforming stores.  That liquidation process commenced on March 1, 2024, and was expanded to the Debtors remaining retail locations on May 2, 2024.  Even in the event that a strategic transaction were to be consummated, the Debtors anticipate that such a transaction may be conditioned on them shrinking their retail footprint by closing a select number of retail stores.

17.     In addition, the Debtors, in consultation with Tiger Finance, elected to appoint Jordan Meyers of SCP as CRO on or about April 4, 2024.  Given the increased role SCP was taking on, the Debtors, in consultation with SCP, decided to engage a third-party investment banker, Capstone Partners ("Capstone" or the "Investment Banker").  On April 5, 2024, Capstone essentially took over the SCP strategic process that was underway and continued to gauge market interest in acquiring a portion of the Debtors' stores as well as their e-commerce and Samson businesses.

18.     At that time, Capstone commenced an extensive transaction process to market the Debtors' assets for sale, to initially, over 80 prospective purchasers, including potential buyers who may be interested in bidding on the Business Units separately.  This process included

Capstone leveraging its proprietary databases and market knowledge, to identify a broad group of potential strategic and financial buyers. Commencing on or about April 19, 2024, Capstone began soliciting those potential buyers by sending "teasers" summarizing the investment opportunity to acquire the Debtors' assets, a non-disclosure agreement to be executed for those potential buyers to receive additional information, preparing marketing information, and populating a virtual data room which will contain a myriad information about the Debtors, their assets, their liabilities, and all aspects of their businesses.

19.     Based on the robust marketing process to date, the Debtors believe there is interest in some or all of the Business Units.  Since the beginning of the marketing process, Capstone has contacted 88 potential purchasers, including specialty retailers and brand portfolio companies.  As of May 8, 2024, as a result of these efforts, 35 parties had executed nondisclosure agreements, indicating their interest to further explore a potential transaction with the Debtors, and 3 parties are in the process of negotiating a nondisclosure agreement.

20.     In addition, consistent with their fiduciary duties to maximize value, shortly after the Petition Date, the Debtors entered into the Stalking Horse APA pursuant to which an affiliate or designee of Tiger Finance (such affiliate or designee, the "Stalking Horse Bidder") proposed to purchase on a liquidation basis under section 363 of the Bankruptcy Code substantially all of the Debtors' businesses.  Under the Stalking Horse APA, the Stalking Horse Bidder proposes to purchase and/or liquidate or otherwise dispose of existing inventory and other assets of the Debtors (as defined in the Stalking Horse APA, the "Sale Transaction").  The Sale Transaction will serve as a stalking horse bid that will be subject to higher or otherwise better offers at an auction (to the extent that other qualified bids are submitted in accordance with the Bidding Procedures ultimately approved by this Court).

47548066

21.     As outlined above, the transaction negotiated with the Stalking Horse Bidder is the culmination of a thorough, fair, arms-length, and fulsome prepetition marketing process.  The Debtors believe that, taken as a whole, the terms of the proposed Sale under the Stalking Horse APA are fair and reasonable, and represents the highest and best offer (and currently is the only offer) for the Debtors' assets at this time.

22.     The Debtors believe that it is critical to establish a floor for the proposed Sale of their assets, subject to higher or otherwise better offers pursuant to an open auction process, to afford the Debtors the best opportunity to maximize the value of their estates for the benefit of their creditors and other stakeholders.  Subject to the Bidding Procedures, the Debtors and their advisors will retain the right to pursue any transaction or restructuring strategy that, in the Debtors' business judgment, will maximize the value of their estates.

23.     The Debtors believe that failure to consummate the Sale Transaction (or a competing transaction that is determined via the auction to constitute a higher or otherwise better offer for the Debtors' assets) will result in an immediate liquidation of the Debtors' estates for the benefit of their creditors.  Consequently, the Debtors believe that the Sale to the Stalking Horse Bidder or to any other successful bidder will maximize the value of the Debtors' estates for the benefit of all of their creditors and other stakeholders.

### III.    The Proposed Dates and Deadlines

24.     Pursuant to the Bidding Procedures, the Debtors will solicit proposals to purchase the Assets according to the following proposed schedule, subject to Court approval and availability:

9

47548066

| Event | Date |
|---|---|
| Bid Deadline | June 14, 2024, at 4:00 p.m., prevailing Eastern Time, as the deadline by which all bids must be actually received |
| Sale Objection Deadline | June 11, 2024, at 5:00 p.m., prevailing Eastern Time; |
| Cure Amount Objection Deadline | June 14, 2024, at 4:00 p.m., prevailing Eastern Time |
| Auction (if necessary) | June 20, 2024, at 10:00 a.m., prevailing Eastern Time, if necessary |
| Supplemental Adequate Assurance Objection Deadline; Deadline to object to (i) conduct of the Auction, and (ii) the proposed Sale Transaction if the Successful Bidder is not the Stalking Horse Bidder. | June 24, 2024, at 5:00 p.m., prevailing Eastern Time |
| Sale Hearing (No Auction) | June 18, 2024, at 10:00 a.m., prevailing Eastern Time |
| Sale Hearing (Auction) | June 28, 2024, at 10:00 a.m., prevailing Eastern Time |

25.    The Debtors believe this timeline is necessary, appropriate, and reasonable under the circumstances. The Debtors have limited liquidity and will require access to proposed debtor in possession financing to operate their businesses and administer these cases.  Accordingly, the funds provided by Tiger Finance, as the proposed debtor in possession lender (the "DIP Lender") and the use of that same lender's cash collateral, are enabling the Debtors to pursue this sale process, and any extended sale process may create risk of further diminution of the value of the lender's collateral.  In light of the foregoing, as part of ongoing negotiations of the proposed debtor in possession funding facility, and as an express term of consenting to the use of its cash collateral, the prepetition secured lender has required – and the Debtors have agreed – to the sale milestones set forth in this Motion.

26.    The Debtors believe the Bidding Procedures will provide time for any potential bidder to put forth an actionable bid.  During the Debtors' prepetition marketing process, relevant

10

information regarding the Debtors' businesses was made available in the data room, allowing potential bidders to conduct diligence on the Debtors.  To the extent that any potential bidder has not conducted such diligence to-date, such bidder will have immediate access to the information regarding the Debtors' Assets contained in the data room, subject to the terms set forth in the Bidding Procedures.

**Bidding Procedures Order**

**I.      The Bidding Procedures**

27.      The Debtors have developed and proposed the Bidding Procedures, attached as **Exhibit 1** to the Bidding Procedures Order, to govern the marketing process.  The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to expeditiously submit competitive, value-maximizing bids.

28.      The Debtors are seeking approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of bids on a timeline that allows the Debtors to consummate a sale of all or discrete subset of the Debtors' Assets pursuant to section 363 of the Bankruptcy Code. The parties that execute confidentiality agreements in accordance with the Bidding Procedures will continue to have access to the virtual data room throughout the sale process.

29.      The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and Potential Bidders (defined below) with the need to run an expeditious and efficient sale process in accordance with the sale milestones.  The Debtors believe that the Bidding Procedures and the timeline set forth therein are in the best interests of the Debtors' estates, will establish whether and to what extent any additional market for some or all of the Assets exists, and provide interested parties with sufficient opportunity to

11

participate in a competitive, value-maximizing process. Because the Bidding Procedures are attached as **Exhibit 1** to the Bidding Procedures Order, they are not restated in their entirety herein. Generally speaking, however, the Bidding Procedures establish the following, among other things:[5]

(a) **Potential Bidders**. To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or part of the Assets (other than the Stalking Horse Bidder) (a "Potential Bidder") must deliver to each of the Debtors' advisors the following documents and information:

    (i) an executed confidentiality agreement on terms acceptable to the Debtors in any material respects (a "Confidentiality Agreement");

    (ii) identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated sale transaction(s); and

    (iii) proof by the Potential Bidder of its financial capacity to close a proposed sale transaction(s), which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtor and its advisors, in consultation with (i) Tiger Finance in its capacity as the prepetition and debtor-in-possession lender and (ii) any official committee appointed in this chapter 11 case (the "Consultation Parties").

(b) **Acceptable Bidder**. The Debtors, with their advisors, with the reasonable consent of the Consultation Parties, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may submit a Bid (each, an "Acceptable Bidder," and each such bid an "Acceptable Bid").

(c) **Requirements for Qualified Bids**. Any proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtors' business judgment and the

---

[5] Capitalized terms used, but not otherwise defined, in this section have the meanings ascribed to them in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

47548066

consent of the applicable Consultation Parties (a "<u>Qualified Bid</u>" and such bidder a "<u>Qualified Bidder</u>")[6]:

(i)     ***Assets and Assumed Liabilities.*** The Bid must clearly identify the following: (a) the Assets, or the portion thereof, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' businesses as a going concern, or to liquidate the businesses.

(ii)     ***Purchase Price.*** The Bid must clearly set forth the purchase price to be paid (the "<u>Purchase Price</u>"). If requested by the Debtors or the Consultation Parties, an Acceptable Bidder shall allocate its Purchase Price among the Debtors' assets subject to the Bid.

(iii)     ***Deposit.*** Each Bid, except for the bid under the Stalking Horse APA (the "<u>Staking Horse Bid</u>"), must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtor (the "<u>Deposit</u>").

(iv)     ***Bid Documents.*** Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "<u>Bid Documents</u>"). The Bid Documents shall include a schedule of assumed contracts to the extent applicable to the Bid, and a clearly marked version of the Stalking Horse APA, showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

(v)     ***Employee Obligations***. Each Bid must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees, and a description of any contemplated incentive plan, to the extent applicable.

(vi)     ***Committed Financing.*** To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid, except for a Stalking Horse Bid, must include committed financing documented to the satisfaction of the Debtors and the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate

---

[6] The Stalking Horse Bidder shall automatically be deemed a Qualified Bidder.

assurance of future performance under all contracts proposed to be assumed by such Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Consultation Parties.

(vii)  **_Identity._**  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction(s) contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Acceptable Bidder, Stalking Horse Bidder, Consultation Party or Qualified Bidder, and/or any officer or director of the foregoing. Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

(viii)  **_Irrevocable._**  An Acceptable Bidder's Bid must be irrevocable until three months after the date of selection of the Successful Bid; _provided_ that if the Bid is not selected as the Successful Bid or Backup Bid, the Bid may be revoked after consummation of the Successful Bid or Backup Bid.

(ix)  **_Backup Bidder._**  Each Bid must contain an agreement for the Acceptable Bidder to be a Backup Bidder.

(x)  **_Satisfaction of DIP Obligations_**.  To the extent that any bid includes collateral of the DIP Lender, absent consent of the DIP Lender, an Acceptable Bidder's Bid must provide for (a) the payment in full of all DIP Obligations (as defined in the DIP Order).[7]

(xi)  **_As-Is, Where-Is._**  Consummation of any sale transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their advisors, representatives, or estates, except as specifically accepted or agreed to by the Debtors. The Bid must include the following representations and warranties: (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all

---

[7] The DIP Orders shall mean _Interim and Final Orders (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, And (VII) Granting Related Relief._

47548066

due diligence regarding the Debtors' businesses and the Assets prior to submitting its bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's proposed asset sale agreement ultimately accepted and executed by the Debtors. The Bid shall not be conditional on any further due diligence.

(xii)    ***Authorization.*** Except for the Stalking Horse Bid, the Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors and the Consultation Parties with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

(xiii)    ***Joint Bids***. The Debtors will be authorized to approve joint Bids in their reasonable business judgment on a case-by-case basis, so long as a joint Bid meets the Qualified Bid requirements and the applicable bidders otherwise comply with these Bidding Procedures;

(xiv)    ***Adequate Assurance Information***. Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the Debtors that such Acceptable Bidder can provide adequate assurance of future performance under the executory contracts and unexpired leases of the Debtors to be assumed in connection with the proposed Sale Transaction. The Bid must also identify a contact person that parties may contact to obtain additional Adequate Assurance Information;

(xv)    ***Expected Closing Date***. Each Bid must state the Acceptable Bidder's expected date of closing of the Sale Transaction;

(xvi)    ***Consent to Jurisdiction***. Each Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to any written indications of

15

interest, the Bid Documents, the Bids, the Debtors' evaluation thereof, the Bid Documents, the Auction, the Sale Transaction(s), and the construction and enforcement of these Bidding Procedures, and any and all other agreements entered into in connection with the Sale Transaction and the closing, as applicable.

(xvii)  *Conditions to Closing*. Each Bid must identify with particularity each and every condition to closing.

(xviii)  ***Disclaimer of Fees.*** Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a fee analogous to a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid each Qualified Bidder agrees to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(xix)  ***Adherence to Bidding Procedures.*** Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, and (b) that the Bid constitutes a *bona fide* offer to consummate the proposed transactions and agrees to be bound by these Bidding Procedures.

(xx)  ***No Collusion.*** The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code  with respect to any Bids, the Auction, or the Sale.

(xxi)  ***Retention of Records.*** To the extent a Bid is a Bid for all or substantially all of the Debtors' Assets, such Bid must include a statement that the Acceptable Bidder will retain or allow the Debtors access to the Debtors' books and records.

(xxii)  ***Other Information.*** The Bid contains such other information as may be reasonably requested by the Debtors and the Consultation Parties.

(d)  **Bid Deadline**. A Potential Bidder that desires to make a bid must transmit via email (in .pdf or similar format) or deliver written copies of its Bid to the following parties so as to be received not later than 4:00 p.m. (prevailing

Eastern Time) on June 14, 2024 (the "<u>Bid Deadline</u>"): (i) proposed counsel to the Debtors, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Ryan T. Jareck, Esq., and Matteo Percontino, Esq., email: msirota@coleschotz.com, rjareck@coleschotz.com, and mpercontino@coleschotz.com; and (ii) the Debtors' proposed investment banker, Capstone, 222 N. Lasalle St., Ste. 1260, Chicago, IL 60601, Attn: Jamie Lisac, email: jlisac@capstonepartners.com. The Debtors will provide copies of all Bids via electronic mail within one (1) day of receipt by the Debtors to (i) the Consultation Parties, and (ii) the Office of the United States Trustee.

(e)   **Minimum Overbid**. Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid (as defined in the Bidding Procedures) for the relevant Assets (each such bid, an "<u>Overbid</u>"). The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, announce increases or reductions to initial or subsequent Overbids at any time during the Auction.

(f)   **Breakup Fee**. Pursuant to the Stalking Horse APA, the Debtors have agreed, subject to entry of the Bidding Procedures Order, to provide the Stalking Horse Bidder with the Breakup Fee.

(g)   **Highest or Best Offer.** After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe, in their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best offer for the relevant Assets (the "<u>Leading Bid</u>"). Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

(h)   **Fiduciary Out**. Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require the Debtors or their board of directors to take any action or to refrain from taking any action related to any Bid (including a Successful Bid or Backup Bid) or with respect to these Bidding Procedures, to the extent the Debtors or their board of directors, reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law. Further, notwithstanding anything to the contrary in these Bidding Procedures, the Debtors and their directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving the Debtors' assets (each an "<u>Alternate Proposal</u>"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity with respect to Alternative

47548066

Proposals; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; and (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals.

(i)    "*As Is, Where Is*."  Consummation of any Sale Transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their advisors, representatives, or estates, except as specifically accepted or agreed to by the Debtors. Unless otherwise specifically accepted or agreed to by the Debtors, all of the Assets will be transferred to the Successful Bidder free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code.  By submitting a Bid, each Potential Bidder will be deemed to acknowledge and represent that it (i) has had an opportunity to conduct adequate due diligence regarding the Sale Transaction prior to making its Bid, (ii) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and unexpired leases, in making its Bid, and (iii) did not rely on or receive from any person or entity (including, without limitation, any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Transaction or the completeness of any information provided in connection with the Sale Transaction or the Auction, except as may be set in the definitive agreement for the Successful Bid.

(j)    **Reservation of Rights.**  The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment and with the reasonable consent of the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all Bids or Qualified Bids and (f) adjusting the applicable minimum overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis; *provided* that any modifications to these Bidding Procedures which extends the timelines included herein shall be subject to the consent of the DIP Lender (as defined in the DIP Orders), whose consent shall not be unreasonably withheld.  For the avoidance of doubt, the Debtors reserve the right, at any point prior to the entry of the Sale Order, to consider an Alternate Proposal. Nothing in the Bidding Procedures shall abrogate the fiduciary duties of the Debtors.

47548066

30.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value, and, as such, do not impair the Debtors' ability to consider all Qualified Bid proposals for the Sale and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates. Moreover, the Debtors will provide information about the ongoing sale process to ensure that the Debtors' stakeholders are apprised of the status and determinations related to the Sale Transaction

## II.     Form and Manner of Sale Notice

31.     The Bidding Procedures contemplate that the Auction, if necessary, will be held on June 20, 2024, at 10:00 a.m., prevailing Eastern Time, and that the Sale Hearing will be held on June 18, 2024, at 10:00 a.m., prevailing Eastern Time (if Auction is cancelled) or June 28, 2024, at 10:00 a.m. prevailing Eastern Time (if Auction occurs), or such other dates and times that the Court may later direct and as agreed upon by the Debtors.

32.     Within three (3) business days after entry of the Bidding Procedures Order, the Debtor will cause the Sale Notice, substantially in the form attached as **Exhibit 3** to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known: (a) the Notice Parties (as defined in the Bidding Procedures); (b) counsel to the Stalking Horse Bidder; (c) all parties to executory contracts and leases to be assumed and assigned, or rejected as part of the proposed Sale; (d) all parties who have expressed a written interest in some or all of the Assets; (e) all known holders of liens, encumbrances, and other claims secured by the Assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) the Federal Trade Commission; (i) the United States Attorney's Office for the District of New Jersey, (j) the attorneys general for the states in which the Debtor operates (k) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (l) all parties

19

that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice need be given.

33.    In addition, as soon as practicable after entry of the Bidding Procedures Order, the Debtor will post the Sale Notice on their restructuring website, https://dm.epiq11.com/SamAsh (the "Case Website") and publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in a national publication to provide notice to any other potential interested parties. The Debtors submit that such publication notice is sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

## III.    Assumption and Assignment Procedures

34.    The Assignment and Assignment Procedures set forth below regarding the assumption and assignment of the Contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder, if any, pursuant to section 364(f) of the Bankruptcy Code in connection with the Sale are hereby approved to the extent set forth herein.

35.    These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtors' Contracts to be assumed and assigned in connection with the Sale, subject to the payment of any amount necessary to satisfy all defaults and actual pecuniary loss to the counterparty resulting from such defaults including, but not limited to, all claims, demands, charges, rights to refunds and monetary and non-monetary obligations that the relevant counterparty can assert under a Contract, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to a Contract (the "Cure Amount"):

47548066

(a)     **Contract Assumption Notice.** No later than May 31, 2024 (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a notice of contract assumption (the "Contract Assumption Notice"), in substantially the form attached hereto as **Exhibit 4** via first class mail on the Contract counterparties (and by email upon such Contract Counterparty's counsel, if known) and provide a copy of the same to the Consultation Parties. The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the executory contract or lease, (ii) the name of the counterparty to the executory contract or lease, (iii) Debtors' good faith estimates of the Cure Amount, if any, required in connection with the executory contract or lease, and (iv) the deadline to file an objection to the Cure Amount; *provided*, *however*, that service of a Contract Assumption Notice does not constitute an admission that any Contract listed thereon is an executory contract or that such stated Cure Amount constitutes a claim against the Debtors or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

(b)     **Cure Payments**. The payment of the applicable Cure Amount by the Debtors and/or the Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Contracts by the Debtors and the assignment of such Contracts to the Successful Bidder, constitute adequate assurance of future performance thereof.

(c)     **Supplemental Contract Assumption Notice**. To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Contracts that may be assumed by and assigned to the Successful Bidder, (ii) remove any Contracts from the list attached to the Contract Assumption Notice, (iii) and/or modifies the previously stated Cure Payment associated with any Contract, the Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the counterparties to a Contract affected by the Supplemental Assumption Notice. Each Supplemental Assumption Notice will include the same information with respect to listed Contracts as was included in the Contract Assumption Notice. A Successful Bidder may designate additional Contracts to be assumed and assigned up to two business days prior to closing and may remove Contracts from the list of Contracts up to two business days prior to closing.

(d)     **Cure Objections**. Objections, if any, to the proposed assumption and assignment or the Cure Amount (other than objections to adequate assurance of future performance) proposed with respect thereto, must (i) be

in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtor, (b) counsel to the Stalking Horse Bidder, (c) the Notice Parties (as defined in the Bidding Procedures), and (v) any other party that has filed a notice of appearance in this chapter 11 case, so as actually to be received on or before **June 14, 2024, at 4:00 p.m., prevailing Eastern Time** or deadline set forth in the Supplemental Assumption Notice, as applicable. Objections to the Cure Amount or adequate assurance of future performance, if any, to any Supplemental Assumption Notice must be made within seven (7) days of receipt of such Supplemental Assumption Notice. Hearings, if any, in connection with a timely objection filed, shall be requested to be heard on no less than 7 days' notice.

(e)     **Adequate Assurance Objections**. Objections to adequate assurance of future performance of any Successful Bidder shall must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, state the correct Cure Amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtors, (b) counsel to the Stalking Horse Bidder, (c) counsel to the Successful Bidder (if different from the Stalking Horse Bidder), (d) the Notice Parties (as defined in the Bidding Procedures), and (e) any other party that has filed a notice of appearance in these chapter 11 cases, so as actually to be received on or before the (i) **June 11, 2024, at 5:00 p.m., prevailing Eastern Time** as to the Stalking Horse Bidder or (ii) **June 24, 2024, at 5:00 p.m., prevailing Eastern Time** as to any other Successful Bidder.

(f)     **Dispute Resolution**. In the event that the Debtors and a Contract counterparty cannot resolve an objection to a Cure Amount, the Contract at issue may be assumed by the Debtors and assigned to the Successful Bidder, *provided that* the Debtors shall segregate the Cure Amount that the counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties. Any objection to the proposed assumption and assignment of a contract or related Cure Amount proposed in connection with the Sale that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

(g)     **Contract Assumption**. No Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of

(i) the date the Court has entered an order assuming and assigning such Contract or (ii) the date the Sale has closed.

(h)     **Failure to Object**. Any party failing to timely file an objection to the Cure Amount or the proposed assumption and assignment of a Contract listed on the Contract Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such Cure Amount, (b) the assumption and assignment of such Contract, (c) the related relief requested in the Motion, and (d) the Sale. Such party shall be forever barred and estopped from objecting to the Cure Amount, the assumption and assignment of the Contract, adequate assurance of future performance, the relief requested in the Motion, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Contract.

36.     The Sale Notice and the Assumption and Assignment Procedures are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction; (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (e) notice of the proposed assumption and assignment of Contracts to the Successful Bidder and related deadlines.

37.     Notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and, as applicable, the Assumption and Assignment Procedures, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The methods of notice described herein comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the proposed sale of the Debtors' assets, and no other or further notice of the Sale is required. Accordingly, the Debtors request that

the Court approve the form and manner of the Sale Notice and Assumption and Assignment

Procedures.

### The Stalking Horse APA – Disclosures Under Local Rule 6004-1[8]

38.     Local Rule 6004-1 requires, among other things, that a debtor include the "material

terms of the proposed sale" in a sale motion.  In accordance with Local Rule 6004-1(a)(3), the

material terms of the Stalking Horse APA are as follows:

(a)     6004-1(a)(3)(A) – The property to be sold is set forth in section 2.1 of the
Stalking Horse APA and the assumed liabilities are set forth in section 2.2
of the Stalking Horse APA.

(b)     6004-1(a)(3)(B) – If the Debtors receive one or more Qualified Bids with
respect to their assets in addition to the Stalking Horse Bid, the Debtors
propose to conduct the Auction at **10:00 a.m. (prevailing Eastern Time)
on June 20, 2024**. The Debtors propose that a Sale Hearing be scheduled at
**10:00 a.m. (prevailing Eastern Time) on June 18, 2024** if there is no
Auction or at **10:00 a.m. (prevailing Eastern) Time June 28, 2024** if there
is an Auction.

(c)     6004-1(a)(3)(C) - The aggregate consideration for the Assets (the "Purchase
Price") shall be the sum of (w) the aggregate dollar amount of remaining
DIP Obligations (as defined in the Interim DIP Financing Order) after
taking into account any paydowns made pursuant to the Approved Budget
(as defined in the Interim DIP Financing Order) or the Interim DIP
Financing Order, plus (x) all interest, fees, and other amounts due by the
Sellers on account of the foregoing, plus (y) Cure Amounts, if any, plus (z)
the payment of the Wind Down Expenses (as defined in the Stalking Horse
APA), which collectively, as of the Closing Date, is estimated to be
approximately $9,083,000.

(d)     6004-1(a)(3)(D) - The closing conditions of the transactions contemplated
by the Stalking Horse APA are set forth in Article VII of the Stalking Horse
APA.

---

[8] The following summaries of the material terms of the proposed Sale and "special provisions" of the Stalking
Horse APA and Sale Order are provided in accordance with Local Rule 6004-1 and are qualified in their entirety by
reference to the provisions of the Stalking Horse APA and Sale Order.  In the event of any inconsistencies between
these summaries and the actual provisions of the Stalking Horse APA and sale order, the terms of the Stalking Horse
APA and Sale Order shall govern in all respects. Capitalized terms used, but not otherwise defined, in this section
shall have the meanings ascribed thereto in the Stalking Horse APA.

47548066

(e)    6004-1(a)(3)(E) – The milestones under the DIP Orders require a Sale Hearing by June 18, 2024 (if no Auction) or June 28, 2024 (if there is an Auction, and further require a Sale be consummated by July 17, 2024.

(f)    6004-1(a)(3)(F) –Not applicable.

(g)    6004-1(a)(3)(G) – Not applicable.

(h)    6004-1(a)(3)(H) – The Stalking Horse APA provides that the Assets include, among other things, all books, records, files and papers of the Debtors relating to the business of the Debtors, the Assets or the Assumed Liabilities.  The Stalking Horse APA further provides the Debtors and any successor thereto with post-Closing access to the books and records to fulfill administrative reporting requirements with the Court.

(i)    6004-1(a)(3)(I) - The Stalking Horse APA provides for the assumption and assignment of the Transferred Contracts pursuant to section 365 of the Bankruptcy Code.

(j)    6004-1(a)(3)(J) – The aggregate consideration for the Assets (the "Purchase Price") shall be the sum of (w) the aggregate dollar amount of remaining DIP Obligations (as defined in the Interim DIP Financing Order) after taking into account any paydowns made pursuant to the Approved Budget (as defined in the Interim DIP Financing Order) or the Interim DIP Financing Order, plus (x) all interest, fees, and other amounts due by the Sellers on account of the foregoing, plus (y) Cure Amounts, if any, plus (z) the payment of the Wind Down Expenses (as defined in the Stalking Horse APA), which collectively, as of the Closing Date, is estimated to be approximately $9,083,000.

(k)    6004-1(a)(3)(K) – The proposed compensation of the Investment Banker will be set forth in the Debtors' application to retain the Investment Banker.

39.    In accordance with Local Rule 6004-1(b), the Stalking Horse Term APA and/or Sale Order, as applicable, include the following "special provisions":

(a)    6004-1(b)(1) – Not applicable.

(b)    6004-1(b)(2) – Not applicable.

(c)    6004-1(b)(3) – In connection with the closing of the Sale, the Debtors will execute a release in favor of the Stalking Horse Bidder (and its respective affiliates, agents, attorneys, directors, officers and employees), releasing the Stalking Horse Bidder from all causes of action, claims and liabilities that the Debtors have or may have against the Stalking Horse Bidder as of the closing the Sale.

25

47548066

(d)    <u>6004-1(b)(4)</u> – Not applicable.

(e)    <u>6004-1(b)(5)</u> – Not applicable.

(f)    <u>6004-1(b)(6)</u> – Not applicable.

(g)    <u>6004-1(b)(7)</u> – Acquired Assets include, claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, rights of set-off, rights of subrogation and all other rights of any kind, in each case solely to the extent arising from the Intellectual Property owned by the Sellers or the Acquired Assets, including all avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law, and all other claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind under any other provision of the Bankruptcy Code or applicable Laws.

(h)    <u>6004-1(b)(8)</u> – The Sale Order shall provide that the Stalking Horse Bidder shall not have any successor or transferee liability by virtue of its purchase of the Debtors' assets, assumption of the Assumed Liabilities, or hiring of certain employees of the Debtors.

(i)    <u>6004-1(b)(9)</u> – Section 3.3 of the Stalking Horse APA provides that the Assets shall be sold to the Stalking Horse Bidder free and clear of all liens, claims and encumbrances. The Sale Order shall also provide that as of the Closing, the Debtors' assets will be transferred to the purchaser free and clear of all liens, claims, encumbrances, and interests.

(j)    <u>6004-1(b)(10)</u> – The Debtors intend to seek a waiver of the 14-day stay of the effectiveness of the Sale Order imposed by Bankruptcy Rules 6004(h) and 6006(d), respectively.

## Basis for Relief

## I.    The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Debtors' Assets, and an Exercise of the Debtors' Reasonable Business Judgment

40.    A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153

(D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor

in possession can sell property of the estate . . . if he has an 'articulated business justification'"

(internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*);

*see also In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding

procedures that have been negotiated by a trustee are to be reviewed according to the deferential

"business judgment" standard, under which such procedures and arrangements are "presumptively

valid").

41.     The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866, 2017 WL

5483156, at *12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion is a necessary

and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate,

and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp.

Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and

maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The

purpose of procedural bidding orders is to facilitate an open and fair public sale designed to

maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir.

1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate

at hand"); *Integrated Res.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law

that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to

obtain the highest price or greatest overall benefit possible for the estate.").

42.     To that end, courts uniformly recognize that procedures intended to enhance

competitive bidding are consistent with the goal of maximizing the value received by the estate

and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re Dura Auto.*

47548066

*Sys.*, 379 B.R. 257, 263 (Bankr. D. Del. 2007); *Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

43.    It is well-settled that where there is a court-approved auction process, a full and fair price is presumed for the assets sold because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (noting that while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction."). This is true here where any sale and related transactions will be subjected to a marketing process and intensively scrutinized by the Debtors and their advisors. As a result, the Debtors and their creditors can be assured that, taking into account current macroeconomic and industry conditions, the consideration obtained will be fair and reasonable and at or above market.

44.    The proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for all or a portion of the Assets. The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction. Specifically, the Bidding Procedures contemplate an open auction process with

minimal barriers to entry and provide Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

45.     At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer related to the Sale(s), while preserving the Debtors' right to not sell any particular Asset if the Debtors do not believe that such a sale would maximize the value of such Asset.  In addition, the Debtors, in conjunction with their professional advisors, already engaged in an extensive marketing process before the Petition Date.  The proposed timeline for the submission of competing bids will permit bidders to submit bids on or before June 14, 2024.  Given that the universe of potential bidders was identified and contacted in mid-April in an effort to solicit bids, it is highly likely that any prospective bidders have (a) been aware of the potential sale of the Assets before the chapter 11 cases were filed and (b) already had a sufficient and adequate opportunity to conduct due diligence and submit a bid within the proposed timeline.

46.     Further, the Stalking Horse APA contains no prohibition on the Debtors' soliciting or receiving offers for the Assets and, accordingly, the Debtors are able to continue marketing such assets for sale even prior to entry of the Bidding Procedures Order.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable in light of the circumstances and at or above market value.

47.     The proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this District.  *See, e.g.*, *In re Careismatic Brands, LLC,* Case No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) [Docket No. 339]; *In re DirectBuy Home Improvement, Inc.,* Case No. 23-19159 (SLM)

(Bankr. D.N.J. Nov. 9, 2023) [Docket No. 187]; *In re Bed Bath & Beyond Inc.,* Case No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 25, 2023) [Docket No. 92]; *In re David's Bridal, LLC,* Case No. 23-13131 (CMG) (Bankr. D.N.J. Apr. 19, 2023) [Docket No. 72]; *In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 2023) [Docket No. 441]; *In re Christopher & Banks Corp.*, Case No. 21-10269 (ABA) (Bankr. D.N.J. 146) [Docket No. 146]; *In re Congoleum Corporation*, Case No. 20-18488 (MBK) (Bankr. D.N.J. Sept. 4, 2020) [Docket No. 275]; *In re RTW Retailwinds, Inc.*, Case No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192]; *In re SLT Holdco, Inc.*, Case No. 20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Doc. No. 72].

48.    Accordingly, the Debtors submit that the Bidding Procedures should be approved as reasonable, appropriate, and in the best interests of the Debtors, their creditors, estates, and all parties in interest.

## II.    The Breakup Fee Is Necessary and Appropriate and Should Be Approved

49.    As set forth above, the Stalking Horse APA provides for a Breakup Fee in the amount of $150,000 triggered under certain limited circumstances.

50.    Generally, bid protections, such as breakup fees, are a normal and, in many cases, necessary component of significant sales under the Bankruptcy Code.  *See Integrated Res.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value.") (emphasis added).  As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees

[a]re actually necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). Indeed, the use of a stalking horse in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitate[ing] a realization of that value." *Off. Comm. Of Unsecured Creditors v. Interform Holding LLC*, No. 11-CV-219, 2011 WL 2671254, No. 11-129, *1 (E.D. Wis. July 7, 2011).

51.    Further, a break-up fee may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien*, 181 F.3d at 537. The availability of break-up fees may also induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, providing a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.*

52.    In the Third Circuit, a breakup fee, such as the one proposed here, is subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 (citing *O'Brien*, 181 F.3d at 535); *Reliant Energy*, 594 F.3d at 206 (holding that the general standard used for all administrative expenses applies to breakup fees). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

47548066

53.     Here, the Breakup Fee was a condition of the Stalking Horse Bidder for its entry into the Stalking Horse APA and agreeing to act as the Stalking Horse Bidder.  Without the commitment of the Stalking Horse Bidder, the Debtors will lose the opportunity to test the Stalking Horse Bid for the Assets in the marketplace and the downside protection afforded by the Stalking Horse Bid.  Furthermore, without the benefit of the Stalking Horse Bid, there can be no assurance that the Debtors would receive a bid equal to that offered by the Stalking Horse Bidder for the Assets.

54.     Additionally, the Breakup Fee will be paid only from the sale proceeds actually received by the Debtors from the closing of a higher or better transaction. Finally, the amount of the Breakup Fee is reasonable and appropriate in light of the size and nature of the proposed Sale and the efforts that have been and will be expended by the Stalking Horse Bidder.

55.     Thus, the Debtors believe that the Breakup Fee is (i) reasonable, given the significant benefits to their estates and these chapter 11 cases of having a definitive Stalking Horse Bidder in place and the risk to the Stalking Horse Bidder that a third-party offer ultimately may be accepted by the Debtors, and (ii) necessary and, in fact, critical, to preserve and enhance the value of the Debtors' estates.  Courts in this district have routinely approved breakup fees offered to stalking horse bidders.  *See, e.g.*, *DirectBuy Home Improvement, Inc.,* Case No. 23-19159 (SLM) (Bankr. D.N.J. Nov. 9, 2023) [Docket No. 187]; *In re Bed Bath & Beyond Inc.,* Case No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 25, 2023) [Docket No. 92]; *In re David's Bridal, LLC,* Case No. 23-13131 (CMG) (Bankr. D.N.J. Apr. 19, 2023) [Docket No. 72]; *In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J. Jan. 30, 2023 [Docket No. 441]; *In re Congoleum Corp.*, Case No. 20-18488 (MBK) (Bankr. D.N.J. Sept. 4, 2020) [Docket No. 275]; *In re RTW Retailwinds, Inc.*,

32

No. 20-18445 (JKS) (Bankr. D.N.J. Aug. 8, 2020) [Docket No. 192]; *In re SLT Holdco, Inc.*, No.

20-18368 (MBK) (Bankr. D.N.J. July 13, 2020) [Docket No. 72].

56.     In sum, the Debtors respectfully submit that the Breakup Fee enables the Debtors

to ensure a sale to a contractually committed bidder at a price that is market-tested, fair and

reasonable, while providing the Debtors with an opportunity to enhance value through an auction

process that will be more robust due to the presence of a firm and committed baseline bid.

Accordingly, the Bid Protections should be approved.

## III.    The Form and Manner of the Sale Notice Should Be Approved

57.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors

with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the

estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice

to include the time and place of the auction and the hearing and the deadline for filing any

objections to the relief requested therein.  As required under Bankruptcy Rule 2002(b), the Debtors

seeks approval of the Sale Notice as proper notice of the Auction.  Notice of this Motion and the

related hearing to consider entry of the Bidding Procedures Order, coupled with service of the

Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the

proceedings with respect thereto in compliance with, and satisfaction of, the applicable

requirements of Bankruptcy Rule 2002.  Accordingly, the Debtor requests that this Court approve

the form and manner of the Sale Notice.

## IV.    The Assumption and Assignment Procedures Are Appropriate and Should Be Approved

58.     As set forth above, the Sale contemplates the assumption and assignment of the

Contracts to the Successful Bidder.  In connection with this process, the Debtor believes it is

necessary to establish the Assumption and Assignment Procedures by which: (a) the Debtor and

Contract counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure payments.

59.    As set forth in the Bidding Procedures Order, the Debtor also requests that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure payments identified in the Contract Assumption Notice.  *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

60.    The Debtor believes that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtor requests the Court approve the Assumption and Assignment Procedures.

## V.    The Sale Should Be Approved as an Exercise of Sound Business Judgment

61.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

34

62. Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

### A.   *A Sound Business Purpose Exists for the Sale*

63. As set forth above, the Debtors have a sound business justification for selling the Assets. ***First***, the Debtors believe the Sale will maximize the value of the Assets exposing them to the market as part of a competitive, arms'-length process. Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure[, t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

64. ***Second***, because any sale of Assets may contemplate the assumption of certain of the Debtors' Contracts, it may result in payment in full for a number of the Debtors' creditors.

35

65.     Thus, the Debtor submits that the Successful Bid will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into a purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

   *B.     Adequate and Reasonable Notice of the Sale Will be Provided.*

66.     The Sale Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. In addition, the Debtors will publish a notice, setting forth the information contained in the Sale Notice, in one of the *The New York Times, Wall Street Journal* or *USA Today*. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest Accordingly, the Debtors submit that the proposed notice of the Sale is adequate and reasonable.

   *C.     The Sale and Purchase Price Will Reflect a Fair Value Transaction*

67.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not

require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

68.     As noted above, prior to the Bidding Deadline Capstone will market the Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting parties within its database, providing acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtor with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary the purchase price will, conclusively, be deemed fair value.

> D.     *The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Is a "Good Faith Successful Bidder"*

69.     The Debtors request that the Court find the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

70.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

71.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

72.     The Debtors submit that the Successful Bidder(s) will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA, or any marked versions thereof, would be a good-faith, arms'-length agreement entitled to the protections of section 363(m) of the Bankruptcy Code.[9]  *First*, as set forth in more detail above, the consideration to be received by the Debtors from a Successful Bidder will be substantial, fair, and reasonable.  *Second*, any sale agreement with a Successful Bidder will presumably be the culmination of a competitive Auction process in which all parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or

---

[9]  The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder.  Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.  And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  ***Finally***, any bids that the Debtors ultimately determine to be Successful Bids will have been evaluated and approved by the Debtors in consultation with their advisors.  Accordingly, the Debtors believe that the Successful Bidder, and any purchase agreement associated with a Successful Bid should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

       *E.*     *The Sale Should be Approved "Free and Clear" Under Section 363(f)*

73.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

74.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all liens, claims, and encumbrances, except with respect to any interests that may be assumed liabilities under the applicable purchase agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

75.     The Debtors submit that any Sale of the Assets will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code.  In particular, all parties known to have asserted a lien or other encumbrance on the Assets will receive notice of the Sale and any such

47548066

interest will be adequately protected by either being paid in full at the time of closing, or by having

it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess

with respect thereto.  In addition, to the extent they have not objected by the Sale Objection

Deadline, such parties will be deemed to have consented to the Sale free and clear of all liens,

claims, and encumbrances (except as otherwise provided in the Stalking Horse APA or other

definitive purchase agreement) pursuant to section 363(f)(2) of the Bankruptcy Code.

76.     The Debtors accordingly requests authority to convey the Assets to the Successful

Bidder, if any, free and clear of all liens, claims, and encumbrance, with any such liens, claims, or

encumbrances to attach to the proceeds of the Sale.

77.     The Debtors further submit that it is appropriate to sell the Assets free and clear of

successor liability relating to the Assets.  Such limitations on successor liability will ensure that

the Successful Bidder is protected from any claims or lawsuits premised on the theory that the

Successful Bidder is a successor in interest to one or more of the Debtors.  If such relief is not

granted, the purpose of a "free and clear" sale of assets under section 363 of the Bankruptcy Code

could be frustrated by the potential for claimants to thereafter use the transfer of assets as a basis

to assert claims against the Successful Bidder arising from the Sellers' pre-sale conduct.

Moreover, without such assurances, the Debtors would run the risk that potential bidders may not

enter the Auction or, if they did, would do so with reduced bid amounts.  Under section 363(f) of

the Bankruptcy Code, potential purchasers are entitled to know that the Debtors' assets are not

infected with latent claims that will be asserted against the purchaser after the proposed transaction

is completed.

78.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section

363 sale takes such assets free and clear from successor liability relating to the debtor's business.

*See, e.g., Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, No. 15-2844-BK(L), 2016
WL 3766237 (2d Cir. July 13, 2016), *12, *13 (stating that "successor liability claims can be
'interests' when they flow from a debtor's ownership of transferred assets" and holding that "a
bankruptcy court may approve a § 363 sale 'free and clear' of successor liability claims if those
claims flow from the debtor's ownership of the sold assets . . . [and] arise from a (1) right to
payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly
giving rise to the claim"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n
personam* claims, including any potential state successor or transferee liability claims against New
Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore
extinguished by the Sale Transaction.").

79.     For these reasons, the Successful Bidder should not be liable under any theory of
successor liability.

## VI.    The Stalking Horse Bidder Should Be Allowed to Credit Bid

80.     Section 363(k) of the Bankruptcy Code states: "[a]t a sale under subsection (b) of
[Section 363] of property that is subject to a lien that secures an allowed claim, if the holder of
such claim purchases such property, such holder may offset such claim against the purchase price
of such property." 11 U.S.C. § 363(k). Indeed, "[i]t is beyond peradventure that a secured creditor
is entitled to credit bid its allowed claim." *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59
(Bankr. D. Del. 2014). Where a secured creditor's claim is allowed, it is well settled in the Third
Circuit that secured creditors can bid up to the full face value of their secured claims under section
363(k) of the Bankruptcy Code. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys.
Corp.)*, 432 F.3d 448 (3d Cir. 2006). This proposition is supported by other district and bankruptcy
courts. *See, e.g., In re SunCruz Casinos, LLC,* 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("[T]he

plain language of [Section 363(k)] makes clear that the secured creditor may credit bid its *entire claim*, including any unsecured deficiency portion thereof.") (emphasis in original); *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof.") (citing legislative history) (alteration in original) (internal quotation marks omitted)) *see also Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC)*, 298 B.R. 527, 532 n. 8 (Bankr. D.N.J. 2003).

81.     Accordingly, the Stalking Horse Bidder can bid any portion, or the full face value, of the outstanding DIP Loan Obligations under and to the fullest extent permitted by section 363(k) of the Bankruptcy Code.

## VII.    The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman

82.     The sale of the Assets will not necessitate the appointment of a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides that:

> [I]if the debtors in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtors and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless . . . such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(1).

83.     Section 101(41A) defines "personally identifiable information" as an individual's name, residence address, email address, telephone number, social security number or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual." 11 U.S.C. § 101(41A).

47548066

84.     The Debtors' privacy policy provides that:

The Company may use Personal Data for the following purposes:

\*\*\*

For business transfers: We may use Your information to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of Our assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which Personal Data held by Us about our Website users is among the assets transferred.[10]

85.     Based on the language of the policy itself, section 363(b)(1) is not implicated because the Debtors did not disclose to an "individual a policy *prohibiting* the transfer of personally identifiable information." See 11 U.S.C. §363(b)(1) (emphasis added). Courts in this district have routinely found that section 363(b)(1) is not implicated where, as here, the Debtor did not disclose to an individual a policy *prohibiting* the transfer of personally identifiable information. *See, e.g.*, *In re DirectBuy Home Improvement, Inc.,* Case No. 23-19159 (SLM) (Bankr. D.N.J. Nov. 9, 2023) [Docket No. 187]; *In re David's Bridal, LLC,* Case No. 23-13131 (CMG) (Bankr. D.N.J. Apr. 19, 2023) [Docket No. 72]; *In re Christopher & Banks Corp.*, Case No. 21-10269 (ABA) (Bankr. D.N.J. Feb. 23, 2021) [Docket No. 266]; *In re RTW Retailwinds, Inc.*, Case No. 20-18445 (JKS) (Bankr. D.N.J. Sept. 4, 2020) [Docket No. 319]; *In re Modell's Sporting Goods, Inc.*, Case No. 20-14179 (VFP) (Bankr. D.N.J. Aug. 14, 2020) [Docket No. 580].

86.     In any event, the buyer of the Assets will utilize the "personally identifiable information" in exactly the same fashion as the Debtors. Accordingly, even if section 363(b)(1) were implicated, the Court may authorize the proposed Sale without appointing a privacy

---

[10]  A true and correct copy of the Debtors' privacy policy, as of the Petition Date, is attached hereto as **Exhibit B**. The privacy policy is also available at: https://www.samash.com/help-center/privacy-policy.

ombudsman because the transfer of the "personally identifiable information" is consistent with the

Debtors' privacy policy as provided in 11 U.S.C. § 363(b)(1).

## VIII.    The Assumption and Assignment of the Contracts Should be Approved

### A.    *The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment*

87.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority

to assign or transfer the Contracts to the Successful Bidder, to the extent required by such bidders.

88.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its

executory contracts and unexpired leases, subject to the approval of the court, provided that the

defaults under such contracts and leases are cured and adequate assurance of future performance

is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease

must only satisfy the "business judgment rule" and will not be subject to review unless such

decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Group of Institutional

Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr.

Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether

executory contract was burdensome in favor of whether rejection is within debtor's business

judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989)

(describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor

to consider whether to reject or assume executory contracts under the Code"); *In re Network Access

Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the

assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R.

222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is

governed by the business judgment standard.").

44

89.     Here, the Court should approve the decision to assume and assign certain designated Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment: *First*, certain of the Contracts are necessary to operate the business and Assets and, as such, they are essential to inducing the best offer for the Assets.  *Second*, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the Contracts needed to manage the Debtors' day-to-day operations were included in the transaction.  *Third*, the Stalking Horse APA and any marked version of it will likely provide that the assumption and assignment of the Contracts is integral to, and inextricably integrated in, a proposed Sale.  *Finally*, the Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in this chapter 11 case.

90.     Accordingly, the Debtors submit that the assumption and assignment of the Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

### B.     *Defaults Under the Assumed Contracts Will be Cured Through the Sale*

91.     Upon finding that a debtor has exercised its business judgment in determining that assuming a Contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  Section 365 "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

45

92.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse APA and any marked copy thereof submitted by Potential Bidder will require that the Debtors cure all defaults associated with, or that are required to properly assume, any Contracts.   Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure payments or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Contract counterparties.

C.     *Contract Counterparties Will Be Adequately Assured of Future Performance*

93.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).   Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).   Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

47548066

94.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Contracts to the Successful Bidder will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under any Contracts to be assumed) and will demonstrate such financial wherewithal, willingness, and ability to perform under any Contracts to be assumed and assigned to a Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed Cure Amount.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the any Contracts to be assumed and assigned to any Successful Bidder.

### Relief Under Bankruptcy Rule 6004(h) and 6606(d) Is Appropriate

95.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

96.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and

47

eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that

the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately

"where there has been no objection to procedure."    10 *Collier on Bankruptcy* ¶ 6004.10

(15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party

informs the court of its intent to appeal, the stay may be reduced to the amount of time actually

necessary to file such appeal.  *Id.*

97.    To maximize the value received for the Assets, the Debtors seek to close the Sale

as soon as possible after the Sale Hearing.  Accordingly, the Debtor hereby requests that the Court

waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Waiver of Memorandum of Law

98.    The Debtors respectfully request that the Court waive the requirement to file a

separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon

which the Debtors rely is incorporated herein and this Motion does not raise any novel issues of

law.

## No Priori Request

99.    No prior request for the relief sought herein has been made to this Court or to any

other court.

## Notice

100.    The Debtor will provide notice of this Motion to the following parties or their

respective counsel: (a) the Office of the U.S. Trustee for the District of New Jersey, Attn: Fran B.

Steele, Esq. (Fran.B.Steele@usdoj.gov) and Peter J. D'Auria, Esq. (Peter.J.D'Auria@usdoj.gov);

(b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis);

(c) counsel for Tiger Finance, Riemer & Braunstein LLP, Seven Times Square, New York, New

York 10036, Attn: Anthony B. Stumbo, Esq. (astumbo@riemerlaw.com) and Steven Fox, Esq.

48

(sfox@riemerlaw.com) with a copy to local counsel for Tiger Finance, Mandelbaum Barret PC, Three Becker Farm Road, Suite 105, Roseland, New Jersey 07068, Attn: Vincent J. Roldan, Esq. (vroldan@mblawfirm.com); (d) the Internal Revenue Service, (e) the offices of the attorneys general for the states where the Debtors operate; (f) the United States Attorney's Office for the District of New Jersey; (g) The National Association of Attorneys General; (h) all parties who have expressed a written interest in some or all of the Assets; (i) all known holders of liens, encumbrances, and other claims secured by the Assets; (j) Capstone; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice is required.

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested by the Motion and such further relief as may be just and proper under the circumstances.

47548066

DATED:  May 10, 2024                    Respectfully submitted,

                                        **COLE SCHOTZ P.C.**

                                        By:     */s/Michael D. Sirota*
                                                Michael D. Sirota, Esq.
                                                Ryan T. Jareck, Esq.
                                                Matteo Percontino, Esq.
                                                Court Plaza North
                                                25 Main Street
                                                Hackensack, NJ 07601
                                                 (201) 489-3000
                                                 (201) 489-1536 Facsimile
                                                Email: msirota@coleschotz.com
                                                        rjareck@coleschotz.com
                                                        mpercontino@coleschotz.com

                                        *Proposed Counsel to Debtors and Debtors in
                                        Possession*

47548066

**<u>Exhibit A</u>**

**Bidding Procedures Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

In re:

SAM ASH MUSIC CORPORATION, *et al.*,

Debtors.[1]

Chapter 11

Case No. 24-14727 (SLM)

Judge:

(Jointly Administered)

## ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING THE FORM ASSET PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES

The relief set forth on the following pages, numbered two (2) through nineteen (19), is

hereby **ORDERED**.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410).  The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

47548066

Page (2)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:          24-14727 (SLM)
Caption of Order:  ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP
                   FEE,    (B) APPROVING    STALKING    HORSE    PURCHASE
                   AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                   HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                   THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                   FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                   LEASES

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(the "Debtors") for entry of an order (this "Bidding Procedures Order"), authorizing the Debtors

to (a) approve the bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures") and

the selection of and Breakup Fee for the Stalking Horse Bidder, (b) approving the Stalking Horse

APA attached hereto as **Exhibit 2** as the form APA, (c) approving the form and manner of notice

of the Auction and the Sale Hearing with respect to the Sale of all or substantially all of the

Debtors' Assets or any portion thereof, (d) scheduling an Auction and a Sale Hearing, and (e)

establishing notice and procedures for the assumption and assignment of certain executory

contracts and leases, all as more fully set forth in the Motion; and upon the First Day Declaration;

and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Standing*

*Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for

the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012

(Simandle, C.J.); consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that venue of this

proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Page (3)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court, if any; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

3.      The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of the Debtors' Assets.

4.      The Debtors' proposed notice of the Motion was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and (iii) adequate and sufficient under the circumstances of the chapter 11 cases, and no other or

Page (4)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

further notice is required. A reasonable opportunity to object or be heard regarding the relief

granted by this Bidding Procedures Order has been afforded to all interested persons and entities.

**I       Sales Dates and Deadlines**

5.       The following dates and deadlines shall apply in these chapter 11 cases:

| Event | Date |
|---|---|
| Bid Deadline | June 14, 2024, at 4:00 p.m., prevailing Eastern Time, as the deadline by which all bids must be actually received |
| Sale Objection Deadline | June 11, 2024, at 5:00 p.m., prevailing Eastern Time; |
| Cure Amount Objection Deadline | June 14, 2024, at 4:00 p.m., prevailing Eastern Time |
| Auction (if necessary) | June 20, 2024, at 10:00 a.m., prevailing Eastern Time, if necessary |
| Supplemental Adequate Assurance Objection Deadline; Deadline to object to (i) conduct of the Auction, and (ii) the proposed Sale Transaction if the Successful Bidder is not the Stalking Horse Bidder. | June 24, 2024, at 5:00 p.m., prevailing Eastern Time |
| Sale Hearing (No Auction) | June 18, 2024, at 10:00 a.m., prevailing Eastern Time |
| Sale Hearing (Auction) | June 28, 2024, at 10:00 a.m., prevailing Eastern Time |

Page (5)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP
                    FEE,    (B) APPROVING    STALKING    HORSE    PURCHASE
                    AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                    HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                    THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                    FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                    LEASES

6.      ***Notice of Qualified Bidder***. On or before June 18, 2024, at 11:59 p.m. (ET), the Debtors, after having consulted with the Consultation Parties, shall notify each Potential Bidder whether such party is a Qualified Bidder.

7.      ***Notice of Successful Bidde***r.  The Debtors shall file a Notice of Successful Bidder upon conclusion of the Auction or as soon as practicable if the Auction is extended, and in no event later than 24 hours after the conclusion of the Auction.

8.      ***Sale Hearing***.  If there are no Qualified Bids other than the Stalking Horse Bid and the Auction is canceled, the Sale Hearing shall commence on **June 18, 2024, at 10:00 a.m. (prevailing Eastern Time)** before the Court.  If there are Qualified Bids other than the Stalking Horse Bid, the Sale Hearing shall commence on **June 28, 2024, at 10:00 a.m. (prevailing Eastern Time)**.  Upon entry of this Bidding Procedures Order, the Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse APA or other applicable purchase agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order. The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

9.      ***Sale Objection Deadline***.  Objections, if any, to the Sale must be made on or before **June 11, 2024, at 5:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"). Objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy

Page (6)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be **actually received** no later than the Sale Objection Deadline by the following parties: (i) proposed counsel to the Debtor, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Ryan T. Jareck, Esq., and Matteo Percontino, Esq., email: msirota@coleschotz.com, rjareck@coleschotz.com, and mpercontino@coleschotz.com; (iii) counsel for Tiger Finance, Riemer & Braunstein LLP, Seven Times Square, New York, New York 10036, Attn: Anthony B. Stumbo, Esq. and Steven Fox, Esq., email: astumbo@riemerlaw.com and sfox@riemerlaw.com with a copy to local counsel for Tiger Finance, Mandelbaum Barret PC, Three Becker Farm Road, Suite 105, Roseland, New Jersey 07068, Attn: Vincent J. Roldan, Esq., email: vroldan@mblawfirm.com; (iv) the Office of the U.S. Trustee for the District of New Jersey, Attn: Fran B. Steele, Esq. (Fran.B.Steele@usdoj.gov) and Peter J. D'Auria, Esq. (Peter.J.D'Auria@usdoj.gov), (v) counsel to any official committee appointed in this chapter 11 case; *provided*, that any objection to the Sale as to adequate assurance, the conduct of the Auction, and the proposed Sale Transaction if the Successful Bidder is not the Stalking Horse Bidder, shall be filed on or before **June 24, 2024 at 5:00 p.m., (prevailing Eastern Time)**, and served on the same parties.

47548066

Page (7)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES

10.     A party's failure to timely file or make an objection in accordance with this Bidding Procedures Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order, and/or consummation of the Sale with the Successful Bidder pursuant to the Stalking Horse APA or other applicable purchase agreement, including the assumption and assignment of the Contracts to the Successful Bidder pursuant to the Stalking Horse APA or applicable purchase agreement, and shall be deemed to constitute any such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto, including, without limitation, such assumption and assignment.  All rights to the extent they exist are reserved for a party to later seek relief from the Court, and the Debtors and all other parties reserve all defenses.

11.     ***Bid Deadline***.  The deadline by which all Bids for the Debtors' Assets must be ***actually received*** by the parties specified in the Bidding Procedures is **4:00 p.m. (prevailing Eastern Time), on June 14, 2024** (the "Bid Deadline").

12.     ***Auction***.  Subject to modifications and/or the ability to schedule separate auctions for subsets of the Debtors' Assets pursuant to the Bidding Procedures, **June 20, 2024, at 10:00 a.m. (prevailing Eastern Time)**, is the date and time the Auction, if one is needed.  Such Auction will be held at the offices of counsel to the Debtor: Cole Schotz P.C., 25 Main Street, Hackensack, New Jersey 07602, or such later time on such day or other place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids.  The Auction shall be transcribed by a court

| | |
|---|---|
| Page (8) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

reporter.  As set forth more fully in the Bidding Procedures, only Qualified Bidders shall be permitted to participate at the Auction, however, any party in interest may attend the Auction.

## II.    Auction, Bidding Procedures, and Related Relief

13.    The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, incorporated herein by reference, are hereby approved in their entirety.  The Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Assets.  Any party desiring to bid on the Assets or a portion or subset thereof shall be bound by and comply with the Bidding Procedures and this Bidding procedures Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

14.    The Stalking Horse APA, substantially in the form attached hereto as **Exhibit 2**, is hereby approved in its entirety as the form of asset purchase agreement for subsequent Bids.

15.    No Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid each Qualified Bidder agrees to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

47548066

| | |
|---|---|
| Page (9) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

16.    If the Debtors receive a Qualified Bid, other than a Stalking Horse Bid, the Debtors shall conduct one or more Auctions to determine the Successful Bidder with respect to the Assets or portion of the Assets.

17.    If the Debtors do not receive any Qualified Bids other than the Stalking Horse Bid by the Bid Deadline, the Debtors shall (i) not conduct the Auction, (ii) designate the Stalking Horse Bid as the Successful Bid, and (iii) be authorized to seek approval of any such Stalking Horse APA at a Sale Hearing on **June 18, 2024, at 10:00 a.m., prevailing Eastern Time**.

18.    Pursuant to Local Rule 6004-2: (a) each bidder participating at the Auction(s) shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bidding Procedures; (b) the Auction(s) shall be conducted openly; and (c) the Auction(s) shall be transcribed or videotaped.

19.    Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Qualified Bid, any bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

| | |
|---|---|
| Page (10) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

20.     Any deposit provided by the Stalking Horse Bidder or other Qualified Bidder shall be held in escrow by the Debtors or their agent and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the applicable escrow agreement, the Bidding Procedures, or order of this Court, as applicable.

## III.    Stalking Horse Bidder, Breakup Fee, and Stalking Horse Agreement

21.     The Debtors' entry into the Stalking Horse APA is authorized and approved, and shall be deemed a Qualified Bid, subject to higher and better offers at the Auction(s) regarding the Assets in accordance with the Bidding Procedures.

22.     The Debtors are authorized to perform all obligations of the Debtors set forth in the Stalking Horse APA that are intended to be performed prior to the applicable, Sale Hearing and prior to the entry of the Sale Order, subject to the terms of the Bidding Procedures.

23.     The Breakup Fee for the Stalking Horse Bidder is approved in its entirety. The Debtors are authorized to pay any amounts that may become due to the Stalking Horse Bidder on account of the Breakup Fee on the terms set forth in the Stalking Horse APA. The Stalking Horse Bidder shall be granted an allowed administrative expense claim under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code in an amount equal to the Breakup Fee to the extent it becomes due in accordance with the terms of the Stalking Horse APA, without further order of or proceedings before this Court. Nothing in this Bidding Procedures Order shall be construed as

47548066

| | |
|---|---|
| Page (11) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

authorizing and directing the payment of any Breakup Fee or other bid protections to the Stalking Horse Bidder in the event the Stalking Horse Bidder becomes the Successful Bidder with respect to the Assets.

24.     In the event of a competing Qualified Bid with respect to the Assets, the Stalking Horse Bidder shall be entitled, but not obligated, to submit subsequent Bids and shall be entitled, but not obligated, in any and all such Bids to credit bid the full amount of the Breakup Fee in lieu of cash, and for purposes of evaluating the Bid, the full amount of such Breakup Fee shall be treated as equal to cash in the same amount.

25.     The Stalking Horse Bidder shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to take any action necessary or required under the Stalking Horse APA.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, *provided, however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

**IV.     Assumption and Assignment Procedures**

26.     The procedures set forth below regarding the assumption and assignment of the Contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy

| | |
|---|---|
| Page (12) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

Code and assigned to the Successful Bidder, if any, pursuant to section 364(f) of the Bankruptcy Code in connection with the Sale are hereby approved to the extent set forth herein.

27.     These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtors' Contracts to be assumed and assigned in connection with the Sale, subject to the payment of any amount necessary to satisfy all defaults and actual pecuniary loss to the counterparty resulting from such defaults including, but not limited to, all claims, demands, charges, rights to refunds and monetary and non-monetary obligations that the relevant counterparty can assert under a Contract, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to a Contract (the "Cure Amount"):

(a)     **Contract Assumption Notice.**     No later than May 31, 2024 (the "Assumption and Assignment Service Deadline"), the Debtors shall serve a notice of contract assumption (the "Contract Assumption Notice"), in substantially the form attached hereto as **Exhibit 4** via first class mail on the Contract counterparties (and by email upon such Contract Counterparty's counsel, if known) and provide a copy of the same to the Consultation Parties.  The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of  the executory contract or lease, (ii) the name of the counterparty to the executory contract or lease, (iii) Debtors' good faith estimates of the Cure Amount, if any, required in connection with the executory contract or lease, and (iv) the deadline to file an objection to the Cure Amount; *provided*, *however*, that

Page (13)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP
                    FEE,     (B) APPROVING     STALKING     HORSE     PURCHASE
                    AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                    HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                    THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                    FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                    LEASES

service of a Contract Assumption Notice does not constitute an admission that any Contract listed thereon is an executory contract or that such stated Cure Amount constitutes a claim against the Debtors or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

(b)    **Cure Payments**.  The payment of the applicable Cure Amount by the Debtors and/or the Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Contracts by the Debtors and the assignment of such Contracts to the Successful Bidder, constitute adequate assurance of future performance thereof.

(c)    **Supplemental Contract Assumption Notice**.  To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Contracts that may be assumed by and assigned to the Successful Bidder, (ii) remove any Contracts from the list attached to the Contract Assumption Notice, (iii) and/or modifies the previously stated Cure Payment associated with any Contract, the Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the counterparties to a Contract affected by the Supplemental Assumption Notice.  Each Supplemental Assumption Notice will include the same information with respect to listed Contracts as was included in the Contract Assumption Notice.  The Successful Bidder may add or remove any Contract to be assumed by the Debtors and assigned to it at any time prior to the Sale Hearing.

(d)    **Cure Objections**.  Objections, if any, to the proposed assumption and assignment or the Cure Amount (other than objections to adequate assurance of future performance) proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state

Page (14)

| | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtor, (b) counsel to the Stalking Horse Bidder, (c) the Notice Parties (as defined in the Bidding Procedures), and (v) any other party that has filed a notice of appearance in this chapter 11 case, so as actually to be received on or before **June 14, 2024, at 4:00 p.m., prevailing Eastern Time** or deadline set forth in the Supplemental Assumption Notice, as applicable. Objections to the Cure Amount or adequate assurance of future performance, if any, to any Supplemental Assumption Notice must be made within seven (7) days of receipt of such Supplemental Assumption Notice. Hearings, if any, in connection with a timely objection filed, shall be requested to be heard on no less than 7 days' notice.

(e) **Adequate Assurance Objections**. Objections to adequate assurance of future performance of any Successful Bidder shall must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, state the correct Cure Amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtors, (b) counsel to the Stalking Horse Bidder, (c) counsel to the Successful Bidder (if different from the Stalking Horse Bidder), (d) the Notice Parties (as defined in the Bidding Procedures), and (e) any other party that has filed a notice of appearance in these chapter 11 cases, so as actually to be received on or before the (i) **June 11, 2024, at 5:00 p.m., prevailing Eastern Time** as to the Stalking Horse Bidder or (ii) **June 24, 2024, at 5:00 p.m., prevailing Eastern Time** as to any other Successful Bidder.

(f) **Dispute Resolution**. In the event that the Debtors and a Contract counterparty cannot resolve an objection to a Cure Amount, the Contract at issue may be assumed by the Debtors and assigned to the Successful Bidder, *provided that* the Debtors shall segregate the Cure Amount that the counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties. Any objection to

Page (15)
Debtors:    SAM ASH MUSIC CORPORATION, *et al.*
Case No.:   24-14727 (SLM)
Caption of Order: ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP
       FEE, (B) APPROVING STALKING HORSE PURCHASE
       AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
       HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
       THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
       FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
       LEASES

the proposed assumption and assignment of a contract or related Cure Amount proposed in connection with the Sale that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

(g) **Contract Assumption**.  No Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Contract or (ii) the date the Sale has closed.

(h) **Failure to Object**. Any party failing to timely file an objection to the Cure Amount or the proposed assumption and assignment of a Contract listed on the Contract Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such Cure Amount, (b) the assumption and assignment of such Contract, (c) the related relief requested in the Motion, and (d) the Sale. Such party shall be forever barred and estopped from objecting to the Cure Amount, the assumption and assignment of the Contract, adequate assurance of future performance, the relief requested in the Motion, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Contract.

28. Any party failing to timely file an objection to the Cure Payments or the proposed assumption and assignment of a Contract listed on the Contract Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Contract, (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Contract, adequate assurance of future performance, the

| | |
|---|---|
| Page (16) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

relief requested in the Motion, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtor and the Successful Bidder with respect to such party's Contract.

29.     Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and the Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Contracts.

## V.     Personal Identifiable Information

30.     The Debtors' privacy policy does not prohibit the transfer of personal identifiable information, and therefore, the appointment of a consumer privacy ombudsman is not required.

## VI.     Sale Notice

31.     The Sale Notice, substantially in the form attached hereto as **Exhibit 3**, incorporated herein by reference, is hereby approved.  Within three (3) business days following entry of this Bidding Procedures Order, the Debtors shall cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the Notice Parties (as defined in the Bidding Procedures); (b) counsel to the Stalking Horse Bidder; (c) all parties to executory contracts and leases to be assumed and assigned, or rejected as part of the proposed Sale; (d) all parties who have expressed a written interest in some or all of the Assets; (e) all known holders of

| Page (17) | |
|---|---|
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

liens, encumbrances, and other claims secured by the Assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) the offices of the attorneys general for the states where the Debtors operate; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

32.     Additionally, within seven (7) days after entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall publish a notice, setting forth the information contained in the Sale Notice, on one occasion, in either *The New York Times, Wall Street Journal* or *USA Today*. Such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

**VII.   Miscellaneous**

33.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

34.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

35.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

47548066

Page (18)
Debtors:            SAM ASH MUSIC CORPORATION, *et al.*
Case No.:           24-14727 (SLM)
Caption of Order:   ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP
                    FEE,   (B) APPROVING   STALKING   HORSE   PURCHASE
                    AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE
                    HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE
                    THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES
                    FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
                    LEASES

36.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

37.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

38.     The Debtors are authorized to take such actions as may be necessary or appropriate to implement and effectuate the terms of this Order, including, but not limited to, expending such funds or taking such actions as may be necessary or appropriate to comply with the Bidding Procedures.

39.     In the event of any inconsistency between the provisions of this Order and any Exhibit referenced herein or in the Motion, the provisions of this Order shall control.

40.     The Court shall retain exclusive jurisdiction to interpret, implement, and enforce the terms and provisions of this Order, the Bidding Procedures, the Stalking Horse Term Sheet, and the Stalking Horse Agreement and decide any issues or disputes concerning this Order, the Bidding Procedures, the Stalking Horse Term Sheet, and the Stalking Horse Agreement, and the rights and duties of the parties hereunder and/or thereunder, including the interpretation of the terms, conditions, and provisions hereof and/or thereof.

| | |
|---|---|
| Page (19) | |
| Debtors: | SAM ASH MUSIC CORPORATION, *et al.* |
| Case No.: | 24-14727 (SLM) |
| Caption of Order: | ORDER (A) APPROVING BIDDING PROCEDURES AND BREAKUP FEE, (B) APPROVING STALKING HORSE PURCHASE AGREEMENT, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (E) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES |

41.     All persons and entities that participate in the bidding process or the Auction shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of the Purchased Assets, the Auction, and any Sale.

42.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h) or 6006(d), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon entry.

**<u>EXHIBIT 1</u>**

**Bidding Procedures**

47548066

**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SAM ASH MUSIC CORPORATION, *et al.*, | Case No. 24-14727 (SLM) |
| Debtors.[1] | (Jointly Administered) |

**BIDDING PROCEDURES**

On [●], 2024, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an order [Docket No. ●] (the "Bidding Procedures Order"),[2] by which the Court authorized the Debtors to solicit bids for and conduct an auction (the "Auction") for a sale or disposition (collectively, the "Sale," and each, a "Sale Transaction") of all or substantially all of the Debtors' assets or any portion thereof or one or more of the Business Units in accordance with the following procedures (the "Bidding Procedures").

---

[1]  The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410).  The location of debtor Sam Ash Music Corp.'s principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

[2]  Capitalized terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

1

47548066

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT THE
DEBTORS' PROPOSED ADVISORS, AS FOLLOWS:**

**Capstone Partners:** Jamie Lisac (jlisac@capstonepartners.com)
**Cole Schotz P.C.:** Michael D. Sirota, Esq. (msirota@coleschotz.com), Ryan T. Jareck, Esq.
(rjareck@coleschotz.com), and Matteo Percontino, Esq. (mpercontino@coleschotz.com)

**I.      Description of Assets**

The Debtors are offering investors and/or purchasers the opportunity to acquire some or all
of the company's assets (the "Assets").  The Assets are related to the company's business units,
and included, among other things, (i) the Debtors' inventory, (ii) retail locations, (iii) e-commerce
business, and (iv) intellectual property related to Samson Technologies Corporation, a wholesaler,
manufacturer, and distributor of musical products, including among brands, Samson, Michael
Kelly Guitar Co., and Hartke and Sam Ash Music which operates the Debtors' retail stores and an
e-commerce retail business (collectively, the "Business Units").

**II.     Participation Requirements**

**A.      Potential Bidders**

To participate in the bidding process or otherwise be considered for any purpose hereunder,
a person or entity interested in the Assets or part of the Assets (other than the Stalking Horse
Bidder (defined below) (a "Potential Bidder") must deliver to each of the Debtors' advisors the
following documents and information:

1.      an executed confidentiality agreement on terms acceptable to the Debtors in any
material respects (a "Confidentiality Agreement");

2.      identification of the Potential Bidder and any principals and representatives thereof
who are authorized to appear and act on its behalf for all purposes regarding the
contemplated Sale Transaction(s); and

3.      proof by the Potential Bidder of its financial capacity to close a proposed Sale
Transaction(s), which may include financial statements of, or verified financial
commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an
entity formed for the purpose of acquiring the desired Assets, the party that will
bear liability for a breach), the adequacy of which will be assessed by the Debtors
and its advisors, with the reasonable consent of the Consultation Parties (as defined
below).

**B.      Obtaining Due Diligence**

The Debtors, with their advisors, with the reasonable consent of the Consultation Parties,
will determine and notify each Potential Bidder whether such Potential Bidder has submitted
adequate documents so that such Potential Bidder may submit a Bid (each, an "Acceptable
Bidder," and each such bid an "Acceptable Bid").  Notwithstanding anything herein to the
contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with

2

Potential Bidders to aggregate Bids into a consolidated Acceptable Bid prior to the Bid Deadline (defined herein).

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors and the Assets. The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right to reasonably limit the information and due diligence provided to competitors and (ii) the Debtors may decline to provide such information, after prior notice to, and with the reasonable consent of the Consultation Parties, to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a proposed Sale Transaction. The due diligence period will end on the Bid Deadline. Subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information to any party. Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors and the Consultation Parties. The Debtors and their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale or Sale Transaction.

The Debtors shall keep the Consultation Parties reasonably informed of all interested parties that become Acceptable Bidders and the status of their due diligence.

## III.    **Requirements for Qualified Bids**

Any proposal, solicitation, or offer (each, a "<u>Bid</u>") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtors' business judgment and the consent of the applicable Consultation Parties (a "<u>Qualified Bid</u>" and such bidder a "<u>Qualified Bidder</u>")[3]:

1.   ***Assets and Assumed Liabilities.*** The Bid must clearly identify the following: (a) the Assets, or the portion thereof, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' businesses as a going concern, or to liquidate the businesses.

2.   ***Purchase Price.*** The Bid must clearly set forth the purchase price to be paid (the "<u>Purchase Price</u>"). If requested by the Debtors or the Consultation Parties, a Acceptable Bidder shall allocate its Purchase Price among the Debtors' assets subject to the Bid.

3.   ***Deposit.*** Each Bid, except for the bid under the Stalking Horse APA (the "<u>Staking Horse Bid</u>"), must be accompanied by a cash deposit in the amount equal to 10 percent (10%) of the aggregate purchase price of the Bid to be held in an interest-

---

[3] The Stalking Horse Bidder shall automatically be deemed a Qualified Bidder.

bearing escrow account to be identified and established by the Debtor (the "Deposit").

4.  **Bid Documents.**  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include a schedule of assumed contracts to the extent applicable to the Bid, and a clearly marked version of the Stalking Horse APA, showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

5.  **Employee Obligations**.  Each Bid must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees, and a description of any contemplated incentive plan, to the extent applicable.

6.  **Committed Financing.**  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid, except for a Stalking Horse Bid, must include committed financing documented to the satisfaction of the Debtors and the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all contracts proposed to be assumed by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Consultation Parties.

7.  **Identity.**  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction(s) contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Acceptable Bidder, Stalking Horse Bidder, Consultation Party or Qualified Bidder, and/or any officer or director of the foregoing.  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

8.  **Irrevocable.**  An Acceptable Bidder's Bid must be irrevocable until three months after the date of selection of the Successful Bid; _provided_ that if the Bid is not selected as the Successful Bid or Backup Bid, the Bid may be revoked after consummation of the Successful Bid or Backup Bid.

9.  **Backup Bidder.**  Each Bid must contain an agreement for the Acceptable Bidder to be a Backup Bidder.

4

10.    ***Satisfaction of DIP Obligations***.  To the extent that any bid includes collateral of the DIP Lender, absent consent of the DIP Lender, a Potential Bidder's Bid must provide for the payment in full of all DIP Obligations (as defined in the DIP Order).[4]

11.    ***As-Is, Where-Is.***  Consummation of any sale transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their advisors, representatives, or estates, except as specifically accepted or agreed to by the Debtors.  The Bid must include the following representations and warranties: (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's proposed asset sale agreement ultimately accepted and executed by the Debtors.  The Bid shall not be conditional on any further due diligence.

12.    ***Authorization***.  Except for the Stalking Horse Bid, the Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors and the Consultation Parties with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

13.    ***Joint Bids***.  The Debtors will be authorized to approve joint Bids in their reasonable business judgment on a case-by-case basis, so long as a joint Bid meets the Qualified Bid requirements and the applicable bidders otherwise comply with these Bidding Procedures.

14.    ***Adequate Assurance Information***.  Each Bid must be accompanied by sufficient and adequate financial and other information (the "<u>Adequate Assurance Information</u>") to demonstrate, to the reasonable satisfaction of the Debtors that such Acceptable Bidder can provide adequate assurance of future performance under the executory contracts and unexpired leases of the Debtors to be assumed in connection with the proposed Sale Transaction. The Bid must also identify a contact

---

[4] The DIP Orders shall mean *Interim and Final Orders (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing Use Cash Collateral and Affording Adequate Protection; (III) Granting Liens And Providing Superpriority Administrative Expense Status, (IV) Modifying The Automatic Stay, (V) Scheduling a Final Hearing; and (VI) Granting Related Relief.*

person that parties may contact to obtain additional Adequate Assurance Information.

15.   *Expected Closing Date*. Each Bid must state the Acceptable Bidder's expected date of closing of the Sale Transaction.

16.   *Consent to Jurisdiction*. Each Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to any written indications of interest, the Bid Documents, the Bids, the Debtors' evaluation thereof, the Bid Documents, the Auction, the Sale Transaction(s), and the construction and enforcement of these Bidding Procedures, and any and all other agreements entered into in connection with the Sale Transaction and the closing, as applicable.

17.   *Conditions to Closing*. Each Bid must identify with particularity each and every condition to closing.

18.   *Disclaimer of Fees*.  Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a fee analogous to a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid each Qualified Bidder agrees to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

19.   *Adherence to Bidding Procedures*.  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, and (b) that the Bid constitutes a *bona fide* offer to consummate the proposed transactions and agrees to be bound by these Bidding Procedures.

20.   *No Collusion*.  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code  with respect to any Bids, the Auction, or the Sale.

21.   *Retention of Records*.  To the extent a Bid is a Bid for all or substantially all of the Debtors' Assets, such Bid must include a statement that the Acceptable Bidder will retain or allow the Debtors access to the Debtors' books and records.

22.   *Other Information*. The Bid contains such other information as may be reasonably requested by the Debtors and the Consultation Parties.

## IV.    **Bid Deadline**

An Acceptable Bidder that desires to make a Bid must transmit via email (in .pdf or similar format) or deliver written copies of its bid to the following parties so as to be received not later than **4:00 p.m. (prevailing Eastern Time) on June 14,  2024** (the "Bid Deadline"): (i) proposed counsel to the Debtors, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Ryan T. Jareck, Esq., and Matteo Percontino, Esq., email: msirota@coleschotz.com, rjareck@coleschotz.com, and mpercontino@coleschotz.com; and (ii) the Debtors' proposed investment banker, Capstone Partners, 222 N. Lasalle St., Ste. 1260, Chicago, IL 60601, Attn: Jamie Lisac, email: jlisac@capstonepartners.com.  The Debtors will provide copies of all Bids via electronic mail within one (1) day of receipt by the Debtors to (i) the Consultation Parties, and (ii) the Office of the United States Trustee.

## V.    **Qualified Bidders**

On or before June 18, 2024, at 11:59 p.m. (ET), the Debtors, after having consulted with the Consultation Parties, shall notify each Acceptable Bidder whether such party is a Qualified Bidder.

If any Bid is determined by the Debtors and the Consultation Parties, not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on or before the date that is five business days after the Bid Deadline.

The Debtors may accept as a single Qualified Bid, multiple bids for non-overlapping material portions of the Assets such that, when taken together in the aggregate, such bids would otherwise meet the standards for a single Qualified Bid. The Debtors may permit otherwise Qualified Bidders who submitted bids by the Bid Deadline for less than a substantial (but nevertheless a material) portion of the Assets but who were not identified as a component of a single Qualified Bid consisting of multiple bids as described in the preceding sentence, to participate in the Auction and to submit higher or otherwise better bids that in subsequent rounds of bidding may be considered, together with other bids for non-overlapping material portions of the Assets, as part of such a single Qualified Bid for overbid purposes.

The Debtors may also accept as a Qualified Bid, a bid for a single Business Unit as determined by the Debtors in consultation with the Consultation Parties.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification regarding any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors and the applicable Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with (a) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single

47548066

consolidated Acceptable Bid prior to the Bid Deadline or (b) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualifying Bid prior to the conclusion of the Auction. The Debtors reserve the right to cooperate with any Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Qualified Bidder to consummate its contemplated transaction. Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

Notwithstanding anything to the contrary herein, for all purposes under the Bidding Procedures, the Stalking Horse Bidder, is deemed to be a Qualified Bidder and its bid (a "Stalking Horse Bid") shall be deemed to be a Qualified Bid, such that the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid. The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.

## VI.    Right to Credit Bid

Pursuant to the DIP Orders, Tiger Finance (or its designee) may credit bid, consistent with the applicable DIP Documents and/or prepetition loan documents, some or all of its claims for its respective collateral (each a "Credit Bid") to the extent permitted by section 363(k) of the Bankruptcy Code, subject in each case to the rights, duties, and limitations under the prepetition loan documents; and Tiger Finance shall each be deemed a Qualified Bidder with respect to its rights to acquire its respective collateral by Credit Bid.

## VII.    The Auction(s)

If the Debtors receive a Qualified Bid, other than the Stalking Horse Bid, the Debtors shall conduct an Auction or Auctions to determine the Successful Bidder with respect to the Assets or portion of the Assets.

If the Debtors do not receive a Qualified Bid other than the Stalking Horse Bid, the Debtors will not conduct the Auction and will designate the Stalking Horse Bid as the Successful Bid.

No later than one day prior to the Auction, the Debtor, with the reasonable consent of the applicable Consultation Parties, will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment (the "Baseline Bid") for any Auction. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the number, type, and nature of any changes to the Stalking Horse APA requested by the Qualified Bidder, including the type and portion of the Assets sought and liabilities to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close the proposed Sale Transaction(s), the conditions thereto, and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transactions contemplated

47548066

by the Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction shall take place at **10:00 a.m. (prevailing Eastern Time) on June 20, 2024**, at the offices of Cole Schotz P.C., 25 Main Street, Hackensack, New Jersey 07602, or such later date, time and location as designated by the Debtors, after providing notice to the Notice Parties and the Consultation Parties. The Debtors shall have the right to conduct any number of Auctions on that date to accommodate multiple bids that comprise a single Qualified Bid, if the Debtors determine, in their reasonable business judgment, and with the reasonable consent of Consultation Parties, that conducting such auctions would be in the best interests of the Debtors' estates. In addition, the Debtors may also conduct separate Auctions, if the Debtors receive multiple Qualified Bids for the separate Business Units, and the Debtors determine, in their reasonable business judgment, and with the reasonable consent of Consultation Parties, that conducting such separate auctions would be in the best interests of the Debtors' estates.

## A.      Participants and Attendees

The Debtors and their advisors shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (defined below).

Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures and in consultation with the Consultation Parties. Qualified Bidders participating in the Auction must appear in person at the Auction, or through a duly authorized representative. The Auction will be conducted openly and all creditors may be permitted to attend; _provided_ that the Debtors may, in its sole and exclusive discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder or creditor at the Auction. In addition, professionals and/or other representatives of the Consultation Parties will be permitted to attend and observe the Auction. Any creditor wishing to attend the Auction may do so by contacting by email, no later than three (3) business days prior to the start of the Auction, the Debtors' advisors.

## B.      Auction Procedures

The Auction(s) shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment and in consultation with the Consultation Parties:

1.    ***Baseline Bids.***   Bidding shall commence at the amount of the Qualified Bid or combination of Qualified Bids that the Debtors determine in their business judgment and in consultation with the Consultation Parties to be the highest and/or best Qualified Bid (the "Baseline Bid").

47548066

2. ***Minimum Overbid.*** Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the relevant Assets (each such bid, an "Overbid"). The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, announce increases or reductions to initial or subsequent Overbids at any time during the Auction.

3. ***Highest or Best Offer.*** After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe, in their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best offer for the relevant Assets (the "Leading Bid"). Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.

4. ***Rejection of Bids.*** The Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Qualified Bid, any bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale or (iii) contrary to the best interests of the Debtors, their estate, their creditors, and other stakeholders.

5. ***Additional Information***. The Debtors and the Consultation Parties, shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties, to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors, in consultation with the Consultation Parties, believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction.

6. ***No Collusion; Good Faith Bona Fide Offer***. Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding and (b) its Qualified Bid is a good-faith *bona fide* offer, and it intends to consummate the proposed Sale if selected as the Successful Bidder.

7. ***Modification of Procedures.*** Any modification of these Bidding Procedures which extends the timelines included herein shall be subject to the consent of Tiger Finance, whose consent shall not be unreasonably withheld.

The Auction may include open bidding in the presence of all other Qualified Bidders. All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; *provided* that any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (defined below)) must remain open and binding on the Qualified Bidder until and unless the Debtors, in consultation with the Consultation Parties, accept a higher or otherwise better Qualified Bid as the Leading Bid. The

10

Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, negotiate with any and all Qualified Bidders participating in the Auction.

### C. Adjournment of the Auction

The Debtors reserves the right, in their reasonable business judgment and with the reasonable consent of the Consultation Parties, to adjourn the Auction one or more times to, among other things (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment and with the reasonable consent of the Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale Transaction(s) at the prevailing bid amount.

### D. Successful Bidder

Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which bid constitutes the highest or otherwise best bid(s) for the applicable Assets (each such bid, a "Successful Bid"); and (ii) notify all Qualified Bidders at the Auction for the applicable Assets of the identity of the bidder that submitted the Successful Bid (each such bidder, the "Successful Bidder") and the amount of the purchase price and other material terms of the Successful Bid.

The Debtor shall file a notice identifying the Successful Bidder and Backup Bidder (if selected), and the asset purchase agreements of the Successful Bidder and the Backup Bidder by no later than 24 hours after the conclusion of the Auction.

## VIII.  Backup Bidder

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment and in consultation with the Consultation Parties (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the applicable Consultation Parties, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

47548066

IX.     **Acceptance of Successful Bid**

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (defined below).  The Debtors shall seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as required and with all rights reserved against the Successful Bidder.

X.      **Free and Clear of Any and All Encumbrances**

Except as otherwise provided for in a Stalking Horse APA or another Successful Bidder's purchase agreement, all right, title, and interest in and to the Assets subject thereto shall be sold free and clear of all liens, claims, rights, interests, charges, and encumbrances (collectively, the "Encumbrances"), subject only to the Assumed Liabilities (as defined in the Stalking Horse APA or  another Successful Bidder's purchase agreement), if any, in accordance with Bankruptcy Code section 363(f), with such Encumbrances to attach to the net proceeds (if any) received by the Debtors from the Sale of the Assets in accordance with the Bankruptcy Code, applicable non-bankruptcy law, and any prior orders of the Court.

XI.     **Breakup Fee**

In the event that the sale to the Stalking Horse Bidder is not consummated pursuant to the terms of the Stalking Horse APA, the Stalking Horse Bidder is entitled to payment of the Breakup Fee pursuant to the terms of the Stalking Horse APA.

The Debtors recognize the value and benefits that the Stalking Horse Bidder has provided to the Debtors by entering into the Stalking Horse Agreement, as well as the Stalking Horse Bidder's expenditure of time, energy and resources.  Therefore, subject to the terms of the Stalking Horse APA, the Debtors shall pay the Breakup Fee to the Stalking Horse Bidder by wire transfer of immediately available funds to the account specified by the Stalking Horse Bidder to the Debtors in writing.  The Breakup Fee shall be paid upon the closing of an alternative transaction, and shall be paid to the Stalking Horse Bidder prior to the payment of the proceeds of such sale to any third party asserting a Lien on the acquired Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee).

The Breakup Fee shall constitute an allowed administrative expense claim against the Debtors' bankruptcy estates pursuant to Bankruptcy Code sections 503(b) and 507(a)(2).

XII.    **Consultation Parties**

The term "Consultation Parties" as used in these Bidding Procedures shall mean (i)  Tiger Finance and (ii) any official committee appointed in these chapter 11 cases; *provided*, *however*, notwithstanding anything herein to the contrary, the Debtors shall only be required to reasonably consult with any official committee appointed in these chapter 11 cases and any such committee shall not have any consent rights with respect to these Bidding Procedures.  The Debtors shall regularly and timely consult and confer with the Consultation Parties in respect of all aspects of

the bidding and Auction process in order to maximize value for all parties in interest. The Debtors may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; *provided*, however, that the Debtors may, limit the consultation rights of Tiger Finance pursuant to its Qualified Bid.

## XIII.  <u>Notice Parties</u>

The term "Notice Parties" as used in these Bidding Procedures shall mean (i) counsel to Tiger Finance, (ii) the Office of the U.S. Trustee for the District of New Jersey, and (iii) counsel to any official committee appointed in these chapter 11 cases.

## XIV.  <u>Fiduciary Out</u>

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require the Debtors or their board of directors to take any action or to refrain from taking any action related to any Bid (including a Successful Bid or Backup Bid) or with respect to these Bidding Procedures, to the extent the Debtors or their board of directors, reasonably determine in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures, the Debtors and its directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving the Debtors' assets (each an "<u>Alternate Proposal</u>"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity with respect to Alternative Proposals; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; and (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals.

## XV.  <u>Reservation of Rights</u>

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment and with the reasonable consent of the applicable Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all Bids or Qualified Bids and (f) adjusting the applicable minimum overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis; *provided* that any modifications to these Bidding Procedures which extends the timelines included herein shall be subject to the consent of Tiger Finance, whose consent shall not be unreasonably withheld. For the avoidance of doubt, the Debtors reserve the right, at any point prior to the entry of the Sale Order, to consider an Alternate Proposal. Nothing in the Bidding

13

Procedures shall abrogate the fiduciary duties of the Debtors. All rights of the Consultation Parties with respect to the proposed Sale Transaction are fully reserved.

## XVI.  Consent to Jurisdiction

All Potential Bidders, Acceptable Bidders and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XVII.  Sale Hearing

If there are no Qualified Bids other than the Stalking Horse Bid and the Auction is canceled, the Sale Hearing shall commence on **June 18, 2024, at 10:00 a.m. (prevailing Eastern Time)** before a United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Martin Luther King Jr. Federal Building, 50 Walnut Street, Newark, NJ 07102.  If there are Qualified Bids other than the Stalking Horse Bid, the Sale Hearing shall commence on **June 28, 2024, at 10:00 a.m. (prevailing Eastern Time)** before a United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Martin Luther King Jr. Federal Building, 50 Walnut Street, Newark, NJ 07102.

**The Sale Hearing may be continued to a later date by the Debtors (after consultation with the Consultation Parties) by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Successful Bidder and the Backup Bidder must acknowledge on the record at the start of the hearing that, in connection with submitting their Bids, they did not engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale, specifying that they did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control the price or any other terms of the Sale.

## XVII.  Return of Deposit

The Deposit, if any, of the Successful Bidder shall be applied to the purchase price of such transaction at closing.  Without otherwise modifying the irrevocability of such Bid, the Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors, with the reasonable consent of the Consultation Parties, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.  The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the Successful Bidder fails to close and the Debtors, in consultation with the Consultation Parties, opts to close on the Sale Transaction(s) set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the purchase price of such transaction(s) at closing.  In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors

14

specifically reserves the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable.

## XVIII. DIP Orders

Notwithstanding anything to the contrary contained in these Bidding Procedures, any right of Tiger Finance to consent to the Sale of any portion of their respective collateral on terms and conditions acceptable to Tiger Finance are hereby expressly preserved and not modified, waived or impaired in any way by these Bidding Procedures or the Bidding Procedures Order.  For the avoidance of doubt, nothing in these Bidding Procedures or the Bidding Procedures Order shall amend, modify or impair any provision of the DIP Order, or the rights of the Debtors or Tiger Finance.

47548066

**<u>Exhibit 2</u>**

**Stalking Horse APA**

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**SAM ASH MUSIC CORPORATION,**

**THE OTHER SELLERS PARTY HERETO,**

**AND**

**TIGER FINANCE, LLC**


**DATED AS OF MAY 10, 2024**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of May 10, 2024 by and among Sam Ash Music Corporation, a New York corporation ("SAMC"), Samson Technologies Corp., a New York corporation ("Samson"), Sam Ash Megastores, LLC, a New York limited liability company ("SAM"), Sam Ash CT, LLC, a Connecticut limited liability company ("SACT"), Sam Ash Quikship Corp., a Florida corporation ("SAQC"), Sam Ash Florida Megastores, LLC, a Florida limited liability company ("SAFM"), Sam Ash Illinois Megastores, LLC, a Illinois limited liability company ("SAIL"), Sam Ash New Jersey Megastores, LLC, a New Jersey limited liability company ("SANJ"), Sam Ash New York Megastores, LLC, a New York limited liability company ("SANY"), Sam Ash Music Marketing, LLC, a New York limited liability company ("SAMM"), Sam Ash California Megastores, LLC, a California limited liability company ("SACM") and Sam Ash Nevada Megastores, LLC, a Nevada limited liability company ("SANV", and together with SAMC, Samson, SAM, SACT, SAQC, SAFM, SAIL, SANJ, SANY, SAMM and SACM, the "Sellers"), and Tiger Finance, LLC ("Buyer"; (including any other persons designated by the Buyer as a "Buyer Designee" (each a "Buyer Designee"))).  Sellers and Buyer are referred to collectively herein as the "Parties".

## WITNESSETH

**WHEREAS**, the Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.) (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") on May 8, 2024;

**WHEREAS**, Sellers are engaged in (a) the business of marketing, distributing and selling musical instruments and related accessories, and (b) the operation of stores and the retail sale of musical instruments and accessories at such stores (the "Stores") and through e-commerce platforms, including the E-Commerce Platform (as defined below) (collectively, the "Business");

**WHEREAS**, Sellers desire to sell, transfer and assign to Buyer all of the Acquired Assets (as defined below), and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets and Assumed Liabilities (as defined below).

**NOW, THEREFORE**, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement:

"Acquired Assets" means all of Sellers' right, title and interest, free and clear of all Liens (other than Permitted Liens and Permitted Post-Closing Liens), in and to the following properties, rights, interests and other tangible and intangible assets of Sellers used in, held for use in, or relating to the Business:

(a)    all Merchandise (whether owned by, or on order to be delivered to Seller), other than Merchandise located at any Closing Location;

(b)    all Furnishings and Equipment (whether owned by, or on order to be delivered to the Seller), other than any Furnishings and Equipment located at any Closing Location or any other Furnishings and Equipment expressly excluded from the Acquired Assets in writing by Buyer after the date hereof;

(c)    all accounts and all Credit Card Receivables;

(d)    all proceeds and other amounts receivable pursuant to or in respect of the Hybrid Agency Agreement in respect of the Store Closing Sale at the Closing Locations;

(e)    the Assumed Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to the underlying real property, and all rights arising thereunder, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases;

(f)    the Transferred Contracts and all rights and benefits thereunder;

(g)    other than as constitutes an Excluded Asset, all prepaid expenses of any Seller (other than pursuant to any Contract which is not a Transferred Contract or any Lease which is not an Assumed Lease);

(h)    to the extent requested in writing by Buyer and assignable to Buyer under applicable Law, all Permits issued to, or for the benefit of, any Seller relating to the operation of the Business, and all pending applications or filings therefor and renewals thereof;

(i)    all internet domain names owned or purported to be owned by Sellers, including the internet domain name registrations and social media accounts set forth in Schedule 1.1(h) (the "Transferred Domain Names");

(j)    all Trademarks owned or purported to be owned by Sellers listed on Schedule 1.1(i) (the "Transferred Trademarks");

(k)    to the extent permitted by applicable Law, all Intellectual Property Licenses, to the extent included in the Transferred Contracts;

(l)    all other Intellectual Property owned by Sellers, or in which Sellers have any interest or right, which is used in, held for use in, or relating to the Business, including all royalty payments and licensing receivables generated by the Business and attributable to the period prior to and after the Closing;

(m)    to the extent their transfer is permitted by applicable Law, all third-party warranties, refunds, rights of recovery, rights of set-off or counter-claim and rights of recoupment of every kind and nature for the benefit of, or enforceable by, any Seller in each case to the extent arising from or relating the Acquired Assets;

2

(n)     all marketing, advertising and promotional materials and product samples and designs used in, held for use in, or relating to the Acquired Assets;

(o)     all books, records, manuals and other materials (in any form or medium and wherever held) relating to the Business, including all records and materials held by the Sellers, advertising matter, catalogues, price lists, correspondence, mailing lists, lists of current and former customers and suppliers (and all data related thereto including contact information, transaction histories, and any and all demographic data), SMS, text, and email distribution lists), distribution and other mailing lists, photographs, production data, computer data, all studies and research, sales and promotional materials and records, purchasing materials and records, personnel records, manufacturing and quality control records and procedures, facilities and/or equipment plans and specifications, blueprints, research and development files, data and laboratory books, intellectual property disclosures and tangible embodiments of intellectual property, media materials and plates, accounting records, sales order files and litigation files related to the Business or the Acquired Assets (collectively,  the "Business Records"); provided however, that the Sellers shall retain certain access rights to all such Business Records post-Closing for a period of time as provided in Section 6.2 hereof;

(p)     goodwill associated with the Business or the Acquired Assets;

(q)     all of Sellers' rights of publicity and all similar rights, including all commercial merchandising rights;

(r)     product designs, design rights, tech packs, artwork, archival materials and advertising materials, copy, commercials, images and artwork owned by any Seller, or in which any Seller has any interest or right;

(s)     all customer data, customer lists, and information related to all customer purchases (the "Customer Information") (excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or other personally identifiable information the transfer of which would contravene applicable privacy Law and the Bankruptcy Code);

(t)     all of Sellers' telephone and fax numbers;

(u)     claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, rights of set-off, rights of subrogation and all other rights of any kind, in each case solely to the extent arising from the Intellectual Property owned by the Sellers or the Acquired Assets, including all avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law, and all other claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind under any other provision of the Bankruptcy Code or applicable Laws;

(v)     all tangible and intangible assets included in the E-Commerce Platform or any similar e-commerce platform owned, operated, or controlled by any Seller (provided that to the extent any such assets include rights to which Sellers are entitled pursuant to any Contract,

such rights shall only be included in the Acquired Assets if such Contract is a Transferred Contract);

(w)     other than as constitutes an Excluded Asset, all (i) rights to refunds relating to, and prepaid expenses and deposits attributable to, any Acquired Asset, and all rights under credit card merchant accounts, (ii) prepaid charges and deposits in respect of utilities (including any security deposit delivered to any utility company under the terms of the Utilities Order), (iii) prepaid common area maintenance expenses relating to any Store or other Lease and security deposits for any such Lease assumed and assigned to the Buyer or its designee, (iv) business non-employee related insurance policies (to the extent assignable) and prepaid premiums in respect of the insurance policies to the extent in respect of periods on or after the Closing Date, (v) ordinary holdbacks (including ordinary credit card holdback payments or protection reserves) in connection with or relating to any Acquired Asset, (vi) other deposits, prepaid charges, prepaid taxes relating to any post-closing tax period and expenses paid by the Sellers and other rights of the Sellers in connection with or relating to any Acquired Asset and (vii) all rights to receive any tax refunds, including (without limitation) federal and state income tax refunds;

(x)     those guarantees, warranties, indemnities and similar rights in favor of the Sellers with respect to any Acquired Asset, to the extent conveyable;

(y)     all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses, except expressly related to any Excluded Liability;

(z)     the balance of any Remaining Cash; and

(aa)     the Disposition Rights.

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise, provided, however, that notwithstanding the foregoing, except where expressly indicated otherwise, the term "Affiliate" shall not include, and is intended to specifically exclude, any non-Debtor Affiliate of the Sellers.

"Affiliate Agreement" has the meaning set forth in Section 3.13.

"Agreement" has the meaning set forth in the preamble.

"Allegedly Infringing Merchandise" means any Merchandise that is the subject of any Litigation which is pending, or threatened in writing against any Seller or its Affiliates or with respect to which any Seller or its Affiliates has received written notice, in each case that alleges that such Merchandise infringes any other Person's Intellectual Property rights, including

Merchandise intended to be withdrawn from advertisement or availability for sale due to such an allegation or claim.

"Approved Budget" means Exhibit 1 to the Interim DIP Financing Order approving the Sellers' post-petition financing arrangement.

"Assumed Leases" has the meaning set forth in Section 2.6(b).

"Assumed Liabilities" means only the following Liabilities:

(a)    all Cure Costs under the Assumed Leases or Transferred Contracts as agreed to by the Buyer and the Sellers, and all Liabilities under the Assumed Leases or Transferred Contracts solely to the extent such Liabilities arise from and after the Closing Date;

(b)    all Liabilities arising solely out of the ownership or operation of any Acquired Asset after the Closing;

(c)    the Assumed Taxes;

(d)    for the avoidance of doubt and without duplication of such amounts included in the Wind Down Expenses, the Sales and Use Taxes arising and accruing solely on or after the Closing Date;

(e)    for the avoidance of doubt and without duplication of such amounts included in the Wind Down Expenses, the Payroll and Payroll Taxes arising and accruing solely on or after the Closing Date;

(f)    for the avoidance of doubt and without duplication of such amounts included in the Wind Down Expenses, the Payroll for the Samson Business, if so acquired, arising solely on or after the Closing Date;

(g)    for the avoidance of doubt and without duplication of such amounts included in the Wind Down Expenses, the PTO Obligations; and

(h)    the sum of (y) the aggregate dollar amount of remaining DIP Obligations (as defined in the Interim DIP Financing Order) after taking into account any paydowns made pursuant to the Approved Budget (as defined in the Interim DIP Financing Order) or the Interim DIP Financing Order, plus (z) all interest, fees, and other amounts due by the Sellers on account of the foregoing, which collectively, as of the Closing Date, is estimated to be approximately $5,665,000;

provided, however, that notwithstanding anything to the contrary set forth in this definition, (x) the Assumed Liabilities shall not include any rejection damages claims or administrative expenses and priority claims, except as set forth above, and (y) nothing in this definition shall be construed to limit Buyer's obligations under any Related Agreement; provided, further, however, that to the extent an Assumed Liability is or could be listed under more than one subparagraph of the definition of Assumed Liabilities, there shall be no double counting and the Buyer shall only be obligated to assume and pay the Assumed Liabilities once.

"<u>Assumed Taxes</u>" means any Liability for Taxes arising from the ownership or operation of the Business or the Acquired Assets for a Post-Closing Tax Period.

"<u>Bankruptcy Case</u>" means the jointly administered cases under chapter 11 of the Bankruptcy Code to be commenced by the Sellers, and continuing immediately thereafter, in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Bankruptcy Case, and the general, local and chambers rules of the Bankruptcy Court.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bidding Procedures</u>" means the bidding procedures for the solicitation and submission of bids for a sale, reorganization, or other disposition of Sellers or all or substantially all of their assets approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"<u>Bidding Procedures Motion</u>" means the motion seeking entry of the Bidding Procedures Order.

"<u>Bidding Procedures Order</u>" means an order of the Bankruptcy Court approving the Bidding Procedures.

"<u>Bill of Sale and Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.5(b)</u>.

"<u>Break-Up Fee</u>" has the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Business Day</u>" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Buyer Designee</u>" has the meaning set forth in the preamble.

"<u>Buyer Party Members</u>" has the meaning set forth in <u>Section 4.7(b)</u>.

"<u>Cash Equivalents</u>" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"<u>Claim</u>" means any claim within the meaning of section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.4.

"Closing Date" has the meaning set forth in Section 2.4.

"Closing Locations(s)" has the meaning set forth in Section 5.2I.

"Closing Location Assets" means all Merchandise, Furnishing and Equipment and other tangible assets located at Closing Locations.

"COBRA" means sections 601 through 608 of the Employee Retirement Income Security Act of 1974 and section 4980B of the IRC.

"COBRA Liabilities" has the meaning set forth in clause (h) of the definition of Excluded Liabilities.

"Confidential Information" has the meaning set forth in Section 5.8(b).

"Consultant" has the meaning set forth in the Store Closing Order.

"Consulting Agreement" means that certain Consulting Agreement dated as of February 27, 2024, by and between SAMC and Consultant, as amended by that certain Addendum to Consulting Agreement dated as of April 24, 2024, by and between SAMC and Consultant.

"Contract" means any agreement, contract, license, arrangement, commitment, promise, obligation, right, instrument, document, purchase order, sales order, or other similar commitment or instrument, whether written or oral, that is intending to be binding on the parties thereto (other than any Leases).

"Contracting Parties" has the meaning set forth in Section 9.14.

"Covered Employee" means an employee of any Seller as of the date hereof whose duties relate primarily to the operations conducted at the E-Commerce Platform, including such employees who are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"Credit Card Receivables" means the accounts receivable and other amounts owed to any of the Sellers in connection with any customer purchases, returns or exchanges from any Closing Location, or otherwise through the Business that are made with credit or debit cards or through other electronic payment methods such as but not limited to PayPal, Venmo, Apple Pay, Chase Pay, etc.

"Cure Costs" means all monetary Liabilities of the Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by any Seller of Transferred Contracts and Assumed Leases only.

"Cure Notice" means those certain statements filed with the Bankruptcy Court regarding the Sellers' potential assumption and assignment of Contracts and Leases and the related Proposed Cure Costs.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Designation Rights Period" means the period commencing on the Closing Date and ending 11:59 p.m. Eastern time on the date that is ninety (90) days thereafter.

"Disclosure Schedule" has the meaning set forth in Article III.

"Disposition Rights" means the right to direct the disposition of the Closing Location Assets.

"Domain Name Assignment Agreement" has the meaning set forth in Section 2.5(b).

"E-Commerce Platform" means the series of software and hardware applications (and related services) integrated into and used in the operation of, and through which Sellers sell inventory to consumers who place orders for such inventory through and any websites used by Sellers and related internet or "app" based sales, marketing, advertising, and social media channels, including the Contracts pursuant to which such software and hardware applications (and related services) are owned or licensed by Sellers.

"Encumbrances" means any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal or similar restriction, including any restriction on use, voting right (in the case of any security or equity interest), transfer right, right to receipt of income or exercise of any other attribute of ownership.

"Environmental Law" means all applicable Laws including any common law cause of action concerning (i) pollution or protection of the environment, or worker health and safety (relating to exposure to Hazardous Substances), or (ii) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, Release or threatened Release of Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means all assets of Sellers other than the Acquired Assets, including, without limitation, the following assets:

(a)    all Merchandise, Furnishing and Equipment and other tangible assets located at any Closing Location;

(b)    all artwork, memorabilia, diplomas, and awards in the corporate offices, and personal instrument collections, that are (i) personally owned by the Ash family, (ii) listed in the Disclosure Schedule, and (iii) not otherwise included in the Merchandise;

(c)      any D&O policy or related tail policy;

(d)      (i) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to any Seller's organization, maintenance, existence, and operation; and (ii) books and records related to (A) Taxes paid or payable by the Sellers or (B) any claims, obligations or liabilities not included in Assumed Liabilities;

(e)      capital stock or other equity interests of any of the Sellers's direct or indirect Subsidiaries;

(f)      all of Sellers' rights under this Agreement or any Related Agreement;

(g)      all of Sellers' rights under any Excluded Asset;

(h)      all Contracts other than the Transferred Contracts;

(i)      all Leases other than the Assumed Leases;

(j)      all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements;

(k)      any Customer Information or any Personal Information, the transfer of which hereunder would result in the violation of Law;

(l)      any credit card numbers or related customer payment source, or social security numbers; and

(m)      all of Samson's (i) accounts and Credit Card Receivables; (ii) inventory and Merchandise; and (iii) Intellectual Property and associated goodwill; provided, however, that the Sellers receive a qualified bid in accordance with the Bid Procedures Order for the foregoing assets of Samson in an amount not less than $7,500,000 and the sale of such assets closes with the proceeds delivered to Buyer for application to the DIP Obligations (as defined in the Interim DIP Order).

"Excluded Liabilities" means any and all Liabilities of Sellers, whether existing at the Closing or arising thereafter, other than the Assumed Liabilities.  Without limiting the foregoing, the Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any of the Sellers or of any predecessor of any of the Sellers, whether incurred or accrued before or after the Closing:

(a)      any Liability of Sellers or of any of their predecessors associated with any and all indebtedness, including any guarantees of third-party obligations and reimbursement obligations to guarantors of Sellers' or any of their respective Subsidiaries'

obligations, and including any guarantee obligations or imputed Liability through veil piercing incurred in connection with Sellers' Subsidiaries;

(b)    all Taxes, including Retained Taxes, other than Assumed Taxes and Transfer Taxes (which shall, for the avoidance of doubt, be allocated consistently with Section 6.5(a)) and the Sales and Uses Taxes and Payroll Taxes arising solely on or after the Closing Date;

(c)    all Liabilities of Sellers or of any of their predecessors under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(d)    all Liabilities of any Subsidiaries of a Seller or of any of their predecessors;

(e)    any Liabilities in respect of any Contracts or Leases that are not Transferred Contracts or Assumed Leases, including any Liabilities arising out of the rejection of any such Contracts or Leases pursuant to section 365 of the Bankruptcy Code;

(f)    all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers or of any of their predecessors in connection with this Agreement or the administration of the Bankruptcy Case (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date (which such amounts shall be paid by Sellers from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, (ii) the negotiation, execution and consummation of any cash collateral or debtor in possession financing arrangement, and (iii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers or of any of their predecessors payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

(g)    subject to Section 6.3 hereof, and except for the Assumed Liabilities, all employment-related Liabilities of Sellers or of any of their predecessors, including, without limitation, all accrued and unpaid payroll (including service credit and accrued paid time off, whether earned pre- or post- Closing Date), payroll Taxes, severance, accrued vacation, workers' compensation and other employee-related claims, and any claim under the WARN Act, with respect to COBRA Liabilities, or with respect to any applicable state or local corollary thereto, and any other Liabilities for any action resulting from Sellers' employees' separation of employment;

(h)    all Liabilities of Sellers with respect to any terminated employees (or other individual who is a COBRA qualified beneficiary on account of the individual's relation to an employee) with respect to COBRA, including any individual who becomes an "M&A qualified beneficiary' (within the meaning of Sections 601, *et. seq.,* of ERISA and Section 4980B of the IRC) ("COBRA Liabilities");

(i)    all Liabilities of Sellers or of any of their predecessors with respect to the termination of employment of the Sellers' "insiders" (as such term is defined under the Bankruptcy Code);

10

(j)      all Liabilities arising under or relating to "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (including all assets, trusts, insurance policies and administration service contracts related thereto);

(k)      all Liabilities of Sellers or of any of their predecessors to their respective equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any Liability of Sellers or of any of their predecessors pursuant to any Affiliate Agreement that is not a Transferred Contract;

(l)      all Liabilities arising out of or relating to any business or property formerly owned or operated by any of the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of the Sellers;

(m)      all Liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, Sellers, any of their Affiliates or predecessors, or any assets or properties of Sellers or of any of their predecessors, in each case arising out of the ownership or operation of the Stores, E-Commerce Platform or any Acquired Asset prior to the Closing;

(n)      all Liabilities arising under Environmental Laws, other than to the extent arising out of the ownership or operation of the E-Commerce Platform or any Acquired Asset from and after the Closing;

(o)      all accounts payable of the Sellers or of any of their predecessors; all Liabilities of Sellers or of any of their predecessors in respect of their employees;

(p)      all Liabilities of Sellers or of any of their predecessors arising out of any Contract, Permit, or claim that is not transferred to Buyer hereunder;

(q)      all Liabilities for all Professional Fees Amounts;

(r)      Sellers' payroll Liabilities for the payroll period that includes the Closing Date; and

(s)      all claims and Liabilities arising under any Agreement for benefits payable pursuant to any healthcare plans of the Sellers.

"Express Representations" has the meaning set forth in Section 4.7(b).

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect and is no longer subject to appeal.

"Final Purchase Price Allocation" has the meaning set forth in Section 2.7.

11

"Furnishings and Equipment" means all tangible assets (other than Merchandise) owned by Sellers or leased or licensed by Sellers pursuant to any Transferred Contract and in each case located at any Store, the corporate offices,  distribution centers and the E-Commerce Platform, including fixtures, trade fixtures, store models, shelving, machinery, equipment, computers, telephones, vehicles, appliances, tools, supplies, furniture, furnishings, janitorial and cleaning equipment, partitions, desks, chairs, tables, telephone lines, cubicles, point-of-sale systems, graphics, branding, signs and signage (including any signs and signage on any buildings, pylons or monuments and any directional or other ground or off-premises signs and signage).

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental, taxing or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Hazardous Substances" means any toxic or hazardous material, substance or waste as to which liability or standards or conduct may be imposed, or that is the subject of regulatory action or could otherwise give rise to liabilities or obligations under, any Environmental Laws, including petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, per- and polyfluoroalkyl substances, radioactive material, toxic molds, and radon.

"Intellectual Property" means any and all worldwide rights in and to all intellectual property rights or assets (whether arising under statutory or common law, contract or otherwise), which include all of the following items: (i) inventions, discoveries, processes, designs, techniques, developments and related improvements whether or not patentable; (ii) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing (collectively, "Patents"); (iii) trademarks (whether registered, unregistered or pending), trade dress, service marks, service names, trade names, brand names, product names, logos, domain names, internet rights (including IP addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law) any applications or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing (collectively, "Trademarks"); (iv) work specifications, databases, drawings, sketches, and artwork; (v) technical, scientific and other know-how and information (including promotional material and tech packs and blocks), trade secrets, confidential information, methods, processes, practices, formulas, designs, patterns, assembly procedures, specifications; (vi) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works (collectively, "Copyrights"); (vii) work for hire; (viii) customer lists and databases, websites, social media sites and accounts (including the content contained therein, user names and passwords), diagrams, drawings, domain names, and all advertising and marketing

12

materials and collateral (including all physical, digital, or electronic imagery and design files), samples, product catalogs, product designs and specifications (including tech specifications) vendor and merchandise supplier data and information, (ix) computer software and firmware, including data files, source code, object code and software-related specifications and documentation, (x) all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records; (xi) financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files in whatever media retained or stored, including computer programs and disks, (xii) the right to sue for infringement and other remedies against infringement of any of the foregoing, and (xiii) rights to protection of interests in the foregoing under the laws of all jurisdictions.

"Intellectual Property Licenses" means (i) any grant to a third Person of any right to use any Intellectual Property owned by or licensed to the Sellers, other than Contracts (e.g., information technology, e-commerce, marketing) entered into in the Ordinary Course of Business pursuant to which Transferred Intellectual Property is licensed to any counterparty to such Contracts in the performance of such counterparty's services to Sellers and/or their Subsidiaries thereunder, and (ii) any grant to the Sellers of a right to use a third Person's Intellectual Property rights, and in each case, including any amendments thereto.

"Interest" means any interest within the meaning of section 363(f) of the Bankruptcy Code, including any interest of a Governmental Authority, and all other interests, pledges, security interests, rights of setoff, restrictions or limitations on use, successor liabilities, conditions, rights of first refusal, options to purchase, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of the Sellers (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal Law, whether known or unknown, legal or equitable, and all liens, rights of offset, replacement liens, adequate protection liens, charges, obligations, or claims granted, allowed or directed in any Decree.

"Interim DIP Financing Order" means, that certain "*Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506 and 507 and Fed. R. Bankr. P. 2002, 4001, 6003 and 9014 (i) Authorizing Debtors to Obtain Post-Petition Financing, (ii) Granting Liens and Superpriority Claims, (iii) Authorizing Use of Cash Collateral, (iv) Modifying the Automatic Stay, (v) Scheduling a Final Hearing, and (iv) Granting Related Relief*" entered in the Bankruptcy Case.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of Jordan Meyers, as Chief Restructuring Officer of the Sellers.

"<u>Law</u>" means any applicable federal, state, municipal or local or foreign law, Decree (judicial or administrative), statute, code, constitutions, regulation, ordinance, decree, common law principle, rule, treaty, collective agreements, judgment or other requirement issued, enacted, adopted, promulgated, implemented or otherwise with similar effect of any Governmental Authority.

"<u>Leases</u>" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Store.

"<u>Liability</u>" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"<u>Licensed Goods</u>" has the meaning set forth in the Consulting Agreement appended to the Store Closing Order.

"<u>Lien</u>" means any lien (statutory or otherwise), Claim, Encumbrance, Interest, Liability, deed of trust, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property, hypothecation, license, preference, priority, covenant, right of recovery, order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or Sellers, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown; <u>provided</u>, <u>however</u>, that "Lien" shall not be deemed to include any license of Intellectual Property.

"<u>Liquidation Trust Funding Amount</u>" means $200,000 to be funded into a liquidation trust or similarly structured vehicle for the post-confirmation collection, administration, and distribution of the remaining assets of the Sellers' estates in the Bankruptcy Case.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity, before any Governmental Authority.

"<u>Licensed Intellectual Property</u>" means any Intellectual Property that is licensed to any Seller pursuant to an Intellectual Property License.

"<u>Material Adverse Effect</u>" means any event, change, occurrence or effect that, individually or in the aggregate, (i) has had, or would reasonably be expected to have, a material adverse effect

14

on the scope or condition (financial or otherwise) of the Acquired Assets, Assumed Liabilities or the Business, taken as a whole, or (ii) prevents, materially impedes or materially delays or would reasonably be expected to prevent, materially impede or materially delay, the consummation by the Sellers or the Buyer of the transactions contemplated by this Agreement; provided, however, that with respect to clause (i); no effect, change, event or occurrence arising out of or resulting from the following, shall constitute or be taken into account, individually or in the aggregate, in determining whether there has been or will be a Material Adverse Effect: (a) general business or economic conditions in any of the geographical areas in which the any Stores operate or affecting retail musical instrument and accessories stores generally; (b) national or international political or social conditions, including the engagement by any country in hostilities, or the occurrence of any military or terrorist attack; (c) any event, change, occurrence or effect affecting United States financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (d) the occurrence of any act of God or other calamity or force majeure events; (e) changes in Law or GAAP; (f) the taking of any action expressly required by this Agreement or at the prior written request of Buyer or its Affiliates; (g) the negotiation, announcement or pendency of this Agreement or the consummation of the sale and assumption contemplated hereby or the identity, nature or ownership of Buyer; (h) any seasonal fluctuations in the Business; (i) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Buyer or its Affiliates or Representatives) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (j) any breach by Buyer of this Agreement; (k) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (l) SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemics or disease outbreaks ("COVID-19") or any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other Law, order, directive, guidelines or recommendations by any Governmental Authority in connection with or in response to COVID-19, or (m) any effect resulting from the filing or pendency of the Bankruptcy Case, any order of the Bankruptcy Court or any actions or omissions of Sellers taken or not taken in order avoid a violation of such order; except, in the case of each of clauses (a), (b), (c), (d), or (e), to the extent that the Acquired Assets, the Assumed Liabilities or the Business, taken as a whole, are disproportionately affected thereby as compared with other participants in the industries in which Sellers operate.

"Merchandise" shall mean all inventory owned by any Seller, wherever located. For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, "Merchandise" shall not include: (i) goods which belong to sublessees, licensees, department lessees, or concessionaires of any Seller; (ii) goods held by any Seller on memo, on consignment, or as bailee; (iii) Furnishings and Equipment or improvements to real property, (iv) Licensed Goods; (v) Allegedly Infringing Merchandise; and (vi) Violative Merchandise.

"Merchandise List" means, to the Knowledge of Sellers, a true and correct list of all Allegedly Infringing Merchandise and Violative Merchandise (including whether any such Merchandise is physically located at any Store as of the Closing sufficient to reasonably identify and locate such Merchandise.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business as conducted by the Sellers through the date hereof consistent with past practice and taking into account the commencement and pendency of the Bankruptcy Case.

"Outside Date" has the meaning set forth in Section 8.1(k).

"Owned Intellectual Property" means all Intellectual Property owned by the Sellers.

"Parties" has the meaning set forth in the preamble.

"Payroll" means the ordinary and usual course of payroll of the Business and pursuant to the Approved Budget.

"Payroll Taxes" payroll, employee withholding and other similar taxes associated with the Business.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes (i) not yet delinquent, or (ii) which are being contested in good faith by appropriate proceedings and for which proper reserves have been established on the Financial Statements in accordance with GAAP applied on a consistent basis; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business; (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto which are customary; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) Liens to be released pursuant to the Sale Order; (f) non-exclusive licenses of Intellectual Property in the Ordinary Course of Business that are listed in the Disclosure Schedule; (g) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects; and (h) liens arising under the DIP Financing Agreements (as defined in the Interim DIP Financing Order) or the Prepetition Financing Documents (as defined in the Interim DIP Financing Order).

"Permitted Post-Closing Lien" shall mean (i) with respect to real property leased or owned by Sellers, zoning restrictions, building codes and other land use Laws regulating the use or occupancy of real property, (ii) non-monetary encumbrances to the extent that the Sale Order does not in fact release any such Lien upon Closing, and (iii) any encumbrances on the interest of any landlord or sublandlord or underlying fee interest of any Assumed Lease.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Personal Information" has the meaning set forth in Section 3.10.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date.

16

"Pre-Closing Tax Period" means any taxable period ending on or prior to the Closing Date.

"Professional Fees Amount" means an amount equal to all fees and expenses incurred and estimated to be incurred on or prior to the Closing Date (regardless of whether such fees and expenses have been approved by the Bankruptcy Court as of the Closing Date) by any professional retained pursuant to sections 327 and 1103 of the Bankruptcy Code in the Bankruptcy Case.

"Proposed Cure Costs" has the meaning set forth in Section 2.6(a).

"PTO Obligations" means, in accordance with applicable law, earned, accrued but unused vacation pay, sick leave or other paid time off, severance, and other employee-related claims to any employees of the Sellers, which amount shall not exceed $1,500,000 and excluding in all cases all such amounts due to insiders or senior management of any of the Sellers as identified in the Disclosure Schedule.

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.7.

"Related Agreements" means the Bill of Sale and Assignment and Assumption Agreement, the Trademark Assignment Agreement, the Domain Name Assignment Agreement, the Hybrid Agency Agreement, and any certificates delivered pursuant to this Agreement.

"Remaining Cash" means all Cash Equivalents of Sellers after payment in full of all Wind Down Expenses;

"Representative" means, when used with respect to a Person, the Person's controlled and controlling Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Requesting Party" has the meaning set forth in Section 6.2.

"Release" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, disposal, dumping, dispersing, leaching or migrating in, into, onto or through the indoor or outdoor environment.

"Responsible Person Taxes" means all Retained Taxes with respect to which "responsible person" claims are brought by an applicable Governmental Authority against any employee, manager, officer, or director of Sellers.

"Retained Taxes" means any Liability for Taxes (i) arising from or related to the Sellers' ownership or operation of the Business or the Acquired Assets prior to the Closing, except to the extent of any Assumed Taxes, (ii) of any and all Sellers (or for which any Seller or any of their Affiliates are otherwise liable, including as a transferee, successor, by contract or otherwise, or arising as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having included or required to be included in any Tax Return related

17

thereto), except to the extent of any Assumed Taxes, or (iii) in respect of any Excluded Assets. For the avoidance of doubt, Transfer Taxes shall be governed by Section 6.5(a).

"Sale Hearing" means the hearing for (i) approval of, among other things, this Agreement and the transactions contemplated herein and (ii) entry of the Sale Order.

"Sale Order" means the sale order or orders, in form and substance reasonably satisfactory to Buyer inter alia, (i) approving this Agreement and the terms and conditions hereof and (ii) approving and authorizing Sellers to consummate the transactions contemplated hereby.

"Sales Tax" means any and all taxes, fees, levies, duties, tariffs, imposts and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any tax authority on the Business for the sale of the Sellers' Merchandise.

"Samson" shall mean Samson Technologies Corp., a New York corporation.

"Seller Fundamental Representations" has the meaning set forth in Section 7.1(a).

"Seller Related Parties" has the meaning set forth in Section 5.8(b).

"Sellers" has the meaning set forth in the preamble.

"Store Closing Order" means, that certain *Interim Order (I) Authorizing the Debtors to Assume and Perform under the Consulting Agreement Related to the Sale of Inventory, (II) Approving Procedures for the Sale of Inventory, (III) Approving Modifications to Certain Customer Programs, and (IV) Granting Related Relief* in the Bankruptcy Case.

"Store Closing Sales" means those "store closing" or other similarly themed sales conducted by Consultant pursuant to the Consulting Agreement and Store Closing Order and the Hybrid Agency Agreement and the Sale Order at the Closing Locations.

"Stores" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, escheat or unclaimed property, value

added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (including withholding on amounts paid to or by any Person), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto and any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Trademark Assignment Agreement</u>" has the meaning set forth in <u>Section 2.5(b)</u>.

"<u>Transfer Tax</u>" has the meaning set forth in <u>Section 6.5(a)</u>.

"<u>Transferred Contracts</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Transferred Intellectual Property</u>" means all Intellectual Property transferred to Buyer or a Buyer Designee on the Closing (or such other later date as may be provided in this Agreement).

"<u>Utilities Order</u>" means, that certain "*Interim Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*" entered in the Bankruptcy Case.

"<u>Violative Merchandise</u>" means any item of Merchandise the sale of which by Sellers would be in violation of an applicable Law.

"<u>WARN Act</u>" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local Law.

"<u>Wind Down Expenses</u>" means (i) "Post-Closing Operating Disbursements" and "Store Closure Fees" (each as defined in and set forth in the Approved Budget), (ii) the PTO Obligations, and (iii) the Liquidation Trust Funding Amount.

Section 1.2    <u>Interpretations</u>.  Unless otherwise indicated herein to the contrary:

When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.  The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."  The use of "or" herein is not intended to be exclusive.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names

19

and pronouns shall include the plural and vice versa. All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein. References herein to a Person are also to its successors and permitted assigns. Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto. Any reference herein to "Dollars" or "$" shall mean United States dollars. Except where the context caps the amount or includes a "not to exceed" amount (or similar such limitation), Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material. References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers or provided to Buyer or its Representatives in response to requests for materials or information. If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. The words "to the extent" shall mean "the degree by which" and not "if."

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing and continuing through the Designation Rights Period, (a) Sellers hereby designate Buyer to serve as their exclusive agent for purposes of selling the inventory of Sellers, including the Merchandise, and the Furnishings and Equipment of Sellers, subject to and in accordance with the Hybrid Agency Agreement (b) Buyer shall have the right and the option to designate itself and/or one or more Buyer Designees to purchase and accept all or a portion of the Acquired Assets, and (c) Sellers will sell, transfer, assign and convey directly to Buyer and/or such Buyer Designee, as applicable, all of Sellers' right, title and interest in, to and under the Acquired Assets so designated by the Buyer and/or Buyer Designee. From and after the Closing, the Sellers shall hold the Acquired Assets strictly in trust for the benefit of Buyer, if applicable.

Section 2.2    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Buyer will assume and become responsible for the Assumed Liabilities.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying all Cure Costs.  For the avoidance of doubt, Sellers shall not be liable for, and shall have no obligation to pay or cause to be paid, the Assumed Liabilities, including paying any Cure Costs.

Section 2.3     Consideration.

(a)     The purchase price payable by Buyer to Sellers hereunder (collectively, the "Purchase Price") shall be (i) Buyer's assumption of the Assumed Liabilities, (ii) payment of the Cure Costs, if any, as set forth herein, and (iii) the payment of the Wind Down Expenses; provided, however, that the Buyer's obligation to pay the Purchase Price and close the transaction contemplated hereunder shall be expressly conditioned on the following: (1) no Event of Default has occurred under and as defined in the DIP Credit Agreement (as defined in the Interim DIP Financing Order) as a result of the Sellers' failure (A) to comply with the Milestones (as defined in the DIP Credit Agreement) within the Sellers' control and/or (B) to perform in accordance with the Approved Budget; and (2) Sellers have cooperated fully and not interfered with Buyer in connection with the Store Closing Sales and/or the DIP Facility (as defined in the Interim DIP Financing Order).

(b)     Sellers shall pay to Buyer the balance of such Remaining Cash on the earlier of (i) ninety (90) days after the Closing Date and (ii) the Business day immediately prior to any hearing to consider conversion of any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

Section 2.4     Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Cole Schotz P.C., located at 25 Main Street, Hackensack, New Jersey 07601 or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 8:00 a.m. local time on a date (the "Closing Date") that is the first (1st) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.  The Closing shall be effective as of 12:01 a.m. New York Time on the Closing Date for all purposes of this Agreement (including for Tax and accounting purposes).

Section 2.5     Deliveries.

(a)     Prior to expiration of the Designation Rights Period, Buyer may designate one or more Buyer Designees to purchase or take transfer, assignment or conveyance of one or more Acquired Assets and/or assume one or more Assumed Liabilities, and Seller hereby agrees to sell, transfer, assign, or convey all such Acquired Assets and Assumed Liabilities to all such Buyer Designees as Buyer may designate.

(b)     Prior to expiration of the Designation Rights Period, Sellers will deliver to Buyer or each Buyer Designee: (i) one or more duly executed Bill of Sale and Assignment and Assumption Agreement substantially in the form of Exhibit A (ii) a duly executed Trademark Assignment Agreement, substantially in the form of Exhibit B (the "Trademark Assignment Agreement"); (iii) a duly executed Domain Name Assignment Agreement, substantially in the form of Exhibit C (the "Domain Name Assignment Agreement"); (iv) the Merchandise List; and

21

(v) such other agreements, certificates, instruments and documents as Buyer or any Buyer Designee may reasonably request.

(c)     Prior to expiration of the Designation Rights Period, Buyer or each Buyer Designee will deliver to Sellers: (i) the Bill of Sale and Assignment and Assumption Agreement duly executed by Buyer or Buyer Designee, as applicable; (ii) the Trademark Assignment Agreement duly executed by Buyer or Buyer Designee, as applicable; (iii) the Domain Name Assignment Agreement duly executed by Buyer or Buyer Designee, as applicable; and (iv) such other agreements, certificates, instruments and documents as Sellers shall reasonably request.

Section 2.6     Assumption/Rejection of Certain Contracts and Leases; Non-Assignment.

(a)     Schedule 2.6(a)(1) sets forth, to the Knowledge of Sellers, a true and complete list, as of the date hereof, of all executory Contracts and unexpired Leases to which any Seller is a party, including the Sellers' proposed Cure Costs associated with each such Contract and unexpired Lease set forth therein (the "Proposed Cure Costs").

(b)     From and after the date hereof until the expiration of the Designation Rights Period, Buyer may, in its sole discretion, (i) designate a Contract listed on Schedule 2.6(a)(1) for assumption and assignment to Buyer or its Buyer Designee, effective on and as of the Closing (such Contracts, together with any other Contracts assumed by Seller and assigned to Buyer or its Buyer Designee pursuant to this Agreement, the "Transferred Contracts"), (ii) designate a Lease listed on Schedule 2.6(a)(1) for assumption and assignment to Buyer or its Buyer Designee, effective on and as of the Closing (such Leases, together with any other Leases assumed by Seller and assigned to Buyer or its designee pursuant to this Agreement, the "Assumed Leases"), (iii) designate any Contract or Lease listed on Schedule 2.6(a)(1) for rejection effective on and as of the Closing, or (iv) defer designation of any Contract or Lease listed on Schedule 2.6(a)(1) for assumption and assignment or rejection effective subsequent to the Closing as set forth in this Section 2.6(b).  In the event following the execution and delivery of this Agreement but prior to the Closing Sellers identify one or more Contracts and/or Leases that should have been included in Schedule 2.6(a)(1) but were not included therein, Sellers may supplement Schedule 2.6(a)(1) by adding any such previously omitted Contract(s) or Leases(s) to Schedule 2.6(a)(1); provided, that Buyer shall have not fewer than thirty (30) days from the date that Sellers deliver an amended Schedule 2.6(a)(1) to decide whether any such added Contract or Lease shall be an Assumed Lease, Transferred Contract or Rejected. The Transferred Contracts and Assumed Leases as of the date hereof that are to be assumed and assigned effective on and as of the Closing are set forth on Schedule 2.6(b) hereto, which Schedule shall be (and shall be deemed) modified or supplemented to reflect additions or removals, as applicable, of Leases and Contracts that are (i) designated for assumption and assignment as set forth in this Section 2.6(b) and (ii) designated for rejection.  Any Contract or Lease so designated pursuant to subclause (iv) of the first sentence of this Section 2.6(b) shall be maintained by the Sellers for the later of (x) thirty (30) days after the Closing Date and (y) thirty (30) days after the date of delivery of an amended Schedule 2.6(a)(1) (which designation period may be extended with the consent of the Sellers, such consent not to be withheld or conditioned by the Sellers if such extension is for a period not to extend beyond sixty (60) days after the Closing Date, does not increase administrative expenses for the Bankruptcy Case, and does not extend the designation rights period after the date the Bankruptcy Court enters an order confirming a chapter 11 plan or conversion of the cases to Chapter 7 of the Bankruptcy Code),

22

with the Buyer to receive the benefits of such designated Contracts and/or Leases and to be responsible for the obligations under such Contracts and/or Leases from the Closing Date until the Buyer designates such Contracts and/or Leases as Transferred Contracts or Assumed Leases or "Rejected," at which time the Sellers shall use best efforts to effectuate such determination.  Buyer shall directly pay, prior to the dates when due, all fees, costs and expenses associated with any Contract or Lease so designated pursuant to subclause (iv) of the first sentence of this Section 2.6(b).  In furtherance of the foregoing, the Sellers agree not to file a motion seeking to covert the Bankruptcy Case to chapter 7, if at all, until a date that is at least thirty (30) days after the Closing Date.

(c)    Sellers shall take all actions reasonably required to assume and assign the Transferred Contracts and Assumed Leases to Buyer or its Buyer Designee, including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Contracts or Leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts or Leases to Buyer or its designee satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(d)    Buyer shall take all actions reasonably required for Sellers to assume and assign the Transferred Contracts and Assumed Leases to Buyer, including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Contracts or Leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts or Leases to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.  Buyer acknowledges and agrees that it shall be solely responsible for ensuring that all of the credit support provisions of the applicable Transferred Contract or Assumed Lease to which they relate are solely satisfied by Buyer.

(e)    Buyer shall as promptly as reasonably practicable, but in any event upon assumption of any Transferred Contract or Assumed Lease hereunder, pay all Cure Costs (if any) in connection with any such assumption.

(f)    Notwithstanding the foregoing and anything herein to the contrary, and subject to Section 5.4, a Contract or Lease shall not be assigned to, or assumed by, Buyer or its designee hereunder to the extent that such Contract or Lease (i) is terminated by a Seller (subject to Section 5.2(b)(vi)) or the counterparty thereto, or terminates or expires by and in accordance with its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, or (ii) requires a consent or authorization from a Governmental Authority (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer or its designee of the applicable Seller's rights under such Contract or Lease, and such consent or authorization has not been obtained prior to the Closing.  In the event that any Transferred Contract or Assumed Lease is deemed not to be assigned pursuant to clause (ii) of this Section 2.6(f), the Closing shall nonetheless occur subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such consent or authorization is obtained and six (6) months following the Closing (or the remaining term of such Contract or Lease or the closing of the Bankruptcy Case, if shorter), Sellers and Buyer shall (A) use reasonable best efforts to secure such consent or authorization as promptly as practicable after the Closing, and (B) cooperate in good faith to allow Buyer or its Buyer Designee to perform the obligations thereunder on Sellers' behalf, in all cases, without infringing upon the legal rights of any third party, including by good faith

23

cooperation with any lawful and commercially reasonable arrangement reasonably proposed by Buyer, including subcontracting, licensing or sublicensing to Buyer any or all of any Sellers' rights and obligations with respect to any such Contract or Lease, under which (1) Buyer shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates) under such Contract or Lease with respect to which the consent and/or authorization has not been obtained, and (2) Buyer shall assume any related burden (net of the amount of any related Tax benefit obtained by Sellers or their respective Affiliates) and obligation (including performance) with respect to such Contract or Lease. Upon satisfying all such requisite consent or authorization requirements applicable to such Contract or Lease after the Closing, such Contract or Lease shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement.

Section 2.7    Allocation. Buyer and Sellers agree to allocate the Purchase Price and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations (the "Allocation Principles"). No later than forty-five (45) days after the Closing Date, Buyer shall in good faith prepare and deliver to Sellers an allocation of the Purchase Price (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Sellers' review and approval (such approval not to be unreasonably withheld, conditioned or delayed). Any reasonable comments provided by Sellers to the Buyer under this Section 2.7 shall be considered by the Buyer in good faith. The Purchase Price Allocation shall be conclusive and binding on the parties unless Sellers notify Buyer in writing that Sellers object to one or more items reflected in the Purchase Price Allocation, and specify the reasonable basis for such objection, within thirty (30) days after delivery to Sellers of the Purchase Price Allocation. In the case of such an objection, Sellers and Buyer shall negotiate in good faith to resolve any disputed items. Any resolution by Sellers and Buyer shall be conclusive and binding on the parties once set forth in writing (any such conclusive and binding Purchase Price Allocation, the "Final Purchase Price Allocation"). If Sellers and Buyer are unable to resolve all disputed items within twenty (20) days after the delivery of Sellers' written objection to Buyer, each of Buyer and Sellers may separately determine the allocation of the Purchase Price, and there shall be no Final Purchase Price Allocation. Buyer and Sellers agree (and agree to cause their respective Subsidiaries and Affiliate) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the Allocation Principles, and if any, the Final Purchase Price Allocation. None of the Parties will take any position inconsistent with the Final Purchase Price Allocation, if any, on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final "determination" within the meaning of section 1313 of the IRC (or comparable provision of state, local or foreign Tax Law). Notwithstanding the foregoing, the Parties recognize that certain allocations may be necessary prior to the above time schedule, such as in the case of any Transfer Tax filings, and agree to reasonably cooperate in determining the appropriate allocation in a timely manner. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.7 shall survive the Closing without limitation.

Section 2.8    Removal of Excluded Assets. As promptly as practicable following the Closing Date (and in any event within thirty (30) Business Days), Sellers shall remove at their expense all of the tangible Excluded Assets that are located at any location that is subject to a Transferred Contract of Assumed Lease and, if requested by Sellers, Buyer shall reasonably

cooperate with Sellers so that Sellers can arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' expense.

Section 2.9    <u>Withholding</u>.  Buyer and any other applicable withholding agent shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement any amount that Buyer or such other withholding applicable agent, as the case may be, is required to deduct and withhold under any provision of Law; <u>provided</u>, <u>however</u>, that the Buyer shall use reasonable efforts to provide the applicable payee with (a) written notice upon the Buyer becoming aware that any deduction or withholding is required and (b) the opportunity to reduce or eliminate any such withholding obligation.  All such withheld amounts shall be treated as delivered to the Sellers hereunder.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Except as set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>"), Sellers represent and warrant to Buyer, as of the date hereof and as of the Closing Date, as follows:

Section 3.1    <u>Organization of Sellers; Good Standing</u>.  Each Seller is duly organized, validly existing and in good standing under the Laws of the state of its formation and has all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as currently and historically conducted, except where the failure to be so qualified would not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.2    <u>Authorization of Transaction</u>.  Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power and authority) to execute, deliver and perform this Agreement, the Related Agreements, and all other agreements contemplated hereby to which it is or will be a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement, the Related Agreements, and all other agreements contemplated hereby to which each Seller is or will be a party have been duly authorized by such Sellers.  Upon due execution hereof by each Seller, this Agreement, the Related Agreements, and all other agreements contemplated hereby (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Sellers, enforceable against such Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3    <u>Title to Assets</u>.  The Sellers have good and valid title to, or, in the case of leased or subleased Acquired Assets, valid and subsisting leasehold interests in, all Acquired Assets, free and clear of all Liens (other than Permitted Liens).  Pursuant to the Sale Order, Sellers

will convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens and Permitted Post-Closing Liens).

Section 3.4    Transferred Contracts and Assumed Leases. The Sellers have made available to the Buyer true and complete copies of all Contracts and Leases material to the operation of the Business.

Section 3.5    Real Property. Sellers have provided a true and complete listing of all real property leased by Seller and exclusively used in connection with the Business and a list of all material leases for each leased real property involving annual payments of at least $10,000.

Section 3.6    Labor Relations.

(a)    Except as set forth in Section 3.6 of the Disclosure Schedule, no Seller is a party to or bound by any collective bargaining agreement.

(b)    Sellers are in compliance with all applicable laws pertaining to employment and employment practices to the extent they relate to employees of the Business, except for such non-compliance as would not result in a material and adverse effect on the Business

(c)    Sellers have provided to Buyer a true and complete list of all employees of Sellers with respect to the Business.

Section 3.7    Brokers' Fees. Other than the fees and expenses payable to Sellers' advisors in connection with the transactions contemplated hereby, which shall be borne by Sellers, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or be obligated to pay.

Section 3.8    Data Privacy. In connection with its collection, storage, transfer (including transfer across national borders) and/or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees and/or other third parties (collectively "Personal Information"), to the Knowledge of Sellers, each Seller is and, during the last year, has been in compliance in all material respects with applicable Laws in relevant jurisdictions. Each Seller has commercially reasonable physical, technical, organizational and administrative security measures in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure in accordance with applicable Law. To the Knowledge of Sellers, (a) each Seller is and, during the last year, has been in compliance in all material respects with all Laws relating to data loss, theft and breach of security notification obligations and (b) all Personal Information included in the Acquired Assets is freely transferrable in accordance with Sellers' existing privacy policies and applicable Law, and no impediments to the sale, transfer, conveyance and assignment to Buyer (or a Buyer Designee) at Closing exist.

Section 3.9    Taxes.

(a)    Sellers have timely filed all material Tax Returns required to be filed by Sellers with respect to the Acquired Assets or the Business with the appropriate Governmental

Authorities (taking into account any extension of time to file granted or to be obtained on behalf of Sellers);

(b)      All Taxes imposed on the Sellers or with respect to the Acquired Assets or the Business that are due and owing have been paid (other than any Taxes not due as of the date of the filing of the Bankruptcy Case as to which subsequent payment was not required by reason of the Bankruptcy Case or any such Taxes that are being contested in good faith and for which appropriate reserves have been made in accordance with GAAP);

(c)      There are no material pending (or threatened in writing) audits, examinations, investigations or other proceedings relating to a material amount of Taxes imposed on the Sellers or with respect to the Acquired Assets or the Business;

(d)      There are no Liens relating to Taxes (other than Permitted Liens) on any Acquired Assets;

(e)      Sellers have withheld all material Taxes with respect to the Acquired Assets or the Business required to be withheld and timely paid or remitted such Taxes to the appropriate Governmental Authority;

(f)      In the last three (3) years, no claim has been made in writing by an authority in a jurisdiction where a Seller does not currently file Tax Returns that such Seller may be subject to Tax by that jurisdiction with respect to the Acquired Assets or the Business; and

(g)      Sellers are not "foreign persons" within the meaning of section 1445(f)(3) of the IRC.

Section 3.10    Employee Benefits.    Section 3.10 of the Disclosure Schedule lists all material "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements) covering employees utilized in connection with the operation of the E-Commerce Platform.

Section 3.11    Intellectual Property.

(a)      Section 3.11 of the Disclosure Schedule lists (i) all Intellectual Property and (ii) all Intellectual Property Licenses that are material to the conduct of the Business.

(b)      Except as would not have a material and adverse effect on the Business, Sellers own or have the right to use all Intellectual Property and the Intellectual Property licensed to Sellers under the Intellectual Property Licenses.

Section 3.12    Compliance with Laws; Permits.

(a)      Sellers are in compliance, in all material respects, with all Laws applicable to the Business.  Except as related to or as a result of the filing or pendency of the Bankruptcy Case, to the Knowledge of Sellers, (i) none of the Sellers has received any written notice of, or

been charged with, the material violation of any Laws, and (ii) no event has occurred or circumstance exists that (with or without notice, passage of time, or both) would constitute or result in a failure by any Seller or its Subsidiaries to comply, in any material respect, with any applicable Law that would have a Material Adverse Effect.  Except as related to or as a result of the filing or pendency of the Bankruptcy Case, no investigation, review or Litigation by any Governmental Authority in relation to any actual or alleged material violation of Law by any Seller or its Subsidiaries is pending or, to the Knowledge of the Sellers, threatened, nor has any Seller or any of its Subsidiaries received any written notice from any Governmental Authority indicating an intention to conduct the same.

(b)     To the Knowledge of Sellers, all Permits required for any Seller and its Subsidiaries to conduct the Business as currently conducted by Sellers have been obtained by any Seller and its Subsidiaries and are valid and in full force and effect.  No event has occurred that, with or without notice, passage of time, or both, would reasonably be expected to result in the revocation, cancellation, modification, suspension, lapse, limitation, or non-renewal of any Permit that would have a Material Adverse Effect.

Section 3.13   Related Party Transactions.  Except as set forth on Section 3.13 of the Disclosure Schedule and other than the Company Benefit Plans, no officer, director or executive committee member of any Seller or any member of their immediate family or any Affiliate of the Sellers (a) is a party to any Contract or Lease required to be set forth on Schedule 2.6(a), or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, any Seller or, to the Knowledge of the Sellers, any actual competitor, vendor or licensor of any Seller (each such Contract, Lease or business arrangement, an "Affiliate Agreement"), (b) to the Knowledge of the Sellers, none of the foregoing Persons have any cause of action or other claim whatsoever against or related to the Business or the Acquired Assets, and (c) to the Knowledge of Sellers, no Seller has any direct or indirect business arrangement with or financial obligation to the foregoing Persons.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers, as of the date hereof and as of the Closing Date, as follows:

Section 4.1   Organization of Buyer; Good Standing.  Buyer is a Delaware limited liability company duly organized, validly existing, and in good standing under the Laws of the state of its formation.

Section 4.2   Authorization of Transaction.  Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement, the Related Agreements, and all other agreements contemplated hereby to which it is or will be a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement, the Related Agreements, and all other agreements contemplated hereby to which Buyer is or will be a party have been duly authorized by Buyer. Upon due execution hereof by Buyer, this Agreement, the Related Agreements, and all other agreements contemplated hereby (assuming due authorization and delivery by Sellers) shall

constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 4.3    Noncontravention.  Neither the execution, delivery, or performance of this Agreement, the Related Agreements, and all other agreements contemplated hereby, nor the consummation of the transactions contemplated hereby and thereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of Buyer, (b) violate any Law or Decree to which Buyer is subject, or (c) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which Buyer is a party, except, in the case of clauses (b) and (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay Buyer's ability to consummate the transactions contemplated hereby.

Section 4.4    Litigation; Decrees.  There is no Litigation pending or, to the Buyer's knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Neither Buyer nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances.  Upon the Closing, Buyer will have, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. As of the Closing, Buyer shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and Assumed Leases and the related Assumed Liabilities.

Section 4.7    Acknowledgements; "As Is' "Where Is" Transaction.

(a)    BUYER ACKNOWLEDGES THAT IT HAS RECEIVED FROM SELLERS CERTAIN PROJECTIONS, FORECASTS, AND PROSPECTIVE OR THIRD-PARTY INFORMATION RELATING TO SELLERS, THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES, AND OTHER RELATED TOPICS.  BUYER ACKNOWLEDGES THAT (I) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS AND IN SUCH INFORMATION; (II) BUYER IS FAMILIAR WITH SUCH UNCERTAINTIES AND IS TAKING RESPONSIBILITY FOR MAKING ITS OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF ALL PROJECTIONS, FORECASTS, AND INFORMATION SO FURNISHED; (III) NONE OF THE

SELLERS NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SUCH PROJECTIONS AND FORECASTS, AND (IV) NEITHER BUYER NOR ANY OTHER PERSON SHALL HAVE ANY CLAIM AGAINST ANY SELLER OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, STOCKHOLDERS, MEMBERS, MANAGERS, PARTNERS, AFFILIATES, AGENTS, OR OTHER REPRESENTATIVES WITH RESPECT THERETO.

(b)      BUYER FURTHER ACKNOWLEDGES AND AGREES ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES, AND EACH OF THEIR RESPECTIVE REPRESENTATIVES, EQUITY HOLDERS, EMPLOYEES, PERMITTED SUCCESSORS AND ASSIGNS (COLLECTIVELY, "BUYER PARTY MEMBERS"), THAT THE REPRESENTATIONS AND WARRANTIES MADE BY THE SELLERS TO BUYER IN ARTICLE III (AS QUALIFIED BY THE DISCLOSURE SCHEDULE (THE "EXPRESS REPRESENTATIONS") ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND MADE TO BUYER OR ANY BUYER PARTY MEMBER ON WHICH BUYER OR ANY BUYER PARTY MAY RELY IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THAT ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED, WHETHER IN WRITTEN, ELECTRONIC OR ORAL FORM, ARE EXPRESSLY DISCLAIMED, INCLUDING WITH RESPECT TO (I) THE COMPLETENESS OR ACCURACY OF, OR ANY OMISSION TO STATE OR TO DISCLOSE, ANY INFORMATION, INCLUDING IN ANY MEETINGS, CALLS OR CORRESPONDENCE WITH MANAGEMENT OF THE SELLERS OR ANY OTHER PERSON ON BEHALF OF THE SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES (II), ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS, AND (III) WITH RESPECT TO THE HISTORICAL, CURRENT OR FUTURE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES, CONTRACTS, AND PROSPECTS OF THE SELLERS, THEIR SUBSIDIARIES, OR THE BUSINESS, OR THE QUALITY, QUANTITY OR CONDITION OF THE ACQUIRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL OR REAL PROPERTY COMPRISING A PART OF THE ACQUIRED ASSETS OR WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSIGNED TO BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE ACQUIRED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF.

(c)      BUYER FURTHER ACKNOWLEDGES ON BEHALF OF THE BUYER PARTY MEMBERS AND NOTWITHSTANDING THE EXPRESS REPRESENTATIONS,

THE BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, UPON THE CLOSING DATE, BUYER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.  From and after the date hereof until the Closing or the earlier termination of this Agreement in accordance with its terms, upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.5.  Without limiting the generality of the foregoing, (a) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, and (b) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled.

Section 5.2    Conduct of the Business Pending the Closing.

(a)    From and after the date hereof until the Closing or the earlier termination of this Agreement in accordance with its terms, but subject to Section 5.2(c), Sellers shall, except with the consent of Buyer or as otherwise required or restricted by Law, pursuant to the Bankruptcy Code or an order of the Bankruptcy Court, (x) operate the Business in the Ordinary Course of Business and (y) without limiting the generality of the foregoing:

(i)    use commercially reasonable efforts to keep available the services of its employees utilized in connection with the operation of the E-Commerce Platform;

(ii)    except as related to or the result of the filing or pendency of the Bankruptcy Case, use commercially reasonable efforts to maintain reasonably satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, vendors and other Persons having business relationships with the Business (other than payment of pre-petition claims);

(iii)    operate the Business and Acquired Assets, in all material respects, in compliance with all Laws applicable to the Business and Sellers;

(iv)    without any obligation to purchase in any quantity of Merchandise for sale in any Store, use commercially reasonable efforts to receive Merchandise ordered in accordance with purchase orders for Merchandise intended to be sold through the E-Commerce Platform channel; and

(v)    use commercially reasonable efforts to identify and remove all Allegedly Infringing Merchandise and Violative Merchandise from any Store.

(b)    Except (i) in the Ordinary Course of Business, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly required by this Agreement or (iv) with the prior written consent of Buyer, Sellers shall not:

(i)    subject any of the Acquired Assets to any Lien, except for permitted post-petition liens and any Lien secured and granted pursuant to any debtor in possession financing order;

(ii)    terminate, permit to expire, amend or fail to renew, obtain or preserve any Permit material to the operation of the Business as a whole;

(iii)    make any loans or advances outside of the Ordinary Course of Business;

(iv)    enter into any Contract or Lease, excluding insurance renewals;

(v)    incur, create, assume, guarantee or become liable for any indebtedness for borrowed money;

(vi)    modify, amend, supplement, transfer, or terminate any Contract or Lease, other than Contracts (but not Leases) which are not material to the Business;

(vii)    fail to maintain in full force and effect any filings necessary to maintain the material Owned Intellectual Property;

(viii)    write up, write down or write off the book value of any assets other than in the Ordinary Course of Business;

(ix)    reject any Contracts or Leases other than as set forth on Section 5.2(b)(ix) of the Disclosure Schedule;

(x)    make any new commitment with respect to material capital expenditures;

(xi)    (a) increase the rate or terms of compensation payable or to become payable to any of the officers or employees of the Sellers utilized in connection with the operation of the E-Commerce Platform, except as required by applicable Law or (b) increase the rate or terms of any (including entering or adopting any new) bonus, pension or other employee benefit plan covering any of the officers or employees of Sellers utilized in connection with the operation of the E-Commerce Platform;

32

(xii)    waive any of the rights of the Sellers under any confidentiality or non-compete provisions of any Contract;

(xiii)    seek to accelerate the receipt of any royalty payments or licensing or other receivables generated by the Sellers, by way of discount or otherwise;

(xiv)    other than acquisitions and dispositions of Merchandise in the Ordinary Course of Business, acquire, dispose of or transfer any material asset, property or intellectual property right;

(xv)    pay, settle or compromise any material Litigation or threatened Litigation involving the Sellers, or commence any Litigation;

(xvi)    change accounting policies or procedures, except as required by a change in GAAP;

(xvii)    invalidate or cause the cancellation of any current insurance coverage (without replacement thereof) or fail to maintain current insurance coverage or suitable renewals thereof providing coverage substantially the same as any expiring policy;

(xviii)    fail to file any Tax Return when due with respect to the Acquired Assets or the Business;

(xix)    agree, whether in writing or otherwise, to do anything prohibited by this Section 5.2; or

(xx)    fail to comply with the terms of the Interim DIP Financing Order (or any subsequent interim and/or final order authorizing the Sellers' incurrence of post-petition financing).

(c)    Consulting Agreement; Store Closings.  Subject to entry by the Bankruptcy Court of the Sale Order, Buyer or its designee shall act as the exclusive agent of the Seller for the purpose of liquidating the Closing Location Assets at the Stores, Ecommerce Platform, distribution centers and corporate office (each a "Closing Location" and collectively, the "Closing Locations") through the conduct of the Store Closing Sales.  Buyer and Seller hereby agree to negotiate in good faith and, prior to the Closing, enter into a Hybrid Agency Agreement reasonably acceptable to Buyer and Seller setting forth the terms, conditions and procedures applicable to the conduct of the Store Closing Sales in the Closing Locations and the sale or other disposition of the Closing Location Assets from the Closing Locations (the "Hybrid Agency Agreement"), a form of which is attached hereto as Exhibit 5.2(c).  For purposes of securing the rights of Buyer with respect to the Disposition Rights at the Closing Locations, Seller, pursuant to the Hybrid Agency Agreement or otherwise, shall grant to Buyer pursuant to Bankruptcy Code § 364(d) a first priority security interest in and lien upon the Merchandise and Furnishings & Equipment owned by Seller located at the Closing Locations, and the proceeds thereof.  Pursuant to the Sale Order, the security interest granted to Buyer hereunder shall be deemed properly perfected without the need for further filings or documentation.

Section 5.3    Bankruptcy Court Matters; Bid Protections.

(a)      If this Agreement is terminated for any reason other than pursuant to Section 8.1(a) and following such termination any of the Sellers enter into a Competing Transaction, in consideration for Buyer having expended considerable time and expense in connection with this this Agreement, the negotiation thereof and the identification and quantification of assets of the Sellers, and Buyer agreeing to this Agreement be subject to Bidding Procedures, Sellers shall pay (i) to Buyer an amount equal to $150,000 (the "Break-Up Fee") and (ii) to Consultant any accrued and unreimbursed expenses due under the Consulting Agreement. The Break-Up Fee shall be deemed earned upon entry of the Bid Procedures Order. Sellers shall seek entry of the Sale Order, the Bidding Procedures Order, including approval of Sellers' payment of the Break-Up Fee as provide herein, and any other necessary orders by the Bankruptcy Court to consummate the Closing as soon as reasonably practicable following the execution of this Agreement. The Parties acknowledge and agree that (A) the transaction is subject to approval by the Bankruptcy Court, (B) the Parties have expressly negotiated the provisions of this Section 5.3 and the payment of the Break-Up Fee is an integral part of this Agreement, and (C) in the absence of the Sellers' obligations to pay the Break-Up Fee, the Buyer would not have entered into this Agreement. Buyer's rights to the Break-Up Fee pursuant to this Section 5.3 shall be the sole and exclusive remedy of Buyer against the Sellers and any of their respective Affiliates for any Liability, damage or other loss resulting from the termination of this Agreement, and none of the Buyer nor any of its Affiliates shall have any other remedy or cause of action  under or relating to this Agreement. Buyer further agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and Bidding Procedures Order, including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(b)      Sellers shall file such motions or pleadings as may be appropriate or necessary to: (A) assume and assign the Transferred Contracts and Assumed Leases and (B) subject to the consent of the Buyer, determine the amount of the Cure Costs; provided that nothing herein shall preclude Sellers from filing such motions to reject any Contracts or Leases that are not listed on Schedule 2.6(b) or that have been designated for rejection by Buyer.

(c)      Sellers shall promptly serve true and correct copies of all applicable pleadings and notices in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable order of the Bankruptcy Court.

Section 5.4      Notices and Consents.

(a)      Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party consents or sublicenses, in connection with the matters referred to in Section 5.4(a) of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby, including the assignment to, and assumption by, Buyer or its designee of the Transferred Contracts and the Assumed Leases; provided, however, that (i) neither Sellers nor any Subsidiary of Sellers shall be required to pay any consideration therefor or incur any expenses in

connection therewith, (ii) Sellers shall not be obligated to initiate any Litigation or legal proceedings to obtain such consent or approval, and (iii) Buyer shall pay any reasonable out-of-pocket costs as a result of amendments or modifications to any Transferred Contract or Assumed Lease, in either case as is necessary to obtain such consent or sublicense, and if Buyer refuses to pay such costs, such Contract or Lease shall be excluded from the transactions hereunder and there shall be no adjustment to the Purchase Price on account of such exclusion.

(b)     Without limiting the applicability of Section 5.4(a), each of the Parties will give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities necessary and appropriate to consummate the transactions contemplated hereby.

Section 5.5     Notice of Developments.  Sellers and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of any date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.5 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.6     Access.  Upon the reasonable written request of Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access in a manner so as not to interfere unreasonably with the normal business operations of Sellers to all premises, properties, information, books and records, Contracts and Leases of the Sellers to the extent reasonably necessary in connection with the consummation of the transactions contemplated hereby; provided, however, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto or that could reasonably be expected to result in violation of applicable Law.  Buyer shall upon reasonable notice to Sellers be permitted to contact employees, vendors, landlords, suppliers, licensors and licensees.  Sellers shall be entitled to be present at any such meetings or during any such communications.

Section 5.7     Bulk Transfer Laws.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws or similar Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith.

Section 5.8     Confidentiality.

(a)     [Reserved].

(b)     Following the Closing, each Seller shall, and shall cause his, her or its respective Representatives and Affiliates (each of the foregoing, collectively, "Seller Related Parties") to, (i) maintain the confidentiality of, (ii) not use, and (iii) not divulge to any Person, any

35

confidential, non-public or proprietary information included in the Acquired Assets ("Confidential Information"), except with the prior written consent of Buyer, or as may be required by applicable Law; provided that such Seller and its Seller Related Parties shall not be subject to such obligation of confidentiality for Confidential Information that is or becomes generally available to the public without breach of this Agreement by such Seller or its Seller Related Parties.  If Seller or any Seller Related Party shall be required by applicable Law to divulge any Confidential Information, such Seller or its Seller Related Party shall provide Buyer with prompt written notice of each such request so that Buyer may, at Buyer's sole expense, seek an appropriate protective order or other appropriate remedy, and such Seller or Seller Related Party shall reasonably cooperate with Buyer to obtain a protective order or other remedy; provided that, in the event that a protective order or other remedy is not obtained, such Seller or Seller Related Party shall furnish only that portion of such Confidential Information which, in the opinion of its counsel, such Seller or Seller Related Party is legally compelled to disclose and shall exercise its commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any such Confidential Information so disclosed.

**ARTICLE VI**
**OTHER COVENANTS**

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.

(a)    If, following the Closing, Buyer or any Seller becomes aware that Buyer or any of its Affiliates is in possession of any asset or right that is an Excluded Asset, such Party shall promptly inform the other Party of that fact.  Thereafter, at the request of any Seller, Buyer shall execute, or cause the relevant Affiliate(s) of Buyer to execute, such documents as may be reasonably necessary to cause the transfer of, and Buyer shall thereafter transfer, any such asset or right to Sellers or such other entities nominated by such Sellers for no consideration and such Sellers shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, Buyer receives any payments in respect of an Excluded Asset, Buyer shall promptly remit such payments to the applicable Sellers or other entity nominated by such Sellers.

(b)    If, following Closing, Buyer or any Seller becomes aware that a Seller or any of its Affiliates is in possession of any asset or right that is an Acquired Asset, such Party shall promptly inform the other Party of that fact.  Thereafter, at the request of Buyer, the applicable Sellers shall execute or cause the relevant Affiliate(s) of such Sellers to execute such documents as may be reasonably necessary to cause the transfer of and such Sellers shall thereafter transfer any such asset or right to Buyer or any other entities nominated by Buyer for no consideration and Buyer shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, a Sellers or its Affiliates receive any payments in respect of the Acquired Assets, such Sellers shall promptly remit such payments to Buyer or other entity nominated by Buyer.

(c)    From and after the Closing, Sellers hereby authorize and empower Buyer and its Affiliates to receive and open all mail and other communications (including electronic communications) received by Buyer or its Affiliates relating to the Business and to deal with the contents of such communications.  From and after the Closing, Sellers shall promptly deliver or

cause to be delivered to Buyer any mail or other communication (including electronic communications) received by Sellers or any of their respective Affiliates after the Closing Date pertaining to the Business, and if Sellers or any of their respective Affiliates receive from any Person after the Closing Date any telephone calls with respect to the Business at any telephone number not transferred to Buyer, Sellers shall inform such Person that the telephone number for the Business has changed and provide such Person with, and forward such call to, such telephone number for the Business as is supplied by Buyer.

(d)     If, following the Closing and prior to the expiration of the Designation Rights Period, Buyer becomes aware of any transition services that Buyer may require from any Seller in connection with the Acquired Assets, the Parties agree to negotiate in good faith the terms of, and enter into a transition services agreement, as may be reasonably required by Buyer.

Section 6.2     Access; Enforcement; Record Retention.  From and after the Closing, upon request by any Party (the "Requesting Party"), the other Parties will, and will cause its employees to, permit such Requesting Party and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of such Party, to all premises, properties, personnel, books and records, and Contracts or Leases of such Party for the purposes of (a) monitoring or enforcing rights or obligations under this Agreement or any of the Related Agreements, (b) complying with the requirements of any Governmental Authority, and (c) otherwise providing such reasonable assistance and cooperation as may be requested by Buyer from time to time prior to the Closing Date to reasonably facilitate the transition of the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require a Party to take any such action if (i) such action would reasonably be expected to result in a waiver or breach of any attorney/client privilege, (ii) such action would reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be materially disruptive to its normal business operations.  Without limiting the generality of the foregoing, from and after the Closing, Buyer will provide Sellers (at no added cost or expense to Buyer) with reasonable assistance, support and cooperation with Sellers' wind down and related activities (e.g., helping to locate documents or information related to prosecution or processing of insurance/benefit claims); provided that such assistance, support and cooperation does not interfere unreasonably with the normal business operations of Buyer.  Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for two (2) years following the Closing.

Section 6.3     Covered Employees.

(a)     Schedule 6.3(a) contains a listing of all current employees utilized by Sellers in the conduct of business under the E-Commerce Platform, including title and compensation.  At least two (2) days prior to the Closing, Buyer shall make written offers of employment to those Covered Employees selected by Buyer and provide to Sellers copies of all such employment offers.  On the Closing Date, the Sellers will terminate the Covered Employees. Buyer's offers of employment (i) will be effective as of the Closing Date, and (ii) will be on the same terms and conditions, including position, compensation and employee benefits, as in effect with respect to each of the Covered Employees as in effect immediately prior to the Closing. Each Covered Employee who accepts such offer of employment shall be deemed a "Transferred

Employee" from and after the date his or her offer becomes effective (i.e., on the Closing Date). Sellers will reasonably cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and the delivery of such offers.

(b)    Waiver of Pre-Existing Conditions; Crediting of Deductibles.  Buyer shall cause or shall cause its applicable Affiliates to (i) use commercially reasonable efforts to waive any limitations as to preexisting conditions and exclusions under the welfare benefit plans maintained by the Buyer or its applicable Affiliates in which any of the Transferred Employees (and their eligible dependents) will be participate after Closing, (ii) recognize the seniority of the Transferred Employees and the crediting of service with Seller and its Affiliates for purposes of satisfying waiting periods with respect to participation and coverage requirements applicable to such Transferred Employees under such plans for purposes of determining eligibility, with no gaps in coverage, for medical, dental, vision, life insurance, paid time-off, and sick time and (iii) for the plan year in which the Closing Date occurs (or, if later, in the calendar year in which such Transferred Employees and their dependents commence participation in the applicable welfare plans), use commercially reasonable efforts to allow for the crediting of each such Transferred Employee with any co-payments and deductibles paid prior to participation in such welfare plans in satisfying any applicable deductible or out-of-pocket requirements thereunder.

(c)    Service Credit.  Buyer shall provide that each Transferred Employee is given credit for all service with Sellers and their Subsidiaries, and their respective predecessors under any employee benefit plans or arrangements of Buyer and its Affiliates maintained by Buyer or its Affiliates in which such Transferred Employees participate following the Closing Date, for purposes of eligibility, vesting, and entitlement to benefits, excluding for severance benefits and vacation entitlement and for accrual of pension benefits.  Notwithstanding the foregoing, nothing in this Section 6.3(c) shall be construed to require crediting of service that would result in a duplication of benefits.

(d)    [Reserved].

(e)    No Third-Party Beneficiary Rights.  Without limiting the generality of this 6.3 or Section 6.4 below, no provision of this Agreement shall create any third party beneficiary rights in any current or former employee or service provider of any Sellers, any Covered Employee or Transferred Employee (including any beneficiary or dependent thereof) in respect of continued employment by the Sellers or its Affiliates or Buyer or its Affiliates or otherwise.  Nothing herein shall (i) guarantee employment for any period of time or preclude the ability of Buyer or any of its Affiliates to terminate any Transferred Employee for any reason, (ii) require Buyer or any of its Affiliates to continue any Company Benefit Plans, employee benefit plans or arrangements or prevent the amendment, modification or termination thereof after the Closing, or (iii) constitute an amendment to any Company Benefit Plan, employee benefit plans or arrangements.

Section 6.4    Cooperation; Pre-Closing Obligations.

(a)    After the Closing Date, Buyer shall, and shall cause its Affiliates to, cooperate with Sellers to provide such current information regarding the Transferred Employees on an ongoing basis as may be necessary to facilitate determinations of eligibility for, and payments of benefits to, the Transferred Employees under any applicable employee benefit that

continues to be maintained by Sellers or its Affiliates. Without limiting the terms of <u>Section 6.2</u>, Buyer shall, and shall cause its Affiliates to, permit Transferred Employees to provide such assistance to Sellers as may be required in respect of claims against Sellers or its Affiliates, whether asserted or threatened, to the extent that, in Sellers' opinion, (i) a Transferred Employee has knowledge of relevant facts or issues or (ii) a Transferred Employee's assistance is reasonably necessary in respect of any such claim.

(b)    Except for any Assumed Liabilities, Sellers will have the sole and absolute responsibility for any financial or other commitments to their employees for the period prior to Closing, including any and all claims or obligations for severance pay and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan (including, any withdrawal Liability) or any local, state or federal law, rule or regulation (including, the WARN Act). Nothing contained herein shall be deemed an admission that Sellers have any financial obligation to employees or that obligations, if any, are entitled to a particular treatment or priority under the Bankruptcy Code. Sellers' failure to pay an obligation, if any, under this <u>Section 6.4</u> shall not be a default or breach under this Agreement.

Section 6.5    <u>Certain Tax Matters</u>.

(a)    <u>Transfer Taxes</u>. Buyer shall be responsible for and shall pay all stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee or governmental charge (a "<u>Transfer Tax</u>") imposed under applicable Law in connection with the transactions contemplated hereby. The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. Accordingly, if Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse Seller for the amount of such Transfer Taxes required to be borne by Sellers (including the cost associated with preparing and filing any such Tax Returns). The Parties hereto shall cooperate to permit the filing Party to prepare and timely file any such Tax Returns.

(b)    <u>Tax Returns</u>. Except as provided with respect to Transfer Taxes in <u>Section 6.5(a)</u>, and as provided with respect to Tax refunds in <u>Section 6.5(c)</u>, from and after the Closing, the applicable Seller, at Sellers' sole cost and expense, shall file (or cause to be filed) all Tax Returns with respect to any Retained Tax, and Buyer, at its sole cost and expense, shall file (or caused to be filed) all Tax Returns with respect to any Assumed Tax. Notwithstanding the foregoing, in the event Seller receives a refund of any Tax associated with a Tax Return with respect to any Retained Tax, Buyer shall reimburse Seller for all costs and expenses actually incurred by Seller in connection with preparing, filing, and if necessary, litigating, such Tax Return.

(c)    <u>Tax Refunds</u>. All refunds for Taxes shall be for the sole benefit of Buyer (or any Affiliate thereof). To the extent any Seller receives a refund of any Tax, such Seller shall promptly pay such refund (without interest, other than interest received from the applicable Governmental Authority, and net of any Taxes or other reasonable third-party out-of-pocket expenses incurred by Buyer in connection with the receipt of such refund) to Buyer. All refunds for Taxes relating to the Assumed Taxes shall be for the sole benefit of Buyer and to the extent that any Seller or any of their Affiliates receives a refund for a Tax that is for the benefit of Buyer,

Sellers shall promptly pay such refund (without interest, other than interest received from the applicable Governmental Authority, and net of any Taxes or other reasonable third party out-of-pocket expenses incurred by Seller in connection with the receipt of such refund) to Buyer.

(d)    Cooperation.    Buyer and Sellers shall reasonably cooperate (i) in the preparation and timely filing of any Tax Return relating to the Business, the Acquired Assets, or the Assumed Liabilities; (ii) in any audit or other proceeding with respect to Taxes or Tax Returns relating to the Business, the Acquired Assets, or the Assumed Liabilities; (iii) make available any information, records, or other documents relating to any Taxes or Tax Returns relating to the Business, the Acquired Assets, or the Assumed Liabilities; and (iv) provide certificates or forms, and timely execute any Tax Return, that are necessary or appropriate to establish an exemption for (or reduction in) any Transfer Tax.

(e)    Tax Proceedings.    Sellers, at their sole cost and expense, shall control any audits or other proceedings relating to Retained Taxes.  Buyer, at its sole cost and expense, shall control any audits or other proceedings relating to Assumed Taxes.

Section 6.6    Press Releases and Public Announcements.    The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.  Prior to Sellers' filing with the Bankruptcy Court, no Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties.

Section 6.7    Personally Identifiable Information.

(a)    Buyer acknowledges that the Acquired Assets include "personally identifiable information" within the meaning of section 363(b) of the Bankruptcy Code, along with associated information about Sellers' customers.

(b)    Buyer shall: (i) employ appropriate security controls and procedures (technical, operational, and managerial) to protect the Customer Information; (ii) abide by all applicable laws and regulations with respect to the Customer Information; and (iii) take any such actions as may be agreed between Sellers and Buyer.

(c)    Buyer shall honor all prior requests by any individual who has opted out of receiving marketing messages from Sellers.

(d)    Buyer may use the Customer Information solely for the purpose of continuing Sellers' Business operations and continuing to provide similar goods and services to individuals, and otherwise in accordance with Sellers' then applicable privacy policy.

Section 6.8    No Successor Liability.    The Parties intend that upon the Closing the Buyer and their respective Affiliates shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Sellers, including, a "successor employer" for the purposes of the IRC, the Employee Retirement Income Security Act of 1974, or other applicable Laws; (b) have any responsibility or Liability for any obligations of Sellers, or any affiliate of Sellers based on any theory of successor or similar theories of Liability; (c) have, de facto or otherwise, merged with or into any of Sellers; (d) be an alter ego or a mere

40

continuation or substantial continuation of any of Sellers (and there is no continuity of enterprise between the Buyer and any Sellers), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Sellers' Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of Sellers or their respective estates.

Section 6.9      [Reserved].

Section 6.10    Confirmation Order.  Sellers shall not propose, file, support, pursue or seek entry of, or aid in another party proposing, filing, supporting, pursuing or seeking entry of, an order confirming a chapter 11 plan that adversely impacts Buyer's rights hereunder without Buyer's prior written consent.  For the avoidance of doubt, notwithstanding any other provision of this Agreement, this Section 6.10 shall survive the Closing.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    Conditions to Buyer's Obligations.  Buyer's obligation to consummate the purchase of the Acquired Assets and the assumption of the Assumed Liabilities is subject to satisfaction or waiver by Buyer of the following conditions:

(a)      (i) The representations and warranties of Sellers set forth in Section 3.1, Section 3.2, Section 3.3 and Section 3.7 (the "Seller Fundamental  Representations") shall be true and correct in all respects as of the date hereof and as of the Closing Date, as though made at and as of the Closing Date, except to the extent any such Seller Fundamental Representations expressly relate to an earlier time (in which case such Seller Fundamental Representations shall be true and correct in all respects at and as of such earlier time), and (ii) all representations and warranties of the Sellers in this Agreement (other than the Seller Fundamental Representations) shall be true and correct, without regard to any qualifications as to "material", "materiality", or "Material Adverse Effect" (or any correlative terms), as of the date hereof and as of the Closing Date, as though made at and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier time (in which case such representations and warranties shall be true and correct at and as of such earlier time), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)      Sellers shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Sellers at or prior to the Closing;

(c)      Buyer shall have received a certificate, dated as of the Closing Date and executed by an executive officer authorized to sign on behalf of the Sellers, stating that the conditions specified in Section 7.1(a), and Section 7.1(b) have been satisfied;

(d)      The Bankruptcy Court shall have entered the Sale Order and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(e)       No material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(f)       Each delivery contemplated by Section 2.5(b) to be delivered to Buyer shall have been delivered.

Section 7.2    Conditions to Sellers' Obligations.  Sellers' obligations to consummate the sale of the Acquired Assets and the transfer of the Assumed Liabilities are subject to satisfaction or waiver by the Sellers of the following conditions:

(a)       The representations and warranties of Buyer made in this Agreement shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made at and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier time (in which case such representations and warranties shall be true and correct at and as of such earlier time), in each case except for such failure to be so true and correct that, individually or in the aggregate, have not had, and would not reasonably be expected to have, a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement;

(b)       Buyer shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Buyer at or prior to the Closing;

(c)       Sellers shall have received a certificate, dated as of the Closing Date and executed by an executive officer authorized to sign on behalf of Buyer, stating that the conditions specified in Section 7.2(a) and Section 7.2(b) have been satisfied;

(d)       The Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(e)       The Bankruptcy Court shall have entered the Store Closing Order, and no Order staying, reversing, modifying, or amending the Store Closing Order shall be in effect on the Closing Date; and

(f)       No material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement.

Section 7.3    No Frustration of Closing Conditions.  Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in this Article VII to be satisfied if such failure was primarily caused by such Party's or its Affiliates' failure to comply with the terms of this Agreement in all material respects.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement.  The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)     by the mutual written consent of the Parties;

(b)     by any Party by giving written notice to the other Parties if any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b) shall not be available to a Party if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled, in any material respect, any of its obligations under this Agreement; or

(c)     by Buyer by giving written notice to Sellers if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.1(a) or Section 7.1(b) and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) five (5) days after receipt of Buyer's notice of intent to terminate, and (B) one (1) Business Day prior to the Outside Date; provided that Buyer shall not have a right of termination pursuant to this Section 8.1(c) if Sellers could, at such time, terminate this Agreement pursuant to Section 8.1(d);

(d)     by Sellers by giving written notice to Buyer if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) or Section 7.2(b), and such breach has not been waived by Sellers, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) five (5) days after receipt of Sellers' notice of intent to terminate, and (B) one (1) Business Day prior to the Outside Date; provided, that Sellers shall not have a right of termination pursuant to this Section 8.1(d) if Buyer could, at such time, terminate this Agreement pursuant to Section 8.1(c);

(e)     by Sellers or Buyer, if the Bankruptcy Court enters a final, non-appealable order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement;

(f)     by Sellers or Buyer, if, prior to the Closing, the Bankruptcy Case are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code;

(g)     by Buyer if Sellers withdraw or seek authority to withdraw the Bidding Procedures Motion;

(h)     by Buyer if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (x) amended, modified or supplemented in an adverse way without Buyer's prior written consent or (y) voided, reversed or vacated or is subject to a stay, or (B) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (x) amended, modified or supplemented in an adverse way without Buyer's prior written consent or (y) voided, reversed or vacated or is subject to a stay;

(i)      by Sellers if (i) all of the conditions set forth in <u>Section 7.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived in an irrevocable writing by Sellers, (ii) at or following the time at which the Closing was required to occur pursuant to <u>Section 2.4</u>, Sellers have irrevocably confirmed in writing to Buyer that Sellers are ready, willing, and able to consummate the Closing, and (iii) Buyer fails to consummate the Closing within two (2) Business Days of receipt of the writing described in clause (ii);

(j)      by Sellers, if any Seller or the board of directors (or similar governing body) of any Seller, based on the advice of outside counsel, determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(k)      by Buyer if the Closing shall not have occurred on or prior to July 17, 2024 (the "<u>Outside Date</u>"); <u>provided</u>, that (i) Buyer shall not have a right of termination pursuant to this <u>Section 8.1(k)</u> if Sellers could, at such time, terminate this Agreement pursuant to <u>Section 8.1(d)</u>, (ii) Buyer and Sellers shall use commercially reasonable efforts to consummate the Closing by July 17, 2024, (iii) Buyer and Sellers shall cause the Closing to occur as soon as reasonably practicable following the satisfaction of all conditions to Closing; and (iv) the Outside Date shall be automatically extended for an additional fourteen (14) days if Buyer is the back-up bidder pursuant to the Bidding Procedures; or

(l)      by Buyer or Sellers, if the Bankruptcy Court shall enter an order approving a transaction for all or any material portion of the Acquired Assets, property or stock of the Sellers with any Person other than Buyer (a "<u>Competing Transaction</u>").

Section 8.2      <u>Effect of Termination</u>.

(a)      If any Party terminates this Agreement pursuant to <u>Section 8.1</u>, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that (x) <u>Article I</u>, <u>Section 2.3(b)</u>, <u>Article IX</u>, and this <u>Section 8.2</u> and (y) the Sellers' obligation to the pay the Break-Up Fee in the event that a Competing Transaction is closed, shall survive any such termination) and no Party shall have any Liability to the other Parties hereunder; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 8.2</u> shall relieve any Party from Liability for any willful breach occurring prior to any such termination set forth in this Agreement.

(b)      Anything in <u>Section 8.2(a)</u> to the contrary notwithstanding, in the event that the Bankruptcy Court has entered the Bidding Procedures Order and this Agreement is terminated in accordance with <u>Section 8.1(l)</u>, Sellers shall pay Buyer the Break-Up Fee by wire transfer of immediately available funds at the closing of the Competing Transaction.

**ARTICLE IX**
**MISCELLANEOUS**

Section 9.1      <u>Survival</u>.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 7.1(c)</u> or <u>Section 7.2(c)</u> shall survive, and each of the same shall terminate and be of no

further force or effect as of, the Closing.  Any covenants or obligations hereunder to be performed from and after the Closing shall survive until completion in accordance with the terms thereof.

Section 9.2    Expenses.  Each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.  This Agreement and the Related Agreements constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Sellers and the Buyer.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    Succession and Assignment.

(a)    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.

(b)    Notwithstanding the foregoing, Buyer may, without the consent of Sellers, designate, in accordance with the terms of this Agreement and effective as of the Closing, one or more Buyer Designees to acquire all, or any portion of, the Acquired Assets and assume all or any portion of the Assumed Liabilities or pay all or any portion of the Purchase Price; provided that, such assignment shall not relieve the Buyer of its obligations under this Agreement.  The above designation may be made by Buyer by written notice to Sellers at any time prior to the Closing

Date.  The Parties agree to modify any Closing deliverables in accordance with the foregoing designation.

Section 9.7     Notices.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was received by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

<table>
<tr><td>If to any Seller:</td><td>Sam Ash Music Corporation<br>278 Duffy Avenue<br>Hicksville, New York 11801<br>Attention: David Ash and<br>Robert Seith<br>E-Mail: dash@samash.com<br>rseith@samash.com</td></tr>
</table>

With a copy (which shall not constitute notice to Sellers) to:

Cole Schotz P.C.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
Attention:  Ryan T. Jareck, Esq.
E-mail: rjareck@coleschotz.com

<table>
<tr><td>If to Buyer:</td><td>Tiger Finance, LLC<br>60 State Street, 11th Floor<br>Boston, Massachusetts 02109<br>Attention:    Andy Babcock<br>Mark Naughton<br>E-mail:    ababcock@tigergroup.com<br>mnaughton@tigergroup.com</td></tr>
</table>

With a copy (which shall not constitute notice to Buyer) to:

Riemer & Braunstein LLP
Seven Times Square
New York, New York 10036
Attn:            Anthony B. Stumbo, Esq.
Steven E. Fox, Esq.
E-mail:        astumbo@riemerlaw.com
sfox@riemerlaw.com

46

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this <u>Section 9.7</u>.

Section 9.8    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal Laws of the State of New York (without giving effect to the principles of conflict of Laws of any jurisdiction that would cause the application of the Law of a jurisdiction other than New York), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    <u>Submission to Jurisdiction; Service of Process</u>.  Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 9.7</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 9.9</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    <u>Waiver of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    <u>Specific Performance</u>.  The Parties shall be entitled to an injunction or injunctions to enforce specifically the Parties' respective covenants and agreements under this Agreement, without the requirement of posting a bond or other security or making a showing of irreparable harm.

Section 9.12    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13   No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

Section 9.14   Non-Recourse.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person.  No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.

Section 9.15   Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16   Disclosure Schedule.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed

or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced.

Section 9.17    <u>Headings; Table of Contents</u>.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18    <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**SELLERS**:

SAM ASH MUSIC CORPORATION

By: _Jordan Meyers_
1B64A34695F3441...

Name: Jordan Meyers

Title: CRO

SAMSON TECHNOLOGIES CORP.

By: _Jordan Meyers_
1B64A34695F3441...

Name: Jordan Meyers

Title: CRO

SAM ASH MEGASTORES, LLC

By: Sam Ash Music Corporation, its sole member

By: _Jordan Meyers_
1B64A34695F3441...

Name: Jordan Meyers

Title: CRO

SAM ASH CT, LLC

By: _Jordan Meyers_
1B64A34695F3441...

Name: Jordan Meyers

Title: CRO

SAM ASH QUIKSHIP CORP.

By: _Jordan Meyers_
1B64A34695F3441...

Name: Jordan Meyers

Title: CRO

[Signature Page to Asset Purchase Agreement]

**SAM ASH FLORIDA MEGASTORES, LLC**

By: _Jordan Meyers_
Name: Jordan Meyers
Title: CRO

**SAM ASH ILLINOIS MEGASTORES, LLC**

By: _Jordan Meyers_
Name: Jordan Meyers
Title: CRO

**SAM ASH NEW JERSEY MEGASTORES, LLC**

By: _Jordan Meyers_
Name: Jordan Meyers
Title: CRO

**SAM ASH NEW YORK MEGASTORES, LLC**

By: _Jordan Meyers_
Name: Jordan Meyers
Title: CRO

**SAM ASH MUSIC MARKETING, LLC**

By: _Jordan Meyers_
Name: Jordan Meyers
Title: CRO

**SAM ASH CALIFORNIA MEGASTORES, LLC**

By: _Jordan Meyers_
Name: Jordan Meyers
Title: CRO

[Signature Page to Asset Purchase Agreement]

DocuSign Envelope ID: C5EF4871-90F8-4E4A-BFAB-4379FE9A6093

SAM ASH NEVADA MEGASTORES, LLC

By: _____

Name: Jordan Meyers

Title: CRO

**<u>BUYER:</u>**

TIGER FINANCE, LLC

By: _____

Name:

Title:

         Andy Babcock

         Managing Director

3924203.12

*[Schedules Omitted]*

**Exhibit 3**

**Sale Notice**

**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | Chapter 11 |
| SAM ASH MUSIC CORPORATION, *et al.*, | Case No. 24-14727 (SLM) |
| Debtors.[1] | (Jointly Administered) |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

   **PLEASE TAKE NOTICE** that on May [•], 2024, the above-captioned debtors and debtors in possession (the "Debtors") filed the *Debtors' Motion for Entry of Orders (I) (A) Approving Bidding Procedures and Breakup Fee, (B) Approving the Stalking Horse Purchase Agreement, (C) Scheduling an Auction and Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Establishing Procedures for the Assumption and Assignment of Contracts and Leases and (II)(A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, and (C) Authorizing the Assumption and Assignment of Contracts and Leases* [Docket No. ●] (the "Motion")[2] with the United States Bankruptcy Court for the District of New Jersey (the "Court") seeking, among other things, entry of an order (the "Sale Order") authorizing and approving: (a) a sale (the "Sale") of  all or substantially all of the Debtors' Assets or any portion thereof free and clear of all Encumbrances, except as set forth in the Stalking Horse APA or an alternative asset

---

   [1]  The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410).  The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

   [2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Order.

1

47548066

purchase agreement with a Successful Bidder at auction; and (b) the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court by entry of an order on [●], 2024 [Docket No. ●] (the "Bidding Procedures Order"). **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Assets on **June 20, 2024 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Cole Schotz P.C., 25 Main Street, Hackensack, New Jersey 07602 (or at any other location as the Debtor may hereafter designate on proper notice).

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing scheduled to commence on or before (i) **June 18, 2024, at 10:00 a.m. (prevailing Eastern Time)** if there are no Qualified Bids other than the Stalking Horse Bid or (ii) **June 28, 2024, at 10:00 a.m. (prevailing Eastern Time)** if the Debtors receives a Qualified Bid other than the Stalking Horse Bid and hold an Auction (the "Sale Hearing") before the Honorable Stacey L. Meisel, United States Bankruptcy Judge for the Bankruptcy Court for the District of New Jersey, Martin Luther King Jr. Federal Building, Courtroom 3A, 50 Walnut Street, Newark, NJ 07102.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to any objections to proposed cure payments or adequate assurance of future performance as to a Successful Bidder that is not the Stalking Horse Bidder, objections to the relief requested in the Motion ***must***: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before June 11, 2024 at 5:00 p.m. (prevailing Eastern Time)** by the following parties: (i) proposed counsel to the Debtor, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Ryan T. Jareck, Esq., and Matteo Percontino, Esq., email: msirota@coleschotz.com, rjareck@coleschotz.com, and mpercontino@coleschotz.com; (iii) counsel for the DIP Lender, Riemer & Braunstein LLP, Anthony B. Stumbo, Esq. and Paul D. Bekker, Esq., email: astumbo@riemerlaw.com and pbekker@riemerlaw.com; (iv) the Office of the U.S. Trustee for the District of New Jerseys, (v) counsel to any official committee appointed in these chapter 11 cases; *provided* that any objection to the Sale to the Successful Bidder other than the Stalking Horse Bidder shall be filed on or before **June 24, 2024 at 5:00 p.m. (prevailing Eastern Time)**

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM**

47548066

**ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse APA, and the proposed Sale Order, are or will be available: (a) free of charge upon request to Epiq (the notice and claims agent retained in this chapter 11 case) by calling (888) 991-6919 (U.S./ Canada toll-free), +1 (971) 257-8267 (international); (b) by visiting the website maintained in this chapter 11 case at https://dm.epiq11.com/SamAsh or (c) for a fee via PACER by visiting http://www.njb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE** that you may obtain additional information concerning the above-captioned chapter 11 case at the website maintained in this chapter 11 case at https://dm.epiq11.com/SamAsh.

DATED: _____, 2024          Respectfully submitted,

**COLE SCHOTZ P.C.**

By:_____
          Michael D. Sirota, Esq.
          Ryan T. Jareck, Esq.
          Matteo Percontino, Esq.
          Court Plaza North
          25 Main Street
          Hackensack, NJ 07601
           (201) 489-3000
           (201) 489-1536 Facsimile
          Email: msirota@coleschotz.com
                    rjareck@coleschotz.com
                    mpercontino@coleschotz.com

*Proposed Counsel to Debtors and Debtors in Possession*

3

## **Exhibit 4**

**Cure Amount Notice**

**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
Ryan T. Jareck, Esq.
rjareck@coleschotz.com
Matteo Percontino, Esq.
mpercontino@coleschotz.com
*Proposed Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SAM ASH MUSIC CORPORATION, *et al.*, | Case No. 24-14727 (SLM) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY**
**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
> OR ONE OF YOUR AFFILIATES ARE A COUNTERPARTY TO AN
> EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
> OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.

 **PLEASE TAKE NOTICE** that on [●], 2024, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (A) Approving Bidding Procedures, (B) Approving the Stalking Horse Purchase Agreement, (C) Scheduling an Auction and Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Establishing Procedures for the Assumption and Assignment of Contracts and Leases* [Docket No. ●] (the "Bidding Procedures

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Sam Ash Music Corporation (3915); Samson Technologies Corp. (4062); Sam Ash Megastores, LLC (9955); Sam Ash California Megastores, LLC (3598); Sam Ash Florida Megastores, LLC (7276); Sam Ash Illinois Megastores, LLC (8966); Sam Ash Nevada Megastores, LLC (6399); Sam Ash New York Megastores, LLC (7753); Sam Ash New Jersey Megastores, LLC (8788); Sam Ash CT, LLC (5932); Sam Ash Music Marketing, LLC (2024); and Sam Ash Quikship Corp. (7410). The location of debtor Sam Ash Music Corporation's principal place of business is 278 Duffy Avenue, P.O. Box 9047, Hicksville, NY 11802.

1

47548066

Order"),[2] authorizing the Debtors to conduct an auction (the "<u>Auction</u>") to select the party to purchase the Debtors' assets.  The Auction will be governed by the bidding procedures attached to the Bidding Procedures Order as **<u>Exhibit 2</u>** (the "<u>Bidding Procedures</u>") and approved pursuant to the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **<u>may</u>** assume and assign to a Successful Bidder the contract or agreement listed on **<u>Exhibit A</u>** to which you are a counterparty, upon approval of the Sale.  The Debtors have conducted a review of its books and records and has determined that the Cure Amount for unpaid monetary obligations under such Contracts is as set forth on **<u>Exhibit A</u>**.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Amount, or object to a proposed assignment to a Successful Bidder of any Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of this chapter 11 case; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, state the correct Cure Amount alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **<u>actually</u> <u>received</u> no later than June 14, 2024**, at **5:00 p.m. (prevailing Central Time)** by the Court and the following parties: (i) proposed counsel to the Debtors, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602, Attn: Michael D. Sirota, Esq., Ryan T. Jareck, Esq., and Matteo Percontino, Esq., email: msirota@coleschotz.com, rjareck@coleschotz.com, and mpercontino@coleschotz.com; (iii) the DIP Lender, Riemer & Braunstein LLP, Anthony B. Stumbo, Esq. and Paul D. Bekker, Esq., email: astumbo@riemerlaw.com and pbekker@riemerlaw.com; (iv) the Office of the U.S. Trustee for the District of New Jerseys, (vii) counsel to any official committee appointed in these chapter 11 cases; and (v) any other party that has filed a notice of appearance in this chapter 11 case.

**PLEASE TAKE FURTHER NOTICE** Objections as to adequate assurance of future performance of any Successful Bidder shall must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, state the correct Cure Amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtors, (b) counsel to the Stalking Horse Bidder, (c) counsel to the Successful Bidder (if different from the Stalking Horse Bidder), (d) the Notice Parties (as defined in the Bidding Procedures), and (e) any other party that has filed a notice of appearance in these chapter 11 cases, so as actually to be received on or before the (i) **June 11, 2024, at 5:00 p.m., prevailing Eastern Time** as to the Stalking Horse Bidder or (ii) **June 24, 2024, at 5:00 p.m., prevailing Eastern Time** as to any other Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Amount, (b) the proposed assignment and assumption of any Contract, or (c) adequate assurance of the

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Order.

47548066

Successful Bidder's ability to perform is filed by the applicable deadlines, then (i) you will be deemed to have stipulated that the Cure Amount as determined by the Debtors is correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Amount are due under the Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of a Contract or related Cure Amount in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Contract on the Contract Assumption Notice or any Supplemental Assumption Notice does not require or guarantee that such Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such executory contracts and/or unexpired leases are reserved. Moreover, the Debtors explicitly reserve the right, in their reasonable discretion, to seek to reject or assume each Contract pursuant to section 365(a) of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Contracts or the validity, priority, or amount of any claims of a counterparty to any Contract against the Debtors that may arise under such Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Contract against the Debtors that may arise under such Contract.

3

47548066

DATED: May 10, 2024         Respectfully submitted,

**COLE SCHOTZ P.C.**

By: _/s/_ _____

        Michael D. Sirota, Esq.
        Ryan T. Jareck, Esq.
        Matteo Percontino, Esq.
        Court Plaza North
        25 Main Street
        Hackensack, NJ 07601
        (201) 489-3000
        (201) 489-1536 Facsimile
        Email: msirota@coleschotz.com
              rjareck@coleschotz.com
              mpercontino@coleschotz.com

*Proposed Counsel to Debtors and Debtors in Possession*

4

## **Exhibit B**

**Privacy Policy**



EXPERT ADVICE
(800) 472-6274

Home / Help Center / Privacy and Cookie Policy



## HELP CENTER

## CUSTOMER SERVICE

## STORE LOCATOR

## INTERNATIONAL CUSTOMERS

## EDUCATIONAL SALES

## ORDERING FAQ

## PAYMENT METHODS

## FINANCING OPTIONS

## SHIPPING FAQ

## SHIPPING RATES

# SAMASH.COM PRIVACY POLICY

Last updated: January 16, 2023

Thank You for joining the Sam Ash Direct® family at our Website, www.samash.com.  This Privacy Policy explains how we collect, use, disclose, and protect Your information when You use Our Website and tells You about Your privacy rights under the law and our Company policies.

We use Your Personal data to provide you with a great customer experience and to improve the Website and our Company. By using the Website, You agree to the collection and use of information in accordance with this Privacy Policy.

# INTERPRETATION AND DEFINITIONS

## INTERPRETATION

The words of which the initial letter is capitalized have meanings defined under the following conditions. The following definitions shall have the same meaning regardless of whether they appear in singular or in plural.

## DEFINITIONS

For the purposes of this Privacy Policy:

**Account** means a unique account created for You to make purchases on ourWebsite or parts of our Website or to sign up for e-mails or contests on our Website.

**Business**, for the purpose of the CCPA (California Consumer Privacy Act), refers to the Company as the legal entity that collects Consumers' personal information and determines the purposes and means of the processing of Consumers' personal information, or on behalf of which such information is collected and that alone, or

SAM ASH
CREDIT CARD

NO CREDIT
NEEDED LEASE
TO OWN WITH
PROGRESSIVE

FINANCING
WITH AFFIRM

45-DAY MONEY
BACK
GUARANTEE

60-DAY PRICE
PROTECTION
POLICY

SAM ASH
AFFILIATE
PROGRAM

ABOUT US

SAM ASH
MUSICAL
INSTRUMENT
REPAIRS

STUDENT
MUSICAL
INSTRUMENT
RENTALS

SAM ASH MUSIC
TRADE
PROGRAM

ACCESSIBILITY
INFORMATION

jointly with others, determines the purposes and means of the processing of consumers' personal information, that does business in the State of California.

**Company** (referred to as either "the Company", "We", "Us" or "Our" in this Agreement) refers to Sam Ash Quikship Corp., and its affiliates, 278 Duffy Ave, Hicksville, NY 11801.

**Consumer**, for the purpose of the CCPA (California Consumer Privacy Act), means a natural person who is a California resident. A resident, as defined in the law, includes (1) every individual who is in the USA for other than a temporary or transitory purpose, and (2) every individual who is domiciled in the USA who is outside the USA for a temporary or transitory purpose.

**Cookies** are small files that are placed on Your computer, mobile device or any other device by a website, containing the details of Your browsing history on that website among its many uses.

**Country** refers to: United States

**Device** means any device that can access the Website such as a computer, a smartphone, or a digital tablet.

**Do Not Track** (DNT) is a concept that has been promoted by US regulatory authorities, in particular the U.S. Federal Trade Commission (FTC), for the Internet industry to develop and implement a mechanism for allowing internet users to control the tracking of their online activities across websites.

**Personal Data** is any information that relates to an identified or identifiable individual. For the purposes of the CCPA, Personal Data means any information that identifies, relates to, describes or is capable of being associated with, or could reasonably be linked, directly or indirectly, with You.

**Sale**, for the purpose of the CCPA (California Consumer Privacy Act), means selling, renting, releasing, disclosing, disseminating, making available, transferring, or otherwise communicating orally, in writing, or by electronic or other means, a Consumer's personal information to another business or a third party for monetary or other valuable consideration.

**Sensitive Personal Information** means Personal Information that reveals (1) (A) your social security, driver's license, state identification card, or passport number; (B) your account log-in, financial account, debit card, or credit card number in combination with any required security or access code, password, or credentials allowing access to an account; (C) a consumer's precise geolocation; (D) your racial or ethnic origin, religious or philosophical beliefs, or union membership; (E) the contents of a your mail, email, and text messages unless we are the intended recipients; (F) your genetic data or (2) (A) the processing of biometric information to identify you, or (B) Personal Information collected and analyzed concerning your health, sex life, or sexual orientation. Although We do store your login and password to our website, We do not collect other Sensitive Personal Information and do not collect financial information, debit or credit card numbers in combination with your security codes or passwords.

**Service Provider** means any natural or legal person who processes the data on behalf of the Company. It refers to third-party companies or individuals employed by the Company to facilitate the Website, to provide the Website on behalf of the Company, to

**PRIVACY AND COOKIE POLICY**

**DISPUTE RESOLUTION POLICY**

**TERMS OF USE**

perform services related to the Website or to assist the Company in analyzing how the Website is used.

**Third-party Social Media Service** refers to any website or any social network website through which a User can log in or create an account to use the Website.

**Usage Data** refers to data collected automatically, either generated by the use of the Website or from the Website infrastructure itself (for example, the duration of a page visit).

**Website** refers to Sam Ash Direct ®, accessible from https://www.samash.com.

**You** means the individual accessing or using the Website, or the company, or other legal entity on behalf of which such individual is accessing or using the Website, as applicable.

# COLLECTING AND USING YOUR PERSONAL DATA

## TYPES OF DATA COLLECTED

### PERSONAL DATA

While using Our Website, We may ask You to provide Us with certain personally identifiable information that can be used to contact or identify You. Personally identifiable information may include, but is not limited to:

- Email address

- First name and last name

- Phone number

- Address, State, Province, ZIP/Postal code, City

- Usage Data

### USAGE DATA

Usage Data is collected automatically when using the Website.

Usage Data may include information such as Your Device's Internet Protocol address (e.g. IP address), browser type, browser version, the pages of our Website that You visit, the time and date of Your visit, the time spent on those pages, unique device identifiers and other diagnostic data.

When You access the Website by or through a mobile device, We may collect certain information automatically, including, but not limited to, the type of mobile device You use, Your mobile device unique ID, the IP address of Your mobile device, Your mobile operating system, the type of mobile Internet browser You use, unique device identifiers and other diagnostic data.

We may also collect information that Your browser sends when You visit our Website or when You access the Website by or through a mobile device.

## INFORMATION FROM THIRD-PARTY SOCIAL MEDIA SERVICES

The Company allows You to create an account and log in to use the Website through the following Third-party Social Media Services:

- Google

- Facebook

- Twitter

If You decide to register through or otherwise grant us access to a Third-Party Social Media Service, We may collect Personal data that is already associated with Your Third-Party Social Media Service's account, such as Your name, Your email address, Your activities or Your contact list associated with that account.

You may also have the option of sharing additional information with the Company through Your Third-Party Social Media Service's account. If You choose to provide such information and Personal Data, during registration or otherwise, You are giving the Company permission to use, share, and store it in a manner consistent with this Privacy Policy.

## TRACKING TECHNOLOGIES AND COOKIES

We use Cookies and similar tracking technologies to track the activity on Our Website and store certain information. Tracking technologies used are beacons, tags, and scripts to collect and track information and to improve and analyze Our Website. The technologies We use may include:

- Cookies or Browser Cookies. A cookie is a small file placed on Your Device. You can instruct Your browser to refuse all Cookies or to indicate when a Cookie is being sent. However, if You do not accept Cookies, You may not be able to use some parts of our Website or may not get the benefit of certain convenience features of our Website. Unless you have adjusted Your browser setting so that it will refuse Cookies, our Website may use Cookies.

- Flash Cookies. Certain features of our Website may use local stored objects (or Flash Cookies) to collect and store information about Your preferences or Your activity on our Website. Flash Cookies are not managed by the same browser settings as those used for Browser Cookies. For more information on how You can delete Flash Cookies, please read "Where can I change the settings for disabling, or deleting local shared objects?" available at **https://helpx.adobe.com/flash-player/kb/disable-local-shared-objects-flash.html#main_Where_can_I_change_the_settings_for_disabling_ _or_deleting_local_shared_objects_**

- Web Beacons. Certain sections of our Website and our emails may contain small electronic files known as web beacons (also referred to as clear gifs, pixel tags, and single-pixel gifs) that permit the Company, for example, to count users who have visited those pages or opened an email and for other related website statistics (for example, recording the popularity of a certain section and verifying system and server integrity).

Cookies can be "Persistent" or "Session" Cookies. Persistent Cookies remain on Your personal computer or mobile device when You go offline, while Session Cookies are deleted as soon as You close Your web browser. Learn more about cookies: **https://www.allaboutcookies.org/manage-cookies/index.html**.

We use both Session and Persistent Cookies for the purposes set out below:

## NECESSARY / ESSENTIAL COOKIES

**Type: Session Cookies**

Administered by: Us

Purpose: These Cookies are essential to provide You with services available through the Website and to enable You to use some of its features. They help to authenticate users and prevent fraudulent use of user accounts. Without these Cookies, the services that You have asked for cannot be provided, and We only use these Cookies to provide You with those services.

**Cookies Policy / Notice Acceptance Cookies**

**Type: Persistent Cookies**

Administered by: Us

Purpose: These Cookies identify if users have accepted the use of cookies on the Website.

**Functionality Cookies**

Type: Persistent Cookies

Administered by: Us

Purpose: These Cookies allow us to remember choices You make when You use the Website, such as remembering your login details or language preference. The purpose of these Cookies is to provide You with a more personal experience and to avoid You having to re-enter your preferences every time You use the Website.

**Tracking and Performance Cookies**

Type: Persistent Cookies

Administered by: Third-Parties

Purpose: These Cookies are used to track information about traffic to the Website and how users use the Website. The information gathered via these Cookies may directly or indirectly identify you as an individual visitor. This is because the information collected is typically linked to a pseudonymous identifier associated with the device you use to access the Website. We may also use these

Cookies to test new pages, features or new functionality of the
Website to see how our users react to them.

## USE OF YOUR PERSONAL DATA

The Company may use Personal Data for the following purposes:

- To provide and maintain our Website, including to monitor
  the usage of our Website.

- To manage Your Account: to manage Your registration as a
  user of the Website. The Personal Data You provide can give
  You access to different functionalities of the Website that are
  available to You as a registered user.

- For the performance of a contract: the development,
  compliance and undertaking of the purchase contract for the
  products, items or services You have purchased or of any
  other contract with Us through the Website.

- To contact You: To contact You by email, telephone calls,
  SMS, or other equivalent forms of electronic communication,
  such as a mobile application's push notifications regarding
  updates or informative communications related to the
  functionalities, products or contracted services, including the
  security updates, when necessary or reasonable for their
  implementation.

- To provide You with news, special offers and general
  information about other goods, services and events which
  we offer that are similar to those that you have already
  purchased or enquired about unless You have opted not to
  receive such information.

- To manage Your requests: To attend and manage Your
  requests to Us.

- To deliver targeted advertising to You: We may use Your
  information to develop and display content and advertising
  (and work with third-party vendors who do so) tailored to
  Your interests and/or location and to measure its
  effectiveness.

- For business transfers: We may use Your information to
  evaluate or conduct a merger, divestiture, restructuring,
  reorganization, dissolution, or other sale or transfer of some
  or all of Our assets, whether as a going concern or as part of
  bankruptcy, liquidation, or similar proceeding, in which
  Personal Data held by Us about our Website users is among
  the assets transferred.

- For other purposes: We may use Your information for other
  purposes, such as data analysis, identifying usage trends,
  determining the effectiveness of our promotional campaigns
  and to evaluate and improve our Website, products,
  services, marketing and your experience.

We may share Your personal information in the following situations:

- **With Service Providers:** We may share Your personal
  information with Service Providers to monitor and analyze

the use of our Website, to advertise on third party websites
to You after You visited our Website, for payment
processing, to contact You.

- **For business transfers:** We may share or transfer Your
  personal information in connection with, or during
  negotiations of, any merger, sale of Company assets,
  financing, or acquisition of all or a portion of Our business to
  another company.

- **With Affiliates:** We may share Your information with Our
  affiliates, in which case we will require those affiliates to
  honor this Privacy Policy. Affiliates include Our parent
  company and its other subsidiaries, joint venture partners or
  other companies that We control or that are under common
  control with Us.

- **With business partners:** We may share Your information with
  Our business partners to offer You certain products,
  services, or promotions.

- **With other users:** when You share personal information or
  otherwise interact in the public areas with other users, such
  information may be viewed by all users and may be publicly
  distributed outside. If You interact with other users or
  register through a Third-Party Social Media Service, Your
  contacts on the Third-Party Social Media Service may see
  Your name, profile, pictures and description of Your activity.
  Similarly, other users will be able to view descriptions of
  Your activity, communicate with You and view Your profile.

- **With Your consent:** We may disclose Your personal
  information for any other purpose with Your consent.

## RETENTION OF YOUR PERSONAL DATA

The Company will retain Your Personal Data only for as long as is
necessary for the purposes set out in this Privacy Policy. We will
retain and use Your Personal Data to the extent necessary to
comply with our legal obligations (for example, if we are required to
retain your data to comply with applicable laws), resolve disputes,
and enforce our legal agreements and policies.

The Company will also retain Usage Data for internal analysis
purposes. Usage Data is generally retained for a shorter period of
time, except when this data is used to strengthen the security or to
improve the functionality of Our Website, or We are legally
obligated to retain this data for longer time periods.

After expiry of the applicable retention periods, your Personal Data
will be deleted. If there is any data that we are unable, for
technical reasons, to delete entirely from our systems, we will
implement appropriate measures to prevent any further use of the
data.  For more information on retention periods please contact us.

## TRANSFER OF YOUR PERSONAL DATA

Your information, including Personal Data, is processed at the
Company's operating offices and in any other places where the
parties involved in the processing are located. It means that the

information must be transferred to — and maintained on — computers located outside of Your state, province, country or other governmental jurisdiction where the data protection laws may differ than those from Your jurisdiction.

Your consent to this Privacy Policy followed by Your submission of such information represents Your agreement to that transfer.

The Company will take all steps reasonably necessary to ensure that Your data is treated securely and in accordance with this Privacy Policy and no transfer of Your Personal Data will take place to an organization or a country unless there are adequate controls in place including the security of Your data and other personal information.

## DISCLOSURE OF YOUR PERSONAL DATA

### Business Transactions

If the Company is involved in a merger, acquisition or asset sale, Your Personal Data may be transferred. We will provide notice before Your Personal Data is transferred and becomes subject to a different Privacy Policy.

### Law enforcement

Under certain circumstances, the Company may be required to disclose Your Personal Data if required to do so by law or in response to valid requests by public authorities (e.g. a court or a government agency).

### Other legal requirements

The Company may disclose Your Personal Data in the good faith belief that such action is necessary to:

- Comply with a legal obligation

- Protect and defend the rights or property of the Company Prevent or investigate possible wrongdoing in connection with the Website

- Protect the personal safety of Users of the Website or the public

- Protect against legal liability

## CONTESTS ON OUR WEBSITE

When you provide information to enter a contest, we may share that information with the contest sponsor or the provider of the contest prize for marketing purposes and prize fulfillment.

## SECURITY OF YOUR PERSONAL DATA

The security of Your Personal Data is important to Us, but remember that no method of transmission over the Internet, or method of electronic storage is 100% secure. While We strive to use commercially acceptable means to protect Your Personal Data, We cannot guarantee its absolute security.

# DETAILED INFORMATION ON THE PROCESSING OF YOUR PERSONAL DATA

The Service Providers We use may have access to Your Personal Data. These third-party vendors collect, store, use, process and transfer information about Your activity on Our Service in accordance with their Privacy Policies.

## ANALYTICS

We may use third-party Service providers to monitor and analyze the use of our Website

### Google Analytics

Google Analytics is a web analytics service offered by Google that tracks and reports website traffic. Google uses the data collected to track and monitor the use of our Website. This data is shared with other Google services. Google may use the collected data to contextualize and personalize the ads of its own advertising network.

You can opt-out of having made your activity on the Website available to Google Analytics by installing the Google Analytics opt-out browser add-on. The add-on prevents the Google Analytics JavaScript (ga.js, analytics.js and dc.js) from sharing information with Google Analytics about visits activity.

For more information on the privacy practices of Google, please visit the Google Privacy & Terms web page: **https://policies.google.com/privacy**

### Magento Business Intelligence

Their Privacy Policy can be viewed at **https://magento.com/legal/terms**

## EMAIL MARKETING

We may use Your Personal Data to contact You with newsletters, marketing or promotional materials and other information that may be of interest to You. You may opt-out of receiving any, or all, of these communications from Us by following the unsubscribe link or instructions provided in any email We send or by contacting Us.

We may use Email Marketing Service Providers to manage and send emails to You.

Salesforce Marketing Cloud
Their Privacy Policy can be viewed at **https://www.salesforce.com/company/privacy/**

## PAYMENTS

We use third-party services for payment processing.

We do not store Your payment card details. That information is
provided directly to Our third-party payment processors whose use
of Your personal information is governed by their Privacy Policies.
These payment processors adhere to the standards set by PCI-
DSS as managed by the PCI Security Standards Council, which is
a joint effort of brands like Visa, Mastercard, American Express
and Discover. PCI-DSS requirements help ensure the secure
handling of payment information.

**PayPal**
Their Privacy Policy can be viewed
at **https://www.paypal.com/webapps/mpp/ua/privacy-full**

**Apple Pay**
Their Privacy Policy can be viewed
at **https://www.apple.com/privacy/**

**Synchrony Bank (Sam Ash Credit Card)**
Their Privacy Policy can be viewed
at **https://www.synchrony.com/privacy-policy.html?
intcmp=home_footer_synchrony_int**

**Cybersource (Major Credit Cards)**
Their Privacy Policy can be viewed
at **https://usa.visa.com/legal/privacy-policy.html**

**Affirm**
Their Privacy Policy can be viewed
at **https://www.affirm.com/privacy**

**Amazon Payments**
Their Privacy Policy can be viewed
at **https://pay.amazon.com/help/201212490**

**GooglePay**
Their Privacy Policy can be viewed
at **https://policies.google.com/privacy?hl=en**

**Progressive Leasing**
Their Privacy Policy can be viewed at
**https://progleasing.com/privacy/**

# BEHAVIORAL REMARKETING

The Company uses remarketing services to advertise to You after
You accessed or visited our Website. We and Our third-party
vendors use cookies and non-cookie technologies to help Us
recognize Your Device and understand how You use our Website
so that We can improve our Website to reflect Your interests and
serve You advertisements that are likely to be of more interest to
You.

These third-party vendors collect, store, use, process and transfer
information about Your activity on Our Website in accordance with
their Privacy Policies and to enable Us to:

- Measure and analyze traffic and browsing activity on Our
  Website

- Show advertisements for our products and/or services to You
  on third-party websites or apps

- Measure and analyze the performance of Our advertising
  campaigns

Some of these third-party vendors may use non-cookie technologies that may not be impacted by browser settings that block cookies. Your browser may not permit You to block such technologies. You can use the following third-party tools to decline the collection and use of information for the purpose of serving You interest-based advertising:

- The NAI's opt-out platform: **http://www.networkadvertising.org/choices/**

- The EDAA's opt-out platform **http://www.youronlinechoices.com/**

- The DAA's opt-out platform: **http://optout.aboutads.info/?c=2&lang=EN**

You may opt-out of all personalized advertising by enabling privacy features on Your mobile device such as Limit Ad Tracking (iOS) and Opt Out of Ads Personalization (Android). See Your mobile device Help system for more information.

We may share information, such as hashed email addresses (if available) or other online identifiers collected on Our Website with these third-party vendors. This allows Our third-party vendors to recognize and deliver You ads across devices and browsers. To read more about the technologies used by these third-party vendors and their cross-device capabilities please refer to the Privacy Policy of each vendor listed below.

The third-party vendors We use for Behavioral Remarketing are:

**Google Ads (AdWords)**

Google Ads (AdWords) remarketing service is provided by Google Inc.

You can opt-out of Google Analytics for Display Advertising and customize the Google Display Network ads by visiting the Google Ads Settings page: **http://www.google.com/settings/ads**

Google also recommends installing the Google Analytics Opt-out Browser Add-on - **https://tools.google.com/dlpage/gaoptout** - for your web browser. Google Analytics Opt-out Browser Add-on provides visitors with the ability to prevent their data from being collected and used by Google Analytics.

For more information on the privacy practices of Google, please visit the Google Privacy & Terms web page: **https://policies.google.com/privacy**

**Bing Ads Remarketing**

Bing Ads remarketing service is provided by Microsoft Inc.

You can opt-out of Bing Ads interest-based ads by following their instructions: **https://advertise.bingads.microsoft.com/en-us/resources/policies/personalized-ads**.

You can learn more about the privacy practices and policies of Microsoft by visiting their Privacy Policy page: **https://privacy.microsoft.com/en-us/PrivacyStatement**

**Facebook**

Facebook remarketing service is provided by Facebook Inc.

You can learn more about interest-based advertising from Facebook by visiting this page: **https://www.facebook.com/help/516147308587266**

To opt-out from Facebook's interest-based ads, follow these instructions from Facebook: **https://www.facebook.com/help/568137493302217**

Facebook adheres to the Self-Regulatory Principles for Online Behavioural Advertising established by the Digital Advertising Alliance. You can also opt-out from Facebook and other participating companies through the Digital Advertising Alliance in the USA **http://www.aboutads.info/choices/**, the Digital Advertising Alliance of Canada in Canada **http://youradchoices.ca/** or the European Interactive Digital Advertising Alliance in Europe **http://www.youronlinechoices.eu/**, or opt-out using your mobile device settings.

For more information on the privacy practices of Facebook, please visit Facebook's Data Policy: **https://www.facebook.com/privacy/explanation**

### Criteo

We use Criteo for retargeting ads, which appear when you visit websites that are part of Criteo's marketing program. Criteo uses data about your activity on our website to provide personalized advertising relevant to our customers as explained at **https://www.criteo.com/privacy/how-we-use-your-data/**. Their Privacy Policy can be viewed at **https://www.criteo.com/privacy/**. You can disable Criteo Services by going to **https://www.criteo.com/privacy/disable-criteo-services-on-internet-browsers/**

### Rakuten Advertising

Rakuten manages our affiliate program, which is described at **https://www.samash.com/sam-ash-affiliate-program**.  When you visit us by clicking a link at one of the members of our affiliate program and make a purchase, we pay a commission to the affiliate through the Rakuten system.  Rakuten's privacy policy can be viewed at **https://rakutenadvertising.com**

# NEVADA PRIVACY

If you are a Nevada resident, even though we do not sell personal information, you still have the right to formally opt-out of the sale of your personal information by submitting a verifiable privacy request.  To do so, sign in to your account on this website and click on "Privacy Request Form.   Complete the request form and click "Submit".  We will respond to your request within 60 days, although we may extend this to 90 days on notice to you.  If you have any difficulty with the "Privacy Request Form" please call us at 1-800-472-6274.

# CCPA PRIVACY

This privacy notice section for California residents supplements the information contained in Our Privacy Policy and it applies sole

## CATEGORIES OF PERSONAL INFORMATION COLLECTED

We collect information that identifies, relates to, describes, references, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular Consumer or Device. The following is a list of categories of personal information which we may collect or may have been collected from California residents within the last twelve (12) months.

Please note that the categories and examples provided in the list below are those defined in the California Consumer Privacy Act ("CCPA") as amended by the California Privacy Rights Act ("CPRA"). This does not mean that all examples of that category of personal information were in fact collected by Us, but reflects our good faith belief to the best of our knowledge that some of that information from the applicable category may be and may have been collected. For example, certain categories of personal information would only be collected if You provided such personal information directly to Us.

**Category A: Identifiers.**

Examples: A real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, driver's license number, passport number, or other similar identifiers.

Collected: Yes.

**Category B: Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)).**

Examples: A name, signature, Social Security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information. Some personal information included in this category may overlap with other categories.

Collected: Yes.

**Category C: Protected classification characteristics under California or federal law.**

Examples: Age (40 years or older), race, color, ancestry, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, veteran or military status, genetic information (including familial genetic information).

Collected: No.

**Category D: Commercial information.**

Examples: Records and history of products or services purchased or considered.

Collected: Yes.

**Category E: Biometric information.**

Examples: Genetic, physiological, behavioral, and biological characteristics, or activity patterns used to extract a template or other identifier or identifying information, such as, fingerprints, faceprints, and voiceprints, iris or retina scans, keystroke, gait, or other physical patterns, and sleep, health, or exercise data.

Collected: No.

**Category F: Internet or other similar network activity.**

Examples: Interaction with our Website or advertisement.

Collected: Yes.

**Category G: Geolocation data.**

Examples: Approximate physical location.

Collected: Yes.

**Category H: Sensory data.**

Examples: Audio, electronic, visual, thermal, olfactory, or similar information.

Collected: No.

**Category I: Professional or employment-related information.**

Examples: Current or past job history or performance evaluations.

Collected: No.

**Category J: Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)).**

Examples: Education records directly related to a student maintained by an educational institution or party acting on its behalf, such as grades, transcripts, class lists, student schedules, student identification codes, student financial information, or student disciplinary records.

Collected: No.

**Category K: Inferences drawn from other personal information.**

Examples: Profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

Collected: No.

Under CCPA, personal information does not include:

- Publicly available information from government records

- Deidentified or aggregated consumer information

- Information excluded from the CCPA's scope, such as:

  - Health or medical information covered by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the California Confidentiality of Medical Information Act (CMIA) or clinical trial data

- Personal information covered by certain sector-specific privacy laws, including the Fair Credit Reporting Act (FRCA), the Gramm-Leach-Bliley Act (GLBA) or California Financial Information Privacy Act (FIPA), and the Driver's Privacy Protection Act of 1994

## SOURCES OF PERSONAL INFORMATION

We obtain the categories of personal information listed above from the following categories of sources:

- Directly from You. For example, from the forms You complete on our Website, preferences You express or provide through our Website, or from Your purchases on our Website.

- Indirectly from You. For example, from observing Your activity on our Website.

- Automatically from You. For example, through cookies We or our Service Providers set on Your Device as You navigate through our Website.

- From Service Providers. For example, third-party vendors to monitor and analyze the use of our Website, third-party vendors to deliver targeted advertising to You, third-party vendors for payment processing, or other third-party vendors that We use to provide the Website to You.

## USE OF PERSONAL INFORMATION FOR BUSINESS PURPOSES OR COMMERCIAL PURPOSES

We may use or disclose personal information We collect for "business purposes" or "commercial purposes" (as defined under the CCPA), which may include the following examples:

- To operate our Website and provide You with our goods, information, and services.

- To provide You with support and to respond to Your inquiries, including to investigate and address Your concerns and monitor and improve our Website.

- To fulfill or meet the reason You provided the information. For example, if You share Your contact information to ask a question about our Website, We will use that personal information to respond to Your inquiry. If You provide Your personal information to purchase a product or service, We will use that information to process Your payment and facilitate delivery.

- To respond to law enforcement requests and as required by applicable law, court order, or governmental regulations.

- As described to You when collecting Your personal information or as otherwise set forth in the CCPA.

- For internal administrative and auditing purposes.

- To detect security incidents and protect against malicious, deceptive, fraudulent or illegal activity, including, when necessary, to prosecute those responsible for such activities.

- Only if you opt-in to our text messaging service, to send you text message advertising.

The examples provided above are illustrative and not intended to be exhaustive. For more details on how we use this information, please refer to the "Use of Your Personal Data" section.

If We decide to collect additional categories of personal information or use the personal information We collected for materially different, unrelated, or incompatible purposes We will update this Privacy Policy.

## DISCLOSURE OF PERSONAL INFORMATION FOR BUSINESS PURPOSES OR COMMERCIAL PURPOSES

We may use or disclose and may have used or disclosed in the last twelve (12) months the following categories of personal information for business or commercial purposes:

- Category A: Identifiers

- Category B: Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e))

- Category D: Commercial information

- Category F: Internet or other similar network activity

Please note that the categories listed above are those defined in the CCPA. This does not mean that all examples of that category of personal information were in fact disclosed, but reflects our good faith belief to the best of our knowledge that some of that information from the applicable category may be and may have been disclosed.

When We disclose personal information for a business purpose or a commercial purpose, We enter a contract that describes the purpose and requires the recipient to both keep that personal information confidential and not use it for any purpose except performing the contract.

## SALE OF PERSONAL INFORMATION

As defined in the CCPA, "sell" and "sale" mean selling, renting, releasing, disclosing, disseminating, making available, transferring, or otherwise communicating orally, in writing, or by electronic or other means, a consumer's personal information by the business to a third party for valuable consideration. This means that We may have received some kind of benefit in return for sharing personal information, but not necessarily a monetary benefit.

Please note that the categories listed below are those defined in the CCPA. This does not mean that all examples of that category of personal information were in fact sold, but reflects our good f

belief and acknowledge that some of that information
from the applicable category may be and may have been shared for
value in return.

We may sell and may have sold in the last twelve (12) months the
following categories of personal information:

- Category A: Identifiers

- Category B: Personal information categories listed in the
  California Customer Records statute (Cal. Civ. Code §
  1798.80(e))

- Category D: Commercial information

- Category F: Internet or other similar network activity

## SHARE OF PERSONAL INFORMATION

We may share Your personal information identified in the above
categories with the following categories of third parties:

## SALE OF PERSONAL INFORMATION OF MINORS UNDER 16 YEARS OF AGE

We do not knowingly collect personal information from minors
under the age of 16 through our Website, although certain third
party websites that we link to may do so. These third-party
websites have their own terms of use and privacy policies and we
encourage parents and legal guardians to monitor their children's
Internet usage and instruct their children to never provide
information on other websites without their permission.

We do not sell the personal information of Consumers We actually
know are less than 16 years of age, unless We receive affirmative
authorization (the "right to opt-in") from either the Consumer who is
between 13 and 16 years of age, or the parent or guardian of a
Consumer less than 13 years of age. Consumers who opt-in to the
sale of personal information may opt-out of future sales at any
time. To exercise the right to opt-out, You (or Your authorized
representative) may submit a request to Us by contacting Us.

If You have reason to believe that a child under the age of 13 (or
16) has provided Us with personal information, please contact Us
with sufficient detail to enable Us to delete that information.

## YOUR RIGHTS UNDER THE CCPA

The CCPA provides California residents with specific rights
regarding their personal information. If You are a resident of
California, You have the following rights:

- The right to notice. You have the right to be notified which
  categories of Personal Data are being collected and the
  purposes for which the Personal Data is being used.

- The right to request. Under CCPA, You have the right to
  request that We disclose information to You about Our
  collection, use, sale, disclosure for business purposes and

shares of Your personal information. Once We receive and confirm Your request, We will disclose to You:

- The categories of personal information We collected about You

- The categories of sources for the personal information We collected about You

- Our business or commercial purpose for collecting or selling that personal information

- The categories of third parties with whom We share that personal information

- The specific pieces of personal information We collected about You

- If we sold Your personal information or disclosed Your personal information for a business purpose, We will disclose to You:

  - The categories of personal information categories sold

  - The categories of personal information categories disclosed

- The right to say no to the sale of Personal Data (opt-out). You have the right to direct Us to not sell Your personal information. To submit an opt-out request please contact Us.

- The right to delete Personal Data. You have the right to request the deletion of Your Personal Data, subject to certain exceptions. Once We receive and confirm Your request, We will delete (and direct Our Service Providers to delete) Your personal information from our records, unless an exception applies. We may deny Your deletion request if retaining the information is necessary for Us or Our Service Providers to:

  - Complete the transaction for which We collected the personal information, provide a good or service that You requested, take actions reasonably anticipated within the context of our ongoing business relationship with You, or otherwise perform our contract with You.

  - Detect security incidents, protect against malicious, deceptive, fraudulent, or illegal activity, or prosecute those responsible for such activities.

  - Debug products to identify and repair errors that impair existing intended functionality.

  - Exercise free speech, ensure the right of another consumer to exercise their free speech rights, or exercise another right provided for by law.

  - Comply with the California Electronic Communications Privacy Act (Cal. Penal Code § 1546 et. seq.).

  - Engage in public or peer-reviewed scientific, historical, or statistical research in the public interest that adheres to

all other applicable ethics and privacy laws, when the information's deletion may likely render impossible or seriously impair the research's achievement, if You previously provided informed consent.

- Enable solely internal uses that are reasonably aligned with consumer expectations based on Your relationship with Us.

- Comply with a legal obligation.

- Make other internal and lawful uses of that information that are compatible with the context in which You provided it.

- The right not to be discriminated against. You have the right not to be discriminated against for exercising any of Your consumer's rights, including by:

  - Denying goods or services to You

  - Charging different prices or rates for goods or services, including the use of discounts or other benefits or imposing penalties

  - Providing a different level or quality of goods or services to You

  - Suggesting that You will receive a different price or rate for goods or services or a different level or quality of goods or services

Under the CPRA, you have the following additional rights:

- The right to correct inaccurate Personal Information.  You have the right to direct Us to correct Your personal information to the extent that it is inaccurate. To submit an correction request please contact Us.

- The right to opt out of sharing data for cross-context behavioral advertising

- The right to limit use and disclosure of Sensitive Personal Information.

- The right to opt-out of the use of automated decision making.

## EXERCISING YOUR CCPA AND CPRA DATA PROTECTION RIGHTS

In order to exercise any of Your rights under the CCPA and CPRA, and if You are a California resident, You can contact Us using any of the methods below:

- Sign In to your Account on our Website and click on "Privacy Request Form" in the left-hand menu.  Complete the request form and click "Submit".  If you have any difficulty with the "Privacy Request Form" please call us at 1-800-472-6274 for assistance.

- Calling us at 1-800-472-6274.

- E-mailing legal@samash.com7

- By mail: 278 Duffy Avenue, Hicksville, NY 11801
  Attention: IT Department

Only You, or a person registered with the California Secretary of State that You authorize to act on Your behalf, may make a verifiable request related to Your personal information.

Your request to Us must:

- Provide sufficient information that allows Us to reasonably verify You are the person about whom We collected personal information or an authorized representative. Requests made by signing into your Account and clicking "Privacy Request Form" on your Account page will be considered verified in most cases.

- Describe Your request with sufficient detail that allows Us to properly understand, evaluate, and respond to it.

We cannot respond to Your request or provide You with the required information if we cannot:

- Verify Your identity or authority to make the request

- And confirm that the personal information relates to You

We will disclose and deliver the required information free of charge within 45 days of receiving Your verifiable request. The time period to provide the required information may be extended once by an additional 45 days when reasonably necessary and with prior notice.

Any disclosures We provide will only cover the 12-month period preceding the verifiable request's receipt.

For data portability requests, We will select a format to provide Your personal information that is readily useable and should allow You to transmit the information from one entity to another entity without hindrance.

## DO NOT SELL MY PERSONAL INFORMATION

You have the right to opt-out of the sale of Your personal information. Once We receive and confirm a verifiable consumer request from You, we will stop selling Your personal information. To exercise Your right to opt-out, please contact Us.  We do not sell Your personal information for money, although we may receive a non-monetary benefit from sharing your information.

The Service Providers we partner with (for example, our analytics or advertising partners) may use technology on the Website that sells personal information as defined by the CCPA law. If you wish to opt out of the use of Your personal information for interest-based advertising purposes and these potential sales as defined under CCPA law, you may do so by following the instructions below.

Please note that any opt out is specific to the browser You use. You may need to opt out on every browser that You use.

## WEBSITE

You can opt out of receiving ads that are personalized as s
by our Service Providers by following our instructions presented
on the Website:

- The NAI's opt-out
  platform: **http://www.networkadvertising.org/choices/**

- The EDAA's opt-out
  platform **http://www.youronlinechoices.com/**

- The DAA's opt-out platform: **http://optout.aboutads.info/?
  c=2&lang=EN**

- Criteo's opt-out page:
  **https://www.criteo.com/privacy/disable-criteo-services-on-
  internet-browsers/**

The opt out will place a cookie on Your computer that is unique
to the browser You use to opt out. If you change browsers or
delete the cookies saved by your browser, You will need to opt
out again.

## MOBILE DEVICES

Your mobile device may give You the ability to opt out of the use
of information about the apps You use in order to serve You ads
that are targeted to Your interests:

- "Opt out of Interest-Based Ads" or "Opt out of Ads
  Personalization" on Android devices

- "Limit Ad Tracking" on iOS devices

- Criteo's opt-out page:
  **https://www.criteo.com/privacy/disable-criteo-services-on-
  mobile-applications/**

You can also stop the collection of location information from
Your mobile device by changing the preferences on Your mobile
device.

---

# "DO NOT TRACK" POLICY AS REQUIRED BY CALIFORNIA ONLINE PRIVACY PROTECTION ACT (CALOPPA)

Our Website responds to Do Not Track signals. We engage in
cross-site tracking, which means that after you visit Our Website
we may serve you ads on other sites as part of a retargeting
campaign.

---

# SENSITIVE PERSONAL INFORMATION

Our Website does not sell or transfer Sensitive Personal Information. The only Sensitive Personal information our site stores is the log-in and password to your account on this site.

## CHILDREN'S PRIVACY

Our Website does not address anyone under the age of 13. We do not knowingly collect personally identifiable information from anyone under the age of 13. If You are a parent or guardian and You are aware that Your child has provided Us with Personal Data, please contact Us. If We become aware that We have collected Personal Data from anyone under the age of 13 without verification of parental consent, We take steps to remove that information from Our servers.

If We need to rely on consent as a legal basis for processing Your information and Your country requires consent from a parent, We may require Your parent's consent before We collect and use that information.

## YOUR CALIFORNIA PRIVACY RIGHTS (CALIFORNIA'S SHINE THE LIGHT LAW)

Under California Civil Code Section 1798 (California's Shine the Light law), California residents with an established business relationship with us can request information once a year about sharing their Personal Data with third parties for the third parties' direct marketing purposes.

If you'd like to request more information under the California Shine the Light law, and if You are a California resident, You can contact Us using the contact information provided below.

## CALIFORNIA PRIVACY RIGHTS FOR MINOR USERS (CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 22581)

California Business and Professions Code section 22581 allow California residents under the age of 18 who are registered users of online sites, services or applications to request and obtain removal of content or information they have publicly posted.

To request removal of such data, and if You are a California resident, You can contact Us using the contact information provided below, and include the email address associated with Your account.

Be aware that Your request does not guarantee complete or comprehensive removal of content or information posted online

and that the law may not permit or require removal in certa
circumstances.

## LINKS TO OTHER WEBSITES

Our Website may contain links to other websites that are not
operated by Us. If You click on a third party link, You will be
directed to that third party's site. We strongly advise You to
review the Privacy Policy of every site You visit.

We have no control over and assume no responsibility for the
content, privacy policies or practices of any third party sites or
services.

## CHANGES TO THIS PRIVACY POLICY

We may update Our Privacy Policy from time to time. We will
notify You of any changes by posting the new Privacy Policy on
this page.

We will let You know via email and/or a prominent notice on Our
Website, prior to the change becoming effective and update the
"Last updated" date at the top of this Privacy Policy.

You are advised to review this Privacy Policy periodically for any
changes. Changes to this Privacy Policy are effective when they
are posted on this page.

## CONTACT US

If you have any questions about this Privacy Policy, You can
contact us:

- By email: legal@samash.com

- By phone number: 1-800-472-6274

- By mail: 278 Duffy Avenue, Hicksville, NY 11801
  Attention: Legal Department

- **Do Not Sell My Information**